RENDERED: MARCH 8, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-1459-MR

JONATHAN SHELL, IN HIS
OFFICIAL CAPACITY AS
COMMISSIONER OF THE
DEPARTMENT OF AGRICULTURE;
AND MARK LYNN, IN HIS
OFFICIAL CAPACITY AS
CHAIRMAN OF THE STATE FAIR
BOARD                                                            APPELLANTS


|            | APPEAL FROM JEFFERSON CIRCUIT COURT |
|------------|-------------------------------------|
| v.         | HONORABLE MARY M. SHAW, JUDGE       |
|            | ACTION NO. 21-CI-002234             |


ANDY BESHEAR, IN HIS OFFICIAL
CAPACITY AS GOVERNOR OF THE
COMMONWEALTH OF KENTUCKY;
BERTRAM ROBERT STIVERS, II, IN
HIS OFFICIAL CAPACITY AS
MEMBER OF THE STATE FAIR
BOARD AND PRESIDENT OF THE
KENTUCKY STATE SENATE;
DAVID W. OSBORNE, IN HIS
OFFICIAL CAPACITY AS A
MEMBER OF THE STATE FAIR
BOARD AND AS SPEAKER OF THE
KENTUCKY HOUSE OF
REPRESENTATIVES; LINDY
CASEBIER, IN HIS OFFICIAL
CAPACITIES AS THE SECRETARY

OF THE KENTUCKY TOURISM,
ARTS, AND HERITAGE CABINET
AND A MEMBER OF THE STATE
FAIR BOARD; AND
COMMONWEALTH OF KENTUCKY
*EX REL.* ATTORNEY GENERAL
RUSSELL COLEMAN                                                APPELLEES


AND


NO. 2021-CA-1503-MR


ANDY BESHEAR, IN HIS OFFICIAL
CAPACITY AS GOVERNOR OF THE
COMMONWEALTH OF KENTUCKY;
AND LINDY CASEBIER, IN HIS
OFFICIAL CAPACITY AS
SECRETARY OF THE KENTUCKY
TOURISM, ARTS, AND HERITAGE
CABINET AND AS A MEMBER OF
THE STATE FAIR BOARD                              CROSS-APPELLANTS


CROSS-APPEAL FROM JEFFERSON CIRCUIT COURT
v.                     HONORABLE MARY M. SHAW, JUDGE
ACTION NO. 21-CI-002234


JONATHAN SHELL, IN HIS OFFICIAL
CAPACITY AS COMMISSIONER OF
THE DEPARTMENT OF
AGRICULTURE; BERTRAM ROBERT
STIVERS, II, IN HIS OFFICIAL
CAPACITIES AS MEMBER OF THE
STATE FAIR BOARD AND AS

-2-

PRESIDENT OF THE KENTUCKY
STATE SENATE; COMMONWEALTH
OF KENTUCKY, *EX REL.* ATTORNEY
GENERAL RUSSELL COLEMAN;
DAVID W. OSBORNE, IN HIS
OFFICIAL CAPACITIES AS A
MEMBER OF THE STATE FAIR
BOARD AND SPEAKER OF THE
KENTUCKY HOUSE OF
REPRESENTATIVES; AND MARK
LYNN, IN HIS OFFICIAL CAPACITY
AS CHAIRMAN OF THE STATE FAIR
BOARD                                                      CROSS-APPELLEES


AND


NO. 2022-CA-0020-MR


COMMONWEALTH OF KENTUCKY,
*EX REL.* ATTORNEY GENERAL
RUSSELL COLEMAN                                              APPELLANT


                    APPEAL FROM JEFFERSON CIRCUIT COURT
v.                  HONORABLE MARY M. SHAW, JUDGE
                         ACTION NO. 21-CI-002234


ANDY BESHEAR, IN HIS OFFICIAL
CAPACITY AS GOVERNOR OF THE
COMMONWEALTH OF KENTUCKY;
BERTRAM ROBERT STIVERS, II, IN
HIS OFFICIAL CAPACITY AS A
MEMBER OF THE STATE FAIR
BOARD AND AS PRESIDENT OF
THE KENTUCKY STATE SENATE;

-3-

DAVID W. OSBORNE, IN HIS
OFFICIAL CAPACITY AS A
MEMBER OF THE STATE FAIR
BOARD AND AS SPEAKER OF THE
KENTUCKY HOUSE OF
REPRESENTATIVES; DR. MARK E.
LYNN, IN HIS OFFICIAL CAPACITY
AS CHAIR OF THE STATE FAIR
BOARD; LINDY CASEBIER, IN HIS
OFFICIAL CAPACITIES AS THE
SECRETARY OF THE KENTUCKY
TOURISM, ARTS, AND HERITAGE
CABINET AND A MEMBER OF THE
STATE FAIR BOARD; AND
JONATHAN SHELL, IN HIS
OFFICIAL CAPACITY AS
COMMISSIONER OF THE
DEPARTMENT OF AGRICULTURE                                    APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE:   ACREE, CALDWELL, AND CETRULO, JUDGES.

CETRULO, JUDGE:   These consolidated appeals arise from a November 2021

Jefferson Circuit Court order ("November 2021 Order") finding various aspects of

House Bill ("HB") 518 to be unconstitutional.  After review, we find that HB 518 –

as codified within Kentucky Revised Statute ("KRS") Chapter 247 – is

constitutional, in part, and violates the Kentucky Constitution, in part.  We affirm

the circuit court.

-4-

# I.    BACKGROUND

During its 2021 regular session, the Kentucky General Assembly passed HB 518. This legislation made several changes to the composition, mode of operation, and method by which members are selected to the State Fair Board. These changes, now within KRS Chapter 247, went into effect on March 29, 2021.

In April 2021, Governor Andrew Beshear and former Secretary Michael Berry[1] (together, "the Governor") filed a legal action in Jefferson Circuit Court to challenge the constitutionality of select portions of KRS Chapter 247. The Commonwealth, through then Kentucky Attorney General Daniel Cameron, intervened to defend KRS Chapter 247, alongside Kentucky Agriculture Commissioner Jonathan Shell, State Fair Board Chair Dr. Mark Lynn, Kentucky Senate President Robert Stivers, and Speaker of the Kentucky House of Representatives David Osborne (collectively, "the Appellants").

Senate President Stivers and House Speaker Osborne moved to dismiss under Kentucky Rule of Civil Procedure ("CR") 12.02(a) and (f), but the motion was denied. Ultimately, the circuit court granted in part, and denied in part, the Governor's motion for summary judgment; and granted in part, and

---

[1] Governor Beshear, in his official capacity as the Governor of the Commonwealth of Kentucky, and Michael Berry, in his official capacity as Secretary of the Kentucky Tourism, Arts, and Heritage Cabinet and in his official capacity as a member of the State Fair Board were co-plaintiffs in the lower action. Jefferson County, Kentucky, 21-CI-002234. Lindy Casebier was substituted as a party in Secretary Berry's place by Order of this Court on March 14, 2023.

denied in part, motions for summary judgment brought forth by the Agriculture Commissioner, the Attorney General, and State Fair Board Chair Lynn.

In the circuit court action, the Governor argued KRS Chapter 247 would "effectively prevent the Governor from fulfilling his constitutional duty to take care that the laws be faithfully executed." More specifically, the Governor argued that the passed legislation unconstitutionally infringed upon his executive powers under §§ 27, 28, 69, 76, and 81 of the Kentucky Constitution and violated Kentucky's strong separation of powers doctrine. To the contrary, the Appellants argued that the General Assembly acted within its powers to alter KRS Chapter 247 in order "to rein in unchecked executive action by the Governor."

A.    History of the State Fair Board

In 1902, the General Assembly made an appropriation to a private entity to oversee the state fair. The State Fair Board was created in 1906 as an Executive Branch board. The Governor has maintained the ability to appoint the majority of members to our State Fair Board since 1906. Still, there have been frequent modifications over the years and various iterations of the agency. The State Fair Board now oversees dozens of events each year, far beyond the state fair, and generates millions of dollars in revenue for the Commonwealth.

However, at least in recent years, the State Fair Board has also been appropriated millions of dollars from the Commonwealth's General Fund.[2]

Again, prior to the changes of KRS Chapter 247 in 2021, the State Fair Board was administratively attached to the Kentucky Tourism, Arts, and Heritage ("TAH") Cabinet, and the Governor provided financial oversight, through the Finance and Administration Cabinet. Compliance with KRS Chapter 45A, the Kentucky Model Procurement Code, was required. Prior to the changes, the State Fair Board consisted of 18 members, with 15 voting members. The Governor appointed 12 of those 15 members.

The current changes to KRS Chapter 247, in part, shifted oversight of the State Fair Board from only the Governor to joint oversight between the Governor, Agriculture Commissioner, and certain members of the Legislature. It also allowed the State Fair Board to operate more independently from the TAH Cabinet, such as allowing it to promulgate its own procurement code. Finally, the recent KRS Chapter 247 modifications changed how and by whom members of the State Fair Board were appointed.

---

[2] The General Fund consists of state tax revenues collected under general tax laws and other designated receipts available for the activities, operations, and services of state government.

### B.    Circuit Court's Ruling

In its November 2021 Order, the Jefferson Circuit Court did not strike down the entirety of the 2021 modifications to KRS Chapter 247, but – finding the provisions severable – held certain provisions to be unconstitutional.  The circuit court found KRS Chapter 247 unconstitutionally (1) appointed legislators (or their designees) as *ex officio*, non-voting, members to the State Fair Board; (2) shifted the power to appoint the majority of voting members from the Governor to the Agriculture Commissioner; and (3) prohibited the Governor from appointing voting members whose terms expired in 2021.  The circuit court found all other modifications to KRS Chapter 247 constitutional.  Additionally, the circuit court entered a permanent injunction preventing the Appellants from enforcing the unconstitutional provisions.  However, in December 2021, the circuit court entered a separate order – staying the effect of its November 2021 Order – allowing the parties to continue to enforce the other provisions of KRS Chapter 247 as enacted.  Three separate notices of appeal or cross-appeal were filed.

In February 2022, the Governor moved this Court to lift the circuit court's stay of its temporary injunction pursuant to CR 65.08 (now Kentucky Rule of Appellate Procedure 20(B)).  In June 2022, a motion panel of this Court granted in part, and denied in part, the Governor's motion ("June 2022 Order").  That order prohibited the parties from enforcing the aspects of revised KRS Chapter 247 "that

-8-

allow[] the President of the Senate and the Speaker of the House or their designees from serving as *ex officio* members of the [State Fair Board]." All other aspects of the KRS Chapter 247 modifications were allowed to remain in effect.[3]

## II. STANDARD OF REVIEW

Here, the circuit court granted in part, and denied in part, respective motions for summary judgment. "The standard of review on appeal when a [circuit] court grants a motion for summary judgment is 'whether the [circuit] court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law.'" *Blackstone Mining Co. v. Travelers Ins. Co.*, 351 S.W.3d 193, 198 (Ky. 2010) (quoting *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky. App. 1996)); *see also* CR 56.03. "Because there are no factual issues in dispute and all issues before us concern issues of law, our review is *de novo*." *Bevin v. Commonwealth ex rel. Beshear*, 563 S.W.3d 74, 81 (Ky. 2018) (citing *Owen v. Univ. of Ky.*, 486 S.W.3d 266, 269 (Ky. 2016)).

## III. ANALYSIS

The Appellants argue that the circuit court erred by finding several provisions of KRS Chapter 247 to be unconstitutional: (1) appointing the Senate

---

[3] The Governor asks this Court to revisit that finding. However, this Court held after extensive review that "in balancing the equities, it appears to the Court that the trial court's stay is, for the moment, the least injurious solution to the [State Fair Board] and the public. . . . After considering the *Maupin* [*v. Stansbury*, 575 S.W.2d 695, 699 (Ky. App. 1978)] factors, we hold that the trial court did not abuse its discretion by staying its own order[.]" We agree.

President and House Speaker to the State Fair Board; (2) shifting the majority of the appointment power from the Governor to the Agriculture Commissioner; and (3) prohibiting the Governor from appointing voting members whose terms expired in 2021. Further, the Appellants assert that even if portions of the KRS Chapter 247 modifications are unconstitutional, any offending provisions were rightly severed to uphold the remainder of the legislation.

Conversely, the Governor argues that the KRS Chapter 247 modifications unconstitutionally stripped the Governor's office of its executive power and the "[L]egislature completely divested the Governor of any meaningful ability to ensure that the [State Fair] Board faithfully executes the law." The Governor also argues that the circuit court erred in finding some portions were within the authority of the Legislature and – because the legislation cannot be severed – the KRS Chapter 247 modifications are unconstitutional as a whole. We will discuss severability later in this Opinion.

The highest court in the Commonwealth previously noted that §§ 27 and 28 of the Kentucky Constitution, together, make Kentucky's separation of powers' doctrine perhaps the strictest doctrine of any state in the United States. *See Sibert v. Garrett*, 246 S.W. 455, 457 (Ky. 1922) ("Perhaps no state forming a part of the national government of the United States has a Constitution whose language more emphatically separates and perpetuates what might be termed the

-10-

American tripod form of government than does our Constitution[.]").  It is a doctrine that is to be strictly construed.  *Legis. Rsch. Comm'n* [*"LRC"*] *By and Through Prather v. Brown*, 664 S.W.2d 907, 912 (Ky. 1984) (citation omitted).[4]

In Kentucky, the branches of state government are distinct and clearly defined.  KY. CONST. § 27.[5]  We, the Judicial Branch, *interpret and apply* the laws – that were *enacted* by the Legislative Branch – as *executed* by the Executive Branch.  *Commonwealth ex rel. Beshear v. Commonwealth Off. of the Governor ex rel. Bevin*, 498 S.W.3d 355, 370 (Ky. 2016).  When the Kentucky Constitution specifically reserves a power to one branch of government, that power may not be delegated to another branch.  *Bd. of Trs. of Jud. Form Ret. Sys. v. Att'y Gen. of the Commonwealth of Ky.*, 132 S.W.3d 770, 782 (Ky. 2003).  In essence, each branch

---

[4] The dissent critiques the jurisprudence behind *LRC* and urges the Supreme Court to recognize that its "catalyst" was rendered by a "partisan-elected judiciary influenced by the deadly politics of its era."  However, this current non-partisan elected Court is bound by *stare decisis*.  *See Caneyville Volunteer Fire Dep't v. Green's Motorcycle Salvage, Inc.*, 286 S.W.3d 790, 795 (Ky. 2009) (internal quotation marks and citation omitted) ("[T]he doctrine of *stare decisis* remains an ever-present guidepost in our undertaking.  *Stare Decisis* compels us to decide every case with deference to precedent.  Thus, it is with anything but a cavalier attitude that we broach the subject of changing the ebb and flow of settled law [and while], we do not feel that the doctrine compels us to unquestioningly follow prior decisions when this Court finds itself otherwise compelled, we recognize that *stare decisis* [is] the means by which we ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion.").  While the dissent's history lesson is intriguing, we cannot ignore binding precedent simply because we believe a 1901 decision was "suspect."  Our Supreme Court has never concluded that the precedent cited herein is at odds with the state of the law, and it is not the role of this Court to do so.

[5] "The powers of the government of the Commonwealth of Kentucky shall be divided into three distinct departments, and each of them be confined to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another."

is directed to stay on its own path, unless venturing off its path is "expressly directed or permitted." KY. CONST. § 28.[6]

The dissent's analysis of the 1849 Convention concludes that it stripped the Governor of the majority of its powers. The 1850 Constitution did expressly deprive the Governor of his previous authority to appoint certain constitutional officers, *e.g.*, Treasurer, Attorney General. Those officers have since been elected by "the People." However, the Governor retained the right to appoint certain officers. Legal scholars generally agree that the 1890 Convention was called to limit and control special legislation and legislative excesses. *Zuckerman v. Bevin*, 565 S.W.3d 580, 589 (Ky. 2018) (citation omitted). Regardless, the sanctity and importance of the separation of powers has remained a primary focus of our precedent.

The question before us now, nearly 200 years later, is simply whether the Governor retains executive power to appoint certain individuals in spite of the significant power of the Legislature. Our precedent proclaims the answer is a "qualified" yes.

> Our Legislature . . . possesses the authority to enact any statute it deems necessary for the public interest, unless prohibited by constitutional provisions. In the exercise of that authority it may frame its enactments and express its

---

[6] "No person or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted."

-12-

intention and purpose as it sees proper, as long as it does not conflict with any inhibition contained in the Constitution of its state.

*Taylor v. Commonwealth ex rel. Dummit*, 202 S.W.2d 992, 996 (Ky. 1947).

In 1982, the Kentucky Supreme Court stated, "[i]t is axiomatic that under our Constitution the General Assembly has all powers not denied to it or vested elsewhere by the Constitution." *Brown v. Barkley*, 628 S.W.2d 616, 623 (Ky. 1982). However, two years later, the same Court clarified that its holding in *Barkley* did not grant residual powers – *i.e.*, those powers not enumerated in the Constitution – to the General Assembly. *LRC*, 664 S.W.2d at 913-14. Emphasizing the importance of the separation of powers, the Court stated:

> Implicit in *Barkley* is that the General Assembly as the legislative branch, has all powers *which are solely and exclusively legislative in nature.* To argue that any other power is given to the General Assembly simply won't wash. The power referred to in *Barkley* is *legislative power and legislative power only.* In summation, our view is best expressed in *Sibert v. Garrett*, 197 Ky. 17, 246 S.W. 455 (1922), which we reaffirm. There we stated:
>
> > But a deeper probing into and investigation of the subject will reveal the truth that the rule so generally stated means, not that the Legislature has "all powers" not withheld by the Constitution, but that it "may pass any acts that are not expressly or by necessary implication inhibited by their own Constitutions or by the Federal Constitution." *In other words, the Legislature may perform all legislative acts not expressly or by necessary implication withheld from it, but it*

-13-

> *may not perform or undertake to perform executive or judicial acts*, except in such instances as may be expressly or by necessary implication directed or permitted by the constitution of the particular state.

*Id.* (quoting *Sibert*, 246 S.W. at 457) (emphasis in original).

The Governor is vested "supreme executive power of the Commonwealth" – KY. CONST. § 69 – and it is his or her responsibility to "take care that the laws be faithfully executed." KY. CONST. § 81. The Governor "has only the authority and powers granted to him by the Constitution and the general law . . . [and], like everyone, is bound by the law." *Bevin*, 498 S.W.3d at 369. "Whereas the [J]udicial [B]ranch must be and is largely independent of intrusion by the [L]egislative [B]ranch, the [E]xecutive [B]ranch exists principally to do its bidding." *Barkley*, 628 S.W.2d at 623.

As the Judiciary, it is our responsibility when construing statutes to determine the Legislature's intent, "and if that language is clear and unambiguous, we look no further." *Beshear v. Acree*, 615 S.W.3d 780, 801 (Ky. 2020) (citations omitted). We must give duly adopted legislation a presumption of validity. *Hayes v. State Prop. & Bldgs. Comm'n*, 731 S.W.2d 797, 799 (Ky. 1987); *see also Wynn v. Ibold, Inc.*, 969 S.W.2d 695 (Ky. 1998) (citation omitted). Further, "[a] constitutional infringement must be 'clear, complete and unmistakable' in order to render the statute unconstitutional." *Acree*, 615 S.W.3d at 805 (quoting *Caneyville*

-14-

*Volunteer Fire Dep't v. Green's Motorcycle Salvage, Inc.*, 286 S.W.3d 790, 806 (Ky. 2009)) (internal quotation marks omitted).  However, even against a strong presumption of constitutionality, "this Court is responsible for assessing statutes based on the directives in our Constitution."  *Commonwealth ex rel. Cameron v. Johnson*, 658 S.W.3d 25, 40 (Ky. 2022).

With those parameters in mind, we find portions of the KRS Chapter 247.090 modifications do infringe on the Kentucky Constitution:   it is unconstitutional for the General Assembly to appoint the Senate President and Speaker of the House (or their designees) as *ex officio*, non-voting, members to the State Fair Board.  We also find "clear and unmistakable" constitutional conflict in the modifications to KRS Chapter 247 which transferred majority oversight of the State Fair Board from the Governor to the Agriculture Commissioner and prohibited the Governor from appointing members whose terms expired in 2021.  Other modifications by the Legislature appear to fall within its legislative powers as the third branch of government.

### A. KRS 247.090(1)(c) and (d) are Unconstitutional

KRS 247.090(1) added two members of the State Legislature (Senate President and House Speaker) onto the State Fair Board as *ex officio*, non-voting, members.

-15-

> The State Fair Board shall be composed of sixteen (16) voting members and five (5) ex officio, nonvoting members, as follows:
>
> . . .
>
> (c) The President of the Senate or his or her designee, who shall serve as an ex officio, nonvoting member for the duration of his or her service as President of the Senate;
>
> (d) The Speaker of the House of Representatives or his or her designee, who shall serve as an ex officio, nonvoting member for the duration of his or her service as Speaker of the House of Representatives[.]

KRS 247.090(1)(c) and (d).

The circuit court determined this provision was unconstitutional because it infringed upon the Executive Branch's appointment authority, a power given to the Executive Branch by the Kentucky Constitution, as reinforced by *LRC*. We agree.

In *LRC*, the General Assembly had passed several acts during its 1982 regular session that tested the Governor's constitutional powers. *LRC*, 664 S.W.2d at 909. Pertinent here, the General Assembly made the House Speaker and Senate President *ex officio* members of "certain existing boards and commissions." *Id.* at 920 (citation omitted). There, the LRC argued it was permitted to appoint the House Speaker and Senate President to the boards because § 93 of the Kentucky Constitution allowed inferior state officers and members of boards and commissions, not otherwise provided for, to be appointed in such a manner as

-16-

prescribed by law. *Id.* at 923 (citation omitted). However, after a thorough recitation of relevant precedent, the Kentucky Supreme Court ultimately found that the statutes that gave board membership to the House Speaker and Senate President were "invalid because such constitutes a legislative appointment which infringes on the right of the Governor to make such appointments." *Id.* at 924. Appellants attempt to distinguish *LRC*, but we are not persuaded.

Appellants point to the discrepancy on the *type* of membership: in *LRC*, the *ex officio* appointments in question were *voting* members, whereas the *ex officio* appointments here are *non-voting* members. The Appellants argue that "[i]n *LRC*, the General Assembly crossed that line [the line prohibiting the General Assembly from absorbing the functions of other branches] by making members of the General Assembly voting members[.]" However, because here the 2021 General Assembly did not give the Senate President and House Speaker the power to vote, they argue the provision found a "delicate balance" between not overstepping the Executive Branch's power of appointments and the power of the Legislative Branch to make appointments "in exercise of its own functions," citing *Sibert*, 246 S.W. at 458.[7] Appellants argue, citing *Sibert*, that the Legislature is

---

[7] "The appointment of officers is intrinsically an administrative or executive act, but this does not imply that no appointment can be made by any department of government other than the executive, for all the authorities agree that the courts and the Legislature may appoint those public officers [who] are *necessary* to the exercise of *their own functions*." *Sibert*, 246 S.W. at 458 (emphasis in original) (citation omitted).

-17-

constitutionally permitted to "exercise [] its own functions" and that entails performing "oversight of the [E]xecutive [B]ranch" by "naming an *ex officio* non-voting member to the State Fair Board." They assert that the legislative additions to the State Fair Board are not an executive act (triggering a separation of powers violation), given that the members cannot formally participate in the State Fair Board's voting. However, that argument fails.

Neither *LRC* nor *Sibert* interpret the allocation of appointment powers as a balancing act. True, respect must be given to the separation of powers, but *LRC* tells us that

> *the Legislature may perform all legislative acts not expressly or by necessary implication withheld from it, but it may not perform or undertake to perform executive or judicial acts*, except in such instances as may be expressly or by necessary implication directed or permitted by the constitution of the particular state.

*LRC*, 664 S.W.2d at 914 (quoting *Sibert*, 246 S.W. at 457) (emphasis in original).

Here, the General Assembly was attempting to usurp the Executive Branch's powers by placing themselves on an executive board. However, this is an attempt to do indirectly what it cannot do directly. *See id.* at 923-24. The General Assembly cannot perform acts expressly given to another branch of government; *i.e.*, the General Assembly cannot create for themselves membership roles on a board clearly within the Executive Branch's control.

> So where the Constitution provides that all officers whose appointment is not otherwise provided for in the Constitution shall be chosen in such manner as may be prescribed by law, it is held that, while this provision authorizes the Legislature to provide by law for the appointment or election of such officers, *it does not authorize the Legislature itself to make such appointment or election.*

*Id.* at 923 (quoting *Sibert*, 246 S.W. at 459) (emphasis in original).

The General Assembly appointing themselves *ex officio* non-voting members to the State Fair Board is more than just permissible "legislative oversight"; it crosses the boundaries established by §§ 27 and 28 of the Kentucky Constitution. These non-voting roles are not "powerless" as the Appellants argue; they can perform all other functions of board members, including serving on committees, engaging in debate, participating in board decisions, and, as the Appellants admit, they are "at the table when voting members of the State Fair Board ma[k]e decisions." Under *LRC*, statutorily appointing legislators as *ex officio* board members infringes upon the appointment authority of the Executive Branch. *Id.* at 924.

The role of this Court is to interpret and apply the laws, not to – as the Appellants requested – "extend" existing precedent beyond our clear reading. "[A]s an intermediate appellate court, this Court is bound by established precedents of the Kentucky Supreme Court." *Sigrist v. Commonwealth*, 660 S.W.3d 636, 646 (Ky. App. 2022) (citing Kentucky Supreme Court Rule

-19-

1.030(8)(a)). *LRC* is binding and not sufficiently distinguishable from the facts before us. Therefore, KRS 247.090(1)(c) and (d) – adding two members of the Legislature onto the State Fair Board – are unconstitutional.

**B. KRS 247.090(1)(g) and (n) are Unconstitutional**

While the Appellants concede that "[a]ppointment to office[] is intrinsically executive" – *Taylor v. Commonwealth*, 26 Ky. 401, 401 (Ky. 1830) – they argue the General Assembly can determine who, within the Executive Branch, may appoint "officers whose appointment is not otherwise provided for in the Constitution[,]" citing *Sibert*, 246 S.W. at 459. Appellants argue that because the Agriculture Commissioner is part of the Executive Branch and members of the State Fair Board are officers "not otherwise provided for in the Constitution[,]" the General Assembly had authority to implement KRS 247.090(1)(g)-(n), giving the Agriculture Commissioner a majority of the State Fair Board's appointments. Appellants rely on *Rouse v. Johnson*, 28 S.W.2d 745 (Ky. 1930); *Cameron v. Beshear*, 628 S.W.3d 61 (Ky. 2021); and *Brown v. Barkley*, 628 S.W.2d 616 (Ky. 1982) to claim the General Assembly has the power "to give someone other than the Governor the ability to appoint a majority of the members to a board or commission."

While the parties agree that § 93 of the Kentucky Constitution permits "an executive officer other than the Governor to participate in board and

commission appointments[,]" the Governor argues that the appointment designation is not so unfettered as to allow a majority of appointments to be made in such a manner by the Agriculture Commissioner. The question, therefore, remains: does the Constitution permit the General Assembly to designate an executive constitutional officer (like the Agriculture Commissioner) to make appointments and give him or her such power that it overrides the "supreme executive power" of the Governor?

First, Appellants point to *Rouse* and argue that the General Assembly has the power "to give someone other than the Governor the ability to appoint a majority of the members to a board or commission[.]" However, the Court in *Rouse* did not make such a conclusion. There, the Court determined that an act designating an "Appointing Board" – which included the Governor – to appoint members of a commission was not unconstitutional under §§ 27, 28, and 93. *Rouse*, 28 S.W.2d at 746, 750-51.

In *Rouse*, the General Assembly repealed an "Old Act," which had designated the Governor to appoint all four members of a commission. *Id.* at 746. In its place, the General Assembly passed a "New Act," which expanded the commission to eight members and designated an "Appointing Board" – comprised of the Governor, Lieutenant Governor, and Attorney General – to appoint the members. *Id.* After the Appointing Board appointed eight members to the

commission, the Governor began to question the constitutionality of the New Act and appointed four other members to the commission under the Old Act. *Id.* The Old Act members then filed suit against the New Act members, claiming the New Act was unconstitutional. *Id.*

Ultimately, the highest Court in Kentucky reviewed the New Act to determine its validity under Kentucky Constitution §§ 27 and 28, the separation of powers doctrine. *Id.* at 747-48. The Old Act members argued the New Act was unconstitutional because (1) the Lieutenant Governor, who served on the Appointing Board, was "primarily and essentially a legislative" office and the Legislature did not have the "executive authority to appoint to office"; and (2) the New Act offended § 152[8] of the Constitution because it authorized the Appointing Board to fill vacancies in the commission even though that section gave the sole authority to fill vacancies to the Governor. *Id.* The Court held that (1) the office of Lieutenant Governor was an executive, not legislative, office; and (2) § 152 was not applicable, but §§ 76 and 93 were, and those did not necessitate that the Governor fill vacancies of inferior state officers. *Id.* at 750-51.

---

[8] Kentucky Constitution § 152 details when and how vacancies for *elective* (not appointive) officers are filled; in pertinent part, "[v]acancies in all offices for the State at large, or for districts larger than a county, shall be filled by appointment of the Governor; all other appointments shall be made as may be prescribed by law." *See id.* at 752.

As to the second issue, the Court explained that Kentucky Constitution § 76 – conferring the Governor's power to appoint vacancies, "except as otherwise provided in this Constitution" – and § 93 – stating inferior state officers may be appointed "in such manner as may be prescribed by law" – must be read together. Therefore, the Court concluded that the vacancies mentioned in § 76 applied only to officers the Constitution created, not vacancies of "inferior state officers," as detailed in § 93. As such, the Court found the New Act was constitutional.

Importantly, Appellants claim *Rouse* held the Governor need not appoint a majority of the members of a Board; however, it is clear that in *Rouse* the Governor remained involved (by way of the Appointing Board) in the appointment of *all* members. Here, however, KRS 247.090 did not keep the Governor involved in all of the appointments – not even a majority of them. Instead, under KRS 247.090(g)-(n), the Agriculture Commissioner now appoints eight of 13 voting members with no input from the Governor. That is distinguishable from *Rouse*. Further, as the *Rouse* Court largely focused on (1) whether the Lieutenant Governor was part of the Legislative Branch, and (2) the constitutional requirements for inferior state officer *vacancies*, not appointments, it is difficult to ascertain the precedential value of this case on this issue.

Next, Appellants detail *Cameron*.  There, the Governor questioned whether the General Assembly could enact legislation amending the Governor's statutorily derived power to respond to emergencies.  *Cameron*, 628 S.W.3d at 66.  Our Supreme Court reviewed two issues:  (1) whether there was a justiciable case or controversy and (2) if so, whether a temporary injunction was warranted.  *Id.* at 68.  The Supreme Court determined that the matter did present a justiciable case or controversy; however, the trial court had abused its discretion in issuing the temporary injunction.  *Id.* at 66.

The Supreme Court acknowledged that KRS Chapter 39A provided the Governor the power to issue states of emergency.  *Id.*  However, the Supreme Court noted that "going forward, the General Assembly could limit the Governor's statutorily[]derived emergency powers should it wish to."  *Id.* (citing *Acree*, 615 S.W.3d at 812-13).  In accordance, the General Assembly passed House Bill 1, Senate Bill 1, and Senate Bill 2, restricting "the Governor's ability to take unilateral action during declared emergencies."  *Id.* at 67.  The Governor (and related parties) then filed a declaratory action to determine whether those bills were unconstitutional under §§ 2, 27, 28, 36, 42, 55, 59, 60, 69, 75, 80, and 81 of the Kentucky Constitution.  *Id.*

Ultimately, the Supreme Court only addressed the Governor's standing to bring the suit and whether the matter was justiciable.  When

determining whether the Governor had an irreparable injury, so as to justify the injunction, our Supreme Court detailed the Governor's powers. *Id.* at 73-74. The Court acknowledged that, unless our Constitution expressly sets forth a power for the Governor, his or her power is derived from the General Assembly's statutes. *Id.* at 73 (citations omitted). As such, the Governor's power to exercise emergency authority was "confined to the statutory authority given to him by the Legislature under KRS Chapter 39A." *Id.* (citing *Acree*, 615 S.W.3d at 812-13). Appellants obviously point to this language in support of the legislation herein.

However, in *Cameron*, the defendants argued Senate Bill 1 – which gave a constitutional officer "authority to approve, or disapprove, any suspension of statute deemed necessary by the Governor to respond to an emergency" – was constitutional because the General Assembly had *delegated its own legislative power* to conduct such suspensions under § 15 of the Kentucky Constitution. *Id.* at 68-69 and 76 (emphasis added). The Governor therein argued that the power to suspend fell under Kentucky Constitution § 69; however, the Supreme Court held that the Constitution expressly gives that power to the General Assembly in Kentucky Constitution § 15. *Id.* at 76. Therefore, the General Assembly had the

right to delegate its own constitutionally derived power to suspend statutes to a constitutional officer (like the Attorney General). *Id.*[9]

Here, however, the power at issue is neither statutorily derived (like the power to respond to emergencies) nor is it a legislative power (like the power to suspend statutes). Here, the Governor's "supreme executive power" is enumerated in Kentucky Constitution § 69. His authority as Chief Magistrate is expressly delineated in the Constitution and expressly removed by this legislation. As such, *Cameron* does not provide relevant authority. The case clearly does not speak to the Legislature impeding on constitutionally derived powers of the Governor.

Finally, Appellants detail *Barkley*. There, the Governor entered an executive order that transferred many functions, personnel, and funds from the Department of Agriculture to a different executive agency. *Barkley*, 628 S.W.2d at 618. The Agriculture Commissioner filed suit challenging the order, and the trial court found the order to be invalid under KRS 12.025(1), "the enabling statute pursuant to which [the order] was issued." *Id.* The Supreme Court upheld the trial court's findings, concluding that the order did not come under the authority of KRS 12.025(1). *Id.* Additionally, the Court analyzed whether the Governor had

---

[9] Relying on *Barkley*, the Court emphasized that the General Assembly may grant *its own* powers to § 91 constitutional officers. *Id.* at 76 (emphasis added).

the constitutional power to reorganize statutorily derived powers that the General Assembly granted to a certain executive agency. *Id.*

"The centerpiece of [the] litigation [was] KRS 12.025(1)," which provided that the Governor may "[e]stablish, abolish or alter the organization of any agency or *statutory* administrative department[.]" *Id.* at 619 (emphasis added). Initially, KRS 12.020 stated that the Department of Agriculture was a "*constitutional* administrative department," not a "statutory administrative department." *Id.* The Court explained that, although later amendments to KRS 12.020 reclassified the administrative departments based on whether the department head was appointed or elected, the original terminology indicated that the General Assembly intended for the Department of Agriculture to be a "constitutional administrative department" and not subject to KRS 12.025(1). *Id.* Again, our Supreme Court noted that the reorganization powers in question were statutorily derived. *Id.*

The Court went on to discuss, in *dicta*, the "interrelation of constitutional powers with respect both to the Governor, the General Assembly" and § 91 constitutional officers. 628 S.W.2d at 621. It found that interplay important "because (1) to the extent that the Governor has any implied or inherent powers in addition to those the Constitution expressly gives him, it seems clear that such unexpressed executive power is subservient to the overriding authority of the

legislature, and (2) the officers named in Const. Sec. 91 have only such powers and duties as are assigned to them by legislative enactment or by executive order expressly authorized by statute." *Id.* Therefore, the Agriculture Commissioner's "functions, authority, funds or personnel can be removed to another agency at the will of the General Assembly." *Id.* at 622.

Importantly, though, the Court acknowledged that the General Assembly's power to use constitutional officers as "convenient receptacles for the diffusion of executive power" was not without bounds. *Id.* "As the Governor is the 'supreme executive power,' it is not possible for the General Assembly to create another executive officer or officers *who will not be subject to that supremacy*, but it definitely has the prerogative of withholding executive powers from him by assigning them to these constitutional officers who are not amenable to his supervision and control." *Id.* (emphasis added). In other words, so long as the General Assembly's diffusion of the Governor's power to a constitutional officer does not inhibit the Governor's "supreme executive power," it is constitutional. *Id.*

It appears clear that the Court in *Barkley* was working within those logical boundaries. Otherwise, there would have been no need to qualify its statement with the impossibility of usurping the Governor's "supreme executive power" by creating officers who were not subject to that supremacy. If we were to

adopt the Appellants' interpretation of *Barkley*, where there is no prohibition on providing a constitutional officer the whole of the Governor's constitutionally derived power, there is nothing stopping the General Assembly from cutting this Governor and all future Governors out of the equation completely.[10] If there is no requirement that the Governor have a majority of appointments to sustain his or her supreme executive power, then there is nothing requiring the Governor to have a hand in those decisions at all.

Nevertheless, the holding in *Barkley* spoke only to whether the Governor had the authority as "supreme executive power" to reorganize an executive agency when the Legislature explicitly provided such power only to "statutory agencies." *Id.* Specifically, the Court found the Governor does not have the power to reorganize the agency "without legislative sanction unless it is necessary in order for him to carry out a law or laws that the legislature has created without prescribing in sufficient detail how they are to be executed." *Id.* Moreover, the Court acknowledged that where the General Assembly has omitted "specifying the manner in which [a law] is to be carried out, the chief executive would be required to carry it out and have the right to choose the means by which

---

[10] When asked at oral argument, the Appellants failed to explain what would constitute the "floor" of the Governor's power, or the point where the Legislature so grossly limits the Executive Branch as to make it an "empty shell"; however, they did recognize that some "floor" must exist.

to do it . . . because it would be within the scope of authority and duty expressly conferred upon him by Const. Sec. 81." *Id.* at 623. The Court held that "[t]his means, we think, that when the General Assembly has placed a function, power or duty in one place there is no authority in the Governor to move it elsewhere unless the General Assembly gives him that authority." *Id.* There, KRS 12.025 did not give the Governor that authority. *Id.* In fact, it expressly denied such authority. *Id.*

Here, however, the Governor has not attempted to reorganize an executive agency so as to transfer authority from one constitutional officer to another. Instead, the General Assembly has altered the structure of the State Fair Board so as to usurp the "supreme executive power" expressly provided to him in the Constitution and muddy whether the Governor is able to "take care that the laws be faithfully executed" under Kentucky Constitution § 81.

In short, we agree with the circuit court's statement below that the precedent within the Commonwealth is not directly on point on this issue, but we do not turn to out of state authority as did the trial court. As our Supreme Court directed in *Acree*, our "North Star" must be "our own Kentucky Constitution." *Acree*, 615 S.W.3d at 805 n.30.[11] Our Constitution clearly grants the supreme

---

[11] In addition to our Constitution, we appreciate the power and influence of our current caselaw. As the intermediate appellate court, we must also consider our Supreme Court precedent and apply those cases to the nuanced issue before us now. We have done so while recognizing that

-30-

executive power of the Commonwealth exclusively to the Governor. We believe that our Constitution does indeed serve as our "North Star" and while our deference to the Legislature is substantial, our obligation to protect the deeply ingrained separation of powers required by our Constitution is greater still.

All parties agree that this is an executive board and that the power to appoint and remove is an executive power. That power can, under recent opinions, be delegated by the Legislature so as to "diffuse" the Governor's authority. *Barkley*, 628 S.W.2d at 622. However, it cannot be diffused to such an extent that it reduces the office to an "empty shell." *Johnson v. Commonwealth ex rel. Meredith*, 165 S.W.2d 820, 829 (Ky. 1942). As the Supreme Court held in *Barkley*, other constitutional officers can be granted duties by the General Assembly, but no other executive office can be created which will not also be inferior to that of the Governor. *Barkley*, 628 S.W.2d at 622. Both *Barkley* and *LRC* make clear that any law passed by the Legislature must not violate our Constitution. The General Assembly cannot do indirectly what it cannot do

---

the Kentucky Supreme Court will determine the ultimate outcome of this case. We note, a motion to transfer this case and others directly to that Court was denied. The dissent's nearly 300 pages of analysis of the Constitution and of our caselaw concludes that the Supreme Court precedent cited herein is flawed, and should bring a degree of embarrassment to the judiciary. Writing for the majority, I disagree but do urge the Supreme Court to exercise its power and address these important constitutional issues and direct the three branches of government accordingly. As then Chief Justice Minton wrote in *Stivers v. Beshear*, 659 S.W.3d 313, 317 (Ky. 2022), "[t]his case illuminates the tension among the three branches of government. . . . As the court of last resort in the Commonwealth, [the Supreme Court is] in the unenviable position of resolving the dispute between the branches of government."

directly.  *LRC*, 664 S.W.2d at 923-24.  Thus, on this issue, we also affirm the circuit court.

## C. KRS 247.100 and KRS 247.110 are Constitutional

KRS 247.100 keeps the State Fair Board attached to the TAH Cabinet, but "solely for administrative purposes" and provides that it is otherwise accountable to the Legislature, Governor, and Agriculture Commissioner, as an "independent, *de jure* municipal corporation[.]"

> (1) As used in this section, "solely for administrative purposes" means those limited functions and purposes expressly requested by the State Fair Board to be performed by the [TAH Cabinet].  The State Fair Board shall have sole discretion as to which functions shall be deemed necessary for the efficient operation of the State Fair Board and the properties in its custody and control.
>
> (2) The State Fair Board shall be a body corporate with full corporate powers.  The General Assembly hereby recognizes and reaffirms that the operations of the State Fair Board and the operation of its facilities are unique activities for state government and that an independent corporate structure is best to enable the State Fair Board to be managed in an entrepreneurial and business-like manner.  The State Fair Board shall be an independent, de jure municipal corporation and political subdivision of the Commonwealth of Kentucky, which shall be a public body corporate and politic.  The State Fair Board shall be deemed a public agency within the meaning of KRS 61.805 and 61.870.  The State Fair Board shall be attached to the [TAH] Cabinet solely for administrative purposes.
>
> . . .

(4) It is the intent of the General Assembly that the State Fair Board shall be accountable to the Governor, the Commissioner of Agriculture, the General Assembly, and the people of the Commonwealth through a system of audits, reports, and thorough financial disclosures.

KRS 247.100.

The circuit court found no constitutional conflict with this restructuring and the new system of oversight, stating "[s]o long as the [State Fair Board] remains under the authority of the [E]xecutive [B]ranch, there is nothing that prevents the [L]egislature from making it an independent agency, attaching it to the [TAH Cabinet] only for administrative support. . . . What matters is whether there is executive oversight, the absence of which could trigger a violation of the separation of powers." To the contrary, the Governor argues that this restructuring of the State Fair Board prevents him from conducting his § 81 duty to faithfully execute the law and gives the Legislature unconstitutional control over an executive board.

First, the Governor argues that the financial restructuring shifts oversight – away from the TAH Cabinet to the General Assembly – through a system of audits, reports, and financial disclosures in violation of §§ 27 and 28 of the Kentucky Constitution. The Governor argues that the General Assembly has breached its constitutional boundaries but admits "[w]hat exactly the [L]egislature will require of the State Fair Board is unclear." The Governor asserts that the

framers of our current Constitution "intended the [L]egislature to discuss and enact laws, and *to do nothing else*." *LRC*, 664 S.W.2d at 912 (quoting *Pratt v. Breckinridge*, 65 S.W. 136, 140 (Ky. 1901)). In this regard, the Governor argues, these KRS Chapter 247 modifications show the General Assembly has ventured off its own path.

Conversely, the Appellants challenge the preservation of this argument and assert that "simply allowing the [L]egislature to see what an agency is doing through reports, audits, and financial disclosures does not offend the separation of powers." We agree, as did the circuit court. Again, we must give duly adopted legislation a presumption of validity – *Hayes*, 731 S.W.2d at 799 – and "[a] constitutional infringement must be 'clear, complete and unmistakable' in order to render the statute unconstitutional." *Acree*, 615 S.W.3d at 805 (internal quotation marks and citation omitted). Here, without knowing what exactly the Legislature will require of the State Fair Board – beyond general financial disclosures[12] – there are no "clear, complete and unmistakable" constitutional provisions to assess for possible constitutional infringement.

Next, the Governor challenges the transformation of the State Fair Board as a body under his control into an independent, municipal, *de jure*

---

[12] The circuit court noted that the only statutory provision was one that required an annual accounting reported to the Governor and LRC, a task "clearly within the [L]egislature's prerogative."

corporation. He states that these structural changes grant the State Fair Board "unchecked control over its own finances, property, and operations, even though the [State Fair Board] is dependent on millions of taxpayer dollars from the General Fund." The Governor argues that these changes allow the State Fair Board to independently perform executive functions including, but not limited to, procuring state contracts under its newly promulgated procurement procedures, rather than the Model Procurement Code under KRS Chapter 45A, thereby removing any substantive executive oversight. The Governor contends there can be no independent agency of state government, citing *LRC*, and asserts that the new independent board structure impairs his ability to fulfill his duty under § 81 of the Constitution. However, here again § 81 must be read *within* a separation of powers context. The Governor shall take care to faithfully execute the laws enacted by the General Assembly.

With KRS 247.100, the General Assembly created an independent, municipal, *de jure* corporation that is not a fourth branch of government, but rather, a board that remains part of the Executive Branch, with presumed fiscal transparency and reporting to the General Assembly, and a measure of statutory independence from the Governor's administration. While the Governor raises concerns about the transparency of the newly restructured board, particularly, in light of the monies provided from taxpayer funds, we cannot find that this portion

of the legislation clearly violates the Constitution. The circuit court concluded that so long as the State Fair Board remains under the authority of the Executive Branch, the Legislature is free to determine the board's procurement practices and make it an independent agency. The circuit court stated that what matters is that there is executive oversight, the absence of which would trigger a violation of the separation of powers. We agree.

Precedent supports the contention that state agencies can be attached to the Executive Branch for budgetary purposes but also maintain an independent corporate structure. *See Bevin*, 498 S.W.3d at 380 (citations omitted) ("Unlike [] cabinets and boards, the Universities' boards are separate 'bod[ies] corporate, with the usual corporate powers.'"). In *Bevin*, former Governor Bevin asserted gubernatorial authority over our state universities, but the Supreme Court upheld their statutory independence as "separate bodies corporate" over the operation of their respective institutions. *Id*. It is clearly no coincidence that KRS 247.100(2) used this same language in restructuring the State Fair Board. Similarly, in *University of Kentucky v. Moore*, 599 S.W.3d 798, 808 (Ky. 2019), the Supreme Court held that an agency can be part of the Executive Branch while maintaining "statutorily recognized independence" in many respects, from the Governor.

Finally, although factually distinct, *LRC* further supports the contention that budgetary enactments are a legislative matter, and it is simply "the

duty of the Governor as the Chief Executive to carry out and to implement the budget which is passed by the General Assembly." *LRC*, 664 S.W.2d at 925 (citation omitted). Again, the General Assembly

> possesses the authority to enact any statute it deems necessary for the public interest, unless prohibited by constitutional provisions. In the exercise of that authority it may frame its enactments and express its intention and purpose as it sees proper, *as long as it does not conflict with any inhibition contained in the Constitution of its state*.

*Dummit*, 202 S.W.2d at 996 (emphasis added).

We find no such conflict; restructuring the State Fair Board into an independent, municipal, *de jure* corporation does not conflict with any specific Constitutional provision, nor does it cross the boundary of the separation of powers, because the Executive Branch maintains ultimate control.

The Appellants argue in various briefs and motions, that this independent corporate structure is not unique to the State Fair Board. However, it is worth mentioning that the existence of similar language in existing and pending legislation is not – standing alone – persuasive as to its constitutionality here. The boards and commissions of this Commonwealth vary greatly from legislative intent, role in government, organization and oversight, structure, and obligations. To argue the General Assembly can create an independent *de jure* corporation out of a state board now, because it did so once before – is unpersuasive and akin to

saying: "I can drive down this street now, because I drove down a different street last week." The correlation and presumptiveness are misplaced. Similarly, our analysis as to the changes made to this board does not necessarily apply to other boards and commissions that have been restructured in recent legislation.

Turning to the next section, KRS 247.110(1) removes the Governor's authority to appoint the chair and vice chair of the State Fair Board, transferring that authority to the voting members of the State Fair Board. The Governor argues this effectively ensures that none of the Governor's appointees will ever serve as chair or vice chair. The circuit court's order simply found the total shifting of power to appoint a majority of members away from the Governor and prohibiting the Governor from appointing voting members whose terms had expired in 2021, was unconstitutional. The circuit court did not find that the State Fair Board choosing its own chair and vice chair violated the Governor's authority as chief magistrate. We do not either. Precedent indicates that such a transfer or restructuring of the board is not unconstitutional. When the Legislature confines itself to establishing the parameters of executive appointment without injecting itself directly into the process, or reducing the supreme executive power to an empty shell, there is no encroachment upon the exercise of the Executive Branch. *See Prater v. Commonwealth*, 82 S.W.3d 898, 907-09 (Ky. 2002). We find no

violation of the Constitution in the restructuring of the State Fair Board to permit members to appoint their own chair and vice chair.

### D. Severability

Finally, we agree with the circuit court as to the severability of the unconstitutional portions of KRS Chapter 247. There is a presumption of severability created by statute in this Commonwealth.

> It shall be considered that it is the intent of the General Assembly, in enacting any statute, that if any part of the statute be held unconstitutional the remaining parts shall remain in force, unless the statute provides otherwise, or unless the remaining parts are so essentially and inseparably connected with and dependent upon the unconstitutional part that it is apparent that the General Assembly would not have enacted the remaining parts without the unconstitutional part, or unless the remaining parts, standing alone, are incomplete and incapable of being executed in accordance with the intent of the General Assembly.

KRS 446.090.

Here, the General Assembly – in enacting KRS Chapter 247– did not refer to severability nor the lack thereof; the remaining provisions are not so "connected with" nor "dependent upon" the removal of the provisions appointing the House Speaker and Senate President to the State Fair Board. The remaining aspects of the KRS Chapter 247 modifications are complete and capable of being executed in accordance with the intent of the General Assembly. As such, KRS 247.090(1)(c), (d), (g), (h), and (n) are severable and the unconstitutionality of

-39-

these provisions does not render the remainder of the changes to KRS Chapter 247 unconstitutional.

Lastly, due, in part, to the consistency of our Opinion now – with the June 2022 Order from this Court's motion panel – we see no need to challenge the status quo as it relates to the injunction. In so ruling, we adopt the language of that motion panel Order as follows:

> it appears to the Court that the trial court's stay is, for the moment, the least injurious solution to the [State Fair Board] and the public. . . . What will remain of HB 518, if anything, is unclear. If the stay is lifted, the composition of the [State Fair Board] may well be adjusted throughout the pendency of this appeal, only to be restored or altered in some other way at the conclusion of the appeal. We believe overturning the stay to the extent that it involves the two *ex officio* members controlled by the legislature, but preserving the composition of the voting members, accomplishes this same end.

## IV. CONCLUSION

Therefore, the KRS Chapter 247 modifications are upheld, with the exception of the aforementioned subsections of KRS 247.090(1).

We AFFIRM the Jefferson Circuit Court as it found (1) the appointment of legislators or their designees as *ex officio* members of the State Fair Board unconstitutional, (2) shifting the power to appoint a majority of voting members from the Governor to the Agriculture Commissioner and prohibiting the Governor from appointing voting members whose terms expired in 2021

unconstitutional, (3) the remainder of the KRS Chapter 247 modifications constitutional, and (4) that the unconstitutional provisions are severable from the remainder of the KRS Chapter 247 modifications.

CALDWELL, JUDGE, CONCURS.

ACREE, JUDGE, DISSENTS AND FILES SEPARATE OPINION.

ACREE, JUDGE, DISSENTING:   Respectfully, I dissent.  I see no conflict between HB 518 and the Kentucky Constitution.  The "big picture" is this—the People[13] of Kentucky long ago expressly removed from the Governor all power to appoint individuals to fill non-constitutional offices by granting that power and more, whole-hog, to the General Assembly.  And despite efforts by some to reinstate those powers to the office of the Governor, the People never did.

If this three-part dissent resembles a law review article in length and citation, it is because some cases require jurists to be legal scholars and not mere dispute arbiters.  This is such a case.  But this dissent attempts far more than simply stating disagreement with the majority.

This dissent strives to reveal old lies perpetrated on bench and bar, intentionally at first but perpetuated because we trust that our judicial forebears

---

[13] "All the American political writers, &c., use the term *people* to express the entire numerical aggregate of the community, whether state or national, in contradistinction to the *government* or *legislature*." *Luther v. Borden*, 48 U.S. 1, 22, 12 L. Ed. 581 (1849) (emphasis in original).

knew the truth and told it in our jurisprudence.  That trust proves to be misplaced

in this area of constitutional law and belief in these lies led to the circuit court's

error here.  The lies are these:

> (1) the purpose in calling the 1890 Constitutional Convention was to restrain legislative power;
>
> (2) the power to appoint is executive in nature and can only be exercised by the Executive Department;
>
> (3) the Kentucky Constitution's §§ 27 and 28 are special and function differently than the separation-of-powers provisions of other states; and
>
> (4) Thomas Jefferson authored those sections of our Constitution.

I am convinced, and hope to persuade others, that none of these statements is true.

Part One explains why and how, in 1850, the People removed

appointment powers from the Governor and gave them to the General Assembly,

and why they did not return those powers in 1891 when given the opportunity.

Part Two analyzes the circuit court's errant reliance on North Carolina

jurisprudence to adjudicate the Kentucky constitutional questions before us.  The

fundamental constitutional differences between these states requires rejection of

North Carolina jurisprudence as a guide.

By far the longest, Part Three, critiques the jurisprudence leading to

the opinion commonly referenced as *LRC v. Brown*, or simply *Brown*.  It implores

the Supreme Court to reconcile that opinion's reference to the jurisprudential

"veer[ing]" back and forth between contradictory constitutional principles when it comes to analysis of § 93. *See Legis. Rsch. Comm'n ex rel. Prather v. Brown*, 664 S.W.2d 907, 921, 922, 923 (Ky. 1984) (*Comm'rs of Sinking Fund v. George*, 47 S.W. 779 (Ky. 1898), said there is "no express or implied provision in the Kentucky Constitution which conferred the power to appoint . . . upon the Governor"; *Pratt v. Breckinridge*, 65 S.W. 136 (Ky. 1901) (hereinafter *Pratt 1*) "veered sharply" away from *George*; *Sewell v. Bennett*, 220 S.W. 517 (Ky. 1920) "made a veer back" to *George*; *Sibert v. Garrett,* 246 S.W. 455 (Ky. 1922) "chose to follow *Pratt*"; *Craig v. O'Rear,* 251 S.W. 828 (Ky. 1923) "another veer by the Court . . . to retreat from *Pratt* and revitalize *George*").

Although *LRC v. Brown* identifies the opinions in this oscillating series, it fails to fully recognize its catalyst, *Pratt 1*, was rendered by what was then a partisan-elected judiciary influenced by the deadly politics of its era. *Pratt 1* was "utterly ignored" for decades as I will discuss, but nevertheless periodically infected opinions that, when rendered, were at odds with the organic law of Kentucky and remain so today.[14] By following them, *LRC v. Brown* joined that list of suspect opinions.

---

[14] *Organic law*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("organic law (1831) 1. The body of laws (as in a constitution) that define and establish a government[.]").

# PART ONE

## 1. *Ancient history and why it matters*

Once upon a time, our Constitution vested Kentucky's Governor with broad authority to appoint nearly every office in state and local government. Both our first and our second constitutions included the following enumerated power:

> He [the Governor] shall nominate, and by and with the advice and consent of the Senate, appoint all officers, whose offices are established by this Constitution, or shall be established by law, and whose appointments are not herein otherwise provided for . . . .

CONST. OF KY. of 1792, art. II, § 8; CONST. OF KY. of 1799, art. III, § 9. That is, the governor appointed every Executive Department officer we today elect, and more.

Soon, the General Assembly did what this provision empowered it to do. In 1805, it "established by law" the office of Assistant Secretary of State. *Page v. Hardin*, 47 Ky. 648, 663 (1848). Thereafter, the Governor appointed each man who held that office. But not just that position. It became "the practice of successive Governors[,]" rather than the Secretary himself, to make even the "appointments to [the Secretary's] ministerial and clerical office[.]" *Id.* at 664.

The Governor's broad enumerated powers of appointment were not to last. "In 1849 there was quite a revolution in the manner of appointing officers in this State." I OFFICIAL REPORT OF THE PROCEEDINGS AND DEBATES IN THE

-44-

CONVENTION ASSEMBLED AT FRANKFORT, ON THE EIGHTH DAY OF SEPTEMBER 1890, TO ADOPT, AMEND OR CHANGE THE CONSTITUTION OF THE STATE OF KENTUCKY 1397 (1890) [hereinafter DEBATES (1890)] (Remarks of Mr. Petrie).[15] The reference to "a revolution" was not hyperbole. The change was tectonic and the delegates who gave us our current Constitution knew it. And, knowing it, those delegates spent a fair amount of time making sure no counter-revolution in the power of appointment succeeded.

What an example this is of the truth that history is the law's driver. History changes the law and in grander ways changes our constitutions. In 1850, history changed Kentucky's Constitution, but few lawyers or judges know why. Unfortunately, what Stanford Law Professor Lawrence M. Friedman says is too true: "Legal scholars and lawyers [a]re interested in precedents, but not in history; they twist[] and use[] the past, but rarely treat[] it with the rigor that history demands." LAWRENCE M. FRIEDMAN, A HISTORY OF LAW 11–12 (Simon and Shouster 2nd ed. 1985) (hereinafter FRIEDMAN). We can no longer afford to take that approach.

We must give more than lip service to the notion "that courts in construing constitutional provisions will look to the history of the times and the

---

[15] Hazel Graham Petrie (1820-1900), delegate from Todd County, served on the Todd County Court and served briefly as a representative to the Kentucky General Assembly (1841). He was elected to the Kentucky Senate in 1891.

state of existing things to ascertain the intention of the framers of the Constitution and the people adopting it . . . ." *Keck v. Manning*, 231 S.W.2d 604, 607 (Ky. 1950). This is because "what the Constitution meant when adopted it continues to mean." *Runyon v. Smith*, 212 S.W.2d 521, 524 (Ky. 1948). As has been said: "we are dealing with our fundamental law. It is not outdated, or obsolete, or contrary to any policy we know of. . . . This law today is just as vital and enforceable as it was the day it was written into the Constitution." *Gillis v. Yount*, 748 S.W.2d 357, 360 (Ky. 1988) (quoting *Russman v. Luckett*, 391 S.W.2d 694, 697 (Ky. 1965)).

But why bring up ancient history going back a century before our current Constitution was adopted? Because deciding constitutional issues requires a *complete* context. The context of the General Assembly's appointment powers is not complete without an understanding of the evolution of those powers over time.

Three Kentucky judicial opinions handcuffing the General Assembly—*Pratt 1*, *Sibert*, and *LRC v. Brown*—represent attempts by judges to right what they saw as errors of the times in which they were rendered. We should know by better examples that such attempts during desperate eras are fraught with peril and are a danger to our jurisprudence. *See, e.g.*, *Dred Scott v. Sandford*, 60 U.S. 393, 15 L. Ed. 691 (1857); *Plessy v. Ferguson*, 163 U.S. 537, 538, 16 S. Ct. 1138, 1138, 41 L. Ed. 256 (1896); *Korematsu v. United States*, 323 U.S. 214, 65 S. Ct. 193, 89 L. Ed. 194 (1944).

## 2. *Why the governor was "shorn" of appointment power in 1849*

Before mid-nineteenth century, the same species of power granted to Kentucky's chief executive in our first two constitutions emboldened President Andrew Jackson to institute the "spoils system" of partisan patronage. Senator Henry Clay declared it an "odious system" by which "the offices, honors and dignities of the people were . . . put up to a scramble" and said the system "would finally end in . . . despotism."[16] 8 Reg. Deb.[17] 1324 (1833) (Remarks of Mr. Clay).

Such abuse was not limited to the *federal* chief executive magistrate. The spoils system became "well established in several *state governments*." *II The Civil Service and the Statutory Law of Public Employment*, 97 HARV. L. REV. 1619, 1624 (1984) (emphasis added). It was well established in Kentucky.

Opposition to Kentucky's chief executive magistrate's appointment power mounted and is reflected in an editorial: "[T]he whole system of official

---

[16] "It may be correct that the patronage system . . . [was] in existence when the Constitution was adopted. However, the notoriety of the practice in the administration of Andrew Jackson in 1828 implies that it was not prevalent theretofore . . . ." *Illinois State Emps. Union, Council 34, Am. Fed'n of State, Cnty. and Mun. Emps., AFL-CIO v. Lewis*, 473 F.2d 561, 568 n.14 (7th Cir. 1972) (responding to *Alomar v. Dwyer,* 447 F.2d 482, 483 (2d Cir. 1971) ("spoils system has been entrenched in American history for almost two hundred years.")).

[17] Register of Debates in Congress.

appointments and tenures in this state is one vast mart for the sale and retention of official plunder." Editorial, KENTUCKY YEOMAN (Frankfort), Oct. 6, 1846.[18]

Public outcry was pervasive, and, on October 1, 1849, Kentucky convened its third Constitutional Convention. REPORT OF THE DEBATES AND PROCEEDINGS OF THE CONVENTION FOR THE REVISION OF THE CONSTITUTION OF THE STATE OF KENTUCKY 2 (1849) [hereinafter DEBATES (1849)]. "To curtail the power of *appointment* to office by the executive . . . was one of the leading objects" of that Convention. *Speed v. Crawford*, 3 Met. 207, 211, 60 Ky. 207, 211 (1860) (emphasis in original).

Convention delegates were themselves eager for reform. One delegate, former United States Congressman Benjamin Hardin,[19] said:

> [F]or five years back I have been exceedingly anxious for the call of a convention. I discovered that great abuses had crept into our government—very great abuses—especially in the appointing power, and that in the language of Jefferson, "power is always stealing away from the many to the few . . . ."

---

[18] As quoted in Gertrude Pettus, The Issues in the Kentucky Constitutional Convention 1849-1850 (1941) (Ph.D. Dissertation, University of Louisville) (on file with ThinkIR, University of Louisville) (https://doi.org/10.18297/etd/1846).

[19] Benjamin Hardin (1784-1852) of Hardin County served in the Kentucky House of Representatives (1810, 1811, 1824, 1825), the Kentucky Senate (1828-1832), and the United States House of Representatives (1815-1817, 1819-1823, 1833-1837); he served as Kentucky Secretary of State (1844-1847). Biographical Directory of the U.S. Congress, Benjamin Hardin: https://bioguideretro.congress.gov/Home/MemberDetails?memIndex=H000184.

DEBATES (1849) 199 (Remarks of Mr. Hardin). He was hardly alone in his opposition to the gubernatorial power of appointment. Another equally credentialed delegate said:

> [W]hen you come to . . . minor ministerial offices, I utterly condemn and abhor that piratical principle that would eject men . . . not acceptable to the incumbents having the appointing power. Such a principle is oppression and tyranny, and I would like to see the free people of this country trample it in the dust and annihilate it.

DEBATES (1849) 21 (Remarks of Mr. Davis).[20]

In the end, Congressman Hardin was satisfied with the fruits of his efforts.[21] When he summarized the accomplishments of the 1849 Convention, stripping the chief executive magistrate of appointment powers was first on his list: "Now we have done all the people claimed. We have taken the appointing power from the governor . . . ." DEBATES (1849) 1080 (Remarks of Mr. Hardin).

The state's largest circulation newspaper reported what the People of Kentucky ratified by voting for the new Constitution, saying, "The Governor under

---

[20] Garrett Davis (1801-1872), delegate from Bourbon County, served in the Kentucky House (1833-1835), the United States House of Representatives (1839-1847), and the Senate (1861-1872). He declined nominations as Lieutenant Governor (1846), Governor (1855), and as American Party candidate for President (1856). Biographical Directory of The United States Congress, Garrett Davis: https://bioguideretro.congress.gov/Home/MemberDetails?memIndex=D000099.

[21] Mr. Hardin may well have led the charge for the 1850 Convention for in his closing remarks he said, "When I first started this question of a convention, it was doubtful whether we would have a majority . . . ." DEBATES (1849) 1080 (Remarks of Mr. Hardin).

the new constitution will be a far different officer, so far as power and patronage is concerned." WEEKLY COURIER-JOURNAL (Louisville, Ky.), Dec. 5, 1849, at 2. "He may still pardon criminals[,]" said the writer, "he may still veto an act of the General Assembly if he see fit; but with these exceptions he is almost wholly shorn of power." *Id.*

### 3. *Appointment power reassigned to General Assembly by 1850 Constitution*

If the 1850 Constitution sheared the Governor of the power to appoint most state officers, to whom did Kentucky citizens grant that power?

"By article 3, section 25[22] [of the 1850 Constitution], it is provided, in substance, that the higher state officers shall be *elected,* but inferior state officers, not specially provided for, shall be appointed *or* elected." *Speed*, 60 Ky. at 211. But appointed or elected by whom?

That section retains for the People the power to elect certain constitutional officers they theretofore allowed the Governor to appoint. As for all

---

[22] In our first three constitutions, individual sections were segregated in articles designated by Roman numerals and title. The text of judicial opinions sometimes refers to a Constitution's provision by first identifying the article and then the section. At other times, the section is identified first, followed by the article. Usually, Arabic numerals rather than Roman numerals were used to identify the articles. Our current Constitution numbers the sections sequentially without regard to the topic under which the sections are grouped. However, separate divisions remain. Relevant to this dissent, the current Constitution begins with an unnumbered "Preamble," followed by the "Bill of Rights" (Sections 1 to 26), "Distributions of the Powers of Government" (Section 27, 28), "Legislative Department" (Sections 29 to 62), and after a few sections not pertinent here, there is the "Executive Department" (Section 69 to 108). Additionally, as will be touched on later as relevant, there is "Suffrage and Elections" (Sections 145 to 155).

other officers, the People empowered the General Assembly the plenary authority to decide. *Standeford v. Wingate*, 63 Ky. 440, 448 (1866) ("[A]s to all offices created by the Legislature, the Constitution has left the tenure, as well as the office, to legislative discretion, with plenary power to regulate it by 'law' . . . .").

But before further addressing this section of the 1850 Constitution, we must acknowledge three things essential to our review of this appeal.

First, section 25 from the 1850 Constitution's article III is in no way different from § 93 as adopted in 1891. *Compare* CONST. OF KY. of 1850, art. III, § 25 *with* CONST. OF KY. of 1891, § 93.[23] There is no reason our high court's opinions interpreting that 1850 constitutional provision should be ignored simply because they predate the 1890 Constitutional Convention. *Fox v. Grayson*, 317 S.W.3d 1, 17 (Ky. 2010) ("[C]ontemporaneous legislative explanation or clarification of a constitutional provision should ordinarily be given deference by a reviewing court."). What the courts and legislators and especially the 1890 Convention delegates said article III, section 25 of the 1850 Constitution meant should be heeded as we seek to define the scope of § 93.

"[T]he members of the last constitutional convention . . . were familiar with the legislative construction of the language distributing the powers of government under the former Constitution, and, so knowing, they re-enacted this

---

[23] *See* footnote 50, *infra* (comparing relevant language of these constitutional provisions).

language, and with it, of necessity, the construction which had theretofore been placed upon it." *Bullitt v. Sturgeon*, 105 S.W. 468, 472 (1907). *See Muhlenburg Cnty. v. Morehead*, 46 S.W. 484, 484–85 (Ky. 1898) (applying precedent of *Pennington v. Woolfolk*, 79 Ky. 13 (1880), that determined the constitutionality of a statute under CONST. OF KY. of 1850, art. I, §§ 1, 2 to analyze constitutionality of a similar statute under §§ 27 and 28; the same point logically applies to interpretation of § 93 as it transitioned, unchanged, from CONST. OF KY. of 1850, art. III, § 25).

Second, although both article III, section 25 and § 93 grant the enumerated power of appointment to the General Assembly,[24] neither is found in the article of their respective constitution addressing the Legislative Department. They were lodged by the People in the Executive Department articles. Expressly, intentionally, and specifically, these all but identical provisions are primarily a restriction of any general power the Governor might otherwise claim as emanating from the sections identifying that office as head of the executive branch and stating expectations that he see the laws are faithfully executed.

---

[24] As discussed, *infra*, "enumerated powers necessarily include those which are reasonably incidental and indispensable to their proper exercise and to the accomplishment of the purpose of their creation and existence and the object to be attained." *Bell Cnty. Bd. of Educ. v. Lee*, 239 Ky. 317, 39 S.W.2d 492, 494 (1931).

Third, we should take special note that the 1792 Constitution is the source for every word of the sections Appellees claim implicitly grant the Governor appointment powers—namely, §§ 27, 28, 69, 76, and 81. So, one might ask, if they are enough in themselves today as Appellees say, why was an express grant of appointment power to the Governor required in the first two constitutions? Such an express grant would be redundant if Appellees' thinking is correct.

The answer is that the language of those sections never was enough, not then and not today, and all the jurisprudence going back to the date of Kentucky's statehood explains why. For ready reference, the evolution of all the significant constitutional provisions implicated by our appellate review is illustrated by this table.

## Table 1

| Topic | Constitution | | | |
|---|---|---|---|---|
| | **1792** | **1799** | **1850** | **1891** |
| **Three distinct departments** | Art. I, §1 | Art. I, §1 | Art. I, § 1 | § 27 |
| **No department exercises power of another** | Art. I, § 2 | Art. I, § 2 | Art. I, § 2 | § 28 |
| **Supreme executive power vested in Governor** | Art. II, § 1 | Art. III, § 1 | Art. III, § 1 | § 69 |
| **Governor to appoint "all officers"** | Art. II, § 8 | Art. III, § 9 | No corollary[25] | No corollary[26] |

---

[25] In the 1850 Constitution, by virtue of article III, section 21, the Governor retained power to appoint the Secretary of State because the delegates believed "the secretary would be the confidential advisor of the governor." DEBATES (1849) 732–33 (Remarks of Mr. Archibald Dixon, delegate from Henderson). All other superior and inferior state offices were filled in accordance with article III, section 25 of the 1850 Constitution. Even that power was taken away from the Governor when Secretary of State became an elected office.

[26] Section 91 of the current Kentucky Constitution removed the Governor's power to appoint the Secretary of State found in the 1850 Constitution, article III, section 21, by making the office of Secretary of State an elected office on par with other offices of the State at Large.

| Governor's power to fill vacancies | Art. II, § 9 | Art. III, § 10 | Art. III, § 9 | § 76 |
|---|---|---|---|---|
| Governor to take care laws faithfully executed | Art. II, § 14 | Art. III, § 15 | Art. III, § 14 | § 81 |
| Inferior officers appointed/elected as per law | No corollary | No corollary | Art. III, § 25 | § 93 |

To be clear as possible, section 25 of the 1850 constitutional article on the Executive Department expressly prohibited the Governor's exercise of power he might have claimed as implicit in the 1850 Constitution's article III, section 1 ("supreme executive power," now § 69) and section 14 ("faithful execution," now § 81)—general provisions that appear nearly identically in every Kentucky constitution.[27] Understanding how these prohibitions manifested in 1849 and were reaffirmed in 1890, as discussed below, is essential to our review. The prohibitions took two forms.

The first part of article III, section 25 expressly deprived the Governor of his former authority to appoint certain state constitutional officers (*e.g.*, Treasurer, Attorney General), who have ever since been elected by the voters. CONST. OF KY. of 1850, art. III, § 25. This departed from the federal model which,

---

[27] Prior versions of the Constitution's § 69 read as follows: "The supreme executive power of this Commonwealth shall be vested in a Governor." CONST. OF KY. of 1792, art. II, § 1. "The supreme executive power of the Commonwealth shall be vested in a chief magistrate, who shall be styled the Governor of the Commonwealth of Kentucky." CONST. OF KY. of 1799, art. III, § 1. "The supreme executive power of the Commonwealth shall be vested in a chief magistrate, who shall be styled the Governor of the Commonwealth of Kentucky." CONST. OF KY. of 1850, art. III, § 1. Prior versions of the current constitution's Section 81 read as follows: "He shall take care that the laws be faithfully executed." CONST. OF KY. of 1792, art. II, § 14. He shall take care that the laws be faithfully executed." CONST. OF KY. of 1799, art. III, § 15. "He shall take care that the laws be faithfully executed." CONST. OF KY. of 1850, art. III, § 14.

to this day, empowers the President to appoint the federal counterparts to these officers upon Senate confirmation. U.S. CONST. art. II, § 2, cl. 2.

Furthermore, article III, section 25 deprived the Governor of any power to define the "duties and responsibilities" of these constitutional officers, stating such duties were thereafter to "be prescribed by law"—that is, to be determined by the General Assembly. CONST. OF KY. of 1850, art. III, § 25. The Governor exercised that power under the prior constitutions.

More relevant to the issues before us, the second part of this section removed from the Governor the enumerated powers of appointment of inferior state officers—enumerated powers he alone enjoyed under both prior constitutions.[28] In its place, article III, section 25 said, henceforth, "inferior State officers, not specially provided for in this Constitution, may be appointed or elected in such manner as shall be prescribed by law"—again, appointed or elected in such manner as the General Assembly decides. *Id.*; *Johnson v. Commonwealth ex rel. Meredith*, 165 S.W.2d 820, 828 (Ky. 1942) ("[D]efinition of 'prescribe' is 'to direct; to ordain.' It is not so narrow as to be confined to a positive order[.]"). As I discuss below, when faced in 1849 and again in 1890 with the opportunity to model the Federal Constitution and restrict the General Assembly's appointment powers by limiting the "manner" of appointing or by limiting what may be

---

[28] Again, CONST. OF KY. of 1792, art. II, § 8; CONST. OF KY. of 1799, art. III, § 9.

"prescribed," the delegates of those conventions elected not to do so. In our pre-1891 jurisprudence, there never was a question of the General Assembly's power.

Our highest court has always followed the rule of construction that "[w]henever a jurist inquires whether a State statute is consistent with the State Constitution, he looks into that Constitution, not for a grant, but only for some limitation of the power inherent in the people's legislative organ so far as not forbidden by their organic law." *Griswold v. Hepburn*, 63 Ky. 20, 24 (1865), *aff'd*, 75 U.S. 603, 19 L. Ed. 513 (1869).

For example, when confronted with a statute designating the manner of electing a municipal office, the jurists of the former Court of Appeals addressed the "failure to make *specific* provision in the constitution" for the legislative authority to determine how that office was to be filled. *Buckner v. Gordon*, 81 Ky. 665, 670 (1884) (emphasis added). The Court said specific authority was unnecessary under the rule just stated. Accounting for the various constitutional provisions granting appointment powers to the General Assembly (all of which were readopted in similar form in 1891), the Court said:

> These provisions of the constitution present a complete corps of officers for the administration of the State government, executive, legislative, judicial, and ministerial, designated in the constitution and provided for by legislative action . . . . [F]ailure to make specific provision in the constitution for [specific officers] clearly shows the *intention of the framers of the constitution to leave all these matters to the legislative will*.

*Id.* (emphasis added). That is, the Court found no restriction on the General Assembly's plenary power of appointment, certainly not in the nearly identical predecessors to the constitutional sections upon which Appellees rely.

*Buckner v. Gordon*, *supra*, was not a difficult decision. The Court had already concluded not only that the Constitution granted the General Assembly the power to create such offices and establish the manner in which they are to be filled, the Court held the General Assembly could change that entire statutory scheme just by amending the statute. *Smith v. Commonwealth*, 71 Ky. 108, 112–13 (1871). *See also Allen v. Hollingsworth*, 56 S.W.2d 530, 531 (Ky. 1933) ("Apart from restraints of the organic law, the Legislature has plenary powers in respect to the establishment and regulation of the government of municipalities[.]").

Without question, the powers of appointment originally enjoyed by the Governor under the first two constitutions have been reassigned since 1850 as enumerated powers of the General Assembly with plenary authority to exercise them. *Bell Cnty. Bd. of Educ. v. Lee*, 39 S.W.2d 492, 494 (Ky. 1931) ("[E]numerated powers necessarily include those which are reasonably incidental and indispensable to their proper exercise and to the accomplishment of the purpose of their creation and existence and the object to be attained.").

Furthermore, "'Plenary power in the legislature for all purposes of civil government is the rule,' with uncontrolled authority in making the laws within

the limits of the constitution." *Commonwealth v. Whipps*, 80 Ky. 269, 279 (1882) (quoting THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 88 (1874)[29] [hereinafter CONSTITUTIONAL LIMITATIONS]). As I discuss below, nothing happened at the 1890 Constitutional Convention to change these parts of our Constitution, and these principles remain the organic law and rules of construction to this day.

The COURIER-JOURNAL was right in 1849—when it came to appointing constitutional and inferior State officers and filling vacancies, the Governor was "wholly shorn of power." That begs a question: Did the 1890 Constitutional Convention delegates restore the powers of appointment, removal, and broader vacancy-filling the Governor enjoyed before 1850? If the circuit court's decision in the instant appeal is to be affirmed, we would have to answer in the affirmative. But that clearly is not what happened.

### 4. *Why the 1890 Constitutional Convention was called*

Here is a good place to call out Appellees' representation that the 1890 Constitutional Convention was called "to restore the separation of powers"

---

[29] Cooley was quoting *People ex rel. Wood v. Draper*, 15 N.Y. 532, 543 (1857), which says in full:

> Plenary power in the legislature for all purposes of civil government is the rule. A prohibition to exercise a particular power is an exception. In inquiring, therefore, whether a given statute is constitutional, it is for those who question its validity to show that it is forbidden.

and "[t]his resulted in Sections 27 and 28 of the Kentucky Constitution."

(Appellees' brief, pp. 11–12; Complaint, ¶ 41). Of course, this is wrong. These provisions are so basic to our form of government they were included in each of our constitutions and the records show they never were a point of debate.

But just how wrong are Appellees? Part owner and editor of the COURIER-JOURNAL and famed journalist in his own right, Henry Watterson,[30] tells us. Watterson "had been eager, even militant, for the [1890] convention" but, as it was coming to an end, he lamented:

> The convention, in fact, has ignored almost entirely the distinctions between the three departments, executive, judicial and legislative. . . . [I]t has failed to mark distinctly the divisions of the three departments of State. Only in the last few weeks was the fact brought to the attention of the convention that it has omitted the ordinary declaration to the effect that the government should be divided into three departments. Without debate that clause [§ 27, along with § 28] was inserted, but through all its deliberations the convention has ignored this principle . . . .

HAMBLETON TAPP AND JAMES C. KLOTTER,[31] KENTUCKY: DECADES OF DISCORD, 1865–1900 266 (1977) [hereinafter DECADES] (quoting COURIER-JOURNAL (Louisville), Apr. 11, 1891). The provisions now contained in § 27 and § 28 were

---

[30] Watterson "personified the best . . . of Kentucky journalism in the nineteenth century." HAMBLETON TAPP AND JAMES C. KLOTTER, KENTUCKY: DECADES OF DISCORD, 1865–1900 266 (1977) [hereinafter DECADES] (footnote omitted).

[31] James Klotter has served as Kentucky's State historian since 1980. This work by Klotter and Tapp was recommended reading in *LRC v. Brown*, although the Court misstates the title as covering the years 1865-1906 instead of 1865-1900. *Brown*, 664 S.W.2d at 922 n.20.

so taken for granted—the concept of a tripartite republican form of government so taken for granted—they were nearly overlooked.  Kentucky was that close to following the federal lead and leaving them out altogether.

I do not dispute Appellees' assertion that some "delegates to the Constitutional Convention [of 1890] sought to 'curb the power of the General Assembly[.]'"  (Appellees' brief, p. 11) (quoting *LRC v. Brown*, 664 S.W.2d at 912).  But that oversimplifies the issue and ignores that many efforts to limit that power failed, including in an area touched upon by the issues in this case—the creation of offices and boards.

When Delegate J. M. Wood[32] proposed an amendment to what is now § 23 to limit the General Assembly's authority to create new offices of indefinite duration, he suggested that, in this area, "[i]t is the desire of a great many people that there should be some limitation put on the Legislature."  I DEBATES (1890) 1009 (Remarks of Mr. Wood).  There was but one response:  "I hope the amendment will not be adopted.  This power should be vested in the Legislature[,]" said the delegate from Warren County.  *Id.* (Remarks of Mr. Rodes).[33]  "I think it

_____

[32] J. M. Wood (d. 1901), delegate from Green and Taylor Counties, was a lawyer and served in the Kentucky General Assembly.  In 1899, he was an unsuccessful candidate for Governor. HARTFORD HERALD (Hartford, Ky.), Dec. 22, 1897, p. 3; ADAIR COUNTY NEWS (Columbia, Ky.), Sep. 11, 1901, p. 4.

[33] Robert Rodes (1824-1913), delegate from Warren County, was a Centre College graduate and lawyer who served in the Kentucky General Assembly 1853-1854.  GENERAL CATALOGUE OF THE CENTRE COLLEGE OF KENTUCKY 32 (1890).

-60-

can be safely left with the Legislature." *Id.* Wood's amendment was rejected by voice vote. I DEBATES (1890) 1009 ("Upon a vote, the amendment was rejected.").

It seems the further removed from those events of 1890 the more congealed is the narrative that the Convention was about one issue—taming a tyrannical legislature. If that is not outrightly false, it certainly is incomplete in its truth. But how did we come to embrace the idea of a single-issue convention?

This congealing might have begun in 1977 when the Supreme Court's researchers of the 1890 Constitutional Convention Debates turned to a simple 1971 public information pamphlet prepared by a Legislative Research Commission worker who got it wrong. *Fiscal Court of Jefferson Cnty. v. City of Louisville*, 559 S.W.2d 478, 480 n.1 (Ky. 1977) (quoting "Constitution of the Comm. of Ky. L.R.C. Info. Bull. # 59 (1971) at vii."). Citing no authority on this point but a nameless state employee who misquoted a nameless delegate without context, the Supreme Court said it:

> [wa]s convinced that the debates indicate that most of the delegates felt that the root of Kentucky governmental problems was the almost unlimited power of the General Assembly. One of the delegates said: "The principal if not the sole purpose of the constitution we are here to frame is to restrain its (*the legislature's*) will and restrict its authority."

*Id.* (emphasis added). We should all be surprised our highest court could be so easily convinced of something so important as this by the single sampling of a

single anonymous voice. Whether the Court or the pamphleteer added this emphasized phrase in the parenthetical, "(*the legislature's*)," I do not know. But if the Court had researched for itself, it would have discovered even the voice of that one delegate, anonymous to the Court then, did not urge a restraint of the legislature, but of government itself.

The delegate to whom the pamphleteer attributes this quote was speaking of the power of state government, not simply the power of the legislature. I DEBATES (1890) 462 (Remarks of Mr. Knott).[34] The debate was over the wording of the Constitution's Preamble. *Id.* at 461. Delegate Proctor Knott, a former governor, offered a criticism of the language used, "however immaterial it may appear[,]" taking exception to the Preamble's use of the term "free government." *Id.* He said, although frequently used "in political and juridical literature, it is, nevertheless, an inapt expression[.]" *Id.*

Mr. Knott's actual sentiment is certainly not what the Court in *Fiscal Court of Jefferson County* represented. He actually said:

> The very word government implies restraint. To apply [the phrase "free government"] to the agency organized by a free people to regulate their public affairs, would be manifestly improper, for the simple reason that the

---

[34] James Proctor Knott (1830-1911), delegate Marion, was born there but entered politics in Missouri where he served in the Missouri House of Representatives (1857-1859) and as attorney general (1859-1862). Returning to Marion County, he served Kentucky in the U.S. House of Representatives (1867-1871, 1875-1883), as Governor (1883-1887), as the assistant attorney general (1887-1888), and Dean of Centre College Law School (1894-1901). James Proctor Knott - National Governors Association: https://www.nga.org/governor/james-proctor-knott/.

> principal, if not the sole purpose of the Constitution which we are here to frame, is to restrain its [*government's*] will and restrict its authority . . . .

*Id.* The Supreme Court erroneously, and I must presume mistakenly because of the ridiculously superficial nature of its research, changed the delegate's meaning from a basic, universally accepted description of limited government to a disparagement of just one of its branches. Mistakes like these in opinions of such magnitude are consequential and cannot be left unnoticed or uncorrected.[35] They carry over to future opinions, like *LRC v. Brown*.

Some historians say the 1890 Convention was called to "control legislative excesses[.]" Sheryl G. Snyder & Robert M. Ireland,[36] *The Separation of Governmental Powers under the Constitution of Kentucky: A Legal and Historical Analysis of* L.R.C. v. Brown, 73 KY. L.J. 165, 167 (1984) [hereinafter Snyder & Ireland, *Analysis*]. But even they are quick to note the problem was not the result of a power grab unique to Kentucky's legislature. It was "a national problem" that

---

[35] Mr. Knott's speech spans twelve (12) pages and takes forty-five (45) minutes to read aloud. 1 DEBATES (1890) 461–73. In candor, he does take the General Assembly to task for its penchant for special legislation. On the other hand, he wanted to further empower the General Assembly by making every "franchise be revocable at the will of the Legislature" because he believed "this country has groaned under the rule established in the Dartmouth College case," *Trs. of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518 (1819), calling it a "false principle" that every charter granted by a state is a contract protected against state government impairment by the Constitution, U.S. CONST. art. I, § 10, cl. 1. 1 DEBATES (1890) 472 (Remarks of Mr. Knott).

[36] Mr. Snyder was counsel for the appellees in *LRC v. Brown*. Dr. Ireland, "[a] noted Kentucky constitutional historian[,]" testified in the case before the circuit court. *Brown*, 664 S.W.2d at 912.

evolved independently in many state legislatures as a political temptation—

"preoccupation with local and private matters[.]" *Id.* at 168. *See, e.g.*, *State v.*

*Circuit Court of Gloucester Cnty.*, 15 A. 272, 294 (N.J. 1888) ("constitutional

provisions in reference to special legislation are of comparatively recent growth,

and the adjudications on the point now involved are not numerous" (Reed, J.,

dissenting)); *Sample v. City of Pittsburg*, 62 A. 201, 206 (Pa. 1905) (Before 1874,

"there was practically no constitutional restraint on the power of the General

Assembly to enact local or special legislation."). It was originally understood that

"[s]pecial or private acts are rather exceptions than rules, being those which only

operate upon particular persons and private concerns." *Cabell v. Cabell's Adm'r*,

58 Ky. 319, 328 (1858) (quoting "Blackstone (1st vol., 86)"). In the nineteenth

century, they became far more common than Blackstone envisioned.

This legislative preoccupation is easy to explain. Passing special

legislation local to a voting district benefitted the incumbent legislative candidate.

Said one Kentucky delegate, "the power of the General Assembly to pass local or

special bills, which influence their political prospects, should be curtailed[.]" IV

DEBATES (1890) 4816 (Remarks of Mr. McDermott).[37] That problem became very

specific to Kentucky in the legislative session of 1889-90, just before the call of the

---

[37] Edward J. McDermott (1852-1926), lawyer and delegate from Louisville, began serving in the Kentucky General Assembly in 1880 and was elected Lieutenant Governor in 1911. G. GLENN CLIFT, GOVERNORS OF KENTUCKY, 1792-1942, at 235–36 (1942) (hereinafter GOVERNORS).

1890 Convention. DECADES 264.[38] But to suggest even a concern for special legislation was the primary reason for the 1890 Convention is a bit myopic.

Unlike the 1849 Constitutional Convention with its clear and nearly singular purpose to curtail the power of the chief executive magistrate, the 1890 Constitutional Convention was called for a host of reasons, not the least of which was to address Kentucky's constitutional provision still purporting to protect the institution of slavery—it violated the Federal Constitution in that regard for a quarter century. Other matters such as "revising the judicial system were felt by many to necessitate the calling of a convention." DECADES 258. A leading delegate from Louisville gave us as good and comprehensive an explanation as any why the Convention was called when he told us, "The experience of forty years gathered from the unparalleled changes in political and social life in this country, rendered many alterations in and additions to the Constitution not only important,

---

[38] According to these authors:

> One of the new provisions of which the convention delegates [of current and future legislators] seemed most proud was that prohibiting local, or special legislation. Because of the abuses of the 1889-90 Assembly, the delegates knew this relief to be timely. That assembly, sitting 149 days, had passed local legislation, covering 4,893 pages of legislative record, including index, at a cost in printing alone of $17,000, and in other respects its expenditures were $151,000.

> The average time and cost of the four preceding legislatures had been little different. The new instrument [1891 Constitution] prohibits special laws on a large number of subjects, and in all cases where general laws can govern, and limits the legislature to a 60 days' session.

DECADES 264 (footnotes omitted).

but absolutely essential for good government." IV DEBATES (1890) 5566

(Remarks of Mr. Young).[39]  That is a good reason to revisit the Constitution.

The Convention's subcommittees created to tackle those political and

social issues hint at its breadth of purpose.  *Rouse v. Johnson*, 28 S.W.2d 745, 748

(Ky. 1930) ("[T]here were divers and sundry committees appointed by it as a

necessary agency to its proper and appropriate functioning[.]").  Separate

committees addressed Education, Railroads, Corporations, Charities, Revenue and

Taxation, Suffrage and Elections, and even the Location of the Capital among

other topics.  I DEBATES (1890) 131–33.

To support their position that the primary purpose of the Convention

was to rein in the General Assembly, both Snyder & Ireland in their article, and the

Court in *LRC v. Brown*, quote the remarks of Henry County delegate to the 1890

Convention, John D. Carroll.[40]  Snyder & Ireland, *Analysis*, at 167; 664 S.W.2d at

---

[39] Bennett H. Young (1843-1919), lawyer and delegate from Louisville's Fourth District, understood "unparalleled changes" on a personal level.  Born and raised in Nicholasville, Young rode with John Hunt Morgan's raiders as a private, became an officer, and led the Confederate attack on St. Albans, Vermont, on October 19, 1864.  Excluded from President Andrew Johnson's amnesty proclamation and unable to return home until 1868, he spent time studying law and literature in Ireland at the Queen's University of Ireland and the University of Edinburgh.  He returned to Louisville and became a prominent attorney and civic leader.  After the 1890 Constitutional Convention, he befriended an ex-slave, George Dinning, and represented him in his federal civil rights lawsuit against leaders of the Ku Klux Klan, winning a $50,000 judgment.  Ben Montgomery, *A Shot in the Moonlight:  How a Freed Slave and a Confederate Soldier Fought for Justice in the Jim Crow South* 109–19, 176–214 (2021).  *See also Dinning v. Conn's Adm'r*, 99 S.W. 914 (Ky. 1907).

[40] John D. Carroll (1854-1927), delegate from Henry County, served in the Kentucky General Assembly from 1881 to 1884.  In late 1891, immediately after the Constitutional Convention,

912. But, after looking a little closer, I conclude the quote does not support the thesis of either those authors or the Court.

Delegates' remarks, such as Carroll's, were always made in the context of debate, not in isolation. Neither the article nor *LRC v. Brown* gives us any context, but they should have. If they had, they might have been prompted to find a quote that actually supports their view.

Carroll was arguing his own motion, and that motion was not for less power in the General Assembly but for more power in the Governor—he was arguing for a stronger, nearly override-proof veto power. I DEBATES (1890) 1478 (Mr. Carroll's motion to amend section 21); 1481–83 (Remarks of Mr. Carroll). Perhaps this was Carroll's backhanded effort to curb special legislation. I DEBATES (1890) 603 (Remarks of Mr. Bourland).[41] But his effort was not well received. His motion was strongly opposed, and the opposition was met with rare

---

Governor John Y. Brown appointed him to compile and edit the statutes of Kentucky which, for many years, were known as Carroll's Code. He was appointed the first Commissioner of the Kentucky Court of Appeals in 1906 by Governor J. C. W. Beckham. A year later, Governor Beckham appointed Carroll to fill a judicial vacancy on the Court of Appeals where he served until 1920 after unsuccessfully seeking the Democratic nomination for Governor. PROCEEDINGS OF THE TWENTY-SIXTH ANNUAL MEETING OF THE KENTUCKY STATE BAR ASSOCIATION 109–10 (1927).

[41] Harvey R. Bourland (c. 1835-1900), delegate from Hopkins County, said: "I hold in my hand a volume of 112 pages, and it is composed almost exclusively of veto messages from the Chief Executive of the Commonwealth of Kentucky at the 1888-9 session of the Legislature. . . . A large majority of the veto messages are of bills that were passed by the Legislature of the State granting special and exclusive privileges to some corporation, or exempting from taxation their property . . . ." 1 DEBATES (1890) 603. Bourland was an unsuccessful candidate for the Fifty-Second Congress running as the "Alliance candidate." W. H. Michael, *Fifty-Second Congress, Official Congressional Directory* 48 (2nd ed. 1892).

applause. "[T]he veto power of the Governor, as it now stands, is a very considerable protection[,]" said Henderson County Delegate H. H. Farmer, "and the members of this Convention and people of the State will sustain me, I hope, in that opinion. (Applause.)" *Id.* at 1483–84 (Remarks of Mr. Farmer). Delegate Carroll's motion was roundly defeated. *Id.* at 1490 (motion defeated: Yeas–12, Nays–75, Absent–13). If curbing the legislature was Carroll's goal, empowering the Governor was not going to be the means to get there.

*LRC v. Brown* also quotes a second delegate, again without context, to support the Supreme Court's notion that the 1890 Convention was called to cure the General Assembly's supposed usurpation of power. The Court said, "According to delegate J. F. Askew,[42] there was a great necessity to 'reform the legislative department. . . .' *Id.* [indicating citation to I DEBATES (1890)[43]] at 3821." 664 S.W.2d at 912. The Supreme Court's research failed it.

If the Supreme Court Justices had read this part of the DEBATES, they would have learned Askew's reason for speaking was distinctly *not* his belief the legislature was corrupt. As explained below, Askew's accusation, one he even hesitated to make, was that the legislators were incompetent. He expressly

---

[42] James F. Askew (1844-1919), delegate from Scott and another former Confederate, served in John Hunt Morgan's command. He studied law at Transylvania University and served as a master commissioner and judge for Scott County. BOURBON NEWS (Paris, Ky.), Feb. 7, 1919, at 9.

[43] The proper cite is to Volume III of the DEBATES, not to Volume I, as indicated here by the opinion author's use of "*id.*"

*rejected* the suggestion they were corrupt. Furthermore, if the Justices had read the Debates, they would have learned Askew was not even expressing his own concern, but that of a colleague back home.[44]

The issue Askew eventually participated in debating was a recommendation by the Committee on the Legislative Department to reduce the number of representatives from 100 to 60. III DEBATES (1890) 3107, 3801–39. The committee's rationale was two-fold: (1) electing fewer representatives saves money; and (2) an individual representing a larger district, "of necessity, must have that intelligence which extends far beyond the little partisan and local views that often characterize the gentlemen of the Lower House[.]" *Id.* at 3814 (Remarks of L. T. Moore, delegate from Boyd and Lawrence). Reducing the number of representatives broadens their constituency and, so goes this thinking, improves their competency.

Delegates differed on this logic but were uniform in their belief that the quality and competency of Kentucky's representatives was lacking as a whole. A delegate from Fayette, Philip P. Johnston, did not agree with the logic of reducing the number of representatives as a cure. "[T]he trouble has not been in

---

[44] Snyder & Ireland did correct the Supreme Court's mistake of attribution. Snyder & Ireland, *Analysis* 167.

the number[,]" said Johnston. *Id.* at 3808 (Remarks of Mr. Johnston).[45] "It has been the lack of experience and the want of familiarity with the character of the work to be done." *Id.* Other delegates focused on saving money. One said it would save "from $40,000 to $60,000 every year by the reduction which they propose[.]" *Id.* at 3815 (Remarks of Mr. Moore). Another found that sum preposterous. He calculated the math out loud before sarcastically reporting the savings of "the enormous sum of $20 a day . . . . I am surprised at such proposed economy[,]" he said; "We must not worship a dollar." *Id.* at 3818 (Remarks of Mr. Young). That is when Askew was motivated to speak up. He wanted to return the conversation to the source problem.

Askew said he "had not intended to take any part in this discussion" because he "never had the pleasure of being in the Legislature[.]" *Id.* at 3820, 3821 (Remarks of Mr. Askew). But he was "urged by an irresistible impulse, to reply." *Id.* He was not concerned about saving money. The delegates had already approved prohibitions on most local and special legislation and, "local legislation being cut off to a great extent, the sessions will not be long, and hence not

---

[45] Philip Preston Johnston (1840-1925), delegate from Fayette, was a former Confederate officer who, after the Civil War, studied law in Lexington, becoming city attorney and eventually state Senator. He served as County Judge until elected to Kentucky's House of Representatives. In 1908, the Governor appointed him Adjutant General where he reformed the Kentucky National Guard. 3 CHARLES KERR, ED., WILLIAM ELSEY CONNELLEY & E.M. COULTER, HISTORY OF KENTUCKY 352 (1922) (hereinafter KENTUCKY).

expensive."[46]  *Id.* at 3821 (Remarks of Mr. Askew).  "[T]his money saving is a fair and legitimate argument[,]" he said.  *Id.*  But his purpose in speaking lay in doing something about the poor quality of representation and the only way, he believed, was by decreasing the number of representatives.

"[T]hink of the men we send to Congress [whose districts are far larger than that of state representatives]," he said, "and then of those who too frequently fill this hall. . . .  Something must be done."  *Id.*  Askew was passing on the sentiment and passion of a colleague back home.  Calling him "[o]ne of the most distinguished men of my acquaintance," Askew was referring:

> to the Hon. Wm. C. Owens[47]—[who] said to me, after my election to this body:
>
> "I do not care what you do; every reform you attempt will turn to ashes in your hands unless you do something to reform the Legislative Department.  *You must raise the standard*, even if you are compelled somewhat to reduce numbers.  It is the only suggestion I care to make, being the only matter that has given me great concern."

*Id.* at 3821 (emphasis added) (Remarks of Mr. Askew, quoting Owens).  It was Owens who spoke the words *LRC v. Brown* erringly attributes to Askew.

---

[46] The convention had yet to adopt the 60-day limit on legislative sessions.

[47] William C. Owens (1849-1925) was not a convention delegate.  He served in the Kentucky House, 1877-87, and the United States House of Representatives, 1895-97.  Biographical Directory of the U.S. Congress, William C. Owens:  https://bioguide.congress.gov/search/bio/O000161.

Owens told Askew that, if it can, the Convention must contrive a means by which to attract better qualified candidates to run for the legislature. *LRC v. Brown* attributes a different, and inaccurate, meaning to the quote.

*LRC v. Brown* more than insinuates that state representatives were not so much unqualified or incompetent as they were corrupt politicians "dominated by a few, powerful special interests who wielded that power for their own benefit." 664 S.W.2d at 912. Notably, the Anderson County delegate, Thomas H. Hanks, levied the very same charge against Askew and received a swift rebuke.

Hanks accused Askew of telling the Convention that "Mr. Owens had said the Legislatures were corrupt, and when asked by the delegate from Boone—" III DEBATES at 3827 (Remarks of Mr. Hanks, delegate from Anderson). Askew refused to let Hanks finish, breaking decorum and directing his response to Hanks personally and not the Chair, saying, "You make a mistake when you put those words in my mouth." *Id.* (Remarks of Mr. Askew). Because the Court in *LRC v. Brown* did not read Askew's comments in context, they made the same mistake Hanks made, putting false words in Askew's mouth and perpetuating the story that the 1890 Constitutional Convention was held to end legislative corruption.

Not surprisingly then, our Supreme Court "has on many occasions recognized the need to curtail special legislation as the primary reason for the 1891 Constitution." *Zuckerman v. Bevin*, 565 S.W.3d 580, 589 (Ky. 2018) (citations

omitted). But my research convinces me that has never been the whole truth. I offer two examples in which, with the opportunity to put restrictions on the plenary authority of the General Assembly, the delegates declined to do so.

In the area of spending authority, the General Assembly's power was not lessened. After adoption of the new Constitution, the Kentucky Auditor challenged the General Assembly's funding for the World's Columbian Exposition to the tune of $100,000 as unconstitutional. *Norman v. Ky. Bd. of Mgrs. of World's Columbian Exposition*, 20 S.W. 901, 905 (Ky. 1892) ("Section 230 of our new constitution, however, says: 'No money shall be drawn from the state treasury except in pursuance of appropriations made by law[.]'"). The Court rejected the challenge, noting "[i]t was done in 1876 for the Centennial Exposition at Philadelphia, and later for the one at New Orleans." *Id.* at 902. These expositions were "well known to the framers of our present constitution, adopted in 1891; and, had it been intended to forbid the exercise of the power by the legislature for such purposes, it would no doubt have been done, in unmistakable terms." *Id.*

The same is so in the area of education. Although some believed "[t]he cause of public education had suffered at the hands of some of the previous Legislatures[,]" *Agric. & Mech. Coll. v. Hager*, 87 S.W. 1125, 1127 (Ky. 1905), "[n]o one dreamed when a new Constitution came to be framed, in 1891, that the commonwealth had tired in her efforts to furnish the best system her resources

could provide for the education of the youth of the state, or intended to take a step backward." *Id.* When a taxpayer challenged the constitutionality of a 1906 law to establish a system of normal schools, the Court rejected it saying nothing in § 184, dealing with school taxes and common school funding, "or any other part of the Constitution militates against the power of the Legislature to [establish this system of education] as may be thought proper." *Marsee v. Hager*, 101 S.W. 882, 884 (Ky. 1907). No one will contend, said the Court, "that the Legislature lacks the power of making any appropriation it sees fit . . . . [T]he Legislature was left free to continue, and, indeed, they were in terms continued by the Constitution itself, till such time as it might be 'changed by law.'" *Id.*

I am convinced it is a myth that the 1890 Constitutional Convention was called primarily to restrain the General Assembly. That myth impacted our constitutional jurisprudence and jurists should purge the idea from their thinking.

However, we need not entirely refute that orthodoxy here. The focus of this appeal is the appointment power of the Executive Department vis-à-vis that of the Legislative Department. Given the 1850 shearing of that power from the Governor, it is far more important to determine whether one of the purposes of the 1890 Convention, and more importantly one of its accomplishments, was to restore that power. For the purpose of this dissent, I can demonstrate, definitively I believe, that it was not called to restore the Governor's powers of appointment.

## 5. *1890 constitution does not restore Governor's appointment powers*

The Convention was not called to restore the Governor's powers to appoint or remove government officers, or to fill vacancies. More importantly, that was not a Convention outcome. "In other words," said one delegate, "we have refused to invest the Governor with the appointment of all inferior officers throughout the State. . . . [P]recisely as provided in the present Constitution [of 1850], which uses the terms, 'inferior officers,' . . . it is left to the Legislature to prescribe the manner in which they shall be appointed . . . ." II DEBATES (1890) 1811 (Remarks of Mr. Washington[48]).

What is clear from all we know, including scholars' and jurists' best guesses as to why the 1890 Convention was convened, is that there is no evidence whatsoever to support the claim it was called to restore the appointive and related powers of the Governor, and it is more certain that the office of Governor emerged weaker from the 1890 Convention.

Thirty-five years after adoption of the current Constitution, our former Court of Appeals neatly summarized what "is known from the history of our state" about the Governor's powers generally. *Votteler v. Fields*, 23 S.W.2d 588, 590 (Ky. 1926). The Court said, "Prior to the adoption of the Constitution of 1850, great power lay with the Governor, for in him was the appointment of a host of

---

[48] George Washington, Jr. (1843-1905), attorney and 1890 delegate from Campbell County.

officials of the state. . . .  By the instrument then adopted," said the Court, "the

Governor was shorn of a great deal of the power he had theretofore enjoyed and

*much of it has never been restored to him*" and what has been restored was restored

only by legislative grace.  *Id.* at 590 (emphasis added) (addressing appointments

and removals at Pharmacy Board).

It is a fact, however, that one man made a valiant effort to restore the

Governor's appointment powers.  For all his influence, he did not move the needle.

The 1890 Constitutional Convention had a formidable advocate for

restoring to the Governor the broader powers that office once enjoyed, especially

the appointment powers Appellees now claim.  That advocate was the delegate

from Hart County, Simon Bolivar Buckner.  Besides being seated as a delegate to

the Convention, he was concurrently serving as Governor.

Governor Buckner began his quixotic campaign by offering

resolutions to restore the pre-1850 Constitution gubernatorial appointment powers.

I DEBATES (1890) 205–06.  Those resolutions, intended for consideration by the

Committee on the Executive Department, proposed a slightly watered-down

version of the Governor's appointment and related powers found in the 1792 and

1799 constitutions that were removed in 1850.  *Compare* I DEBATES (1890) 206

(Remarks of Mr. Buckner) *with* CONST. OF KY. of 1799, art. III, § 9.[49]  The

Committee rejected Buckner's proposals, and so did the Convention delegates.

Instead, the committee recommended, and the Convention adopted,

nearly verbatim, the language of article III, section 25 of the 1850 Constitution,

and that became § 93.  *Compare* CONST. OF KY. of 1850, art. III, § 25 *with* CONST.

OF KY. of 1891, § 93.[50]  Both the 1850 and 1891 versions grant to the legislature

plenary power to determine how inferior state officers are appointed or elected.

---

[49] Buckner's proposal would have empowered the Governor as follows:

> The Governor shall nominate, and, by and with the consent of two-thirds of the Senate, shall appoint a Secretary of State, an Attorney General, a Treasurer, and a Superintendent of Public Instruction at pleasure, and such other officers of the Commonwealth as he is or may be authorized by the Constitution or by the law to appoint.

I DEBATES (1890) 206.  The relevant section of the 1799 Constitution, in pertinent part, says:

> He shall nominate, and by and with the advice and consent of the Senate, appoint all officers, whose offices are established by this Constitution, or shall be established by law, and whose appointments are not herein otherwise provided for . . . .

CONST. OF KY. of 1799, art. III, § 9.

[50] That portion of CONST. OF KY. of 1850, art. III, § 25 says:  "inferior State officers, not specially provided for in this Constitution, may be appointed or elected in such manner as shall be prescribed by law, for a term not exceeding four years."  That portion of CONST. OF KY. of 1891, § 93 says: "Inferior State officers, not specifically provided for in this Constitution, may be appointed or elected, in such manner as may be prescribed by law, for a term not exceeding four years, and until their successors are appointed or elected and qualified."  In 1992, this portion of Section 93 was amended, increasing the scope of the General Assembly's appointment powers, as follows: "Inferior State officers and members of boards and commissions, not specifically provided for in this Constitution, may be appointed or elected, in such manner as may be prescribed by law, which may include a requirement of consent by the Senate, for a term not exceeding four years, and until their successors are appointed or elected and qualified."  1992 Ky. Acts ch. 168, § 12 (S.B. 226).

And, as if maintaining the 1850 restrictions on the Governor's powers of appointment was not enough, the 1890 Convention delegates took away the Governor's token authority to appoint the Secretary of State that remained under the 1850 Constitution, article III, section 21, by making the office of Secretary of State an elected office on par with other offices of the State at Large. CONST. OF KY. of 1891, § 91; I DEBATES (1890) 1056–57.

And there is still more indication that the 1890 delegates had no intention of reinstating the Governor's appointment, removal, and broader vacancy-filling powers. When the Convention's Revisory Committee[51] examined a new section proposed to be added to the Constitution and discovered it might unintentionally grant appointment powers to the Governor, the Convention removed it.[52] The Revisory Committee "found that section 76[53] was in direct conflict with the latter clause of section 96"[54]—that is, it conflicted with article

---

[51] "The convention met in September, 1890, and having in April, 1891, completed a draft of a constitution, . . . submitted it to a popular vote, and then adjourned until September . . . . [Upon reconvening,] the delegates, moved no doubt by patriotic impulse, made numerous changes in the instrument . . . and, as thus amended, it was promulgated by the convention on September 28, 1891, as the constitution of the state." *Miller v. Johnson*, 18 S.W. 522, 522 (Ky. 1892).

[52] The date this section was removed was September 11, 1891, a month or so after the popular vote to approve the original version of the Constitution.

[53] Each Committee sequentially numbered the proposed sections of the article it was tasked with revising. This "section 76" does not correlate to the current constitution's § 76 and, as noted, did not survive the Convention. What became § 76 began as "section 79." IV DEBATES (1890) 5578.

[54] *See* footnote 53, *supra*. The Committee's section 96, after removing lower numbered sections, was renumbered as § 93.

III, section 25 of the 1850 Constitution and, therefore, with what "section 96" would become—our current Constitution's § 93. IV DEBATES (1890) 5728 (Remarks of Mr. Bronston).[55] As initially proposed and as Mr. Bronston explained, those sections then read as follows:

> Section 76. He [the Governor] shall appoint, with the advice and consent of the Senate, all State officers who are not required by this Constitution, or the laws made thereunder, to be elected by the people.
>
> The latter clause of section 96 reads:
>
> Inferior State officers, not specifically provided for in this Constitution, may be appointed or elected, in such manner as may be prescribed by law, for a term not exceeding four years.

*Id.* The committee that prepared this section 76 explained the thinking behind it; they "thought [it] important to allow the Governor to appoint the Librarian. It was not understood at that time that the appointing power should be extended to any other office save that." *Id. See also Kraus v. Ky. State Senate*, 872 S.W.2d 433, 438 (Ky. 1993), *as modified on reh'g* (Mar. 24, 1994) ("Section 76 of the Kentucky Constitution was changed[56] in 1890 [sic, 1891] . . . to eliminate any

---

[55] Charles Jacob Bronston, Jr (1882-1961), delegate and respected lawyer from Lexington, served as Commonwealth's Attorney (1879-1895), and in the Kentucky Senate (1896-1900).

[56] The *Kraus* Court obviously did not understand that the section numbered "76" at that time was not the section we know by that number in the current Kentucky Constitution. When the delegates were debating "section 76," the provision we now know as § 76 was actually numbered "§ 79." *See*, footnote 53, *supra*. The original § 76 was simply deleted entirely and not "changed."

possible conflict with what was to become Section 93 of the same constitution.").

The Committee was concerned the courts would construe the original section 76

too broadly, and that:

> would allow the Governor to appoint, not only the Librarian, but the Commissioner of Insurance and the Reporter of the Court of Appeals, and other subordinate officers . . . and it would disturb that *settled principle* which, we believe, has been approved by the people, that *as to all these subordinates it should be left to the power of the General Assembly to say whether they should be elected or appointed, and if not elected by the people, by whom they should be appointed.*

IV DEBATES (1890) 5728 (Remarks of Mr. Bronston) (emphasis added). The

Convention delegates agreed. They struck the section entirely. *Id.*

But Governor Buckner had even more fruitless ideas to restore power

to the office of the Governor. By means of another resolution, he asked the

Committee on the Executive Department to consider recommending a power

Appellees believe exists today[57]—that "[t]he Governor shall have power to remove

any officer whom he may appoint, in case of incompetency, neglect of duty, or

malfeasance in office; and he may declare his office vacant, and fill the same . . . ."

---

[57] As addressed, *infra*, Appellees cite North Carolina court opinions deciding the constitutionality of North Carolina statutes under the North Carolina Constitution as supportive of their argument that the Governor must have power to remove inferior officers he appoints as a means of fulfilling his constitutional duty under § 81 to ensure the laws are faithfully executed. (Appellees' brief, pp. 21–24, 28–29 (quoting *North Carolina v. Berger*, 781 S.E.2d 248, 257 (N.C. 2016) ("[C]ontrol that the Governor has . . . depends on his ability to appoint the commissioners . . . and *to remove them* from office." (emphasis added); Record (R.) at 999 ("The Court is persuaded by the analysis in *State v. Berger* . . . .")). As discussed below, it does not persuade me.

I DEBATES (1890) 205 (Remarks of Mr. Buckner). The Committee took the Governor's proposal under advisement.

Two months later during the Convention, presumably having considered Governor Buckner's resolution, the Committee on the Executive Department gave its report and Buckner's proposal was not included. I DEBATES (1890) 1458 (report of Committee on the Executive Department). Instead, the committee moved for a routine re-adoption of the general power that had appeared in the 1792, 1799, and 1850 Constitutions, and what would become the current § 81, and which has forever stated: "He shall take care to see that the laws are faithfully executed." *Id.* Because the committee report served as a motion not requiring a second under parliamentary procedures, it was ready for an immediate voice vote. But before the President could call that vote, Buckner piped up.

"I have an amendment to offer[,]" he said and read his motion to amend the proposed § 81. *Id.* If passed, it would grant the Governor "the power to suspend from office any Executive or ministerial officer who may fail and refuse to discharge the duties of his office, and to fill the vacancy thus occasioned." *Id.* Buckner wanted to graft onto the Governor's general power under § 81 a specific power the Appellees insist is already implied—the express power to remove officers the Governor himself comes to believe are not performing their constitutional or statutory duties. His motion was not well received.

The Governor's fellow delegates skewered the idea. One said it is "an infringement upon the Republican Government[.]" *Id.* at 1459 (Remarks of Mr. Bronston). Another said, "It gives almost regal power to the Governor." *Id.* (Remarks of Mr. Pettit).

Morris Sachs, a delegate from Louisville, and others, sought to explain to Buckner how this section, destined to become § 81, is designed to work:

> I think the trouble in this matter arises on account of a difference of opinion as to what are the duties of the Governor. . . . [Mr. Buckner] seemed to think that the Governor occupied a position like a private citizen would with regard to his general business affairs. He illustrated it by the management of a farm . . . [but] that would be placing in the hands of the Chief Executive a kingly power . . . . If the Governor were, like a king, responsible for the management of the affairs of the kingdom he necessarily and logically should have that power.

*Id.* at 1460 (Remarks of Mr. Sachs). Of course, Governor Buckner's comparison with managing a farm is hopelessly flawed. Unlike the operator of a farm, the Governor cannot personally weigh the merits of a worker's efforts, decide whether he contributes to the endeavor, and terminate him if, in his sole opinion, he does not. The delegates thought Buckner misperceived this as depriving him of all power under § 81. Appellees share this misconception. The 1890 delegates' comments enlightened Buckner and, perhaps, will do the same for Appellees.

"[T]he Governor of this Commonwealth can call into force and being all necessary powers of the State as they are vested in the Courts or in the

Legislature." *Id.  See, e.g.*, *Page*, 47 Ky. at 657 ("by the writ of *mandamus* it [the judiciary] may coerce a ministerial officer, though of the executive department, to the performance of a legal duty").  Mr. Sachs continued:

> I say the power is as broad as it can be.  "He shall take care that the laws be faithfully executed."  That simply means if the Governor of the State finds that in certain quarters those over whom he has no control, who are elected by the same sovereign power which places him in office, are not doing their duty, then, under this authority, he can direct the attention of the proper tribunal to it and see that the trouble is remedied as speedily as possible.  That is all that can be done under our form of government.

*Id.  See Gordon v. Morrow*, 218 S.W. 258, 262 (Ky. 1920) (Writs will "issue to compel the public officer . . . to do something that the law makes it his duty to do, or to restrain him from doing something that the law directs he shall not do.").

The delegate from Lexington, Charles Jacob Bronston, former Commonwealth's Attorney and future State Senator, responded too:

> I differ from [Governor Buckner] that there is any great lack of power in his provision of the present [1850] Constitution [*i.e.*, the verbatim antecedent of the current § 81] wherein it says, 'he shall see that the laws are faithfully executed.'  He can do that by calling attention of those tribunals having power to remove the respective officials to the fact that they have failed to discharge their duties.  By calling the attention of the Legislature to those officials that it has the power to remove; and by calling the attention of the Courts to the officials they have the power to remove; but certainly I never wish to see the time come in the history of the affairs in the State of Kentucky when one man will have the power with one stroke of his pen  to remove  every  subordinate,  executive  and  ministerial

officer in the Commonwealth and supply his place by appointment.

*Id.* at 1459.

Another delegate said, "I cannot believe [Governor Buckner] has carefully considered the extent and scope of his amendment. . . . This certainly is regal power, and it may be safe in the hands of [Governor Buckner], but human nature is the same in all ages of the world, and I, for one, enter my most earnest and solemn protest against lodging this power [of removal from office] in the hands of any single human being." *Id.* at 1461 (Remarks of Mr. Beckham).[58]

To eliminate any of the Governor's remaining doubt, a "gentleman of the Committee" that proposed re-adopting verbatim this same general power found in all three prior constitutions stood and expressed his solidarity with Buckner's opponents:

> It is not only in the statutes, in the Constitutions of 1792, and 1799, and 1849 [sic], but I think it is a proper provision . . . and I am prepared to say that I agree with the gentleman who preceded me [Mr. Beckham], that the law, with the power [the Governor] has, can be enforced, and should be, without any extension.

*Id.* at 1461 (Remarks of Mr. Burnam).[59]

---

[58] John Crepps Wickliffe Beckham (1869-1940), delegate from Shelby, served in the Kentucky House of Representatives, 1894-1898, as Kentucky's Governor, 1900-1907, and in the United States Senate, 1915-1921.

[59] Curtis F. Burnam (1820-1909), lawyer and delegate from Madison County, was Yale's valedictorian in 1840. He canvassed Kentucky in 1849 to urge the gradual abolition of slavery.

In the face of universal opposition, Governor Buckner withdrew his motion to amend. *Id.* at 1462 (Remarks of Mr. Buckner). "[H]e failed to get the governor's appointing power extended to minor state officials . . . [and] accepted the completed document [1891 Constitution], but he was not enthusiastic about it." Lowell H. Harrison, ed., KENTUCKY'S GOVERNORS 121 (2004). Buckner left the Convention knowing his successor would enjoy fewer powers of appointment than even he had when the Convention began in September 1890.

The 1890 Constitutional Convention delegates' outright refusal to grant the Governor even the slightest explicit powers of appointment, removal, or vacancy-filling, and the People's adoption of the current Constitution withholding such powers, should give every Kentucky jurist pause before deciding such powers can be found implicitly. Jurists should ask themselves this: If, as the delegates concluded, granting this power expressly is clothing the Governor with regal power, does any part of the Constitution empower the judiciary to clothe the Governor with the same vestments by finding they already exist implicitly? My question is rhetorical for, obviously, the judiciary does not have such power.

---

Pro-union, he was often in the General Assembly, including during the Civil War and received public support for U. S. Senator. He was a founder of the Kentucky State Historical Society in the 1870s and a member of the Knights Templar. President Grant appointed him Assistant and Acting Secretary of the Treasury in 1890. He was twice elected to the Kentucky Senate without opposition, in his 80s, and died in office. Bennet H. Young, ed., KENTUCKY ELOQUENCE, PAST AND PRESENT 427 (1907); REGISTER OF KENTUCKY STATE HISTORICAL SOCIETY 141 (1909).

### 6. *Appellees cite immemorial, never-controversial constitutional provisions*

Except for Governor Buckner's surprising kerfuffle over § 81, there was no debate over any section of the Constitution relied upon by Appellees.[60] None of those sections was controversial. All were understood simply as descriptors of a tripartite republican government. Each section upon which Appellees rely—§§ 27, 28, 69, 76, and 81—can be traced verbatim, or nearly so, to Kentucky's founding. *See* Table 1, *supra*.

On the other hand, Appellants cite the General Assembly's express grant of enumerated powers created in 1850 and reinstated in 1891 for the very purpose of restricting the Governor's general power that less informed jurists resurrect by purporting to discover them, implied by the Founders, in the separation-of-powers provisions Appellees cite.

Notably, the appointment powers granted to the General Assembly in article III, section 25 of the 1850 Constitution and in § 93 use sweeping language authorizing the General Assembly to determine whether every inferior state officer is appointed or elected, and in what manner. Why is that notable? Because, as discussed in the next section, the delegates to the 1849 Convention had a template

---

[60] What became § 81 was reported by the Committee on the Executive Department as "section fourteen." I DEBATES (1890) 1458. It is likely no debate was expected about this section of the proposed new constitution because it was adopted, and readopted, and readopted again without debate and without change in the three previous constitutional conventions. CONST. OF KY. of 1792, art. II, § 14; CONST. OF KY. of 1799, art. III, § 15; CONST. OF KY. of 1750, art. III, § 14. At least the delegates' reactions indicate they were surprised by Buckner's motion.

to follow if they chose to—the U.S. Constitution.  DEBATES (1849) 1124 (Remarks of Mr. Gaither[61]) ("select committee appointed . . . to enquire into the powers of . . . Federal Government").  Had the delegates followed that model, Appellees' argument would be tenable.  As will be discussed, because they chose not to follow the federal model, the Appellants' argument that the General Assembly is not restricted by the Governor's implied general powers is all the more persuasive.

## 7. *Delegates at both conventions decline to exclude the General Assembly itself from electing or appointing inferior state officers*

The Federal Constitution was a ready resource available to the 1849 Convention delegates.  Some of its provisions aligned with Kentucky's constitutions, for example, as in sections identifying the Governor as the chief executive magistrate and charging him with a general power to see that laws are faithfully executed.  *Compare* U.S. CONST. art. II, § 1, cl. 1 *and id.* art. II, § 3 *with* CONST. OF KY. of 1850 art. III, §§ 1, 14 (and antecedent provisions of the 1792 and 1799 Constitutions).  If one accepts Appellees' argument, Congress's power to appoint or elect inferior officers would be prevented by the President's powers

_____

[61] Nathan Gaither (1788-1862), a physician and delegate from Adair County, served in the Kentucky House of Representatives (1815-1818; 1855-1857), and United States House of Representatives (1829-1833).  Biographical Directory of the United States Congress, Nathan Gaither:  https://bioguide.congress.gov/search/bio/G000010.  Gaither's committee "enquire[d] into the powers of the State and Federal Government[.]"  He expressly addressed the Appointment Power Clause, U.S. CONST. art. II, § 2, cl. 2, stating, "The Legislative powers are—That Congress . . . [m]ay invest the appointment of inferior officers in the President alone, in the courts of law, or the heads of Departments."  DEBATES (1849) 1124.

implied in those sections of the Federal Constitution. But if they were, there would be no reason to create the separate Appointing Powers Clause and word it as the Constitution does.[62] The fact that the Founders concluded a separate provision was necessary to restrict the legislature's appointment powers is pretty persuasive authority that general provisions such as those Appellees rely upon are not enough.

The Federal Constitution's Appointing Power Clause granted such power generally to the Congress, but specifically limited the entities in which Congress may vest appointment power. U.S. CONST. art. II, § 2, cl. 2. Section 93 and its antecedent do not. Look again at the language of article III, section 25, and compare it to the language that was not adopted, starting with the federal model the 1890 delegates did not copy.

The Appointing Power Clause says: "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.* Pause here a moment to consider a question: if, as must follow from Appellees' argument, the Constitution's sections identifying the President as the chief executive magistrate and imposing upon him the duty to see the laws are carried out are enough to confer a chief executive magistrate's power of appointment, why would the

---

[62] Of course, the 1792 and 1799 constitutions did not copy the Federal Constitution's Appointing Power Clause, the delegates choosing instead to expressly grant to the Governor the power to appoint every office.

-88-

Appointing Power Clause need to name the President specifically?  It reveals

Appellees' argument as unsound.  But setting aside the Founders' conclusion that

the President must be named in the Appointing Power Clause to make that office

eligible as a repository for appointment powers, there is another thing to learn from

the Appointing Power Clause.

By using the language they did, the Framers consciously excluded

Congress from the list of entities that could be vested with the power of

appointment.  It would have been a simple matter for Kentucky's delegates to

emulate the federal model, but the 1849 delegates chose not to.  Instead, they

granted the General Assembly the broadest of powers to fill inferior state offices

without prohibiting the General Assembly itself from making appointments.[63]

The Appointing Power Clause implicates, of course, a cardinal rule of

construction—that the mention of one thing implies exclusion of another.  "[T]he

---

[63] As discussed, *infra*, the former Court of Appeals usurped the authority of the People by, in effect, adding new language to the Kentucky Constitution, § 93, restricting the General Assembly's power to make appointments itself.  *Craig v. O'Rear*, 251 S.W. 828, 831 (Ky. 1923) ("[T]he Legislature is given full power to determine by whom the appointment of all inferior officers and agents may be made (section 93, Constitution), subject to the *qualification, laid down in the Sibert Case*, that it may not itself make appointments to office." (referencing *Sibert v. Garrett*, 246 S.W. 455, 461 (Ky. 1922) (no express grant of power in Kentucky Constitution authorizing General Assembly to itself appoint or elect inferior officers)).  "[T]he people are the only power that can limit their own sovereignty, by restrictive provisions in the organic law; and it is not for the judiciary to furnish these . . . .  [T]he Legislature is the representative and embodiment of the sovereignty of the people . . . ."  *Police Comm'rs v. City of Louisville*, 66 Ky. 597, 605 (1868).

Framers were well aware of the *expressio unius*[64] argument that would result from their wording . . . ." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 793 n.9, 115 S. Ct. 1842, 1850 n.9, 131 L. Ed. 2d 881 (1995) (addressing the Qualifications Clauses). That is, quite obviously, why they made this list in the Appointing Powers Clause.

More to the point of this review, the delegates to the 1849 Convention almost certainly were aware of this maxim. However, what uncertainty exists there does not exist at all regarding the 1890 delegates. We know for certain they were aware. II DEBATES (1890) 2183 (Remarks of Mr. Knott) (referencing "the familiar rule of construction *expressio uniis* [*sic*] *exclusio alterius*"); III DEBATES (1890) 4438 (Remarks of Mr. Washington) ("[U]pon every principle of construction . . . by this enumeration, other exceptions are excluded: *expression unius est expressio alterius*. You are acquainted with that principle, I suppose.").

Knowing the 1890 delegates understood that legal principle, and that they repeated the 1849 decision not to copy the federal model, how can we doubt that the 1890 delegates consciously chose not to exclude the General Assembly from those entities in which it could vest the appointment power? All it would

---

[64] "'It is a familiar and general rule of statutory construction that the mention of one thing implies the exclusion of another. . . .' This basic tenet of statutory construction is usually referred to by the Latin phrase *expressio unius est exclusio alterius*." *Fox v. Grayson*, 317 S.W.3d 1, 8 (Ky. 2010) (footnote omitted).

have taken was to make a list that did not include the General Assembly.  Instead, the delegates and ultimately the People repeated the broad language from the 1850 Constitution and fashioned § 93 without the limitations that Appellees claim, and that the circuit court found, do exist.  To agree with Appellees and the circuit court, I would have to embrace a new and absurd rule of constitutional construction—that general powers granted one branch can implicitly restrict otherwise unrestricted express grants of power to another branch.  And another new rule that turns the old rule on its head—that the judiciary *can* add language to the Constitution.

The People of this Commonwealth could read the language of § 93 and comprehend its broad nature.  They did and overwhelmingly adopted § 93 as part of the new constitution by a vote of 213,432 to 74,017.  DECADES 267 (footnote omitted).  By adopting our current Constitution, the People did not prohibit the General Assembly itself from electing individuals to inferior offices.  Furthermore, no express authority is needed.  That is how our highest court interpreted both article III, section 25 of the 1850 Constitution and § 93.

In *Speed v. Crawford*, the Court referenced this power of the General Assembly to elect individuals to boards when it said, "Wherever the selection of an officer is referred to the governor or other functionary it is called an *appointment*, and wherever such selection is referred to the people, or to an organized body (*as*

*the legislature, for instance*), it is called an *election*."  60 Ky. 207, 211 (1860) (emphasis original; double emphasis added)).

The Court said the same in 1920.  In *Sewell v. Bennett*, the Court said whenever a board or commission such as the Kentucky Fair Board "is purely a legislative creation[,]" and where it "provid[es] for the appointment of members of the board[,] the Legislature had the undoubted power to make these appointments itself or give them to the Governor, or indeed any other person or body that it might designate . . . . This power is conferred on the Legislature by section 93 of the Constitution . . . ."  220 S.W. 517, 519 (Ky. 1920).

There is an example of the General Assembly's exercise of constitutional authority to elect an officer, as a board member, right under our noses.  For decades, part of the pre-HB 518 law governing the Kentucky Fair Board, KRS[65] 247.090, designated the Governor as a member.  But, if we accept Appellees' argument, there is no constitutional authority for the General Assembly to name the Governor to any board.  If that is so, imagine how many statutes creating and populating boards and commissions would be affected.  *See, e.g.*, *Kerr v. City of Louisville*, 271 Ky. 335, 111 S.W.2d 1046, 1050 (1937) ("The Governor is a member of the State Highway Commission, the State Board of Charities and

---

[65] Kentucky Revised Statutes.

Corrections, the Sinking Fund Commission, the Printing Commission, and many other boards and commissions.").

Because the General Assembly lacks constitutional authority to define any duty of the Governor,[66] what is the source of the General Assembly's authority to name the Governor to that board if not § 93? We know the answer, of course. Section 93 _is_ that source because, as explained: (1) § 93 does not, within itself, restrict the General Assembly to the exercise of legislative power only, (2) the General Assembly's exercise of appointment power (whether deemed inherently executive in nature or not, to be discussed at length, _infra_) is not expressly prohibited, and (3) the General Assembly's exercise of that power is not implicitly restricted by an express constitutional grant of such authority to any other branch.

The power Appellees claim and that the circuit court found to be unconstitutional is the very power that put the Governor himself on the Fair Board.

---

[66] Section 93 authorizes the General Assembly to "prescribe[] by law" the "duties and responsibilities of these officers" who are identified in the section as the Treasurer, Auditor of Public Accounts, Secretary of State, Commissioner of Agriculture, Labor and Statistics, and Attorney General. The Governor is not included in the list. _But see Rouse_, 28 S.W.2d at 749 (It is "legal and proper for the Legislature to annex such nonconferred duties and powers by the Constitution to an officer created by it as has been done with reference to the _Governor_ . . ." and other constitutional officers such as the "Attorney General, Auditor, Secretary of State, Treasurer, and Superintendent of Public Instruction . . . ." (emphasis added)). Clearly, the Court misspoke to the extent _Rouse_ seems to suggest the Legislature could annex duties to the office of Governor.

## 8. *Section 76 is no basis to challenge HB 518*

The circuit court below and Appellees cite § 76 to claim a general power to fill vacancies which, the latter asserts, supersedes in some way the specific appointment powers of § 93. As with all the constitutional sections Appellees cite, § 76 is quite faithful to the wording of its antecedents. *Compare* CONST. OF KY. of 1850, art. III, § 9 *with* CONST. OF KY. of 1891, § 76.[67] But the Appellees' claim of power under § 76 was long ago held to be only general and not self-executing. Again, our highest court explained.

Section 76's direct antecedent, "section 9 of article 3 [of the 1850 Constitution] confers upon the Governor, who is the head of the executive department, the general power to fill vacancies" and, being a general power, it "[wa]s not self-executing, [and] was *not conferred upon the Governor*, to be exercised by him . . . *without further constitutional or statutory authority*." *In re*

---

[67] As with each of the Kentucky Constitution's provisions relied upon by Appellees, the source of § 76 is a corresponding provision of the 1850 constitution. Compare § 76 with its source and you will see the only change is one that seemingly incorporates the 1881 analysis of *In re Opinion of Judges of Court of Appeals*, 79 Ky. 621 (1881), addressed *infra*:

"He shall have power to fill vacancies that may occur, by granting commissions, which shall expire when such vacancies shall have been filled according to the provisions of this constitution." CONST. OF KY. of 1850, art. III, § 9.

"He shall have the power, except as otherwise provided in this Constitution, to fill vacancies by granting commissions, which shall expire when such vacancies shall have been filled according to the provisions of this Constitution." CONST. OF KY. of 1891, § 76. The phrase "except as otherwise provided in this Constitution" was added by the Revisory Committee in September 1891, as discussed below, after the original draft of the Constitutional was adopted by the People in August.

*Opinion of Judges of Court of Appeals*, 79 Ky. 621, 623 (1881) (emphasis added).

"Section 26, article 8," of the 1850 Constitution was the Governor's necessary and "further constitutional . . . authority . . . for filling vacancies . . . in the office of Attorney General, Auditor of Public Accounts, Treasurer, Register of the Land Office, President of the Board of Internal Improvement, or Superintendent of Public Instruction . . . in the recess of the Senate[.]"[68] *Id.* at 624–25. That also defined the <u>*constitutional limits*</u> of the Governor's vacancy-filling power. As our highest court said, article VIII, section 26 would have been "wholly unnecessary to confer upon him the power to fill the vacancies in those offices" if the general power described in article III, section 9 [now § 76] was enough in itself. *Id.* at 625. But, because the constitutional "power to fill vacancies" was only general, when there was no further express *constitutional authority*, the Governor's power to fill a vacancy was entirely dependent upon "further . . . *statutory authority*." *Id.* at 623 (emphasis added). Under such circumstances, only the General Assembly could and, occasionally, did provide it. *See, e.g.*, *Long v. Comm'rs of Central Ky. Lunatic Asylum*, 6 S.W. 335, 335 (Ky. 1888) ("Under the general law regulating

---

[68] "When a vacancy shall happen in the office of Attorney General, Auditor of Public Accounts, Treasurer, Register of the Land Office, President of the Board of Internal Improvement, or Superintendent of Public Instruction, the Governor, in the recess of the Senate, shall have power to fill the vacancy by granting commissions which shall expire at the end of the next session, and shall fill the vacancy for the balance of the time by and with the advice and consent of the Senate." CONST. OF KY. of 1850, art. VIII, § 26. This language can now be found in § 152 of our current Constitution and is cited as the source of § 152.

the conduct and management of these asylums, nine commissioners are to be appointed by the governor . . . .").

Our highest court said that, because the General Assembly regularly provided such necessary further authority in the form of a statute, the whole of government "considered it necessary to the exercise of the power by the Governor to expressly invest him with authority to fill [vacancies] . . . , and the executive department has uniformly complied with this provision of the law, thereby showing its recognition of the authority of the legislature to enact it." *In re Opinion of Judges*, 79 Ky. at 627.[69]

*In re Opinion of Judges* refutes Appellees' argument that § 76 alone, or even in conjunction with the other sections they cite, grants "the Governor the power to fill vacancies[,]" and it refutes their argument that HB 518, in violation of that constitutional provision, "tak[es] away [his] ability to fill the vacancies" on the

---

[69] The Court thoughtfully considered its interpretation of these constitutional provisions, even addressing the maxim of *contemporanea expositio*:

> While "contemporary construction can never abrogate the text, never fritter away its obvious sense, never narrow down its true limitations, and never enlarge its natural boundaries," the practical exposition of section 9, article 3, of the constitution, which the legislature has given by the many provisions for filling vacancies temporarily, sustains the construction of that section we have indicated with a plausibility and strength not easily destroyed.

*In re Opinion of Judges*, 79 Ky. at 627 (without attribution to the source of the quotation). *See also Fox*, 317 S.W.3d at 17 ("contemporaneous legislative explanation or clarification of a constitutional provision should ordinarily be given deference by a reviewing court").

Fair Board. (Appellees' brief, p. 20). Just as article III, section 9 of the 1850 Constitution was general only, requiring "further constitutional or statutory authority" such as article VIII, section 26 of the 1850 Constitution or some statute, the current Governor's general power to fill vacancies under § 76 also requires further constitutional or statutory authority to do so.

Although Appellees do not cite § 152, that is the express further constitutional authority of the Governor's vacancy-filling power generally identified in § 76. But § 152 also defines the limits of the Governor's constitutional authority for filling vacancies. That is the import of *In re Opinion of Judges* to this review we are now undertaking. Consequently, by its plain language, § 152 does not empower the Governor to fill vacancies on the Fair Board.[70]

To fill vacancies on the Fair Board, the Governor must find that further power in legislation, and right there it is in HB 518 § 2(3). Before that, it was in KRS 247.090(1)(e)-(l) (2017). If the General Assembly had failed entirely in HB 518 to provide for the filling of vacancies, the Governor's necessary further authority would have been a different statute. KRS 63.190 ("In every case where there is no other provision of law for the filling of a vacancy in any office, the

---

[70] In pertinent part, § 152 says: "Vacancies in all offices for the State at large, or for districts larger than a county, shall be filled by appointment of the Governor; all other appointments shall be made as may be prescribed by law."

vacancy shall be filled by appointment by the Governor."). Of course, that statute and its predecessor which dates at least to 1903, KS[71] 3758,[72] would be totally unnecessary if § 76 was sufficient in itself to authorize the Governor to fill such vacancies. But there is still more in our constitutional jurisprudence to counter Appellees' argument.

In addition to § 152's limitations on the Governor's constitutional vacancy-filling powers, our high court held § 76 is specifically limited by § 93, not the other way around as Appellees argue. Section 76 includes the phrase "except as otherwise provided in this Constitution"; therefore, it "should be read in connection with section 93[.]" *Rouse*, 28 S.W.2d at 751. The authority granted the General Assembly in § 93 that "'Inferior state officers, not specifically provided

---

[71] Kentucky Statutes.

[72] KS 3758 reiterated much of what is already in § 152 and, upon revision in 1942 as a revised statute was shortened to its current form. The unrevised statute reads as follows:

"The following officers shall have commissions issued to them by the Governor, that is to say: Secretary of state, register of the land office, auditor of public accounts, treasurer, commissioner of agriculture, labor and statistics, superintendent of public instruction, judges of the court of appeals, clerk of the court of appeals, judges of the circuit courts, county judges, police judges, railroad commissioners, commonwealth's attorney, justices of the peace, notaries public, and all officers of the militia of rank and grade higher than and including the rank and grade of captain. Should a vacancy occur in any of said offices, by reason of the death, resignation or removal of the officer, or from any other cause, or should a like vacancy occur in any other office where there is no provision of law for filling same, such vacancy shall be filled by the appointment of the Governor, subject to the provisions of the Constitution applicable thereto."

*Traynor v. Beckham*, 74 S.W. 1105, 1106 (Ky. 1903), *on reh'g*, 76 S.W. 844 (Ky. 1903) (quoting KS 3758).

for in this Constitution, may be appointed or elected, in such a manner as may be prescribed by law' . . . falls within the inserted exception contained in section 76[.]" *Id.* "[T]he two sections read together . . . confine the vacancies mentioned in section 76 to such officers as are created by the Constitution, and not to the filling of vacancies in those created by the Legislature . . . ." *Id.*

Since 1850, and continuing through the current Constitution, authority previously enjoyed by the Governor to fill virtually all government vacancies, like the appointment power, is today largely under the General Assembly's authority. *See* CONST. OF KY. of 1850, art. II, § 31 (vacancies in Legislative Department); art. IV, § 4 ("whenever a vacancy shall occur in [Court of Appeals] from any cause, the General Assembly shall have the power to reduce the number of judges and districts"); art. IV, § 35 (vacancies in local conservators of the peace); art. VI, § 7 ("Vacancies in offices under this article [Executive and Ministerial Officers for Counties and Districts] shall be filled . . . as the General Assembly may provide."). Today, these provisions, dispersed in the 1850 Constitution, are largely coalesced in § 152. *See also* CONST. OF KY. of 1891, §§ 85, 160, 222.

Nothing about § 76 persuades me that HB 518 is unconstitutional given the General Assembly's broad authority in § 93 to establish and reconstitute the Fair Board and determine how its members are appointed or elected.

## 9. *Sections 69 and 81 are not sweeping grants of broad power*

Without § 93's tempering of the Governor's authority, "[t]he supreme executive power of the Commonwealth" in combination with the duty to "take care that the laws be faithfully executed[,]" might very well clothe the Governor in the vestments of a king, just as Governor Buckner's opponents chided. And that is very nearly what Appellees are arguing—that the power granted in the general sections of the article on the Executive Department, § 69 and § 81, supersedes the very restrictions on the Governor's power adopted in § 93. Appellees are simply wrong, and so was the circuit court.

A rule of constitutional construction is "that if there be conflict [between constitutional provisions] it is the duty of the court to uphold that portion containing express language relating to the subject, rather than to one dealing with matters in general terms." *Ward v. Harding*, 860 S.W.2d 280, 281–82 (Ky. 1993) (modification original) (quoting *Commonwealth ex rel. Attorney General v. Howard*, 180 S.W.2d 415, 418 (Ky. 1944)). Appellees' argument turns that rule on its head. They claim, in essence, that even an express grant of constitutional authority such as § 93 should be disallowed if it offends "the spirit supposed to pervade the Constitution, or is against the nature and spirit of the government, or is contrary to the general principles of liberty, or the genius of a free people." *Louisville/Jefferson Cnty. Metro Gov't Waste Mgmt. Dist. v. Jefferson Cnty.*

*League of Cities, Inc.*, 626 S.W.3d 623, 628 (Ky. 2021) (quoting *Craig v. O'Rear*, 251 S.W. 828, 830 (Ky. 1923)). But in these two cited opinions—*Jefferson County League of Cities* and *Craig*—rendered a hundred years apart, our highest court rejected that argument. 251 S.W. at 830 ("courts are not at liberty to declare a statute invalid" for such reasons).

Additionally, to accept Appellees' argument would be to make the last sentence of § 93 irrelevant. It would, in effect, be a judicial repeal of a part of the Constitution; the judiciary is powerless to make such a ruling. *Russman v. Luckett*, 391 S.W.2d 694, 697 (Ky. 1965) ("no authority . . . recognize[s] an implied repeal of a constitutional provision").

Appellees succeeded in convincing the circuit court that when the General Assembly enacted HB 518, it unconstitutionally diminished the Governor's power to remove officers and fill vacancies because that is how the Governor "oversee[s] faithful execution of the law." (R. 1000). That is unquestionably contrary to the intention of the 1890 Constitutional Convention delegates as discussed, *supra*, Sections 5, 8, and 9. The circuit court's decision reveals an illogic, contrary to that intent, that the source of the Governor's power to remove officers is § 81. It is not.

> It is perfectly clear from the history of our state and an examination of our Statutes, that the people, as a fundamental proposition, did not mean to vest their Governor with the right to remove from office those

> appointed thereto in the manner prescribed by the people acting through their Legislature, unless and until such power was expressly or by the clearest implication given to the Governor.

*Votteler*, 23 S.W.2d at 590. Our Supreme Court reiterated this ruling in *McClure v. Augustus* when it said, "[T]he executive power of removal is . . . subordinate to [the] will of the General Assembly." 85 S.W.3d 584, 586 (Ky. 2002) (citing *McChesney v. Sampson*, 23 S.W.2d 584, 586 (Ky. 1930) (Governor could not remove his own appointee without statutory authority)).

Furthermore, if the Governor suffered a diminution of his constitutional power of appointment, removal, and vacancy-filling when HB 518 was passed, then, to use the circuit court's phrase, "the Governor suffered the same diminution to his power" when § 93 was adopted 135 years ago, and when its antecedent was adopted forty years before that. (R. 1001). In other words, the Governor's power to remove persons from office does not emanate from any of the constitutional provisions Appellees cite. I am certain the act of the People in adopting § 93 was not unconstitutional. *Votteler*, 23 S.W.2d at 590 ("A people are entitled to that form of government they wish[.]"). What the People and § 93 authorized, the General Assembly and HB 518 simply made law.

Section 93, as well as its antecedent, was purposefully adopted by the Commonwealth's citizenry and plays a significant role in tempering the Governor's power. Those citizens granted the General Assembly, and the General

Assembly alone, the express and specific authority, without restriction, to "prescribe[] by law" the "manner" in which these "Inferior State officers" of the Fair Board are "appointed or elected[.]"  CONST. OF KY. of 1891, § 93.  When the General Assembly enacted HB 518, it merely exercised that power.

Consider these sections, § 69 and § 81, separately.  Section § 69 "reflects the fact that under our Constitution there are other constitutional officers in whom executive powers may be vested by the legislative body.  Sec[tion] 69 makes it clear that these officers are inferior to the Governor and that no other executive office can be created which will not also be inferior to that of the Governor." *Brown v. Barkley*, 628 S.W.2d 616, 622 n.12 (Ky. 1982) (hereinafter *Barkley*).  Section 69 simply "vests the Governor with executive powers, just as Section 29 vests the General Assembly with legislative powers and Section 109 vests the Court of Justice with judicial powers." *Fletcher v. Commonwealth*, 163 S.W.3d 852, 869 (Ky. 2005).  It is not more subtle or complex than that.

Jurists should not be deceived into believing § 69 grants the Governor an omnipotence simply because the phrase "supreme executive power" is used to identify the head of the executive branch of government.  It merely identifies "the office of governor [which] was 'unknown to common law[.]'" *Kentucky Emps. Ret. Sys. v. Seven Cntys. Servs., Inc.*, 580 S.W.3d 530, 539 (Ky. 2019) (quoting *Royster v. Brock*, 79 S.W.2d 707, 709 (Ky. 1935)).  As our Supreme Court made

clear, in proper context the phrase loses its authoritative mystique—"The governor 'has only such powers as the Constitution and Statutes, enacted pursuant thereto, vest in him, and *those powers must be exercised in the manner and within the limitations therein prescribed.*'" *Id.* (quoting *Royster*, 79 S.W.2d at 709) (emphasis added in *Seven Cntys.*). *See also Cameron v. Beshear*, 628 S.W.3d 61, 73–74 (Ky. 2021) (hereinafter *Cameron*) (emphasis added) (citation omitted) ("Practically speaking, except for those conferred upon him *specifically* by the Constitution, [the Governor's] powers, like those of the executive officers created by Const. Sec. 91, are only what the General Assembly chooses to give him.").

As our Supreme Court also said, "The same Constitutional powers and duties described in §§ 69 and 81 are granted to the President of the United States by Article II, Sections 1 and 3 of the United States Constitution." *Fletcher*, 163 S.W.3d at 869. Under those federal constitutional provisions, and consistent with *In re Opinion of Judges*, 79 Ky. at 623, "[t]he executive power was given in general terms strengthened by specific terms where emphasis was regarded as appropriate, and was limited by direct expressions where limitation was needed . . . ." *Myers v. United States*, 272 U.S. 52, 118, 47 S. Ct. 21, 26, 71 L. Ed. 160 (1926).

The same is true of the Kentucky Constitution. The executive power was given in general terms in § 69, strengthened by specific terms where emphasis

-104-

was regarded as appropriate in § 152, and was limited by direct expression where limitation was needed in § 93.

As for § 81, our Supreme Court compared it to the President's power under Article II, Section 3 of the United States Constitution, saying "[t]he duty of the President to see that the laws be executed is a duty that does not go beyond the laws or require him to achieve more than Congress sees fit to leave within his power." *Fletcher*, 163 S.W.3d at 869 (quoting *Myers*, 272 U.S. at 295, 47 S. Ct. at 85 (Holmes, J., dissenting)). Our congress, the Kentucky General Assembly, has often chosen to "leave within his [the Governor's] power" the authority to appoint inferior state officers and, since amendment of § 93, members to boards and commissions as well. *See, e.g.*, KRS 63.190.

In fact, by the free and constitutional exercise of the legislative prerogative, the General Assembly has always vested in the Governor, in addition to his constitutional powers in § 152, the power to make certain appointments. *Sewell*, 220 S.W. at 519. A comparison of one of those early statutes with its modern counterpart shows the General Assembly has afforded the Governor more appointment and removal authority than enjoyed at the time of the adoption of the current Constitution.[73] By that same largesse, the General Assembly left in HB

---

[73] *Compare* KS 3750 (1920) *with* KRS 63.080. The former statute said:

518 the Governor's power to appoint six (6) members of the Fair Board, reduced from twelve (12) of the original eighteen (18) total members.  Appellees never challenged the General Assembly's authority under § 93 to grant the Governor appointment power of those twelve (12) members only.  Equally ironic is that Appellees never argued §§ 27, 28, 69, 76, and/or 81 prohibited the General Assembly itself from electing the Governor to the Board or that those sections meant legislation vesting in him the power to appoint members was unnecessary.

When asked at oral argument whether § 93 authorized the General Assembly to deprive the Governor of *all* appointments to the Fair Board, the Solicitor General, with some little hesitation, responded in the affirmative.  His hesitation, no doubt, was because whether to do so is a political question for which

---

"No person appointed to an office by the Governor, by and with the advice and consent of the Senate, shall be removed therefrom by the Governor, during the term for which he was appointed, unless for failure to discharge, or neglect in the performance of the duties of his office.  And any person removed for such cause shall be notified, in writing, of the cause of his removal; and the facts connected therewith shall be laid before the Senate by the Governor at its next session.  Unless otherwise provided, all persons appointed to an office by the Governor, whether to fill a vacancy, or as an original appointment, shall hold office, subject to the advice and consent of the Senate, which body shall take appropriate action upon such appointments at its first session held thereafter."

*Sewell*, 220 S.W. at 519 (quoting KS 3750 which was "a part of the chapter in the Kentucky Statutes entitled 'Offices and Officers,' enacted by the Legislature in 1893, although a number of the sections now found in the chapter had been the law for many years prior to 1893").  The successor and current statute, KRS 63.080, grants far more power to the Governor.  A sense of the Governor's greater authority allowed in this somewhat lengthy statute can be had by reference to the opening line which states that, except as otherwise provided in the statute, "any person appointed by the Governor, either with or without the advice and consent of the Senate, may be removed from office by the Governor for any cause the Governor deems sufficient . . . ."  KRS 63.080(1).

-106-

the members of the General Assembly would answer to their constituents. *Purnell v. Mann*, 48 S.W. 407, 410 (Ky. 1898), *overruled on other grounds by Pratt 1* ("The people alone, through the legislature, must determine as to justice and policy of the statute."). In fact, if the People believe the members of the General Assembly who favored HB 518 abused the power granted the General Assembly in § 93, then the People have a political solution at the ballot box.

What is certain is that §§ 69, 76, and 81 do not grant the Governor authority to exercise political power on behalf of the People that the People retained for themselves, or to take away from the Legislative Department what the People expressly granted it, any more than any part of the Constitution empowers the judiciary to discover that authority is implicitly residing in the Constitution to empower the Governor. *Hager v. Robinson*, 157 S.W. 1138, 1142 (Ky. 1913) ("The courts are not the guardians of the rights of the people . . . [and] cannot assume their rights.").

The circuit court revealed its sense, perhaps unwittingly, that it was tempted to do just that, to assume the People's rights, when it chose not to "determin[e] the number of appointments the Governor requires to maintain constitutionality" and suggesting "[t]he General Assembly can enact new legislation rebalancing the respective appointment authority . . . ." (R. 1002, n.12). This instinct should have set off an alarm that if the Constitution is not specific

enough to tell us how many or what percentage of the appointments the Governor

is authorized to make, the prohibition on the General Assembly the circuit court

found exists, in fact, does not. Otherwise, how could it be that the Governor is not

required to make every appointment if, as discussed below, all appointments are

executive in nature and exercisable only by the Executive Department? The

answer is that this, too, is a fallacy.

We can deny it if our ends are other than to follow the Constitution,

but the fact is, when it comes to the manner in which state officials of the nature

involved here are appointed or elected, the power is wholly within the Legislative

Department. Our highest court said long ago:

> It would be difficult, perhaps impossible, to define the extent of the legislative power of the state, unless by saying that so far as it is not restricted by the higher law of the state and federal constitutions, it may do every thing which can be effected by means of a law. It is the great supervising, controlling, creative and active power in the state, subject to the fundamental restrictions just referred to. Whatever legislative power the whole commonwealth has, is, by the constitution, vested in the legislative department, which, representing the popular majorities in the several local divisions of the state, and under no other restraint but such as is imposed by the fundamental law, by its own wisdom and its own responsibilities, may regulate the conduct and command the resources of all, for the safety, convenience and happiness of all, to be promoted in such manner as its own discretion may determine.

*Slack v. Maysville & Lexington R.R. Co.*, 52 Ky. 1, 22 (1852) (quoted in *George*, 47 S.W. at 780, *overruled by Pratt 1*) (quoted, in part, in *Commonwealth ex rel. Beshear v. Bevin*, 575 S.W.3d 673, 682 (Ky. 2019)).

Significant to this review, the Court also said when the General Assembly enacts a law, "[i]t may be carried into operation by the executive alone . . . [or] by the judiciary, or by the co-operation of the judiciary and the executive." *Id.* "But the legislature is not restricted to these agencies. *It may select* or appoint others, as is often done[.]" *Slack*, 52 Ky. at 22–23 (emphasis added).

Could it be clearer that the citizens of Kentucky in 1850 wanted broad appointment power with the General Assembly and not in the hands of one person? Could it be clearer they did not want to restore that power to the Governor in 1891? As one delegate summarized it, "[T]he time has passed when the people of Kentucky believe that all wisdom and learning is with the Governor. The people are opposed to the one-man power, however learned or pure that man may be." I DEBATES (1890) 1423 (Remarks of Mr. Hanks). It is § 93 that safeguards the People from abuse by a chief executive magistrate, and it is the diffusion of power among the many elected representatives sent to the General Assembly by their constituents that safeguards the public from legislative abuse of § 93.

## 10. *Misguided reliance on North Carolina constitutional interpretation*

This Kentucky constitutional history mattered little to the circuit court. After rotely noting the rules for deciding constitutional questions and touching upon the "veering" opinions *LRC v. Brown* mentioned, the circuit court strangely turned to North Carolina law to say it was "persuaded by the analysis in *State [ex rel. McCrory] v. Berger*,[74] 781 S.E.2d 248 (N.C. 2016) that the General Assembly's conferring to the Commissioner of Agriculture authority to appoint a majority [of Fair Board members] . . . places the Governor's power under a Section 91 executive officer and effectively prevents him from overseeing faithful execution of the law." (R. 999–1000.) Relying on North Carolina jurisprudence was more than unnecessary. It was a bad choice.

"Within wide constitutional bounds, States are free to structure themselves as they wish." *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 183, 142 S. Ct. 2191, 2197, 213 L. Ed. 2d 517 (2022) (hereinafter *Berger v. NAACP*); *Votteler*, 23 S.W.2d at 590 ("A people are entitled to that form of government they wish[.]"). If between those wide bounds is a spectrum, one

---

[74] This was the first in a series of recent North Carolina Supreme Court separation-of-powers cases. *Cooper v. Berger*, 809 S.E.2d 98 (N.C. 2018) (*Cooper I*); *Cooper v. Berger*, 822 S.E.2d 286 (N.C. 2018) (*Cooper II*); *Cooper v. Berger*, 852 S.E.2d 46 (N.C. 2020) (*Cooper III*); *N.C. State Conf. of NAACP v. Moore*, 876 S.E.2d 513 (N.C. 2022). The subsequent North Carolina opinions caption this one *State ex rel. McCrory v. Berger* and reference it in short form as *McCrory*. *See, e.g.*, *Cooper III*, 852 S.E.2d at 54, 56. This dissent follows that convention.

would have to place Kentucky and North Carolina at opposite ends when it comes to their respective governor's appointment powers. Owing to the unique characteristics of North Carolina constitutional law, that state's constitutional jurisprudence is totally inapposite. The circuit court should have heeded the North Carolina Supreme Court's warning that "each state constitution has its own unique history of development, both in terms of the constitutional text itself and of the judiciary's interpretation of that text." *Cooper v. Berger*, 822 S.E.2d 286, 297 (2018) (*Cooper II*).

Consider this fact first. At Kentucky's 1890 Convention, the Committee on the Executive Department obtained and considered "the compilation of the Constitutions of the several States published by the authority of Congress, and embracing the Constitution of each State to and including the year 1876 . . . ." 1 DEBATES (1890) 39. The Committee and all the delegates thus had, as a guide, the 1868 Constitution of North Carolina—that state's last constitution before adopting its current one in 1971. But that 1868 constitution proved to be no help to the 1890 Kentucky delegates. Following it would have taken us backward.

Article III, section 10 of the 1868 North Carolina Constitution allowed that state's Governor the same appointment powers found in Kentucky's 1799 Constitution, which the citizens of Kentucky expressly rejected in 1850.

-111-

*Compare* CONST. OF N.C. of 1868, art. III, § 10[75] *with* CONST. OF KY. of 1799, art.

III, § 9.[76]  In other words, Kentucky's 1850 Constitution eliminated its Governor's

constitutional appointment powers nearly twenty years before North Carolina's

1868 Constitution took those same powers from its legislature and granted them to

its Governor.  *McCrory*, 781 S.E.2d at 253 ("Constitution of 1868 removed all of

the provisions that had authorized the General Assembly to appoint executive and

judicial officers.").

      In fact, the very North Carolina opinion that persuaded the circuit

court in this case pointed out that stark difference when it said, "[T]he Constitution

of 1868 had 'superadded' the phrase 'and no such officer shall be appointed or

---

[75] North Carolina's version of this gubernatorial power of appointment reads:

> Sec. 10. The governor shall nominate and, by and with the advice and consent of a majority of the senators-elect, appoint all officers whose offices are established by this constitution, or which shall be created by law, and whose appointments are not otherwise provided for, and no such officer shall be appointed or elected by the general assembly.

CONST. OF N.C. of 1868, art. III, § 10.

[76] In pertinent part, Kentucky's Governor was granted the following power of appointment as shown, in pertinent part, below:

> § 9. He shall nominate, and by and with the advice and consent of the Senate, appoint all officers, whose offices are established by this Constitution, or shall be established by law, and whose appointments are not herein otherwise provided for . . . .

CONST. OF KY. of 1799, art. III, § 9.

elected by the General Assembly' to ensure that the General Assembly could not appoint constitutional *or statutory officers . . . .*" *Id.* at 253 (emphasis added). Other state constitutions vest their governors with this appointment power and, either expressly or by necessary implication in granting the power to another branch, withhold that power from the state's legislature. *See, e.g.*, W. VA. CONST. art. VII, § 8 ("The governor shall nominate, and . . . appoint all officers whose offices are established by this constitution, or shall be created by law, and whose appointment or election is not otherwise provided for; and no such officer shall be appointed or elected by the Legislature."); ILL. CONST. art. V, § 9 (a) ("The Governor shall nominate and . . . shall appoint all officers whose election or appointment is not otherwise provided for. . . . The General Assembly shall have no power to elect or appoint officers of the Executive Branch."). Both Governor Buckner in 1890 and Appellees today likely would prefer such language had been adopted in Kentucky's current Constitution, but the People of Kentucky chose the opposite path in 1850 and clearly had no intention of reversing course in 1891.

As the circuit court notes, the two states' respective current constitutions have some basic provisions in common. That is true. It would be amazing if they did not, given that both follow the same tripartite republican model. But within the wide constitutional bounds Justice Gorsuch notes in *Berger v. NAACP*, the two constitutions have meaningful differences. Look closer at what

the North Carolina Constitution does *not* include that *is included* in ours—North Carolina has nothing resembling Kentucky's § 93.

When North Carolina adopted its 1971 constitution, it reaffirmed the 1868 Constitution's redistribution of appointment power from the Legislative Department to the Executive Department—just as in 1891 the People of Kentucky reaffirmed the 1850 shift of that very power in the opposite direction. Knowing this diametric difference gives me confidence in my position that the circuit court's reliance on North Carolina constitutional jurisprudence is fully misplaced.

It does not matter whether we compare North Carolina's 1868 constitution, as the 1890 Kentucky Convention delegates knew it, or that state's current 1971 Constitution. Neither version has any provision close in nature to Kentucky's § 93 that deprives the Kentucky Governor of the very power the North Carolina Governor expressly controls under that state's "Appointments Clause." CONST. OF N.C., art III, § 5(8) ("Appointments. The Governor shall nominate and by and with the advice and consent of a majority of the Senators appoint all officers whose appointments are not otherwise provided for" in the North Carolina Constitution.). The North Carolina Appointments Clause is a constitutional grant of power from the People of North Carolina to their Governor, a grant that does not exist in Kentucky's Constitution. That Appointments Clause is a more powerful weapon in North Carolina's Governor's disputes with its legislature than the

somewhat similar *statutory* power the Kentucky General Assembly grants our Governor in KRS 63.190—a legislative grant constitutionally and expressly authorized by § 93.  Once North Carolinians granted that power in 1868, "the General Assembly . . . has never regained the full scope of appointment power that it had in 1776."  *McCrory*, 781 S.E.2d at 256.  That is why North Carolina opinions are irrelevant.  But there is more.

*McCrory* turns on the North Carolina Governor's power to remove officers, not just his power to appoint.  By North Carolina law, the Governor's *constitutional* power to appoint includes the power to remove.  *James v. Hunt*, 258 S.E.2d 481, 487 (N.C. App. 1979) (quoting *State ex rel. Caldwell v. Wilson*, 28 S.E. 554, 562 (N.C. 1897)) ("[T]he power of suspension rests in the hands of the governor, which, when exercised in an orderly manner, is not reviewable by the courts (whether the action of the governor was justified by the facts, which he alone could find, is not for us to say).")); *id.* at 488 ("we find no case nor indication by any court that the courts should bind the Governor to any statutory procedure unless the Constitution of the state or the statutory provisions giving him the power of removal specify a specific procedure therefor").  Kentucky does not follow that rule or that model.

In Kentucky, "an appointment to office once made is incapable of revocation or cancellation by the appointing executive in the absence of a statutory

or constitutional power of removal." *McChesney v. Sampson*, 23 S.W.2d 584, 587 (Ky. 1930). *See also Holliday v. Fields*, 275 S.W. 642, 648 (Ky. 1925) (Governor could not remove sheriff); *Page v. Hardin*, 47 Ky. at 677 ("Secretary [of State who was appointed per the Constitution by the Governor] is not subject to removal from office at the will of the Governor, or on his judgment[.]"). Several cases before our highest court challenged "the decision of the governor that a vacancy in office existed, . . . and in each one it was decided no vacancy existed, his act [filling the vacancy] was invalid, and the person appointed by him was not entitled to the office." *Toney v. Harris*, 3 S.W. 614, 617 (Ky. 1887).

Because Kentucky's Governor does not have removal authority absent statutory authorization, Appellees' argument is untenable. Appellees rely on the North Carolina cases that persuaded the circuit court, saying "the governor must always have enough control over [board appointees] to perform his constitutional duty" to see the laws are faithfully executed and that "[t]he degree of control. . . depends on his ability to remove them from office." (Appellees' brief, p. 22 (quoting *McCrory*, 781 S.E.2d at 257)). In other words, Appellees argue the Governor must have the power to appoint in order to perform his § 81 responsibilities which can only be met by removing appointees he believes are not "faithfully execut[ing]" the law. Again, as discussed, *supra*, Sections 5, 8, and 9, that was never intended by the 1890 Convention delegates.

Because Kentucky requires specific statutory authority for the Governor to exercise the general power of § 81 to remove officers, the rationale of *McCrory* utterly fails precisely because it depends on a power the Kentucky Governor lacks—express constitutional authority to remove someone from office. Such power was given to the North Carolina Governor in that state's constitution; it has not been a constitutional power of the Kentucky Governor since 1850.

In summary, the constitutional and jurisprudential differences between North Carolina and Kentucky are so dramatic that *McCrory* and the line of North Carolina cases that follow should not persuade anyone that they enlighten us to answer the issues before us.

That leaves the circuit court's reliance on *LRC v. Brown*, an opinion built on a shifting-sand foundation of opinions that should bring a certain degree of embarrassment to the Kentucky judiciary.

## **PART THREE**

*LRC v. Brown* has been called "seminal." *Beshear v. Acree*, 615 S.W.3d 780, 809 n.39 (Ky. 2020); *Kraus*, 872 S.W.2d at 435. That's hard to dispute given that the word defines something "highly original and influencing the development of future events[.]" *Seminal*, THE RANDOM HOUSE DICTIONARY OF THE AMERICAN LANGUAGE 1741 (2nd ed. 1987). It makes my questioning of *Brown* seem all the more against the grain, especially considering that seven years

after its rendition, when the Supreme Court could have corrected its mistake, it stubbornly reaffirmed it instead. "*We do not now retreat from our decision in LRC v. Brown one iota*[,]" it said in *Kentucky Association of Realtors, Inc. v. Musselman*, 817 S.W.2d 213, 216 (Ky. 1991) (emphasis in original). But, to paraphrase the Bard, the Court doth protest too much, methinks. WILLIAM SHAKESPEARE, HAMLET, act 3, sc. 2.

One cannot help but wonder, with identical separation-of-powers provisions dating back to 1792 and the language of § 93 dating to 1850, why well more than a century passed before a "seminal" opinion appeared.

*Brown*'s seminality is the deviant course it takes, away from the constitutional principles embedded in our jurisprudence starting nearly two centuries ago and accurately reiterated in *Brown v. Barkley*, 628 S.W.2d 616 (Ky. 1982) (hereinafter *Barkley*). That course slyly "veers" from that grounded jurisprudence, just as the flawed decisions upon which it relies veered from it. *Brown* is a detour paved with aberrant opinions leading those who follow it beyond its delegation-of-powers holding to blind-alley arguments and dead-end decisions.

## 11.  Brown *does more than needed to declare the legislation unconstitutional*

The first signpost on the detour is in *Brown*'s opening paragraphs. The Supreme Court said the case is about "the delegation of powers by the General Assembly to the LRC" despite being inaccurately "trumpeted abroad as a test of

-118-

the relative constitutional powers of the Governor . . . [and] the General Assembly" and even "a power struggle" between them. *Brown*, 664 S.W.2d at 909.

In the end, *Brown* has become appropriately known simply as a delegation-of-powers case. As the Supreme Court said recently in an opinion that seems, in some ways, to marginalize its other aspects:

> The precise issue in *Brown* was occasioned by the then statutory provisions that purported to give the General Assembly authority, through the L.R.C., to review and void executive branch administrative regulations. We held this review process was unconstitutional either as a legislative veto or as an impermissible extension of the legislative session [thus violating CONST. OF KY. of 1891, § 42].

*Cameron*, 628 S.W.3d at 74. Like many other opinions, *Cameron* tells us, precisely, that this is what *Brown* has justly come to be known for. *Diemer v. Commonwealth, Transp. Cabinet, Dep't of Highways*, 786 S.W.2d 861, 865 (Ky. 1990) ("[A] long line of cases . . . upheld the principle that the General Assembly cannot delegate any portion of the legislative function to another authority.").

But did the Court that decided *Brown* actually treat it as a delegation-of-powers case? That answer is no. If only the Court had stuck to its guns, *Brown* could have achieved the same outcome without, in effect, refuting the superior nature of the General Assembly's appointment powers so plainly granted by § 93. The Court had the perfect exit from its detour and chose not to take it.

KRS 446.090 allows the General Assembly to expressly provide that if any part of a statutory scheme is held to be unconstitutional, it shall be deemed so in its entirety. Such a provision was included in the statutory scheme *Brown* reviewed. *Brown*, 664 S.W.2d at 919 ("The non-severability clause that appears in KRS 13.092(3) has the effect of throwing the baby out with the bath water."). *Brown* determined that portions of the statutory scheme enacted as KRS 13.080— 13.125 violated "KY. CONST. Sec. 42, in that such a provision brings new life to the General Assembly (through the LRC) following adjournment[,]" and also "ha[s] the effect of creating a legislative veto of the administrative policy of the executive branch of government." *Id.* at 918. The non-severability statute, KRS 13.092, expressed the General Assembly's intent that, indeed, if any part of that statutory scheme was unconstitutional, the General Assembly wanted the Court to "toss the baby out with the bath water." *Id.* at 919.

But the Court ignored the General Assembly's intent in this regard. It decided not to restrict itself to what it claimed the case was about—"the delegation of powers by the General Assembly to the LRC." *Brown*, 664 S.W.2d at 209. It could have said that, although only portions of KRS 13.080, *et seq.*, are clearly unconstitutional, the non-severability clause requires it all be disallowed. Instead, the Court resolved to do what it indicated it would not do—decide "a power struggle" between the other branches of government. There can be no other reason

-120-

for ignoring the non-severability clause but to address and affirm the circuit court's ruling that "[t]he right of the [President Pro Tem of the Senate, and Speaker of the House of Representatives] to make certain appointments to boards and commissions was . . . invalid for the reason that the power of appointment was an executive function." *Id.* at 910. The simplism of this holding was too enticing and too easy for the *Brown* jurists to go the extra mile and examine the issue more closely, as I examine it in Section 12, *infra*. It has obviously and similarly enticed Appellees in the instant appeal. This review provides the chance to give it the fuller explanation it enjoyed beginning in 1830 and deserves today.

## 12. *Appointments not limited to Executive Department*

Before considering Kentucky's past jurisprudence on this issue, we should be pondering (sarcastically so) the imminence of a constitutional challenge to KRS 13A.020 because, if *Brown* is good law, we should expect that challenge soon. That statute creates (perhaps I should say re-creates) the "Administrative Regulation Review Subcommittee" of the Legislative Research Commission and purports to do exactly what *Brown* says is unconstitutional. The current statute says: "The subcommittee shall be composed of eight (8) members appointed as follows" including "three (3) members of the Senate appointed by the President [Pro Tem of the Senate]" and "three (3) members of the House of Representatives

-121-

appointed by the Speaker of the House of Representatives . . . ." KRS 13A.020(1). I do not believe such a challenge is forthcoming, nor should it be.[77]

As to the holding that the power of appointment is inherently executive, *Brown* is at least incomplete, if not entirely wrong. *Brown* and the opinions upon which it relies tell only the deviant part of our jurisprudence.

*Brown* held that statutes authorizing the General Assembly or its designees "to make appointments, fly in the face of the principle which declares such appointments cannot be made by the General Assembly itself. Such statutes constitute an incursion . . . into the separation of powers doctrine." *Brown*, 664 S.W.2d at 923. Contrary to its fuss that the case was not really a power struggle between the Governor and the General Assembly, the Court surely inserted itself to referee that fight. That would not be so bad, if only the Court had not gotten the law so wrong.

*Brown*'s conclusion that the separation-of-powers doctrine prevents any but the Executive Department from making appointments because

_____

[77] The response to this sarcastic suggestion might well be that *Brown* implies the General Assembly can make appointments to legislative committees. *Brown*, 664 S.W.2d at 922. But if so, how could the Court in that very case also hold that statutes authorizing "the Speaker and the President Pro Tem . . . to make appointments [to the LRC subcommittee], fly in the face of the principle that declares such appointments cannot be made by the General Assembly itself. Such statutes constitute an incursion by the General Assembly, *or in this case*, its designees, into the separation of powers doctrine."? *Id.* at 923 (emphasis added). If this language, obviously reflecting *Sibert* though *Sibert* is not cited here, was intended to reference appointments other than to the LRC subcommittee, then this part of the opinion is just whining to be declared dicta.

-122-

appointments are inherently executive was not an idea embraced by the Founders of our federal model for constitutions, nor was that the Founders' experiences. "Many incidents prior to the adoption of the Federal Constitution indicate that historically the appointing function was not necessarily included in the executive office." Note, *Power of Appointment to Public Office Under the Federal Constitution*, 42 HARV. L. REV. 426, 427 (1929) [hereinafter *Power of Appointment*]. At the Constitutional Convention in the summer of 1787, there was "violent disagreement . . . concerning the proper body to exercise the power of appointment[.]" *Id.* at 428. Conflicting drafts of the new constitution by delegates who "were experienced in the practical administration of government" "dealt chiefly with the practical advantages of having either the President or Congress appoint to office . . . ." *Id.* (citing 1 MAX FARRAND, RECORDS OF THE FEDERAL CONVENTION 67 *et seq.*, 119–25 [hereinafter FARRAND, RECORDS]; 2 *id.* 23, 37, 41, 51, 71, 80, 97, 99, 110, 118 (1911)). In the end, the exclusive power of appointment in the President was rejected in favor of a proviso that "Congress may . . . vest the power of appointment" signifying an intention "to give the legislature power to vest the appointment of officers in some other body, or to permit Congress, in its discretion, to exercise that function itself . . . ." *Id.* (citing 1 FARRAND, RECORDS 282, 292; 3 *id.* 617, 625 (Hamilton Plan)).

The idea that executive appointments must be made by executive officers remains an uncommon view in the federal system, as Boston University federal courts scholar Professor Yackle tells us:

> [I]t has been insisted that article II's injunction that the "executive Power shall be vested in a President" squarely prohibits the appointment of federal officers (conceived as an intrinsically executive function) by anyone other than the president or his linear agents. Yet neither the overarching separation-of-powers idea nor the language of article II mandates any such formalism. Modern appraisals of constitutional structure and language fully contemplate that other branches may play a significant, even determinative, role in the selection of even executive officers.

Larry W. Yackle, *Choosing Judges the Democratic Way*, 69 B.U.L. REV. 273, 319–20 (1989) (footnotes omitted).

Such insistence as described in Professor Yackle's article is in no way different in kind or substance from what Appellees insist here. It is quite the same argument as rejected in *Morrison v. Olson*, 487 U.S. 654, 108 S. Ct. 2597, 101 L. Ed. 2d 569 (1988). In *Morrison*, the Supreme Court of the United States addressed the constitutionality of the independent counsel provisions of the Ethics in Government Act of 1978 (Act) that allowed for the appointment of a special counsel independent of executive control. *Id.* at 661, 108 S. Ct. at 2603. Those challenging the law made the same arguments as made in *Brown* and as repeated in the case now under review. The Court dispatched those arguments, saying, "the

power to appoint inferior officers . . . is not in itself an 'executive' function in the constitutional sense . . . ." *Id.* at 695, 108 S. Ct. at 2621. The Court also said "we do not think that the Act impermissibly undermines the powers of the Executive Branch, . . . or disrupts the proper balance between the coordinate branches by preventing the Executive Branch from accomplishing its constitutionally assigned functions . . . ." *Id.* (brackets, internal quotation marks, and citations omitted).

Federal jurisprudence can be illuminating, especially when addressing core principles of the American system of government such as the separation of powers. But did the states align with federal thinking? More importantly, has Kentucky jurisprudence ever aligned with it? The answer to the first question is yes. *See Marine Forests Soc'y v. California Coastal Commonwealth*, 113 P.3d 1062, 1085–86 (Cal. 2005) (citing a majority of the states that follow the reasoning of *Morrison* but counting *Brown* among "the minority of state cases that reach a contrary conclusion"). The answer to the second question is that Kentucky did not simply align with it, Kentucky pioneered the principle until the aberrant opinions of *Pratt 1* and *Sibert* bastardized it, and *LRC v. Brown* followed them. I do my best to reveal the incredible flaws in these opinions in Sections 34–38 and Sections 50, 54, *infra*.

As for the states as a whole, "[t]hough the state constitutions in force between 1776 and 1787 uniformly used the term 'executive power,' the power of

appointment was largely vested in the legislatures." *Power of Appointment*, 42

HARV. L. REV. 427. An analysis of the states' high-court opinions conducted about

the time Kentucky rendered *Sibert* concluded: "The ordinary constitutional

distributive clause for the separation of powers [such as Kentucky's §§ 27 and 28]

has been deemed *insufficient* to vest the power of appointment, as a *per se*

executive function, solely in the governor . . . ." *Id*. at 430 (emphasis added).

Notably, the analysis identified *Pratt 1* as the only case out of step with this widely

held view. *Id*. at 430 n.33.

   As for Kentucky, if we followed *Brown*'s lead and unwisely narrowed

our focus until we saw *Pratt 1* and *Sibert* as the only jurisprudence on the issue of

the nature of the appointment power, we might believe Kentucky jurisprudence

simply chose to go its own, lone way. But *Pratt 1*, which is *Sibert*'s authority and

both of which are crucial to *Brown*, was far from the first case to address the issue.

*Pratt 1* was not even, as *Brown* ignorantly calls it, the case on this issue most

"contemporaneously decided with the adoption of our present constitution[.]"

*Brown*, 664 S.W.2d at 912. That case was *Commissioners of Sinking Fund v.*

*George*, 47 S.W. 779 (Ky. 1898). I'll come to that later. For now, let us return to

consider Kentucky's influential jurisprudence regarding the nature of appointment

powers.

Kentucky was among the first states, perhaps the very first, to address the nature of the appointment powers.  It did so in *Taylor v. Commonwealth*, 3 J.J. Marsh. 401, 26 Ky. 401 (1830), a case often cited side-by-side with *Marbury v. Madison*, 5 U.S. 137, 2 L. Ed. 60 (1803).  *See, e.g.*, *Witherspoon v. Mississippi*, 103 So. 134, 143 (Miss. 1925); *Nebraska v. Moores*, 76 N.W. 175, 190 (Neb. 1898), *overruled by Redell v. Moores*, 88 N.W. 243 (Neb. 1901); *North Dakota ex rel. Standish v. Boucher*, 56 N.W. 142, 147 (N.D. 1893); *Connecticut v. Barbour*, 22 A. 686, 688 (Conn. 1885); *Indiana v. Denny*, 21 N.E. 274, 279 (Ind. 1889); *Hoke v. Field*, 73 Ky. 144, 145 (1874).

In *Taylor*, the clerk of the Campbell County Court accepted a commission as an army paymaster.  The county court, supposing there to be a vacancy, appointed another to succeed him.  Taylor wanted to keep both jobs and so appealed the county court decision to the Court of Appeals.  *Id.* at 401.  The case presented a question of jurisdiction.  If the county court's appointment of Taylor's successor was a judicial act, the Court had jurisdiction.  However, if the appointment was merely an executive act, it did not.  *Id.* ("The appellate jurisdiction of this court is judicial.  We can revise that only which is judicial.").

Analysis began with the holding that "[t]he appointment of a [court] clerk, is not, strictly speaking, a judicial act.  Appointment to [any] office is intrinsically 'EXECUTIVE.'"  *Id.* (emphasis in original).  "[A]ppointment of a

clerk, [is], as we have supposed it must be, the exercise of an executive function, and is, therefore, as purely an executive act, as if it had been performed by the governor." *Id.* at 402. The Court offered several iterations of the same idea: "It is the prerogative of appointing to office, and is of the same nature, whether it belong to a court or to a governor." *Id.* at 401. An appointment "is essentially executive, whensoever, or by whomsoever it may be exercised. It is as much executive when exercised by a court as by the governor." *Id.* In the end, the Court ruled that it lacked appellate jurisdiction because the Campbell County Court—part of the judiciary—constitutionally exercised an executive power in making an appointment. *Id.* at 402. The point made by repeating the holding in different ways was that the power to appoint, though intrinsically executive in nature, is not restricted to the Executive Department or deprived of the other two branches.

For the remainder of the century, under three constitutions including the current one, our courts repeated the principle that just because the power of appointment was, by its nature, executive does not mean such power cannot be exercised by a department of government other than the Executive Department. *Bruce v. Fox*, 31 Ky. 447, 449 (1833); *Justices of Spencer Cnty. Court v. Harcourt*, 43 Ky. 499, 500 (1844) (hereinafter *Harcourt*); *Gorham v. Luckett*, 45 Ky. 146, 159 (1845) (hereinafter *Gorham*) (emphasis added) ("although the power of appointment would seem to be . . . executive or ministerial in its nature, it has been

repeatedly held by this Court, that because the laws vest in certain individuals, (in preference to others,) the rights of administration, or *because the law designates the person who is entitled to the grant of administration*" the appointment is lawful though not vested in the Executive Department); *Speed v. Crawford*, 3 Met. 207, 214, 60 Ky. 207, 214 (1860) (hereinafter *Speed*) ("construction [of Constitution] which would deny to the legislature the right of clothing the judicial tribunals with certain minor functions, that are in their nature strictly executive, would greatly embarrass, if it did not defeat, to some extent, the practical workings of our system"); *Applegate v. Applegate*, 61 Ky. 236, 237 (1863) (hereinafter *Applegate*); *George*, 47 S.W. at 787; *Purnell*, 48 S.W. at 407.

But *Taylor v. Commonwealth* was not only precedent in Kentucky. It had national prominence and was cited as persuasive in more than a dozen foreign jurisdictions. When the Constitutional law expert of the era reported on the case, this is what he said:

> An appointment to office was said in *Taylor v. Commonwealth* . . . to be intrinsically an executive act. In a certain sense this is doubtless so, but it would not follow that the legislature could exercise no appointing power, or could confer none on others than the chief executive of the state. *Where the constitution contains no negative words to limit the legislative authority in this regard*, the legislature in enacting a law must decide for itself what are the suitable, convenient, or necessary agencies for its execution, and the authority of the executive must be limited to taking care that the law is executed by such agencies.

CONSTITUTIONAL LIMITATIONS 114 n.3 (1874) (emphasis added).

Shortly after Kentucky's 1890 Constitutional Convention, the North Dakota Supreme Court addressed this issue in *Boucher*, *supra*, 56 N.W. 142. Alerted to *Taylor v. Commonwealth* by its being referenced in another legal treatise, MECHAM ON PUBLIC OFFICERS, the North Dakota court said, "The case from Kentucky, which seems to be a leading case, and which asserts that the power to appoint to office is inherently executive, still upheld an appointment made by a court exercising judicial powers." *Id.* at 147–48. Relevant sections of Mecham's treatise said this:

> **§ 103. Where the Power of Appointment lies**. — The power of appointing public officers rests primarily with the people. By their constitutions, however, they delegate it to their representatives, and we find it usually vested in the chief executive of the nation, state or municipality by which the officer's authority is created, but it is sometimes conferred upon legislatures . . . .
>
> **§ 104. Appointment to office is an executive Act**. — So it is said that appointments to office, whether made by judicial, legislative or executive officers or bodies, are in their nature intrinsically executive acts. Though it by no means follows that the appointing power is inherent in the executive.
>
> . . . .
>
> **§ 108. Authority of Executive to appoint must be conferred by sovereign Power**.— But, even though the act of appointing officers may be deemed executive in its nature, the power to appoint officers, excepting, perhaps,

those who are to assist him in the discharge of his personal executive duties is not inherent in the chief executive, but must exist, if it exist at all, by virtue of the authority conferred on him by the sovereign power.

FLOYD R. MECHAM, A TREATISE ON THE LAW OF PUBLIC OFFICES AND OFFICERS 42–44 (1890).

Cooley and Mecham were not the only scholars to take special note of the precedent of *Taylor v. Commonwealth*. Abraham C. Freeman, editor of AMERICAN STATE REPORTS, authored an exhaustive note on the question, prompted by a recently rendered California opinion, *California ex rel. Waterman v. Freeman*, 22 P. 173 (Cal. 1889). After considering *Taylor v. Commonwealth*, the *Waterman* court held "that the power of appointment to office, so far as it is not regulated by *express provisions* of the constitution, may be regulated by law, and, *if the law so prescribes*, *may be exercised by the members of the legislature*." *Id.* (emphasis added).

Mr. Freeman's note in AMERICAN STATE REPORTS "review[ed] all the authorities upon this subject" including *Taylor v. Commonwealth*. *Fox v. McDonald*, 13 So. 416, 421 (Ala. 1893). He first said *Waterman* was just "one of several which have recently arisen in which the executive department of the state has resisted a supposed encroachment, and has claimed to be the sole constitutional depository of [appointment] powers exercised by the legislature." 13 A. C.

FREEMAN, AMERICAN STATE REPORTS 125 (1890) [hereinafter AMERICAN STATE

REPORTS].  Courts uniformly found the supposed encroachments constitutional.

Whether the lawyers who predominated at Kentucky's 1890

Convention were aware of this national trend or of the experts' research we cannot

say with certainty.  *But see Bullitt*, 105 S.W. at 472 ("among the members of the

last constitutional convention were many of the most learned lawyers of the state").

But such works as those by Cooley, Mecham, and Freeman were the lawyers'

stock-in-trade in those days before online digital legal research engines.  It is

foolish to believe the delegates were unaware of *Taylor v. Commonwealth* and its

national prominence as they deliberated the distribution of powers among the three

departments.  Certainly, they understood these scholars were speaking with one

voice, as Freeman's thorough research concludes:

> The truth is that the power of appointing or electing to office does not necessarily and ordinarily belong to either the legislative, the executive, or the judicial department.  It is commonly exercised by the people, but the legislature may, as the lawmaking power, when not restrained by the constitution, provide for its exercise by either department of the government, or by any person or association of persons whom it may choose to designate for that purpose.  It is an executive function when the law has committed it to the executive, a legislative function when the law has committed it to the legislative, and a judicial function, or at least a function of a judge, when the law has committed it to any member or members of the judiciary.

*Id.* at 130.

The turn of the century did not bring an end to our Kentucky courts'

understanding and application of the principle established in *Taylor v.

Commonwealth*. In *Sewell v. Bennett*, the Court addressed competing

appointments to the Workmen's Compensation Board. 220 S.W. 517, 518 (Ky.

1920). Ignoring *Pratt 1* decided two decades before, our highest court held that

when a board or commission "is purely a legislative creation [such as the Fair

Board or even the election contest boards in *Pratt 1*] . . . the Legislature had the

*undoubted power to make these appointments itself* or give them to the Governor,

or indeed any other person or body that it might designate . . . . This power is

conferred on the Legislature by section 93 of the Constitution . . . ." *Sewell*, 220

S.W. at 519 (emphasis added).

In 1923, the former Court of Appeals declined to find unconstitutional

a law that "authorized the speaker of the House and president of the Senate to

make the appointments" to a commission and, having been vested with such

power, the speaker and president "had the right to act in an executive capacity."

*Craig v. O'Rear*, 251 S.W. 828, 831 (Ky. 1923).

In 1930, when the General Assembly amended a statute relating to the

State Highway Commission removing the power to appoint its members from the

Governor and lodging it with an "Appointing Board," the Governor challenged the

amendment as unconstitutional, in violation of §§ 27 and 28. *Rouse*, 28 S.W.2d at

-133-

746–47.  Consistent with *Taylor v. Commonwealth*, and by its logic therefore contradicting both *Pratt 1* and *Sibert*, the Court rejected the argument and said: "[I]t should also be remembered that the express mentioning in, and conferring by, a constitutional provision of named powers and duties [as in § 93] without a further provision confining them to those so expressly named,[78] does not create an inhibition upon the Legislature . . . which principle grows out of the one above mentioned; *i.e.*, that a state Constitution is not a grant of powers to the Legislature, but only a limitation upon them." *Id.* at 747.

In 1942, the court in *Johnson v. Commonwealth ex rel. Meredith* said there "are the many instances where the legislature has from time to time assigned to other officers duties which naturally and conventionally belong to the Governor . . . or other constitutional officer, concerning whose duties the constitution is silent, or does not expressly authorize the legislature 'to prescribe' . . . but the power has not been questioned."  165 S.W.2d 820, 828 (Ky. 1942).

As discussed below, *Pratt 1* and *Sibert* and *Brown* ignore this substantial body of law born in *Taylor v. Commonwealth* and nurtured nationwide.

---

[78] *See* footnote 62, *supra*, and text following, including Section 7, and the discussion of the choice by delegates to both the 1849 and 1890 Constitutional Conventions not to emulate the federal Appointment Power Clause that does include "a further provision confining them [*i.e.*, appointment powers] to those expressly named[.]"

And as will be discussed, the reasons for such exclusionary analysis can only be and, in fact, are explained by extra-judicial motivations.

But before focusing on *Pratt 1* and *Sibert*, some of *Brown*'s independent departures from our jurisprudence must be addressed.

### 13. ***"The Legislature has all power, unless restricted by the Constitution"***

In *Brown*, the Supreme Court rejected its appellants'"urg[ing of] this court to adopt a so-called liberal construction of the separation of powers doctrine" as though the idea were new and radical. *Brown*, 664 S.W.2d at 913. Perhaps the Court was unaware, but that ship sailed long ago—"The ever–increasing complexity of modern business and social conditions demands that *the courts exercise a liberal rather than a restrictive attitude* toward legislative acts enacted pursuant to the police power inherent in the exercise of governmental functions and that such act should not be set aside lightly, but only when it is plainly violative of some constitutional provision." *Whitaker v. Green River Coal Co.*, 122 S.W.2d 1012, 1016 (Ky. 1938) (emphasis added).

The Court also refused to agree with its appellants who "argue[d] that the General Assembly is the 'dominant' branch of government." *Brown*, 664 S.W.2d at 913. Perhaps the Court also was sadly unfamiliar with James Madison's work in which he famously explained that "[i]n republican government the legislative authority, *necessarily*, predominates." ALEXANDER HAMILTON, ET AL.,

THE FEDERALIST No. 51, at 356 (Benj. F. Wright ed., 1961) (emphasis added) (hereinafter FEDERALIST). Given this principle of republican government, the Supreme Court should have suppressed its outrage in response to what it saw as its appellants' suggestion that, "in *Brown v. Barkley*, Ky., 628 S.W.2d 616 (1982), we denigrated the power of the Governor and gave the General Assembly a dominant role . . . ." *Brown*, 664 S.W.2d at 913. *Barkley* didn't do that, the nature of republican government does it, and necessarily according to James Madison.

The *Brown* Court further told its appellants they were wrong to say "the General Assembly possesses all powers and authority to act which are not specifically denied it by the Constitution and has the authority to act in exercising those powers." *Brown*, 664 S.W.2d at 913. Said the Court, "We do not agree." *Id.* But our jurisprudence is replete with decisions that do agree with exactly what the *Brown* appellants said.

"The Legislature has all power, unless restricted by the Constitution." *Rhea v. Newman*, 156 S.W. 154, 158 (Ky. 1913) (internal quotation marks and citation omitted). "It is as fundamental as it is elementary that the legislature expresses the will of the people and may exercise plenary power in all things where it is not restrained by the Constitution or limited by the powers surrendered to the Federal government." *Board of Educ. of Louisville v. City of Louisville*, 288 Ky. 656, 157 S.W.2d 337, 345 (1941).

The seeming ignorance of these fundamental elements of republican government should disturb us. It was not that long ago when our courts reflexively voiced a deeper understanding.

For example, in 1930, our high court remained confident in Judge Cooley's expertise, saying:

> [S]tate Constitutions do not *delegate* power to the Legislature of the state, which body has all power unless prohibited or limited by the Constitution. In other words, state Constitutions unlike the federal one only prescribe inhibitions and limitations upon legislative power and that unless the legislative body is so prescribed and limited by the Constitution **its authority is unlimited** and it may enact upon any subject in the mode and manner it sees proper.

*Rouse*, 28 S.W.2d at 747 (emphasis in original; double emphasis added) (citing CONSTITUTIONAL LIMITATIONS, (8th ed.) vol. 1, p. 96). *See Miller v. State Bldg. Comm'n*, 214 S.W.2d 265, 276 (Ky. 1948) (discussing Legislative Department's "plenary and inherent powers"). Our Supreme Court said it concisely this way: "[T]he legislative branch . . . has *all governmental authority* not delegated elsewhere and not prohibited by the [Federal] Constitution." *Ex parte Auditor of Public Accounts*, 609 S.W.2d 682, 685 (Ky. 1980) (emphasis added).

Mr. Freeman in his AMERICAN STATE REPORTS nicely explains how this concept of the General Assembly's plenary power and the nature of the appointment power work together.

The legislature represents the whole power and authority of the people, except when they have withheld or limited such power, or have conferred it upon some other department. "In creating a legislative department and conferring upon it legislative power, the people must be understood to have conferred the full and complete power, as it rests in and may be exercised by the sovereign power of any country, subject only to such restrictions as they may see fit to impose, and to the limitations which are contained in the constitution of the United States. The legislative department is not made a special agency for the exercise of specifically defined legislative powers, but is intrusted with general authority to make laws at discretion": Cooley's Constitutional Limitations, 87. Undoubtedly the people, being the sovereign power in every republican form of government, may make laws in such modes and at such times as they may see proper. But the people do not act directly, but by the legislature. They have granted the legislature power to do for them whatever they might otherwise do for themselves, except when they have by the constitution withheld this power. *The legislature*, acting for the people, may therefore provide for officials not otherwise provided for in the constitution, and may, we think, *choose officials directly*, or in any other mode not prohibited by the constitution.

13 AMERICAN STATE REPORTS 126–27 (emphasis added).

If there is any doubt that the delegates of the 1890 Constitutional Convention knew this concept at their core when proposing the boundaries of power between the three departments, just read what was said by John Carroll, one of the delegates *Brown* quotes as knowing what the Convention was all about:

I inquire if it is not an elementary doctrine which has never been questioned, that when the Constitution of a State is silent, the General Assembly is supreme; and if the

-138-

Legislature has not a right to do anything that is not *positively* prohibited by the Constitution?

4 DEBATES (1890) 5831 (Remarks of Mr. Carroll) (emphasis added).

The authority of this abundant jurisprudence and even the delegates' words at the Constitutional Convention certainly could not have escaped the *Brown* Court. The Court must have closed its eyes to it. We cannot close ours.

All that Appellees offer is the same argument that led the Court in *Brown* to blind itself. Section 93's power of appointment is prohibited, say Appellees, by the spirit of the republican form of government and the separation of powers doctrine as ensconced in §§ 27 and 28. But that is not the law.

## 14. *The Judiciary cannot conjure spirits for the Governor*

The circuit court in this case under review held that while § 93 authorizes the General Assembly to vest appointment power in an executive officer other than the Governor, "at some point" that can go too far. (R. at 1001). Just what point that might be, the circuit court did not know. (R. at 1002, n.12). It chose not to speculate, "[g]iven the prohibition against establishing public policy from the bench." The circuit court believed it would be doing just that— establishing public policy—if it "determine[d] the number of appointments the Governor requires to maintain constitutionality." (*Id.*)

But that excuse only raises the undoubtable principle that "the Legislature has the plenary power to declare the public policy of the state . . . ."

-139-

*Totten v. Parker*, 428 S.W.2d 231, 238 (Ky. 1967). If it is so that the number of members of the Fair Board the Governor gets to appoint is a question of public policy, what prevents the General Assembly from choosing whatever number it wants, including zero? I believe it is wisdom that prevents it and the lack of wisdom that invites it. *Hager v. Robinson*, 157 S.W. at 1142 ("the justice and patriotism of the representatives of the people" is "[t]he protection against the unwise or oppressive legislation").

The circuit court's opinion hardly explains how the non-specific powers of the inert cornerstones of the constitutional provisions upon which they rely trump the express power of § 93 and the plenary power of the General Assembly. As a mathematical metaphor, the circuit court proposed an equation that $27 + 28 > 93$ but could not show its proof. No one can without ignoring longstanding precedent.

Like a medium conjuring ectoplasm from thin air, the circuit court claimed it could discern a spirit of republicanism not expressly stated in the Constitution, but emanating from §§ 27 and 28, and then wielded that imagined might to realign the power of the government departments. The legacy of *Brown* is the temptation to do it again—to conjure such spirits and exercise power never given the courts. Our own jurisprudence warned against that temptation long ago.

Soon after the Court in *Sibert* contrived and appended to § 93 an unwritten restriction—that the General Assembly may not make appointments itself— certain national events raised "anew the issue whether state legislatures are limited in their powers by restrictions not found in the text of written constitutions." Walter F. Dodd, *Extra-Constitutional Limitations Upon Legislative Power*, 40 YALE L.J. 1188, 1188 (1931) [hereinafter Dodd, *Extra-Constitutional*]. Opinions like *Sibert* and that cited first in the article, *Thomas v. Reid*, 285 Pac. 92 (Okla. 1930),[79] prompted renewed interest in relearning "[t]he orthodox doctrine of American constitutional law that a statute may be declared invalid only because of conflict with the text of written constitutions"—that is, conflict with express words of limitation. *Id.* at 1190. To explain the doctrine, the author turned to Justice James Iredell's explication in *Calder v. Bull*, 3 U.S. 386, 1 L. Ed. 648 (1798).

After acknowledging our courts' duty to declare unconstitutional laws that conflict with prohibitory language in a constitution's text, Justice Iredell said a court is prohibited from pronouncing a statute void:

> merely because it is, in their judgment, contrary to the principles of natural justice. The ideas of natural justice are regulated by no fixed standard; the ablest and the purest of men have differed upon the subject; and all that

---

[79] In *Thomas*, the Oklahoma court "held invalid a legislative act requiring a vote of sixty per cent of the qualified voters to authorize the sale of a municipally-owned public utility, saying that majority rule is one of the foundation stones of our government and that the legislature is powerless to take away the right of local government existing in the several municipalities at the time of the adoption of the state constitution." *Extra-Constitutional*, 40 YALE L.J. at 1188.

> the [c]ourt could properly say, in such an event, would be, that the [l]egislature (possessed of an equal right of opinion) had passed an act which, in the opinion of the judges, was inconsistent with the abstract principles of natural justice.

*Id.* at 399. That was a warning to the courts.

Kentucky embraced this view very early on. The first of the Kentucky opinions citing Iredell alluded to the above-quoted longer statement before quoting a more succinct one: "We must be content to limit [legislative] power, where we can; and where we can not, consistently with its use, we must be content to repose a salutary confidence." *Lapsley v. Brashears*, 14 Ky. 47, 105 (1823) (quoting *Calder*, 3 U.S. at 400). "[I]f the judges have the power to declare a law void, because they *think* it unconstitutional," said the Kentucky court, "they may put a stop to all legislation that does not accord with their notions of policy." *Id.* (emphasis added).

Shortly thereafter, in *Fisher v. Higgins*, the court included the full quote from the beginning. 21 Ky. 140 (1827). "Judge Iredell is equally explicit, and declares that if 'the legislature . . . shall pass a law, within the general scope of their constitutional power, the court can not pronounce it to be void, merely because it is in their judgment contrary to the principles of natural justice.'" 21 Ky. at 149 (quoting *Calder*, 3 U.S. at 399).

Under the current Kentucky Constitution, our former Court of Appeals, with some help from Judge Cooley, put the idea in its own terms in *Hager v. Robinson*. "The courts are not the guardians of the rights of the people of the state, except as those rights are secured by some constitutional provision which comes within the judicial cognizance . . . [and that depends on whether] restrictions upon the legislative authority can be pointed out in the Constitution, and the case shown to come within them." 157 S.W. at 1142 (quoting CONSTITUTIONAL LIMITATIONS (7th Ed.) §§ 236, 237). "Pointed out" in this context means directing the Court to specific language limiting the power of the General Assembly.

A bit more recently, our high court described the illogic and incompatibility of the Legislative Department's plenary power and the Judicial Department's supposed power to declare a statute unconstitutional without identifying express prohibitory constitutional text. The Court said:

> the theory that an act of the Legislature can offend the spirit and not the letter of the state Constitution is obviously inconsistent with the almost, if not universally, recognized fact that under such an instrument the power of the Legislature is plenary, except as therein defined.

*Johnson v. Fordson Coal Co.*, 281 S.W. 472, 475 (Ky. 1926).

The judiciary cannot conjure the spirits of republicanism from §§ 27 and 28 to assist in usurping both the plenary and the express power of the General

-143-

Assembly.  But that is what was done in *Brown* and in the opinions essential to

*Brown*'s holding—*Pratt 1* and *Sibert*.  It is what the circuit court did in this case.

### 15. *There is nothing special about Kentucky's separation of powers provisions*

It might seem sacrilegious to say there is nothing special about

Kentucky's separation-of-powers provisions.  But believing otherwise is believing

a myth that Thomas Jefferson authored them.  Before busting that myth as

historically disprovable, we should test its viability as a simple question of reason.

Jefferson's authorship was supposed to have been solicited "to insure

a more perfect separation of the powers and privileges of the three great

departments of government than was secured by" the Federal Constitution—a

document Jefferson took no part in drafting.  *Id.*  But those who did author the

Constitution, especially James Madison,[80] believed its text and structure

---

[80] Madison, a practical thinker experienced in government, never believed the complete separation of powers could yield a workable government:

> The oracle who is always consulted and cited on this subject, is the celebrated Montesquieu. . . . [I]n saying "there can be no liberty where the legislative and executive powers are united in the same person, or body of magistrates," or "if the power of judging be not separated from the legislative and executive powers," he did not mean that these departments ought to have no *partial agency* in, or no *control* over the acts of each other.  His meaning, as his own words import, and still more conclusively as illustrated by the example in his eye, can amount to no more than this, that where the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free constitution, are subverted.

FEDERALIST No. 47 (Madison) (emphasis in original).  He also commented on the state constitutions that had thus far been adopted: "If we look into the constitutions of the several states we find that notwithstanding the emphatical, and in some instances, the unqualified terms in which

-144-

establishing a republican form of government inherently and sufficiently embodied the concept of three separate, co-ordinate branches. They saw no need for an express separation-of-powers provision. And when Madison examined the state constitutions,[81] he said, "in no instance has a competent provision been made for maintaining in practice the separation delineated on paper." FEDERALIST No. 47 (Madison). That included Jefferson's draft of Virginia's constitution.

So, what does "a more perfect separation" mean? We know this much. Nothing in "the political apothegm" of the separation-of-powers doctrine "require[s] that the legislative, executive, and judiciary departments should be wholly unconnected with each other." FEDERALIST No. 48 (Madison).

"The men who met in Philadelphia in the summer of 1787 were practical statesmen, experienced in politics, who viewed the principle of separation of powers as a vital check against tyranny." *Buckley v. Valeo*, 424 U.S. 1, 121, 96 S. Ct. 612, 683, 46 L. Ed. 2d 659 (1976). "But they likewise saw that a hermetic sealing off of the three branches of Government from one another would preclude the establishment of a Nation capable of governing itself effectively." *Id.* Do Kentucky jurists conceive of "a more perfect separation" as the hermetic sealing of

---

this axiom has been laid down, there is not a single instance in which the several departments of power have been kept absolutely separate and distinct." *Id.* He took special note that "[t]he language of Virginia['s constitution] is still more pointed on this subject . . . ." *Id.*

[81] Each of the original 13 states had adopted a constitution.

our separate departments from one another, no matter what the rest of the Constitution says? I think not. Why would we? How could we do so and still call ourselves a government of the People?

If "people are entitled to that form of government they wish," *Votteler*, 23 S.W.2d at 590, and if Kentuckians from time to time put to use the most significant part of § 28 (and its antecedents)—its exceptions clause— for example by shifting the appointment powers from the Governor to the General Assembly in 1850, is it the purpose of this "more perfect separation" to empower the Judicial Department to undo that expression of the will of the People? Is our judiciary naïve enough to believe it possible to define an *equipoise* of power among the three branches, and brazen enough to say we judges can establish it? If the Founders could do neither, why should we believe we can?

As far as I understand them, §§ 27 and 28 do no more or less than the unwritten understanding of the Federal Constitution's establishment of the tripartite system of republican government. These sections tell us there are boundaries between the three departments, and we must simply remember that the People define the contours of those boundaries in the language of the remaining sections of the Constitution. Sections 27 and 28, just like the corresponding

provisions of all the states and commonwealths in the Union,[82] identify our state government as tripartite and republican, notwithstanding that the boundaries and degree to which interstitial power is exercised necessarily varies from state to state. Thus, two states can have different republican forms of government, one in which the People grant more express powers to the Executive Department and expressly place more limits on the legislature's plenary power, such as North Carolina, while another state's People withhold express powers from the Governor and impose fewer limitations on the General Assembly's plenary powers, such as Kentucky.

---

[82] There is a presumption in the chutzpah that Kentucky's separation-of-powers provisions are qualitatively better than those of other states. It is the presumption that such provisions can vary in strength. But if that is so, then the Federal Constitution, with no such provision, would be weakest by far. The assertion in Kentucky opinions that ours are the strongest separation-of-powers provisions is just "my-dad-can-beat-up-your-dad" braggadocio that has no place in thoughtful jurisprudence. These provisions have an important purpose, of course. It is to identify the state governments as embracing the republican form of government, a requirement of the Federal Constitution for statehood, U.S. CONST. art. 4, § 4, and to prohibit arbitrary power from being exercised by any branch. *Arkk Properties, LLC v. Cameron*, 681 S.W.3d 133, 140 (Ky. 2023) (internal quotation marks and citations omitted) ("The doctrine of the separation of powers was adopted . . . to preclude the exercise of arbitrary power. The purpose was . . . to save the people from autocracy.").

But if we accept this unfounded presumption, we must swallow our pride because New Hampshire might have a better claim for top honors. Its separation-of-powers provision says its three branches of government "ought to be kept as separate from, and independent of, each other, as the nature of a free government will admit[.]" N.H. CONST. Pt. 1, art. 37th. If we are frank, we will admit Kentucky's provisions are simply not, in any substantial way, unlike the corresponding provisions of other states and commonwealths. *See, e.g.*, ARK. CONST. art. IV, §§ 1, 2; COLO. CONST. art. III; CONN. CONST. art. II; FLA. CONST. art. II, § 3; IND. CONST. art. III, § 1; LA. CONST. ANN. art. II, §§ 1, 2; ME. CONST. art. III, §§ 1, 2; MD. CONST. Decl. of Rts. art. 8; MASS. CONST. Pt. 1, art. XXX; MO. CONST. art. II, § 1; NEB. CONST. art. II, § 1; NEV. CONST. art. III, § 1; N.J. CONST. art. III, ¶ 1; TENN. CONST. art. II, §§ 1, 2; VA. CONST. art. I, § 5; art. III, § 1; VT. CONST. CH II, § 5; W. VA. CONST. art. V, § 1.

Both satisfy the Federal Constitutions guarantee and requirement of a republican form of government. U.S. CONST. art. 4, § 4.

The notion that it is the courts' duty to maintain a balance of power among the branches, or even that these powers can be measured in a way that permits an apples-to-apples comparison branch-to-branch, is fantastic. We are foolish to try. And we violate the Constitution when we do.

### 16. *The Myth of Jefferson's involvement in Kentucky's Constitution*

The legend that Thomas Jefferson authored Kentucky's separation-of-powers provisions is hypnotic. It is time to come out of our trance.

The idea that the walls separating the departments of Kentucky's government are taller or wider or stronger than those of any other state's constitution stems from the imaginings of Judge George DuRelle.[83] He first told his tale in *Sinking Fund v. George*, in a dissenting opinion. 47 S.W. at 785 (DuRelle, J., dissenting). It was a hoax. A hundred years passed before we even suspected anything.

In 2005, the Supreme Court discovered "Judge Du Relle cited to no authority for the following account of Jefferson's role. Later authorities cite only to Judge Du Relle's dissents in *George* and *Purnell*, *infra*." *Fletcher*, 163 S.W.3d

---

[83] *See* biography of George DuRelle (1852-1926), in 2 E. POLK JOHNSON, A HISTORY OF KENTUCKY AND KENTUCKIANS 862–63 (1912) [hereinafter KENTUCKIANS].

at 861 n.3.  The Court apparently never looked further.  Now we must examine

those suspicions because the hoax has played an overwhelming role in our

jurisprudence ever since Judge DuRelle first perpetrated it.

How has the hoax lasted a century and a quarter?  Because "lawyers

[a]re interested in precedents, but not in history."  FRIEDMAN, 11–12.  History tells

us the story was first told in an age when facts often took a backseat to grandiose

rhetoric.  In his "Cross of Gold" speech, William Jennings Bryan appealed to his

audience's patriotism and invoked images of the Resurrection.  DuRelle's dissent

appealed to his audience's patriotism and invoked images of America's founding.

He started by naming Kentucky the "firstborn daughter of Virginia."

*Id.* at 787.  He then planted seeds of a missed opportunity, speculating what

Jefferson would have done had he participated in drafting the Federal Constitution:

> [H]ad Mr. Jefferson been in America at the time of the
> adoption of the federal constitution, that instrument would,
> in all probability, have contained the enactment which we
> find only in the constitution of Kentucky, with its three
> distinct provisions:  First, that the government shall be
> divided into three distinct departments; second, that each
> of them shall be confined to a separate body of magistracy;
> and, third, that no person or collection of persons shall
> exercise any power properly belonging to either of the
> others . . . .

*Id.* at 785.  Besides erroneously saying no other state has such provisions—they all

do—what Judge DuRelle thought Jefferson would have done is, of course, naked

speculation.  Jefferson would have had to match wits on the subject with James

-149-

Madison who thought express statements of the separation of powers, at least for the Federal Constitution, was unnecessary, perhaps even pointless. *See Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. ___, 140 S. Ct. 2183, 2205, 207 L. Ed. 2d 494 (2020) (internal quotation marks omitted) ("It is true that there is no 'removal clause' in the Constitution, [citation omitted], but neither is there a 'separation of powers clause' or a 'federalism clause.' These foundational doctrines are instead evident from the Constitution's vesting of certain powers in certain bodies."). The historical record indicates Jefferson had less interest in challenging Madison's view than DuRelle wanted us to believe.

Jefferson was familiar with the Constitution's language—or lack of it on this point—well before he returned to America from his service as Minister to France in 1790. From Paris, he wrote to his good friend, Kentuckian John Brown,[84] expressing little reservation about the founding document. "I am greatly

---

[84] John Brown (1757-1837) was born in Staunton, Virginia, was close friends with George Washington, John Adams, Thomas Jefferson, and James Madison, served in the Revolution and afterwards attended William and Mary, 1778-80, before studying law under George Wythe and Jefferson. Around 1783 Brown moved to Kentucky and practiced law, first in Danville and then in Frankfort. He represented the Kentucky district in the Senate of Virginia, 1784-88, and in the Confederation Congress, 1787-88, and he supported the new federal constitution. Brown was elected from Virginia to the United States Congress, 1789-92, and represented the new state of Kentucky in the United States Senate, 1792-1805, allying himself with Jefferson and Madison and serving as president pro tempore, 1803-04. Losing his bid for a third term, Brown returned permanently to Liberty Hall, his home in Frankfort, where he again practiced law. Letter James Madison to George Washington (April 10, 1788), *in* 6 W. W. ABBOT, THE PAPERS OF GEORGE WASHINGTON, CONFEDERATION SERIES, 1 JANUARY 1788–23 SEPTEMBER 1788 202–03 n.2 (1997); "Rules of the Constitutional Society of Virginia, [ca. 14 June] 1784," *in* 8 ROBERT A. RUTLAND AND WILLIAM M. E. RACHAL, ED., THE PAPERS OF JAMES MADISON, 10 MARCH 1784-28 MARCH 1786 71–75 n.3 (1973) [hereinafter MADISON PAPERS].

anxious to hear that nine states accept our new constitution[,]" he wrote. "We must be contented to accept of its good, and to cure what is evil in it hereafter." Letter from Thomas Jefferson to John Brown (May 28, 1788) *in* 13 JULIAN P. BOYD, ED., THE PAPERS OF THOMAS JEFFERSON, MARCH–7 OCTOBER 1788, 211–13 (1956)[85] [hereinafter JEFFERSON PAPERS].

I do not deny that Jefferson likely preferred express separation-of-powers language because he urged it in Virginia's constitution of 1776, although he also included quite the exception by allowing that "Justices of the County Courts shall be eligible to either House of Assembly." VII. The Constitution as Adopted by the Convention (June 29, 1776) *in* 1 JEFFERSON PAPERS, 1760–1776 377–86 (1950). We would call the idea of sitting judges simultaneously serving in the General Assembly quite the breach of a tripartite republican government.

Compare the separation of powers provisions in the first constitutions of Virginia and Kentucky and you might ask why Jefferson, if he did author Kentucky's version, could not persuade Virginia delegates to adopt a "more perfect" version like ours.

Although they certainly differ, the 1776 Virginia constitution may well be the actual inspiration for Kentucky's 1792 version of its own. But there is

---

[85] Digital versions of the cited letters of the Founders and their correspondents are found at *Founders Online,* National Archives, https://founders.archives.gov/documents.

not the least suggestion in Jefferson's correspondence with his good friend in Kentucky that he believed such a provision must be or should be included in the Kentucky or Federal Constitutions.  If Jefferson did not tell this to his good friend John Brown, who did DuRelle say he told?

According to Judge DuRelle, Jefferson insisted to two others—men who later became prominent in Kentucky politics—that it was dangerous not to include in our constitution the strongest separation-of-powers language that could be written.  DuRelle said:

> [H]aving been appointed secretary of state [on March 22, 1790], [Jefferson] obtained permission to go to Monticello for some months.  John Breckinridge and George Nicholas paid him a visit there, and informed him that Kentucky was about to frame a constitution for herself, and that Virginia was about to permit Kentucky to become a separate and independent state.  He told them that there was danger in the federal constitution, because the clause defining the powers of the departments of government was not sufficiently guarded, and that the first thing to be provided for by the Kentucky constitution should be to confine the judiciary to its powers, and the legislative and executive to theirs.  Mr. Jefferson drew the form of the provision, and gave it to Nicholas and Breckinridge; and it was taken by Nicholas to the convention which met at Danville, and there presented,—Breckinridge not being present at the convention.  There was much discussion and dissent when the article was offered, but, when its author was made known, the respect of Kentucky for the great name of Jefferson carried it through, and it was at once adopted.

*George*, 47 S.W. at 785 (DuRelle, J., dissenting).  I find this account unbelievable.

First, if Breckinridge and Nicholas informed Jefferson in 1790 of Kentucky's desire to separate from Virginia, it was very old news to Jefferson. Jefferson himself drafted the provision of Virginia's 1776 constitution that allowed Kentucky to become a state. 1 BOYD, JEFFERSON PAPERS 385. More importantly, James Madison wrote Jefferson in Paris in early 1786 letting him know the "Act concerning the erection of Kentucky into an independent State" had come before the Virginia Assembly "and passed without opposition."[86] Letter from James Madison to Thomas Jefferson (Jan. 22, 1786) *in* 8 ROBERT A. RUTLAND AND WILLIAM M. E. RACHAL, ED., THE PAPERS OF JAMES MADISON, 10 MARCH 1784–28 MARCH 1786 472–82 (1973) [hereinafter MADISON PAPERS]. This plan for statehood was in the works for years and was far from a surprise to Jefferson.

Second, although John Breckinridge[87] traveled to Kentucky in 1789 at the urging of two half-brothers who settled in Louisville, the state was still a

---

[86] This is not to suggest nothing more was necessary to effectuate statehood. However, Jefferson was not one to be wanting for information about domestic affairs or politics of Virginia or any of her counties.

[87] John Breckinridge (1760-1806), drafted the address with which a committee of Albemarle County residents welcomed TJ home from France in February 1790; Breckinridge's signature appears seventh among the thirteen who signed it. I. The Welcome, 12 February 1790, 16 JEFFERSON PAPERS 177–78. After holding office as attorney general of Kentucky, 1795–97, Breckinridge served in the lower house of the state legislature, 1797–1801, presiding as speaker from 1799, where he guided a modified version of Jefferson's Kentucky Resolutions of 1798 through the legislature. He represented Kentucky in the United States Senate from 1801 to 1805 and was appointed Attorney General by Jefferson during the latter year, serving until his death. ADRIENNE KOCH, JEFFERSON AND MADISON: THE GREAT COLLABORATION 185, 187–88, 196–201, 209 (1950); JAMES C. KLOTTER, THE BRECKINRIDGES OF KENTUCKY 3–16 (1986) (hereinafter BRECKINRIDGE).

dangerous place and he hesitated to relocate. In 1792, he was still active in Albemarle County politics and was elected then and there to serve Virginia in Congress. When he finally did move to Kentucky in August 1792 to take advantage of the "desperate paucity of skilled lawyers," Kentucky's constitution was already two months old. JAMES C. KLOTTER, THE BRECKINRIDGES OF KENTUCKY 3–12 (1986) (hereinafter BRECKINRIDGES). That is why, as Judge DuRelle admits, Breckinridge took no part in Kentucky's 1792 Convention. He was not here yet.

If Breckinridge had an interest in our constitution before relocating, his biographer makes no mention of it. *Id.* at 1–37. And for Breckinridge to make Kentucky's Constitution that much of a priority would have taken his focus away from planning and actually relocating a family, "whose Happiness is my greatest object[,]" and establishing a law practice in Lexington. *Id*. at 3 (quoting Letter from John Breckinridge to James Breckinridge (Aug. 17, 1788) *in* 5 BRECKINRIDGE FAMILY PAPERS, MANUSCRIPT DIVISION, LIBRARY OF CONGRESS),

There is no doubt a relationship spawned between Jefferson and Breckinridge that may have begun as early as mid-1796.[88] But if any relationship

---

[88] *See* footnote 87, *supra.* Jefferson sent a second letter of introduction in 1796. Letter from Thomas Jefferson to John Breckinridge (June 21, 1796) *in* 29 JEFFERSON PAPERS, p. 131. But no communication of substance between the two appears among Jefferson writings until early 1800—and, still, Jefferson misspelled his name. Letter from Thomas Jefferson to John Breckinridge (Jan. 29, 1800) *in* 31 JEFFERSON PAPERS, pp. 344–45 (discussing Alien and Sedition Acts and the Virginia and Kentucky Resolutions).

existed between the thirty-year-old Breckinridge and the forty-seven-year-old Jefferson in 1790, we will never know just how warm it was.  The first known correspondence between the two is a 1793 letter from Jefferson addressed to "Mr. Brackenridge" in Kentucky and introducing "a gentleman who goes to visit your state with a view to settle in it."  Letter from Thomas Jefferson to John Breckinridge (Oct. 25, 1793) *in* 27 JEFFERSON PAPERS 270–71.

Frankly, both Breckinridge and George Nicholas seem to have been on more intimate terms with James Madison than with Jefferson.  Memorial and Remonstrance against Religious Assessments, [ca. 20 June] 1785, 8 MADISON PAPERS, 10 MARCH 1784–28 MARCH 1786 295–306 (Commentary:  "Nicholas and other young men in the Piedmont whom Madison could trust to keep his secret— Archibald Stuart, John Breckinridge").  And it was Madison who drafted much of the Federal Constitution without express separation-of-powers provisions.

The other Kentuckian Judge DuRelle says visited Jefferson was George Nicholas.  Nicholas needed neither education nor encouragement from

---

Others may choose to be generous in the assessment of Judge George DuRelle by suggesting he confused Jefferson's ghost authorship of the Kentucky Resolutions opposing the Alien and Sedition Acts, somehow mistaking it for the falsehood he advanced over and again. *See* BRECKINRIDGE 20–22 ("In Kentucky, [John] Breckinridge and his old ally George Nicholas led the movement for repeal of the Alien and Sedition laws. . . . [Breckinridge obtained] an important draft document prepared by Jefferson . . . [from which] evolved the famous Kentucky Resolutions of 1798.  Precisely how Breckinridge received the original draft is uncertain. . . . As revised, the Kentucky Resolutions did not completely satisfy Jefferson.").  Given how frequently DuRelle repeated the story, expressly acknowledging he had done no research to confirm it despite ample opportunity to do so, I cannot be so generous.

Jefferson about the Federal Constitution. Two years before Jefferson's return to America, Nicholas actively participated[89] in the Virginia Ratifying Convention, June 2–27, 1788, voting in favor of ratification in a close vote, 89 to 79. Not only did Nicholas display a knowledge of Montesquieu's thinking on the separation of powers, he voted in favor of recommending that Congress add a prefatory declaration to include the following language: "That the legislative, executive, and judiciary powers of Government should be separate and distinct . . . ." 3 JONATHAN ELLIOT, ED., THE DEBATES OF THE SEVERAL STATE CONVENTIONS, OF THE ADOPTION OF THE FEDERAL CONSTITUTION 247, 654, 657–58 (1861) [hereinafter ELLIOT, DEBATES]. Although that recommendation was rejected, it demonstrates Nicholas held that view two years before Jefferson returned to America and that contradicts DuRelle's tale that Jefferson gave him the idea. But, given what is known about their relationship, I doubt Nicholas even would have dared darken Jefferson's door in 1790.

In the summer of 1781, as a brash, young, and new representative in the Virginia Assembly, Nicholas preferred charges against Jefferson for his conduct as the state's governor. *See* Charges Advanced by George Nicholas, with

---

[89] Only 21 of the Virginia's 170 delegates spoke at the Convention. VIRGINIUS DABNEY, VIRGINIA: THE NEW DOMINION 179 (1971). George Nicholas spoke at length on multiple days. ELLIOT, DEBATES 7–21, 97–103, 236–47, 332–33, 356–61, 370, 388–93, 403, 426–28, 430, 434–35, 442–44, 449–52, 456–58, 460, 476–77, 482–83, 497–502, 506, 523, 576–82, 627, 662.

Jefferson's Answers, (after July 31, 1781) *in* 6 JEFFERSON PAPERS, 21 MAY 1781–1

MARCH 1784 106–109.  Hardly in the spirit of the season, on Christmas Eve that

year, Jefferson said Nicholas was "[t]he trifling body who moved this matter" and

that he "was below contempt; he was more an object of pity" with a "natural ill-

temper[.]"  Letter from Thomas Jefferson to Isaac Zane (Dec. 24, 1781) *in* 6

JEFFERSON PAPERS, 21 MAY 1781–1 MARCH 1784 143–44.  "On the day appointed

for hearing his charges he withdrew from the house," said Jefferson.  So, Jefferson

announced the charges himself and then defended against them, after which the

Assembly "passed an unanimous vote of approbation[.]"  I. Diary of Arnold's

Invasion and Notes on Subsequent Events in 1781:  Versions of 1796?, 1805, and

1816, 4 JEFFERSON PAPERS, 1 OCTOBER 1780–24 FEBRUARY 1781 258–68.

        While Jefferson served as Minister to France starting in 1785, he

continued to read Virginia newspapers sent to him in diplomatic pouches from

Washington.  He took note that in one of them "George Nicholas advertised his

departure to settle in Kentuckey [sic] this present month of February [1789]."

Letter from Thomas Jefferson to William Short (Feb. 28, 1789) *in* 14 JEFFERSON

PAPERS 8 OCTOBER 1788–26 MARCH 1789 596–98.

        After returning home and a year after DuRelle said Nicholas called on

him, Jefferson wrote to Philip Mazzei, a Florentine merchant and immigrant to

Virginia, noting that Nicholas may have double charged him for legal services but

saying "neither that nor any other matter of account is worth enquiring into as to him, as he has settled that and all his immense debts by an insolvency and retirement to Kentuckey." Letter from Thomas Jefferson to Philip Mazzei (Aug. 2, 1791) *in* 20 JEFFERSON PAPERS 1 APRIL–4 AUGUST 1791 713–15.

Not until 1798, after Nicholas publicly apologized for his youthful actions in 1781 deriding Jefferson before the Virginia Assembly, did Jefferson have anything kind to say about Nicholas. I. Diary of Arnold's Invasion and Notes on Subsequent Events in 1781: Versions of 1796?, 1805, and 1816, 4 JEFFERSON PAPERS, 1 OCTOBER 1780–24 FEBRUARY 1781 258–68 (referring to him then as an "honest and honorable man[.]"). Whether Nicholas would have felt welcome enough to venture a visit to Monticello before 1798 is highly unlikely.

The third reason I find Judge DuRelle's story unbelievable is that he gives us more detail about the 1792 Kentucky Constitutional Convention than any extant records can substantiate. Jefferson makes no mention of any of it in any of the many thousands of records that the habitual recordkeeper saved. If Jefferson had participated in the formation of Kentucky's Constitution, even in the most remote way, it would not have been like him to keep it a secret. We must look elsewhere. Did DuRelle have some personal knowledge? It is not likely.

DuRelle was born in New York six decades after the events about which he claims to have this intimate knowledge. Still, he purported to know: (1)

there was much debate and discussion at the 1792 convention about the separation of powers; (2) George Nicholas offered the language of what is now §§ 27 and 28; and (3) once Nicholas invoked the sainted name of Jefferson as their author, they sailed through passage. That is not what the historical record says.

The only records of Kentucky's first constitutional convention we have are memorialized in STATE BAR ASSOCIATION OF KENTUCKY, JOURNAL OF THE FIRST CONSTITUTIONAL CONVENTION OF KENTUCKY, HELD IN DANVILLE, KENTUCKY, APRIL 2 TO 19, 1792 (1942) [hereinafter JOURNAL]. A mere 22 pages long, there is no mention of Thomas Jefferson. On Friday the 13th of April 1792, the convention resolved itself in a committee of the whole "and had come to sundry resolutions" which were presented to the Clerk and read twice,

> some of them amended & then the whole agreed as follows viz.
>
> Resolved, That the powers of Government ought to be divided into three distinct departments each of them to be confided to a separate body of Magistracy Towit, those which are legislative to one, those which are executive and those which are judiciary to another except in such case as may hereafter be particularly excepted.

JOURNAL 4.

George Nicholas headed a select committee that gathered these resolutions and prepared a constitution, but nothing indicates Nicholas had any role in a specific separation-of-powers provision. *Id.* at 9. The committee completed

-159-

its work and presented the draft constitution to the convention on Tuesday, April 17, after which the convention adjourned until the next day, no doubt to allow the delegates to read and consider the draft. *Id.* The next day, the delegates debated proposed amendments. The first was a minor amendment to Article 1, Section 4. *Id.* at 9–10. There is no record of debate, discord, or further discussion of the first two sections of Article 1, what we now know as §§ 27 and 28. The Constitution was adopted on April 19, 1792, the seventeenth anniversary of the Battle of Lexington and Concord. *Id.* at 22.

Thomas Jefferson's involvement in our constitution is a tall tale. Why DuRelle created it deserves separate treatment, *see infra*, in discussing how he resurrected the tale to justify reversing *George* and its progeny in *Pratt 1*.

Spinning this tale and its Jefferson tie again clouded jurists' thinking in *LRC v. Brown*, or so I believe. Before that, the same tale led to a simpleminded metaphor first used in *Sibert v. Garrett*, that of a "tripod," to describe our form of government. The metaphor added to *Brown*'s errant analysis.[90]

---

[90] We should apologize to Louisiana. In *Saint v. Allen*, 126 So. 548 (La. 1930), the Supreme Court of Louisiana noted the language in CONST. OF LA. of 1812, art. I, §§ 1, 2, were copied verbatim from Kentucky's Constitution. Then, the Louisiana court swallowed the Thomas Jefferson myth hook, line, and sinker. The Louisiana high court said its own separation-of-powers article "was written by Thomas Jefferson himself." *Id.* at 552. The opinion repeat the full embellishment to be drawn for the several Kentucky versions of the tale and giving complete credit for the story.

> Judge Du Relle's [dissenting] opinion [in *George*], when rendered, was not authority, except for the historical information which it contained, because the majority of the members of the court did not then agree with him that the Kentucky

### 17. *"American tripod"—a naïve and deceptive metaphor*

It was the *Sibert* court that first described our state constitution's "divisional structure as the 'American Tripod form of Government'" *Arnett v. Meredith*, 121 S.W.2d 36, 37 (Ky. 1938). We should not be surprised. The analogy of a stool with three legs of equal length was essential to another myth—that "equalizing" the power of government's three branches is both possible and the responsibility of the judiciary. That myth was essential to *Sibert*'s reasoning. The *Brown* Court bought into the "tripod" analogy completely, blinding it to the substantive jurisprudence that *Pratt 1* then *Sibert* chose to ignore and exclude.

When the appellants in *Brown* cited *Barkley* to support their argument that the General Assembly and not the Governor had the power to exercise an executive power to appoint persons to its LRC subcommittee, the Court reacted as though offended, interpreting the argument as a charge that "this Court has sawed off one of the legs of the tripod, viz., that of the executive, and that we have made that branch of government less than equal to the other two branches." *Brown*, 664 S.W.2d at 913. "Nothing in *Barkley* can be construed to deny the existence of the

---

statute in question was unconstitutional; but Judge Du Relle's opinion afterwards became authority, for it was adopted as the prevailing opinion in *Pratt v. Breckinridge*, 112 Ky. 1, 65 S. W. 136, 66 S. W. 405; where it was held that the Legislature had not, under its authority to create a public office, the power to elect or appoint the officer or officers to fill it.

*Id.*

-161-

doctrine of separation of powers and the equality of the three coparceners in government." *Id.*

The *Brown* Court equated the separation of powers doctrine with a judicial responsibility to maintain equal power among the three branches. This argument directly reflects the Anti-federalists' position in 1787. "One of the[ir] principal objections" to the draft of the Constitution was "its supposed violation of the political maxim, that the legislative, executive, and judiciary departments, ought to be separate and distinct." FEDERALIST No. 47 (Madison). They saw "[t]he several departments of power" as having been "distributed and blended in such a manner, as at once to destroy all symmetry and beauty of form: and to expose some of the essential parts of the edifice to the danger of being crushed by the disproportionate weight of other parts." *Id.* Madison dispatched the Anti-federalists' objection in FEDERALIST Nos. 47 and 48. But *Brown* resurrected the Anti-federalists' concern as though the Court discovered a legitimate fear mislaid for two hundred years. That is evident from the opinion's hyperbolic claim that "[n]early every one of our sister state courts have similarly resisted any weakening of the doctrine of the separation of powers." *Id.* at 914.

*Brown* cites only two opinions for this quite broad claim. The first is *State ex rel. Wallace v. Bone*, 286 S.E.2d 79 (N.C. 1982), a North Carolina opinion distinguished by that state's subsequent opinion, *Cooper II*, *supra*. *Cooper II* said

violation of the separation of powers provisions occurs when the legislature has "unreasonably disrupt[ed] a core power of the executive" such as North Carolina's express constitutional grant of appointment power as discussed in Part Two, Section 10, *supra*. *Cooper II*, 852 S.E.2d at 63. But no core power of the executive was disrupted in that case. The North Carolina Court said when a power not constitutionally and expressly granted to the governor is a delegation by the General Assembly of a portion of its plenary power, such as to make public policy, the Governor's exercise of that interstitial discretionary authority is not a violation of the separation of powers provisions. *Id.* at 64.

That is entirely consistent with my, and Appellants,' view of the case under review. The power to appoint Fair Board members is entirely within the necessary power of § 93 that prohibits the Governor from making such appointments and within the General Assembly's plenary powers to do so. The relinquishment by delegation of that power to the Governor to make any appointments at all is part of what Snyder & Ireland call the "play in the joints" between the Executive and Legislative Departments. Snyder & Ireland, *Analysis*, at 186. The Governor enjoys the power to appoint members of the Fair Board by the prerogative of the General Assembly's delegation of its own power to do so, and it delegates that power consistently with and because of the authority of § 93.

The *Brown* Court seems not to have read too closely the only other case it cites—*State ex rel. McLeod v. McInnis*, 295 S.E.2d 633, 634 (S.C. 1982). Like *Brown*, *McInnis* addressed the constitutionality of a body other than the legislature that was exercising legislative power, "the Joint Appropriation Review Committee (JARC), which is composed of six members of the Senate and six members of the House of Representatives . . . ." *Id.* at 634. Unlike *Brown*, *McInnis* never doubted that the legislature could appoint its own members to serve on a committee or board. *Id.* at 635 ("The right of the members to serve in their capacity as legislators is not contested. It is their right to exercise powers."). Furthermore, rather than resisting a weakening of the separation of powers, *McInnis* "acknowledged that 'there is tolerated in complex areas of government of necessity from time to time some overlap of authority and some encroachment to a limited degree.'" *S.C. Pub. Interest Found. v. S.C. Transp. Infrastructure Bank*, 744 S.E.2d 521, 526 (S.C. 2013) (quoting and interpreting *McInnis*, 295 S.E.2d at 636). If only the *Brown* Court could have disciplined itself to address the case as the delegation-of-powers case it was, it might simply have quoted *McInnis* as holding that "Legislative authority may not be delegated." *Id.* at 639.

How does one even measure an equality of power in such a complex system? It is not as simple as evening up the three legs of a stool. If we must have an analogy, perhaps it should be a steam engine with component parts of a boiler, a

-164-

piston, and a regulator.[91]  We should, at least, shed ourselves of this idea of a tripod

which, by its simplicity, is deceptive.  Other than Kentucky, no state's judiciary—

not one—falls for such a simple analogy.[92]  It is naïve and teaches us nothing while

tempting us to think no further, no deeper.

This superficially pleasing but nescient metaphor stifles intellectual

curiosity.  It fosters acceptance of a co-equality of government's branches in the

strictest sense rather than pursuit of an understanding of what the Founders

envisioned—co-ordinate branches of government.  *See Bevin v. Commonwealth ex*

*rel. Beshear*, 563 S.W.3d 74, 79 (Ky. 2018) ("coordinate branch of the

government"); *Philpot v. Haviland*, 880 S.W.2d 550, 553 (Ky. 1994) ("coordinate

branches"); *Yanero v. Davis*, 65 S.W.3d 510, 519 (Ky. 2001) ("coordinate

branches"); *Knight v. Spurlin*, 226 S.W.3d 844, 849 (Ky. App. 2007) ("coordinate

branches").  But just changing the adjective in our jurisprudence is not enough.

We must go far back in Kentucky jurisprudence to find even a

simplistic description of what "co-ordinate branches" means.  "The three branches

---

[91] This last part of a steam engine is known as a governor, but that would have confused the analogy with the boiler being the Legislative Department, the piston being the Executive Department, and the regulator (governor) being the Judicial Department.

[92] Only a single opinion from the federal courts even deigns to quote it, and then, only to note its prosaism.  *Maxwell's Pic-Pac, Inc. v. Dehner*, 739 F.3d 936, 942 (6th Cir. 2014) ("Kentucky's constitution . . . 'emphatically separates and perpetuates what might be termed the American tripod of Government.' . . .  But, even in Kentucky, this principle means only that the "duty to define general terms cannot be delegated by the legislative branch to the executive branch" (citations omitted)).

of government are co-ordinate and yet each, within the administration of its own affairs, is supreme." *Burton v. Mayer*, 118 S.W.2d 547, 549 (Ky. 1938). We must regain and elucidate the concept of coordinacy and stop leaning on the grade school civics class understanding infecting our jurisprudence.

## 18. *Co-ordinate, not co-equal branches*

Section 27 says "[t]he powers of the government . . . shall be divided into three distinct departments . . . ." Section 28 says no department or person in any department is allowed to "exercise any power properly belonging to either of the others, except" when the People allow it. Together, these sections do not describe a system of equal powers but one of coordinacy, of grants of authority co-ordained by the People. James Madison explained: "The several departments being perfectly co-ordinate by the terms of their common commission, neither of them, it is evident, can pretend to an exclusive or superior right of settling the boundaries between their respective powers." FEDERALIST No. 49 (Madison). That obviously includes the judiciary. Only the Constitution itself, by express terms, can settle those boundaries.

Professor Michael Stokes Paulson, lead author of the University Casebook, *The Constitution of the United States* (5th ed. 2022), more thoroughly explains the concept of coordinacy, as follows:

> The "coordinacy" of the three branches of the federal government is one of the fundamental political axioms of

our federal Constitution. The legislative, executive, and judicial departments are "co-ordinate" in the sense that they are all *ordained* (co-ordained) by the same authority—the People themselves—and are, consequently, coequal in title and rank as representatives of the People. None is subordinate (the very opposite of "coordinate") to another.

This does not mean that the branches are equal in the quantum of powers assigned to them. They plainly are not. Madison and Hamilton, writing as "Publius" in The *Federalist*, take pains to point out that the legislative power necessarily predominates in a republic and that the judicial branch is by far the weakest of the three in terms of the relative powers assigned to it and the practical means of defending those powers against encroachments by the other two branches. This does not make the judicial branch any less *coordinate* with the other two branches in terms of the source of its authority and the relationship of its authority to that of the other two branches. Coordinacy is a term of power-*relationship,* not of power-*scope.* The three branches possess unequal powers but equal title from the People to exercise those powers that they do possess.

Michael Stokes Paulsen, *The Most Dangerous Branch: Executive Power to Say What the Law Is*, 83 GEO. L.J. 217, 228–29 (1994) (footnotes omitted).

North Carolina opinions, including one cited by Appellees and the circuit court, demonstrate that its judiciary understands the concept. *State v. Berger*, 781 S.E.2d at 256 ("Although the text of the separation of powers clause has changed very little since 1776, the powers that the current constitution allocates to the legislative and executive branches have changed significantly.").

The truth is this—equipoise *of power* in a tripartite system of government is not an expectation. It is not even an aspiration. Because "[a]ll power is inherent in the people, . . . they have at all times an inalienable and indefeasible right to alter . . . their government in such manner as they may deem proper." CONST. OF KY. of 1891, § 4. The People can choose to assign legislative power to the Governor, for example. As our highest court held:

> All American courts . . .—as well as all text writers on the subject—unanimously hold that the *exercise by the Governor of the veto power* conferred upon him by the local Constitution *is a legislative act* and involves an encroachment by the executive department upon the functions of the legislative department, and which is one of the exempted "instances hereinafter expressly directed or permitted," as is contained in section 28, supra, of our Constitution.

*Arnett v. Meredith*, 121 S.W.2d 36, 37 (Ky. 1938) (emphasis added).

The exception clause of § 28 contemplates that the People who, in 1792, came up with it in the first place will, from time to time, use it. The evolution of Kentucky's Constitution demonstrates, with respect to the appointment power, that the People altered the coordinacy of the Executive Department and Legislative Department in 1850, and in 1891 by means of § 93. By adopting those constitutions, the People redistributed from the Executive Department to the Legislative Department the power to determine how to appoint or elect inferior state officers and others, and it did not matter to the People

-168-

whether that power was intrinsically executive or not. And, in North Carolina in 1868, the People of that state redistributed the power in the opposite direction. Could both republican governments be said to have established equipoise of power between their respective legislative and executive branches? Certainly not.

But the *Brown* Court clearly believed in that "hermetically sealed" division of the branches rejected by the Founders. That is obvious from the passage from *Brown* that Appellees and the circuit court rely on: "[T]he General Assembly as the legislative branch, has all powers *which are solely and exclusively legislative in nature.* To argue that any other power is given to the General Assembly simply won't wash." *Id.* at 913 (emphasis in original). This entirely ignores the irrefutable fact that "[an]other power *is given*" by the People to the General Assembly—the power to appoint inferior state officers—in three different ways: (1) as a core concept of republicanism by the plenary power of the General Assembly exercised on behalf of the People to the fullest extent not expressly limited by the People in the Constitution (and there is no such restriction); (2) by refraining from granting to the Governor or any other executive officer, or the judiciary or any judicial officer, the power to appoint inferior state officers like those of the Fair Board; and (3) by expressly stating:

> Inferior State officers and members of boards and commissions, not specifically provided for in this Constitution, may be appointed or elected, in such manner as may be prescribed by law, which may include a

-169-

requirement of consent by the Senate, for a term not exceeding four years, and until their successors are appointed or elected and qualified.

CONST. OF KY. of 1891, § 93.

If the Governor's powers Appellees say are implied in §§ 27 and 28 and the other three sections they cite are superior to the General Assembly's plenary powers and the express powers of § 93, what purpose is left to ascribe to that section? The question is rhetorical; we all know the answer. The sections Appellees cite, even together, do not neuter the plenary power of the General Assembly much less its express power granted in § 93.

So, how is it possible then that the *Brown* Court got these constitutional principles so wrong? We need only look at the opinions upon which *Brown* hinges—*Pratt 1* and *Sibert*—and that starts with Judge DuRelle.

## 19. *George DuRelle—"by nature a political animal"*[93]

From adoption of the 1850 Constitution until well after *Sibert v. Garrett* was rendered in 1922, judges of the Court of Appeals were elected on a partisan basis. Becoming a judge on Kentucky's highest court required nomination

---

[93] 1 BENJAMIN JOWETT, TRANS., THE POLITICS OF ARISTOTLE 4 (1885) (*Politics*, I.2, 1253a 9) (Discussing the growth of the state, Aristotle said, "to be self-sufficing is the end and the best. Hence it is evident that the state is a creation of nature, and that man is by nature a political animal.").

and support by a candidate's political party.  George DuRelle was a partisan and well credentialed for such an effort.

A New Yorker by birth, DuRelle's ancestry included a colonial governor and an attorney general of Connecticut.  2 E. POLK JOHNSON, A HISTORY OF KENTUCKY AND KENTUCKIANS 863 (1912) [hereinafter KENTUCKIANS].  Educated largely in New England prep schools and at Yale, DuRelle also attended the Louisville law school and began practice in the mid-1870s with Robert W. Woolley.  Woolley, once a candidate for Kentucky attorney general, withdrew from state politics when Congress confirmed his nomination as Secretary to the American Legation at Madrid.  *Id.*; LOUISVILLE DAILY COURIER (Louisville), Dec. 24, 1858, at 2; EVENING STAR (Washington, DC), Dec. 27, 1858, at 2.  DuRelle left Woolley's practice in 1882 for his own government service.

In 1882, President Chester A. Arthur nominated DuRelle as assistant district attorney for the western district of Kentucky and Congress confirmed him.  2 KENTUCKIANS 863.  He resigned in 1886 when his boss, George Thomas, was elected to Congress on the Republican ticket.  *Id.*; DAILY EVENING BULLETIN (Maysville, Ky.), Sep. 16, 1886, at 3; Biographical Directory of the U.S. Congress, George M. Thomas:  https://bioguide.congress.gov/search/bio/T000167.

Re-nominated in 1889 by President Benjamin Harrison and again confirmed by Congress, DuRelle resumed the assistant district attorney position

under the new United States Attorney, George Jolly.  2 KENTUCKIANS 863;

HOPKINSVILLE KENTUCKIAN (Hopkinsville, Ky.), Apr. 16, 1889, at 3.  But DuRelle

resigned again when he received appointments as Special Master for the federal

courts.  2 KENTUCKIANS 863; *Central Tr. Co. v. Richmond, N., I. & B.R. Co.*, 68 F.

90, 104 (6th Cir. 1895) (noting DuRelle's service as Special Master).

DuRelle made a name for himself, especially as Congressman

Thomas's assistant prosecutor at the U.S. Attorney's office.  In 1894, he was

touted as a possible Republican candidate for Kentucky Attorney General.

EVENING BULLETIN (Maysville, Ky.), Nov. 20, 1892, at 3.  But he was pre-

occupied that autumn representing the Republican candidate for the Court of

Appeals, St. John Boyle, in contesting the election of Louisville's circuit judge,

Democrat Sterling Toney.  2 KENTUCKIANS 863; HARTFORD HERALD (Hartford,

Ky.), Feb. 27, 1895, at 3.  Toney succeeded in his appeal to the State Contest

Board, "but under such circumstances that he declined the seat."  2 KENTUCKIANS

863.  Democratic Governor John Y. Brown appointed attorney George Eastin to

fill the vacancy until a special election in November 1895; Eastin then ran as the

Democratic candidate for the balance of the term.  *Id.*  "DuRelle, whose conduct of

the contested election case had won him distinction, was made the candidate of the

Republican party . . . ."  *Id.*

The day after the state elections, the pundits were shocked. "Oh, Ye Gods!" the headlines read, "Has the State of Kentucky joined the Republican Ranks?" KENTUCKY POST (Covington, Ky.), Nov. 6, 1895, at 1. DuRelle was elected to the Court in a low turnout, Republican wave, including election of the state's first Republican Governor. *Id.* But the Republican surge in Kentucky was short-lived, at least for DuRelle. He was defeated for re-election in 1902, having served only a partial term on the Court.

A few weeks after his defeat, DuRelle was "already letting [his] aspirations be known" to become Governor in 1903. HOPKINSVILLE KENTUCKIAN (Hopkinsville, Ky.), Dec. 9, 1902, at 5. But he soon reset his sights. In late January 1903, with Senator William DeBoe's[94] endorsement, DuRelle met with President Theodore Roosevelt at the White House to be considered for a lifetime appointment to the Sixth Circuit Court of Appeals. PADUCAH SUN (Paducah, Ky.), Jan. 29, 1903, at 2; HARTFORD REPUBLICAN (Hartford, Ky.), Feb. 20, 1903, at 2. DuRelle neither ran for Governor nor was he appointed to the federal bench. However, he was selected that year as chairman of the Republican Campaign Committee for the state. INTERIOR JOURNAL (Stanford, Ky.), Aug. 14, 1903, at 3.

---

[94] William J. DeBoe (1849-1927), served the Kentucky Senate (1893-1898); elected as a Republican to the United States Senate in 1897 and served from April 29, 1897, to March 3, 1903; was not a candidate for renomination in 1902. Biographical Directory of the U.S. Congress, William Joseph DeBoe: https://bioguide.congress.gov/search/bio/D000182.

In late 1904, DuRelle again visited the White House. He and Kentucky Republican Party Chair R. P. Ernst "outlined to the President their views of how to proceed in the work of converting Kentucky into a Republican State. The President was very much interested, and told them to go ahead and keep up their efforts." KENTUCKY POST (Covington, Ky.), Dec. 16, 1904, at 1. Part of that plan was DuRelle's invitation to Justice John Marshall Harlan, the Great Dissenter, that if he "wants the Republican nomination for Governor of Kentucky he can get it without a struggle and be elected beyond a doubt." INTERIOR JOURNAL (Stanford, Ky.), June 16, 1905, at 3. History shows us Harlan declined.

By 1906, DuRelle was labeled by the newspapers one of the "machine Republicans." KENTUCKY POST (Covington, Ky.), Mar. 10, 1906, at 2. He was confirmed that year as United States Attorney for the Western District of Kentucky, called by his party "a deserving Republican." HARTFORD REPUBLICAN (Hartford, Ky.), June 15, 1906, at 5. In 1908, he represented Republicans to challenge the Democrat-dominated General Assembly's "gerrymandering" of federal legislative districts, taking the case all the way to the Supreme Court of the United States. FRANKFORT ROUNDABOUT (Frankfort, Ky.), June 30, 1906, at 5; *Richardson v. McChesney*, 108 S.W. 322, 322-23 (Ky. 1908); *Richardson v. McChesney*, 218 U.S. 487, 490, 31 S. Ct. 43, 43, 54 L. Ed. 1121 (1910).

In 1908 he was a featured speaker at the Kentucky Republican Presidential Convention in Louisville.  DAILY PUBLIC LEDGER (Maysville, Ky.), May 8, 1908, at 4.  DuRelle was in Washington again in 1911 to meet with the President, this time with William Howard Taft, to secure his reappointment as district attorney.  THE CITIZEN (Berea, Ky.), Jan. 26, 1911, at 2.  After that meeting, Senator Bradley,[95] who had been advocating another candidate, "gracefully yielded to the personal wishes of the President in the matter and agreed to assist in having Judge Durells [sic] appointment confirmed."  THE CENTRAL RECORD (Lancaster, Ky.), Feb. 24, 1911, at 3.  DuRelle served as United States Attorney for the Western District until Woodrow Wilson became President; Wilson refused to reappoint DuRelle.  BEE (Earlington, Ky.), June 16, 1914, at 2.  But DuRelle remained a popular influence in the Republican Party.

There was a "movement on foot to get Judge George DuRelle of Louisville to become a candidate for the Republican nomination for Governor" in 1915.  PUBLIC LEDGER (Maysville, Ky.), Feb. 4, 1915, at 3.  He was supposed to run for Congress in 1916 "but his defeat for the same office a few years ago made him gun-shy."  KENTUCKY IRISH AMERICAN (Louisville, Ky.), July 1, 1916, at 2.

---

[95] William O'Connell Bradley (1847–1914), was appointed Minister to Korea in 1889 but declined; member of the Republican National Committee 1890-1896; Republican Governor of Kentucky 1895-1899; elected as a Republican to the United States Senate and served from March 4, 1909, until his death in Washington, D.C., May 23, 1914.  Biographical Directory of the U.S. Congress, William O'Connell Bradley:  https://bioguide.congress.gov/search/bio/B000749.

George DuRelle finished his career in private practice and as a bankruptcy referee, although his name was occasionally thrown into the mix for appointments to political or government office. HARTFORD HERALD (Hartford, Ky.), Mar. 16, 1921, at 3. He practiced law nearly till the end of his life and died at home at age 73. KENTUCKY POST (Covington, Ky.), Aug. 27, 1923, at 1; CINCINNATI POST (Cincinnati, Oh.), Aug. 10, 1926, at 9.

I do not measure Judge DuRelle's legacy by any good he did for the Republican Party. His legacy, in my opinion, is not a good one. He infected our constitutional jurisprudence with bad law by his partisan influence during his single partial term on the Court of Appeals.

## 20. **Commissioners of the Sinking Fund v. George—*the backstory***

Judge DuRelle did not know the Republican wave that put him and Governor William Bradley in office would spawn ominous events. Nor could he know the tall tale about Thomas Jefferson in his theretofore inconsequential *Sinking Fund v. George* dissent would be his entrée to abuse judicial power to solve a political problem his party faced. But it would.

Daniel Webster said, "[I]t is the evil genius of Democracy to be the sport of factions." *Myers v. United States*, 272 U.S. 52, 149, 47 S. Ct. 21, 36, 71 L.Ed. 160 (1926) (quoting 1 Private Correspondence of Daniel Webster (Fletcher Webster Ed.) 486 (1903 National Ed., Little Brown Co.)). When DuRelle was

elected, the Kentucky factions were in a heightened state of tension. The wave of 1895 filled the Executive Department with Republicans and added their numbers to the General Assembly, but that body was still controlled by the Democrats. That was the state of affairs when a case came before the Court that would decide which political party holds the keys to one of the state's great coffers—The Kentucky Sinking Fund.

The Sinking Fund, created in 1836, consisted of monies collected from specified taxes and dividends, and was to be used in discharging the state's existing debt. The Fund grew steadily until the 1870s when it exceeded the state's deficit by a million-and-a-third dollars. Following the Civil War, the practice developed of the General Assembly borrowing money from the Sinking Fund to fund the state's budget. DECADES 51 n.32 (citing 1 LEWIS COLLINS, HISTORY OF KENTUCKY 40 (1874) and 2 WILLIAM E. CONNELLEY AND E. MERTON COULTER, HISTORY OF KENTUCKY 836 (Charles Kerr, ed., 1922) (hereinafter KENTUCKY)). Until 1895, the borrowing was effortless because the same party was in charge of both sides of the transaction. But borrowing excesses led to a deficit three times what it had been, establishing a "a fool's paradise financially, even though several previous governors had sugar coated reports concerning conditions, as [Governor] Bradley had charged." DECADES 173.

When the Republican Party won the governorship in 1895, it meant the Sinking Fund would be run by Republican Commissioners and chaired by a Republican Governor who appointed them. Governor Bradley had promised fiscal reform, and reform in the penitentiary system. *Id*. at 234, 355. Both now seemed possible because the Sinking Fund Commissioners appointed the penitentiary officials. "The Republicans had charge of the penitentiary at Frankfort two years and four months" before the General Assembly wrested control back. EVENING BULLETIN (Maysville, Ky.), Oct. 5, 1898, at 3. And here is how that happened.

On March 5, 1898, the Kentucky General Assembly passed "An act to create a board of penitentiary commissioners and regulate the penal institutions of this commonwealth." *Board of Penitentiary Comm'rs v. Spencer*, 166 S.W. 1017, 1020 (Ky. 1914). Members of that board were "elected by the general assembly on or before the 10th day of March, 1898" and the General Assembly elected three Democrats. *George*, 47 S.W. at 779. That is, the new law removed the statutorily granted appointment power from the Sinking Fund Commissioners (who themselves were appointed by the Governor) and the General Assembly itself elected the Board of Penitentiary Commissioners. Because the new penitentiary board and penal institutions were still to be funded from the Sinking Fund, its Republican commissioners immediately challenged the law's constitutionality on

the same grounds that succeeded in the circuit court in this case currently under review. *Id.*; B<small>RECKENRIDGE</small> N<small>EWS</small> (Cloverport, Ky.), Mar. 16, 1898, at 1.

The Board of the Sinking Fund Commission "contended that the legislature could not constitutionally pass the act and elect the commissioners; that the election of the commissioners is an executive, not a legislative, function." *Id.* It was a spurious argument from the start for it ignored the source of the Governor's authority to act as the Board's presiding officer. From the day of the Board's creation, the General Assembly "elected" the Governor to head that Board. *Commissioners of Sinking Fund v. Theobald*, 56 Ky. 459, 467 (1856) ("In February, 1836, the legislature of Kentucky created and established a sinking fund . . . (Sess. Acts, 1835-36, p. 415.) By the same act the governor of the State and the presidents of three banks then existing were made the commissioners of the sinking fund . . . ."); *see, e.g.*, 1845 Ky. Acts ch. 263, § 3 (electing "the Governor, as President of the Board of Commissioners of the Sinking Fund").

The majority opinion in *George* did not need to point out this obvious irony. Disciplined in its analysis, the majority of the Court of Appeals simply held true to all the rules of constitutional interpretation.

Consistently with the 1830 decision in *Taylor v. Commonwealth*, the Court held that the People, by its organic law, can and did empower the General Assembly with that executive power to appoint inferior officers. The opinion also

said again the Governor's powers are limited "'to those the Constitution expressly gives him,'" *Cameron*, 628 S.W.3d at 73 (citations omitted), and found "[t]here is no express power conferred upon the executive department by the constitution to appoint such officers or agents which the general assembly may designate for the direction or control of the penitentiaries." *George*, 47 S.W. at 779.

Obedient to the rule that "[t]he Legislature has all power, unless restricted by the Constitution[,]" *Rhea*, 156 S.W. at 158; *Cheaney v. Hooser*, 48 Ky. 330, 333 (1849), the Court then said: "There is no provision of the constitution which places any limitation on the power of the legislative department to name or select the officers or agents necessary to properly manage the penal institutions." *Id.* at 780 (citing *Cheaney*).

Finally, the Court held the Constitution's fundamental general provisions do not imply a restriction on the General Assembly's plenary powers:

> Neither is there any provision of the constitution from which it can be fairly implied that the legislative department shall not elect or select those who may aid or control in the conduct of the affairs of the penal institutions. When the constitution has imposed no limits upon the legislative power, it must be considered practically absolute. Plenary power in the legislature for all purposes of civil government is the rule. A prohibition to exercise a particular power is the exception. When one questions the legislative power to pass a statute, he should show that the constitution expressly prohibits its enactment, or that such prohibition is fairly implied from its provisions.

*George*, 47 S.W. at 779–80 (citing *Slack*, 52 Ky. at 12 (General Assembly "may do everything which can be effected by means of a law.")).  The majority's reliance on *Slack*, tellingly shows a consistency in our constitutional jurisprudence that § 27 and § 28 and its antecedents were not a source either of an implied gubernatorial power or an implied restriction on the General Assembly's plenary powers.

One of the arguments in *Slack* was the same as argued in *George* and now argued in this case—that without express authority, the General Assembly is powerless to exercise any power not intrinsically legislative.  That was and is a fallacious argument that both *Slack* (under the second and third constitutions) and *George* (under the current Constitution) rejected.

In *Slack*, the constitutional attack was that "[a]n act of the legislature [permitting municipalities upon a majority vote of its citizens to purchase stock in a railroad] . . . is in conflict with both the constitutions of 1799 and 1850, secs. 1, 2, art. 1 [what is now § 27 and § 28, because i]t is not a legislative act . . . ."  *Slack*, 52 Ky. at 40 (Hise, J., dissenting (stating appellants' argument)).  The majority rejected the argument after first noting "[t]he general principles and provisions of the two instruments [the 1792 Constitution and the 1850 Constitution], so far as they bear upon this subject [of the separation of powers], are substantially the same."  *Id.* at 10.  *See* Section 9, *supra*, (quoting *Slack*).  The majority rejected the idea that the General Assembly was restricted by "the fundamental law" of the

separation of powers, holding instead that the General Assembly, "by its own wisdom and its own responsibilities, may regulate the conduct and command the resources of all, for the safety, convenience and happiness of all, to be promoted in such manner as its own discretion may determine." *Id.* at 22.

The majority opinion in *George* said the same. Citing §§ 27 and 28, the Court noted that "[i]t is these sections upon which counsel for the appellees rely to show that the selection of the board of commissioners is an executive function." *George*, 47 S.W. at 781. The Court rejected the argument, saying, "These sections do not indicate a purpose upon the part of the framers of the constitution to limit the power of the legislature in the matter of selecting or electing officers or agents to carry out its will." *Id.*

That is, the General Assembly was not impliedly prohibited from itself appointing prison board commissioners by the separation of powers provisions, § 27 and § 28.

The majority opinion in *George* enjoyed the support of all four Democrat judges and one Republican, Judge Guffy.[96] EVENING BULLETIN

---

[96] The Court's Democrats were Chief Justice Joseph H. Lewis, Thomas H. Paynter who authored the majority opinion, James H. Hazelrigg, and James D. White. The Republicans were George DuRelle, Bayless L. D. Guffy (1833-1910), and Anthony R. Burnam (1846-1919).

Joseph Horace Lewis (1824-1904) was a member of the Kentucky House of Representatives (1850-1855, 1869-1870); elected as a Democrat to Congress and served from May 10, 1870, to March 3, 1873; he was not a candidate for renomination in 1872; elected judge of the Kentucky

(Frankfort, Ky.), June 24, 1898, at 3.  Two Republican judges wanted the

Republican Governor in control and dissented.  Because the law was against him,

Court of Appeals in 1874 and served until 1898.  Biographical Directory of the U.S. Congress, Joseph Horace Lewis:  https://bioguide.congress.gov/search/bio/L000289.

Thomas Hanson Paynter (1851-1921), Democrat, was elected to the House of Representatives for the 51st through 53rd Congresses and served from March 4, 1889, until his resignation, effective January 5, 1895, having been elected to the Kentucky Court of Appeals where he served from 1895–1906.  He resigned, when he was elected to the United States Senate where he served from March 4, 1907, to March 3, 1913; he did not seek reelection in 1912.  Biographical Directory of the U.S. Congress, Thomas Hanson Paynter:  https://bioguide.congress.gov/search/bio/P000156

James Hervey Hazelrigg (1848-1924) "belongs to that political party whose leaders find extreme gratification in referring to Judge Hazelrigg's section of the United States as the 'Solid South,' and he has always lent its measures and its representatives his most effective support."  3 HISTORY 1279.  He served as Mt. Sterling City Attorney (1873-1881), Montgomery County Judge (1881-1886).  He served on the Court of Appeals (1893-1900) and as its Chief Justice (1899-1900).

Less accomplished than his colleagues, "James D. White [(1833-1915)] has ever been an ardent Democrat, and in 1880 was chosen a presidential elector . . . .  [A]ctive in politics, regarding it the duty as well as the privilege of the citizen to express his preference," White served as a common pleas judge in Blandville, Kentucky, from 1870 to 1879.  In the fall of 1896, he was elected to serve an unexpired term on the Court of Appeals, but he did not run for re-election in 1902.  THE COURIER-JOURNAL (Louisville, KY), Feb. 6, 1915; H. LEVIN, ED., THE LAWYERS AND LAWMAKERS OF KENTUCKY 60-61 (1897).

Bayless Leander Durant Guffy (1832-1910) was elected Butler County Judge (1862, re-elected 1866, 1878, 1882); elector on the Grant and Colfax ticket (1868); ran unsuccessfully for Congress (1876); unsuccessful candidate for attorney general (1891); elected to Court of Appeals (1895-1903); served as Chief Justice (1902-1903).  BRECKENRIDGE NEWS (Cloverdale, Ky.), Mar. 2, 1910, at 1.

Anthony Rollins Burnam (1846-1919) was appointed Collector of Internal Revenue by President Benjamin Harrison (1889-1893); elected Judge of the Court of Appeals (1897-1905) but did not seek re-election; served as Chief Justice (1903-1905); elected to Kentucky Senate as unopposed Republican (1907); longtime member of the Republican National Committee for Kentucky and delegate to the nominating conventions of President Hayes (Cincinnati 1876), President McKinley (St. Louis 1896) and President Taft (Chicago 1908).  RICHMOND DAILY REGISTER (Richmond, Ky.), Sep. 27, 1919, at 1 (report of open court in memoriam services and resolution honoring Judge Anthony R. Burnam); NEW YORK TRIBUNE (New York, N.Y.), Sep. 10, 1919, at 6.

Judge DuRelle took the fabled approach. This is where DuRelle fabricated the story of Jefferson's authorship of §§ 27 and 28, discussed in Section 16, *supra*.

Not unlike a waving of the "bloody shirt," DuRelle probably warmed some passions with his Jeffersonian myth in a dissent he said was "a bare outline of my views upon the subject, and the reasons which have led me to the conclusion reached, *without any elaboration of argument or citation of authority*." *George*, 47 S.W. at 784 (DuRelle, J., dissenting) (emphasis added). It was good of him to admit the conclusions he reached were only partially illuminated by thought or research. Skipping those essential parts of judicial analysis and relying on Founder idolatry was the only way to reach his unsupportable conclusion that "it was deemed necessary by the framers of the constitution to expressly direct and permit the legislature to exercise the power of appointment to office in a specified case, and this by necessary implication forbids the exercise of such power in all other cases." *Id.* at 787. Beyond false, it is an ignorant suggestion that, like the other two branches, the Legislative Department has no plenary authority but may only exercise such authority as is *expressly* granted. Like DuRelle's storytelling, this, too, is false.

DuRelle's dissent in *George* might have gone unnoticed as a one-off musing, never to be repeated again, "a bare outline of [his] views" as DuRelle

himself called it. But DuRelle would find it useful again one day, when assessing the constitutionality of even more divisive legislation, the Goebel Election Law.

## 21. *The Goebel Election Law*

On March 11, 1898, six days after passage of the board of penitentiaries act adjudicated in *George*, an even more divisive bit of legislation became law. Known as the Goebel Election Law, KS 1596a (1898), it was the brainchild of Senator William Goebel. Many lawmakers and journalists "believed it was coldly thought out and designed . . . to make Goebel governor, regardless of the wishes of the people." DECADES 370. Our State Historian tells us it is inescapable that "the bill's chief aim was to keep the Democracy [*i.e.*, Democratic Party] supreme." JAMES C. KLOTTER, WILLIAM GOEBEL: THE POLITICS OF WRATH 58 (1977) [hereinafter WRATH].

The law created a Board of Electoral Commissioners of three members to be appointed by the General Assembly; nothing prohibited appointing three commissioners of the same party. Three Democrats were appointed.[97] The

---

[97] The inaugural three members were:

William S. Pryor (1825-1914), served as circuit judge from Henry County (1866-1871); Court of Appeals Judge (1871-1896); and Chief Justice (1871-1872, 1878-1880, 1886-1888, 1895-1896). 3 HISTORY 1648-50.

William T. Ellis (1845-1825) was a Harvard Law School graduate (1870); served as Daviess County Attorney (1870-1878); served in the United States House of Representatives (1889-1895); delegate to the Democratic National Convention (1896, Chicago, Ill.). Biographical Directory of the U.S. Congress, William Thomas Ellis: https://bioguide.congress.gov/search/bio/E000139.

law empowered that Board to then appoint three commissioners in each county to serve on its own local election contest board who, in turn, were to appoint all subordinate election officers, poll watchers, etc., for their respective counties. The law did not prevent appointing each and every one of those officials from the same political party. The state commission could remove members of county boards any time without the need to show cause and fill the vacancy. DECADES 370–71; KS 1596a (1898). The responsibilities of these state and county boards included counting votes, disqualifying votes deemed inconsistent with law, and issuing certificates of election. Once the certificates were issued, the ballots were destroyed and going behind the decision was not allowed. *Id.* at 371.

The bill was hotly debated. Republicans naturally opposed the bill but some of its most ardent opponents were Democrats. PADUCAH DAILY SUN (Paducah, Ky.), Feb. 12, 1898, at 3 ("six Democratic senators . . . had the manliness, independence and honor to vote against the measure"). Nevertheless, enough "Goebel" Democrats were persuaded to pass the bill and it was sent to the Governor's desk where it was promptly vetoed and almost immediately repassed in the legislature where, in those days, a bare majority sufficed.

---

Charles B. Poyntz (1853-1924) served on the Maysville City Council (1886-1888); was a delegate to the Democratic National Convention (1888, St. Louis, Mo.); Railroad Commissioner (1892-1895) EVENING BULLETIN (Maysville, Ky.), Nov. 27, 1886, at 4; June 12, 1889, at 4; May 9, 1892; OWENSBORO MESSENGER (Owensboro, Ky.), Dec. 25, 1924, at 5.

The Louisville newspapers also wrote stinging editorials against the bill's passage.  DECADES 371–73.  Henry Watterson of the pro-Democrat COURIER-JOURNAL wrote, "The people's wrath and outrage will give those responsible for 'this monstrous usurpation of power' their just reward . . . ."  *Id.* at 372 (quoting COURIER-JOURNAL (Louisville, Ky.), Feb. 25, 1898).  Once the legislative session ended, the editor of another pro-Democrat Louisville newspaper with an even greater circulation, Richard Knott of the *Evening Post*, wrote:

> There are indications already that the gentlemen responsible for the Goebel force bill are becoming alarmed at the popular revolt against them and their machine.  The people of Kentucky are wide awake . . . suspicious of the men who have been dominant at Frankfort, and more intolerant than ever of the scheme to overthrow popular institutions.

*Id.* at 372–73 (quoting EVENING POST (Louisville, Ky.), Mar. 15, 1898).  In fact, pro-Democrat newspapers all across the Commonwealth were against it.[98]

---

[98] The Paris, Kentucky newspaper reported its poll of newspapers as follows:

> Among the Democratic papers arrayed against the Goebel bill are the Louisville *Courier-Journal*, *Post*, *Critic*, and *Times*, Woodford *Sun*, Winchester *Democrat*, Stanford *Journal*, Georgetown *Times*, Danville *Advocate*, Owenton *Herald*, Anderson *News*, Middlesboro *Herald*, Harrodsburg *Democrat*, Owensboro *Inquirer*, Owingsville *Outlook*, Flemingsburg *Times-Democrat*, Smith's Grove *Gazette*, Madisonville *Hustler*, Mayfield *Index*, Carrollton *Democrat*, Cynthiana *Times*, Murray *Times*, Lexington *Herald*, *Argonaut* and *Observer*, Fulton *Democrat*, Livingston *Colonel*, Mt. Sterling *Advocate*, Graves County *Index*, Hawesville *Plaindealer* and Scottsville *Reflector*.

THE BOURBON NEWS (Paris, Ky.), Mar. 4, 1898, at 5.

Freedom of the press and the right to vote—or rather the incumbents' fear of being voted out—would be the cure eventually. The incumbents' immediate fears were justified by the voters' reactions. For example, "Five hundred Democrats of Owen County assembled in mass convention at Owenton, and with only ten opposing votes adopted resolutions denouncing the Goebel Election bill, and indorsing Representative Orr and Senator Brown for opposing it." DAILY PUBLIC LEDGER (Maysville, Ky.), Mar. 3, 1898, at 5.

The curative political pressures of a free press and suffrage inherent in a republican form of government is what the Court of Appeals had in mind when it spoke of the General Assembly's "own wisdom and its own responsibilities" as a guard against bad laws. *Slack*, 52 Ky. at 22. The Goebel Election Law was of the species of laws the Court hoped against. That very law may also have been in the Court's collective thoughts when, just a few years later, it said:

> The protection against the unwise or oppressive legislation within constitutional bounds is by an appeal to the justice and patriotism of the representatives of the people. If this fail, the people in their sovereign capacity can correct the evil, but courts cannot assume their rights.

*Hager v. Robinson*, 157 S.W. 1138, 1142 (Ky. 1913).

The pressures on legislators to be re-elected would eventually work. On February 6, 1900, prominent members of both parties would get together to discuss "[a] new, 'absolutely fair' election law [that] would replace the present

one[.]" DECADES 451. But the new and fair law would not come soon enough to prevent the need for the Court of Appeals to resolve lingering disputes.

### 22. **Purnell v. Mann**—*following rules of constitutional interpretation*

Because the General Assembly met only in even-numbered years, the state had to survive two election seasons (1898 and 1899) before the deliberative body could repeal the bad law it created. Less than eight months after its enactment, and before the 1898 election, the law's constitutionality was tested.

In *Purnell v. Mann*, individuals who would have been the Bourbon County election officials under the prior law (judge of the county court (Purnell), the county clerk, and the sheriff) claimed the Goebel Election Law was unconstitutional and sought to enjoin the newly appointed officials from exercising the authority that was previously theirs. 48 S.W. at 407. The circuit court found the law constitutional and refused to enjoin the new commissioners.

On appeal, the Court showed its awareness of the political backlash that dominated the citizenry's reaction to Goebel's law. Even ill-advised laws, said the Court, "must be presumed . . . to have been enacted with knowledge of, and under instructions by, the people; and, if not so, it is always subject to repeal, which is the natural and safest process by which, in a government like ours, to get rid of an objectionable statute." *Id.* at 408. Still, the Court would "not shrink"

from pronouncing the law invalid if applying the cardinal rules for testing the statute showed it to be inconsistent with the Constitution's provisions. *Id.*

The Court first considered the limitation § 28 placed on its power of constitutional review. It concluded that going beyond the "salutary and inflexible rules, universally recognized in this country" for determining constitutionality would constitute the Court's own violation of the separation of powers. *Id.* The Court asked under what circumstances would it "be justly chargeable with wandering from the appropriate sphere of the judiciary department"? *Id.* The answer was at its fingertips, in the Kentucky Reporter from sixty years earlier, and the Court found it worth repeating. The Court would violate § 28 "'were we, by subtle elaboration of abstract principles and metaphysical doubts and difficulties, to endeavor to show that such a power may be questionable, and on such unstable and unjudicial grounds to defy and overrule the public will clearly announced by the legislative organ.'" *Id.* (quoting *City of Louisville v. Hyatt*, 41 Ky. 177, 178 (1841)).

The Court reiterated that principle in parlance of its own and of its own time, saying:

> [T]he judiciary cannot pronounce a statute unconstitutional and void because it may, in the opinion of the court, be impolitic, unjust, or oppressive, or because it appears to violate what might be deemed fundamental principles, or what are called the "genius and spirit of our institutions." The true and only test of the validity of a

statute which the court can properly apply is whether it be in express terms or by clear implication forbidden by the constitution, and, if there be a doubt on the subject, it is the duty of the court to resolve it in favor of the validity of such statute. For the judiciary to apply any other test would be for the judiciary itself to become *pro tanto* lawmaker.

*Id.*

The Court then quoted Kentucky jurisprudence from 35 years earlier that received the approbation of the Supreme Court of the United States "Whenever a jurist inquires whether a state statute is consistent with the state constitution, he looks into that constitution, not for a grant, but only for some limitation of the power inherent in the people's legislative organ, so far as not forbidden by their organic law." *Id.* at 408 (quoting *Griswold v. Hepburn*, 63 Ky. 20, 24 (1865), *aff'd*, 75 U.S. 603, 19 L. Ed. 513 (1869)).

Applying these rules to the Goebel Election Law, the Court first considered the appellants' claim—not relevant to our review in this case—that it violated § 51 and its antecedent, CONST. OF KY. of 1850, art. II, sec. 37. These provisions require each statute to address one topic, and that the topic be expressly stated in its title. The Court found no violation of § 51, concluding, "Manifestly, neither members of the general assembly nor the people could misunderstand or be deceived as to the purview, purport, or effect of the act." *Id.* at 409.

Then the analysis moved on to an issue and an argument directly implicated in the instant appeal. That is, the charge that the law was a usurpation by the Legislative Department of a power solely to be exercised by the Executive Department—in *Purnell*, that was the legislature's appointment of the election commissioners. The Court rejected that argument by simply respecting the doctrine of *stare decisis* and following the reasoning of an opinion that had nothing to do with election laws, but everything to do with assessing the constitutionality of statutes—*George*.

> Whether election by the general assembly of the state board of elections, and appointment by it of the county board, provided for in the act, involve exercise of power by the legislative department properly belonging to the executive department, and are consequently forbidden by section 28 of the constitution, is a question to some extent considered in the case of *Commissioners [of the Sinking Fund] v. George* (decided at the last term of this court) 47 S.W. 779.

*Id.* at 410.

Accounting for the fact that *George* was not about election laws simply strengthened the argument for the law's constitutionality. The Constitution itself provided that strength. Said the Court:

> Section 153 of the constitution is as follows: "Except as otherwise herein expressly provided, the general assembly shall have power to provide by general law for the manner of voting, for ascertaining the result of elections and making certificates or commissions to persons entitled thereto and for trial of contested elections." As plenary

-192-

power over the subject of elections is thereby given, it at least is a fair inference, in the absence of any provision forbidding, that exercise of power by the general assembly in the manner provided by the act in question is permitted.

*Id.* Then, of course, there was § 93 and, finally, § 107 that authorized the General Assembly to "provide for the election or appointment . . . of such other county or district ministerial or executive officers as may from time to time be necessary." *Id.* Given these express powers and the absence of any express restrictions, the Court held it was "not justified in deciding [the constitutional grant of power to the General Assembly] has been exceeded or improperly exercised by election of the state board and appointment by it of the county board as provided by the act." *Id.*

After consideration of the details of the law under review, the Court summarized its conclusion:

> We are unable to perceive that the act in question is forbidden in express terms or by clear implication of the constitution. Nor does it have effect to hinder operation or enforcement of any part of the general election law, except such parts thereof, plainly indicated and easily understood, as are inconsistent with and repealed by it. Whether legislative power has, as argued, been exercised in an unwise, improvident, or dangerous manner, is not for this court to decide; our power being restricted to the single inquiry whether the constitution has been violated. The people alone, through the legislature, must determine as to justice and policy of the statute.

*Id.*

The majority opinion was rendered on December 10, 1898. The judges split along party lines, the four Democrats in the majority following *George* and the cardinal rules for measuring the constitutionality of statutes. The two Republicans who dissented in *George*, dissented again in *Purnell* but, this time Judge Guffy, who was with the majority in *George*, flipped to join the dissent of his fellow Republicans. And, just as § 153 and § 107 strengthened the validity of the election law, it reciprocally weakened the reasoning of DuRelle's dissent in *George*. But that did not stop him from dissenting anyway.

### 23. *DuRelle's* **Purnell** *dissent—a* **Sinking Fund v. George** *redux*

Before DuRelle got around to writing his dissent, Judge Guffy appears to have felt a need to explain his flip-flop from *George*. On February 4, 1899, almost two months after the majority opinion was rendered, Guffy issued his dissent in *Purnell*. He took a shotgun approach.

He said the statute violated no less than seven separate constitutional sections, listed here in the order he discusses them: § 51, § 6, § 161, § 28, § 135, § 107, and even § 93. *Purnell v. Mann*, 49 S.W. 346, 346–48 (1899) (Guffy, J., dissenting) (because rendered later, given its own West Reporter citation). He also believed the majority's construction of § 153 violated § 2 and § 4. *Id.* at 349.

As for § 28, Guffy said nothing more than, "It seems to me that the election of state commissioners provided for is an exercise of executive authority." *Id.* at 348. That was it—no elaboration.

He also claimed the law violated § 93 because he believed election commissioners "are in no sense inferior officers, and cannot be so treated or recognized." *Id.* That was it, again—no elaboration.

As for the remaining constitutional provisions he believed the law violated, I leave it to others to read and decide for themselves afterwards whether the effort was worth it. I did read them and concluded, for myself, it was not.

Nearly another two months would pass before Judge DuRelle rendered his own dissent. Like Judge Guffy's dissent, being remote in time from the majority opinion, it was given its own separate citation in the West Reporter. *Purnell v. Mann*, 50 S.W. 264 (Ky. 1899) (DuRelle, J., dissenting). Perhaps that is why Appellees mistakenly cite it as though it is a majority opinion and, therefore, law. (Appellees' brief, p. 11).[99] It is not.

DuRelle gets right to his point with an emotional criticism "that the act was inherently vicious, as an invasion by the legislature of the powers of the

---

[99] Appellees cite the case only for the proposition that the 1890 convention was called to rein in the General Assembly, a proposition I adamantly challenge in Sections 4 and 5, *supra*. If it were true, and if that was the outcome (the only position that advances Appellees' argument), how do we explain passage of legislation like the Goebel Election Law?

executive." *Id.* That is, it violated the spirit of the separation of powers. To support that position, DuRelle makes his Jefferson yarn a twice-told tale, adding a new fact not in his first telling in *George*, and removing all doubt (from his own mind at least) that the story is true. *Id.* This time he told us Kentucky's separation of powers "provision was drawn by Mr. Jefferson, with the provision of the federal constitution before him[.]" *Id.* DuRelle must have forgotten the Federal Constitution has no separation-of-powers provision at all. It would be hard for Jefferson to have that non-existent provision in front of him. But with these fallacies again as foundation material, he began his analysis.

He claims *George* runs counter to *Taylor v. Commonwealth*. But to support that claim in his dissent, he misinterprets that case and the many other cases following it as standing for something it did not—that the legislature cannot appoint any non-legislative officer without an express grant in the Constitution. As explained in Section 12, *supra*, *Taylor v. Commonwealth* was never interpreted in such a way. It is also inconsistent with how that opinion was understood by constitutional law authorities Cooley, Mecham, and Freeman who used it as an example of a principle contrary to what DuRelle was selling. So, to further support his contrarian view, DuRelle limits his citation of Kentucky authority to three cases—*Justices of Spencer Cnty. Court v. Harcourt*, 43 Ky. 499 (1844), *Gorham v. Luckett*, 45 Ky. 146 (1845), and *Applegate v. Applegate*, 61 Ky. 236 (1863).

The first two opinions were decided before 1850 when the 1799 Constitution expressly empowered the Governor to make all appointments to office except where it grants such power to another branch as in the last phrases of CONST. OF KY. of 1799, art. III, sec. 9, empowering the County Courts to appoint various county officers.  DuRelle thus argues the intrinsically executive power of appointment could be exercised by the judiciary *only* because of that express grant. A neat trick, but why?  There is more than one reason.

First, he failed to point out that, before 1850, the power of appointment did not need to be "intrinsically" executive to be reserved to the Governor; appointment power was expressly granted to the Governor in the 1799 constitution.  CONST. OF KY. of 1799, art. III, § 9.  And he failed to explain that the appointment power of the county courts is in the Judicial Department article (Article IV), it is part of that same § 9 of the Executive Department article and operates as a limitation on the Governor's appointment powers, just like article III, § 25 of the 1850 Constitution and § 93 of the current one.

Second, he also fails to recognize that if that § 9 of the Executive Department article in 1799 had not vested such power in either the Executive Department or the Judicial Department, it would have been a power exercisable by the Legislative Department's without an express grant because it would have been within its plenary authority.  All powers exercised by the judicial and executive

branches must derive from an express constitutional grant, while the legislative branch with implied plenary powers is presumed empowered unless one can point to a constitutional prohibition. This dissent is peppered with cases showing universal acceptance of this principle as a vital element of republicanism.

The third opinion DuRelle cites, *Applegate*, was decided after the appointment powers of both the Executive Department and the Judicial Department in CONST. OF KY. of 1799, art. III, sec 9, were removed by the 1850 Constitution and lodged with the Legislative Department by adopting an entirely new section, § 93's antecedent, CONST. OF KY. of 1850, art. III, § 25. Pursuant to those powers, the General Assembly enacted a law, cited in *Applegate* as "Sec. 6, chap. 91, 2 Stant. Rev. Stat. 340," that said, "Every sheriff may, by and with the approval of the county court, appoint his own deputy." *Applegate*, 61 Ky. at 237.

In *Applegate*, a sheriff argued the power to appoint included the right to approve the appointment and both were exclusive to him as an executive officer. *Id.* at 236. He claimed the law cited above unconstitutionally authorized the judiciary to exercise the executive power of approval. The Court disagreed.

"The right of approval," said the Court, "conferred by law on the court, appropriately belongs to the executive, and not the judicial power of the court." *Id.* DuRelle put a spin on this sentence never intended. He read that sentence as saying the right of appointment approval "belongs to the executive"

-198-

*branch*, but that is unquestionably not what the opinion says. If DuRelle's reading had been correct, the sheriff would have won his case. He did not.

Rather, that sentence says "[t]he appointing *power*, although vested in a court, is executive and not judicial. [citation to *Taylor v. Commonwealth* omitted]. The right of approval . . . belongs to the executive . . . *power* of the court." *Id.* (emphasis added). The right of the judiciary that *Applegate* addressed did not derive from the current Constitution as it had under its 1799 iteration, but pursuant to a law enacted by legislative authority granted in § 93's antecedent, CONST. OF KY. of 1850, art. III, § 25. The decision upheld the court's (Judicial Department's) exercise of executive power of appointment approval against the claim of the sheriff (Executive Department) that only he could wield the power to approve his appointment of a deputy. The Court saw the law as the legal vesting of an executive power in the judiciary by a statute enacted pursuant to the General Assembly's power derived from the Constitution. *Applegate*, 61 Ky. at 237 ("This limitation on the power of the sheriff was doubtless conferred on the court the better to protect the public interest of each county[.]").

DuRelle's reasoning cannot withstand scrutiny. Contrary to DuRelle's claim that *George* overruled *Taylor v. Commonwealth*, the exact opposite is true. *George* followed the *Taylor* opinion.

The heart of DuRelle's dissent continued to be, as it was in *George*, that judges should serve as the oracular spirit guides of republicanism. Beginning with an assertion disprovable by the convention of 1849 if not also that of 1890, DuRelle says "the spirit of each successive change in the organic law of the commonwealth [has] been in the direction of more strictly limiting the legislative power." *Id.* at 266. That is simply not so.

DuRelle's main objection was actually a political one. He particularly objected that the law allowed appointment of commissioners who belong to one party—the party in power.[100] Still, he acknowledged no part of any constitution considered party parity much less required it. He even admitted the issue was in

---

[100] Despite my dissent's length, it is far from a full treatment of the politics at work that greatly affected our jurisprudence. As explained in DECADES, the law did not pass because of Democrat control of the legislature, but rather because it was controlled by one faction of one party—the Goebel faction. DECADES 371. Professor Klotter quoted a journalist of the time who captured the foreboding of this bad law:

> Wrote Edward A. Jonas, a Louisville reporter, "What Senator Goebel proposed was that elections be held by officers to be selected by a partisan county board, that board to be appointed by, and therefore to become the creature and the servant of, a partisan state board. This last," he declared, "was to be named by one party in the Legislature and to be self-perpetuating. These canvass returns and decide contests. In practice, what this intended," he asserted, "was that every election would be at the mercy, not of one party but of whatever faction of that party chanced to be on top. And so," Jonas concluded, "he not only destroyed self-government but party government in the broader sense."

DECADES 371 (footnote omitted).

the hands of the General Assembly and that "no statute requiring officers of election to be of different political parties was passed until 1858 . . . ." *Id.* at 269.

Absence of constitutional prohibition did not prevent him from calling the law an "invasion of the right to free and equal elections guaranteed by section 6 of our bill of rights . . . ." *Id.* To resolve the heady, hazy question of when a law offends § 6, he proposed a subjective analytical tool for courts to apply.

The judiciary could protect against invasion of the right to fair elections, he claimed, by measuring every new election law by the previous one, an assessment entirely dependent on the jurists' sensibilities. Thus, "any statute which is a distinct departure for the worse; which is less reasonable, uniform, and impartial than the law before in force; which alters that law so as, and with the purpose, directly or indirectly, to deny or abridge the constitutional right of citizens to vote, or unnecessarily to impede its exercise,—is void[.]" *Id.* at 270. This envisages judicial power never intended either by the Founders or by the authors of our own Constitution. If we did not know then, we certainly know now that what a party or faction or person perceives as a hindrance to free and fair elections, others see as a protection. Applying the rules of constitutional construction requiring challengers to point to concrete rather than abstract constitutional prohibitions is what protects our jurisprudence from our judges' own opinionations.

When DuRelle authored his *Purnell* dissent, Republican Governor Bradley was still in office. DuRelle noted that Bradley shared his lament not only that the law allowed one-party dominance, but that § 107 empowered the legislature to "elect all of the 350 county commissioners provided for in this law, and every other appointive officer in the commonwealth." *Id.* at 268. Quoting the leader of his political party was irresistible and DuRelle included the Governor's nebulous objection in his dissent. "'The exercise of such power would,' as said by the governor in his veto message, 'destroy the very object for which the legislative department was created.'" *Id.* Perhaps DuRelle perceived an unspoken invitation to try and succeed where his Governor's veto power fell short. But DuRelle appears not to understand that Governor Bradley did not question the law's constitutionality; he questioned the abuse of power within the constitution's confines, correctible by his veto or, if it be overridden, by the People, either by changing the law through urgings to their representatives, or by changing their representatives at the polls.

Notwithstanding that the Court in *Purnell* voted along party lines, the majority opinion was true to the precedent of Kentucky jurisprudence— jurisprudence specifically followed by courts in almost all sister states. Judge DuRelle's reasonings, like his historical facts, were peculiarly his own.

But this would not be the last time Judge DuRelle urged his facts and his rationale.  There was another election cycle yet to go.  And the political pressures only increased for all the decisionmakers involved.

## 24.  *1899 election—the Goebel Election Law in operation*

Despite contentious nominating conventions in both parties and a heated general election contest between Democratic candidate William Goebel and Republican candidate William S. Taylor, "election day [November 7, 1899] passed quietly" all across the Commonwealth.  DECADES 440.  It would be the last peaceful day for a while.

*Purnell v. Mann* had decided nearly a year prior to the 1899 general election that the Goebel Election Law was constitutional and, in accordance with that law, all the new commissioners were about to be put to work again.  Slow returns and a close race "meant that the Goebel-appointed Board of Electoral Commissioners would have the power to decide the election."  *Id.* at 440–41.

Nearly a month passed from election day before the three-Democrat-member Board of Electoral Commissioners convened on December 6, 1899, in the Senate Chamber to canvass the statewide vote and to decide which candidates to favor with a certificate of election.  KENTUCKY POST (Covington, Ky.), Dec. 6, 1899, at 1.  Three days after that, the Board surprised many when, in a 2-1 vote, it granted certificates of election to the Republican candidate for Governor, William

S. Taylor, and all the other Republican candidates down the ticket.  KENTUCKY

POST (Covington, Ky.), Dec. 9, 1899, at 1.

The Board decided the elections on the face of the election returns

alone.  The members concluded they "had no judicial powers in the governor's

race and thus could not hear proof or swear witnesses.  This only the legislature

could do."  DECADES 444; CONST. OF KY of 1891, § 90 ("Contested elections for

Governor and Lieutenant Governor shall be determined by both Houses of the

General Assembly, according to such regulations as may be established by law.").

The raw vote showed Republicans won every race and the Board issued certificates

of election to each.  The votes for governor were 193,714 for Taylor and 191,331

for Goebel with similar numbers favoring Republican John Marshall over

Democrat J. C. W. Beckham for Lieutenant Governor.  *Id.*

On Tuesday, December 12, 1899, with his certificate of election in

hand, William Taylor was inaugurated Governor with Marshall as Lieutenant

Governor.  But that was far from the end of the story.  The General Assembly

would eventually decide the contests.

In accordance with statutes promulgated pursuant to § 90 of the

Constitution to decide the election of governor and lieutenant governor, separate

eleven-member, joint committees of the House and Senate would canvass votes,

receive evidence, entertain vote challenges, and make their reports to the General

Assembly for action. A random selection process resulted in a joint committee to decide the race for Governor comprised of ten Democrats and one Republican.[101] DECADES 445 (footnotes omitted). For two weeks, from January 15 to January 29, 1900, the committees heard testimony and closing arguments to decide who would be Governor, Lieutenant Governor, Attorney General, as well as some other executive and legislative branch, and local offices. *Id.* at 445–47 (footnotes omitted). "[T]he committee upheld all Democratic objections and overturned all Republican ones." DECADES 446 (footnotes omitted).

Contests over these challenges made their way before the Court of Appeals, beginning right after Taylor was inaugurated Governor. They presented the same argument Appellees make in this case. The first case challenged the General Assembly's power under § 93 to say how the state Board of Electoral Commissioners were selected. *Poyntz v. Shackelford*, 54 S.W. 855 (Ky. 1900), *overruled by Pratt 1*.

---

[101] The separate committee to determine the race for Lieutenant Governor was similarly lopsided at 9 Democrats and 2 Republicans. DECADES 444–46. Republican accusations challenging the manner of selection went nowhere in a General Assembly dominated by the opposing party. CAMPAIGN 171–73. The claims of trickery in the selection were brought before the Court of Appeals and Supreme Court of the United States to no avail. *Taylor v. Beckham*, 56 S.W. 177, 183 (Ky. 1900); *Taylor v. Beckham*, 178 U.S. 548, 584, 20 S. Ct. 890, 903, 44 L. Ed. 1187 (1900) (Brewer, J., dissenting).

## 25. Poyntz v. Shackelford—*another constitutional challenge*

On December 15, 1899, three days after Taylor's inauguration, the two Democrat Board of Electoral Commissioners who voted to award the election to the Republicans, Pryor and Ellis, resigned from the Board. HICKMAN COURIER (Hickman, Ky.), Dec. 15, 1898, at 5. They had to be replaced.

Governor Taylor, "[r]ight after Christmas named Judge A. M. J. Cochran, of Maysville, a republican, and W. H. Mackoy, [a] Brown democrat,[102] of Newport, members of the board to succeed Messrs. Pryor and Ellis." R. E. HUGHES, F. W. SCHAEFER AND E. L. WILLIAMS, THAT KENTUCKY CAMPAIGN; OR THE LAW, THE BALLOT AND THE PEOPLE IN THE GOEBEL-TAYLOR CONTEST 156 (1900) [hereinafter CAMPAIGN]. But the remaining Democrat member of the Board who dissented and did not resign, Charles Poyntz, turned to the election law itself for his own authority to appoint Democrat Judge John A. Fulton to fill one of the vacancies; likewise in accordance with that law, Poyntz and Fulton together named Democrat Morton K. Yonts as the Board's third member. *Id.* This set up the next case to again follow the holdings in *George* and *Purnell*. It again pitted

---

[102] "Brown democrats" were members of a splinter faction of the Democrat Party opposed to the radical politics of William Goebel. They held their own convention in Lexington and nominated former Governor John Young Brown as their candidate. His campaign was doomed once Presidential candidate William Jennings Bryan heartily endorsed the Goebel ticket. CAMPAIGN 56–62, 89–90, 95–96, 124.

the Governor's authority to exercise the inherently executive appointment power against the constitutional grant of appointment power to the General Assembly.

Sam "Shackelford, clerk [of the Court of Appeals], was about to qualify [Governor Taylor's appointees] Mackoy and Cochran, as members of that board, and the latter were about to enter upon the discharge of their alleged duties as such members" when Poyntz, Fulton, and Yonts sought an injunction to stop it. *Poyntz*, 54 S.W. at 856. The circuit court granted the injunction but in the same order dissolved it under a procedure allowing review by the Court of Appeals and granting the Court of Appeals its own power to grant or deny reinstatement. *Id.*

The case presented a slightly different issue than *Purnell*—not the appointment of board members but the filling of vacancies on the board. As the Court said, the former point was settled law.

> The competency of the legislature to create the election board, and elect its members, admittedly is settled in the *Purnell v. Mann* Case (Ky.) 48 S. W. 407, where the constitutionality of the act conferring such power on that body was carefully considered and upheld.

*Poyntz*, 54 S.W. at 856. The Court concluded it rationally followed that the power to fill vacancies was a necessary incident to that power:

> When the force of this adjudication [in *Purnell*] is considered, it can hardly be argued seriously that the legislature is lacking in power to provide how vacancies in their creature, the board, may be filled. Legislative competency to create the board and fill it implies

legislative competency to provide how vacancies on the board may be filled.

*Id.*

However, the Court acknowledged that an express constitutional grant of that power to another department would limit the General Assembly's vacancy-filling authority. "[T]he right to fill such vacancies may be denied to the legislature because of some provision of the organic law conferring that right elsewhere . . . ." *Id.* "[T]hat such right has been vested by the constitution on the governor exclusively is the contention of the defendants [the Governor's appointees]." *Id.* It was not unlike Appellees' contention here.

Unlike Appellees in the instant appeal, the Governor's appointees seeking to hold onto their positions in *Poyntz* knew better than to argue that § 76 alone grants the Governor vacancy-filling authority. That was an unsuccessful argument in *In re Opinion of Judges of Court of Appeals*, 79 Ky. 621, 623–24 (1881) (as explained in Section 8, *supra*, this provision only confers a "general power to fill vacancies" and such power "was not conferred upon the Governor, to be exercised by him . . . without further constitutional or statutory authority." (interpreting CONST. OF KY. of 1850, art. III, sec. 9, the direct antecedent of § 76)). The *Poyntz* Court reiterated the very principle enunciated in *Opinion of Judges*. *Poyntz*, 54 S.W. at 858 (quoting *Opinion of Judges*). The Court also noted the slight differences in wording between the "further constitutional authority"

*Opinion of Judges* found in the 1850 Constitution (CONST. OF KY. of 1850, art. VIII, sec. 26) and its corollary in the current Constitution (§ 152).  But the Court said § 152 "confers no other or greater power on the governor than the old section, and it does not, in any event, confer the right on him to fill the vacancies in the appointive offices in dispute, in the face of the statute providing otherwise."  *Id.*

The Court added another explanation why § 76 alone is not a winning argument.

> By its provisions, it confers only power to fill vacancies by granting commissions which shall expire when the vacancies shall be filled according to the provisions of the constitution.  It cannot, of necessity, have any application to vacancies in office for the filling of which no provision is made in the constitution; for, as to such offices, there would be no period at which the commissions granted by the governor would expire.  It does not, therefore, apply to the offices in question, unless there is some other provision in the constitution directing how vacancies in them shall be filled.  The only other provision of that instrument respecting vacancies is that of section 152, which, as we have seen, does not affect the filling of vacancies in other than elective offices, and the offices in dispute are not of that class.

*Id.* at 857–58.  The *Poyntz* Court did not find a vacancy-filling power of the Governor in § 76 or § 152 superior to that of the General Assembly.  I do not find one in the instant case either.

The Republican judges disagreed, again.  They dissented but almost gave up on making a separation-of-powers argument.

## 26. **Poyntz** *dissent—Republican judges' enthusiasm waning*

Faced with opinion after opinion following *George* and *Purnell*, Judge DuRelle took a different tack. He dissented on procedural grounds—a lack of appellate jurisdiction, he argued. *Poyntz*, 54 S.W. at 859 (DuRelle, J., dissenting).

The logic he urged to achieve a Republican victory in this political fight was that the immediate dissolution of the trial court's injunction stopping the Republican Governor's appointees amounted to no injunction at all. That is, he objected to the General Assembly dictating the judiciary's procedural rules. "[T]he circuit judge having refused to alter the status," said DuRelle, "the party seeking the relief is presumed not to be entitled to it; and as the extraordinary remedy has not been granted, to the disturbance of the existing state, there is no occasion to permit an application to a judge of the court of appeals." *Id.* But, for this logic to make sense, DuRelle had to deal with the General Assembly's statute that created this procedural rule giving the Court appellate jurisdiction. His argument had to shift from the Legislative Department's encroachment on the Executive Department, to its encroachment on the Judicial Department.

Neither the majority opinion nor the dissent cites the allegedly encroaching statute, but only states that Poyntz followed a procedure "as is provided by law." *Poyntz,* 54 S.W. at 856. That law, entitled "Reinstatement of injunctions," was enacted in 1894 as Title VIII, ch. V, § 297 of the Civil Code (Act

1894, p. 203).  JOSHUA BULLITT, ED., CIVIL AND CRIMINAL CODES OF PRACTICE OF

KENTUCKY AND AMENDMENT ENACTED PRIOR TO 1899 § 297, at 241a–241b (1899)

(hereinafter BULLITT'S CODE).  *See also St. Bernard Coal Co. v. Pittsburg Coal

Co.*, 64 S.W. 288, 288 (Ky. 1901) (appeal brought "under section 297 of the Civil

Code, for the reinstatement of an injunction, which purports to have been granted

and dissolved by the judge").

DuRelle's solution to a law he found objectionable directly reveals his

own judicial philosophy, a philosophy that could only be inferred before *Poyntz.*

He wanted the Court of Appeals to exercise its own power to override the General

Assembly.  And he said so.

DuRelle criticized the Court's restraint from weighing in on

legislative policy and, in frustration, took to moaning.  "So much has been said

recently of the court's want of power to consider a question of legislative policy

that this suggestion seems hardly worthy to be considered."  *Poyntz*, 54 S.W. at

859 (DuRelle, J., dissenting).  He was tired of banging his head against the wall

among colleagues who refused to exercise judicial power to weigh in on policy.

Specifically, DuRelle did not agree with Section 297 of the Civil Code that the

General Assembly enacted as law.  *Id.*  He decried the judiciary's reluctance to

question the legislative policy that generated it, saying:

> [T]his court, by all proper rules of construction, is as
> impotent as the circuit court in controlling a question of

legislative policy . . . . *This, in my judgment, is the basic objection to the action of the majority of the court*.

*Id.* (emphasis added).

Whether DuRelle's "basic objection" was the Court's impotence or its cowardice in "controlling a question of legislative policy" matters not. He was unquestionably wrong to suggest this to be the Court's role. His politics, in my opinion, blinded him to that reality. He saw no reason for the Court of Appeals to restrain itself when the separation-of-powers provisions were right at its fingertips, and he believed the spirit of republicanism freed the Court to weigh in on legislative policy. In sum, he showed his colors as a jurist who wanted the judiciary to function as a superlegislature. *See Steven Lee Enterprises v. Varney*, 36 S.W.3d 391, 395 (Ky. 2000) (Nothing in the Constitution will "authorize 'the judiciary [to] sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations'" (quoting *Heller v. Doe by Doe,* 509 U.S. 312, 319–21, 113 S. Ct. 2637, 2642–43, 125 L. Ed. 2d 257 (1993)).

He did not reiterate the Jefferson myth, not this time anyway, nor did he expressly urge against the use of § 27 and § 28 as vehicles to consider legislative appointment policy. He simply reminded us that he had "stated briefly my reasons for so thinking in my dissenting opinion in *Purnell v. Mann*, reported in 50 S. W. 268." *Id.* at 860. But DuRelle's dissenting associates said even less.

Judge Guffy, who had written a near-incoherent dissent in *Purnell*, declined to write separately this time, but he did concur in DuRelle's dissent.

Judge Burnam, who theretofore had been relatively quiet, said he "concurs in this dissent, and will state his further objections." *Id*. at 860 (Burnam, J., dissenting). But, for unknown reasons, he never did.

The test of Burnam's judicial mettle came in the next case, one which forced him to decide whether he agreed with Judge DuRelle that express or irrefutably implied constitutional limitations on the General Assembly were not necessary; whether he agreed that, because of its "special" strength, Kentucky's separation-of-powers provisions alone empowered the Court as surrogate for the People to re-draw the boundaries between the departments. That case is *Taylor v. Beckham*, 56 S.W. 177 (Ky. 1900) (hereinafter *Taylor 1*).

## 27. **Taylor 1—***deciding the governorship*

A summary of what happened in the first months of 1900 could never give a complete sense of the political climate.[103] But the following are facts helpful to understanding the judicial decisions rendered over the next few years.

---

[103] For those interested, two of the books by Kentucky's State Historian, James Klotter, cited in this dissent as DECADES and WRATH, give excellent accounts of what happened next. A contemporaneous, detailed, and highly illustrated account, cited in both of Klotter's books, is R. E. HUGHES, F. W. SCHAEFER AND E. L. WILLIAMS, THAT KENTUCKY CAMPAIGN; OR THE LAW, THE BALLOT AND THE PEOPLE IN THE GOEBEL-TAYLOR CONTEST (1900) [cited previously herein as CAMPAIGN].

All during January and until the 29th of the month, the General Assembly heard the contests to determine the Governor and Lieutenant Governor races. Before the results could be announced, "on January 30 William Goebel was shot by an assassin . . . . [O]n January 31 . . . Taylor as governor issued a proclamation declaring that a state of insurrection existed at Frankfort, Kentucky, adjourning the general assembly . . . ." *Taylor v. Beckham*, 178 U.S. 548, 557, 20 S. Ct. 890, 895, 44 L. Ed. 1187 (1900).

Despite Governor Taylor's adjournment of the legislature, "in the Capitol Hotel," a "meeting of members of the General Assembly was held . . . without any notice to any of the Republican members of the general assembly and without any notice to" Taylor or Marshall. *Id.* at 557, 20 S. Ct. at 894-95. On "February 2, 1900, the board in each of the contests reported [to the legislature] . . . that William Goebel had received the highest number of legal votes cast for governor; [and] that J. C. W. Beckham had received the highest number of legal votes cast for lieutenant governor . . . ." *Id.*, 20 S. Ct. at 895. "Goebel and Beckham on that day, February 2, took the oath of office[.]" *Id.*

"[O]n the 3d of February, 1900, William Goebel died, and by law said Beckham was required to discharge the duties of the office of governor, and accordingly on that day he took the oath prescribed by law . . . ." *Id*. at 570, 20 S. Ct. at 891.

After Goebel's death, Beckham was positioned to challenge Taylor for the Governor's office which Taylor refused to voluntarily relinquish. Both Beckham and Taylor raced to the courthouse seeking injunctive relief against the other. Taylor filed his action in Louisville two hours before Beckham sued in Georgetown, so the actions were consolidated in Jefferson Circuit Court. CAMPAIGN 284. The circuit court ruled Beckham was entitled to the office and adjudged that Taylor and Marshall had usurped the offices of governor and lieutenant governor, respectively. Taylor and Marshall appealed.

The stakes had never been higher in the Court of Appeals, nor had the allegations been more serious. The spat over the General Assembly's appointment power paled by comparison with the issues before the Court in *Taylor 1*. Taylor and Marshall accused the Democrat-controlled General Assembly of fraud and corruption of the highest order.[104]

---

[104] Judge Burnam summarized the allegations of wrongdoing:

> [T]he entire election machinery of the state was in the hands of the friends and partisans of contestants [Beckham, *et al*] . . . contestees [Taylor and Marshall] were illegally, and in many cases fraudulently, deprived of a large number of votes . . . contestants had entered into a conspiracy with divers members of the legislature to nullify this election . . . by a fraudulent device, not by lot, as required by law . . . 10 out of the 11 members selected for the trial of the governor's contest were partisans of the contestant . . . at least one member of the board selected to try the contest for the office of governor had wagered money on the result . . . the contest boards, in the trial of the contests, had acted throughout in an illegal, tyrannical, and arbitrary manner in the admission and rejection of testimony, and in the whole conduct of the trial; that they did not report . . . any of the testimony which had been taken upon the trial; and that the general assembly . . . did not have a particle of testimony before them, were not familiar with the facts, refused to hear argument, held their

Most believed the hard constitutional issues had been settled by *George*, *Purnell*, and *Poyntz*, each of which conclusively rejected the argument that the Governor's executive powers entitled him to appoint members of boards such as the prison board and the state election contest board and holding that § 93 lodged in the General Assembly the power to elect those minor officers notwithstanding that appointment power is intrinsically executive in nature.

Those decisions clarified the boundary between the Executive Department and the Legislative Department. *Taylor 1* tested the boundary between the Legislative Department and the Judicial Department. Yet there is a common thread running through those earlier cases, and *Taylor 1*, and cases yet to come. The question each case asks and that the Court was to answer is this: If the People modify the original boundaries dividing the three departments of government by expressly granting to one department a power intrinsically belonging to another, does the separation-of-powers doctrine alone empower the Judicial Department to restore the boundaries existing before the People modified them?

---

alleged meeting . . . at a secret place without the knowledge of either contestees, or more than one–third of the entire membership of the general assembly [Republican senators and representatives], who were thereby excluded from any participation in the action so taken at the time of the alleged determination of the contests in favor of contestants.

*Taylor*, 56 S.W. at 184–86 (Burnam, J. concurring).

In *George*, *Purnell*, and *Poyntz*, the modifying constitutional provision was § 93. And the answer to this question was no. In *Taylor 1*, the modifying constitutional power was § 90. And, again, the answer was no.

Section 90 of the Kentucky Constitution is short and straightforward:

> Contested elections for Governor and Lieutenant Governor shall be determined by both Houses of the General Assembly, according to such regulations as may be established by law.

CONST. OF KY. of 1891 § 90. Despite the plenary nature of § 90, Taylor and Marshall objected to the "regulations . . . established by law"—the Goebel Election Law—because it prevented judicial oversight that would have revealed mass disfranchisement of the voters.

> The republicans contended that the court had the power to remedy a wrong act even by the legislature, which they said had disfranchised 150,000 electors—that many votes having been objected to by Goebel before the contest boards, and the contest board apparently cut out all of them, not having specified any vote in its return [to the General Assembly]. There was nothing to show that Goebel had been elected, they [argued], and yet the legislature of Kentucky was declared to be above all attack and above the constitution of Kentucky, above the people who gave it being, above the constitution of the United States.

CAMPAIGN 285.

Taylor and Marshall argued the General Assembly's adjudicative proceedings by which the state's two highest offices were determined "were void,

-217-

and did not affect in any way their rights to the offices of governor and lieutenant governor" determined by the original state election contest board's vote-canvassing that determined all the Republicans had won. *Taylor 1*, 56 S.W. at 178. They wanted the Court to "institute an inquiry into the conduct of [the Legislative Department] and form an issue to try by what motives legislators were governed in the enactment of a law." *Id.* at 180. The Court was not persuaded, foreseeing the grand mischief that would result if had been persuaded.

> If this may be done, we may also inquire by what motives the executive is induced to approve a bill or withhold his approval, and, in case of withholding it corruptly, by our mandate compel its approval. To institute the proposed inquiry would be a direct attack upon the independence of the legislature, and a usurpation of power subversive of the constitution.

*Id.*

The Court explained its view of how, "[b]y section 27[,] the powers of the government are divided into three distinct and independent departments[.]" *Id.* at 179. And this bears on the Appellees' same arguments in the instant case that convinced the Jefferson Circuit Court to do what the *Taylor 1* Court refused to do.

The Court said, "The legislative branch of the government more nearly represents the people than any other branch, and it is charged by the constitution and laws of this state with many important interests directly affecting the people, to secure which their independence of the executive is absolutely

-218-

necessary." *Id.* That branch's "independence is effectually guarded against any encroachment on the part of the executive." *Id.* (quoting 1 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 611–12, § 843 (M. Bigelow, ed., 1891)). "We are clearly of the opinion that the state constitution was intended to maintain the absolute independence of the legislative branch of the government . . . ." *Id.*

Judge DuRelle agreed with his fellow Republicans Taylor and Marshall and dissented yet again. He refused to buy any of what the majority was selling. He still believed the Goebel Election Law was "inherently vicious," and worse. He criticized his colleagues' milquetoast approach. "[T]he *criminal purpose* of the present election law," he said, "[and] its potential spawn of force and fraud, now realized, [f]ailed to engender anything beyond mild doubt of its constitutionality." *Id*. at 188 (DuRelle, J., dissenting) (emphasis added). He insisted "an election under an unconstitutional law is no election." *Id.* That is, he regarded as unconstitutional the General Assembly's election of Goebel by operation of Goebel's own election law. DuRelle insisted only one "tribunal can decide the question that there was no election"—the Court of Appeals. *Id.* at 187–88.

The frustration DuRelle revealed earlier in *Poyntz* resurfaced in *Taylor 1*. "It has been reiterated so many times that the repetition is *wearisome*

that the courts will not lightly, nor in a doubtful case, hold the action of a co–ordinate branch of the government unconstitutional . . . ." *Id.* at 187 (emphasis added).  He seemingly took the position that even "mild doubt of its constitutionality" should be enough for the Court to reject the Goebel Election Law.  The Court's docility exhausted him.  He proclaimed, "[T]he judiciary has rights also . . . and should be a little jealous of its own rights; and one of the essential rights of the judiciary is its right and power . . . to announce when other departments go beyond them . . . ." *Id.* at 188.  "In its delicacy as to invading the jurisdiction of the co-ordinate legislative branch of the government this court seems to me to have been somewhat overnice." *Id.* at 188.  DuRelle asked who but the Court of Appeals has the power to say whether another department "has violated the inhibitions of the constitution"? *Id.* at 187.  Who else, indeed.  DuRelle should have known.  When there is "mild doubt" of constitutionality—for that matter when there is something less than judicial certainty—, the core principle of republican government tells us all power resides with the People and they have the power to say.

But the majority did not doubt it had the *power*.  It simply drew the line between use and abuse of such power in a different place than DuRelle.  The majority knew those opposing the Federal Constitution's ratification in 1787 and 1788 predicted "that sooner or later one of the three equal departments of the

government would overshadow and supervise the others." *Id*. at 181. It must have been obvious to the majority that judicial supervision of that nature is what DuRelle wanted for it pointed out that "[t]he framers of our government have not constituted [the judicial department] with faculties to supervise co-ordinate departments, and correct or prevent abuses of their authority." *Id*. at 183.

As often happens, the majority responded to DuRelle's dissent, narrowing the issue before the Court to its simplest expression. "The question is, therefore, can the court hear evidence of this character assailing the integrity of the legislative journals?" *Id.* at 180. The majority said no.

"[T]he authorities are uniform that evidence cannot be received in court to impeach the verity of the record provided by the constitution as evidence of legislative proceedings." *Id.* at 180. After citing and summarizing a fair number of those authorities, the Court particularly embraced the view of the Pennsylvania Supreme Court, saying:

> We know of no such check upon legislation, and would not desire to see such a one instituted. . . . If the judiciary have such authority, then every justice of the peace is competent to sit in judgment upon every act of legislation which disorderly moralists or knavish or ignorant anarchists may choose to charge as fraudulent. Nay, more, if the question may be raised in a judicial proceeding, the judges and justices of the peace will be bound to investigate and decide it, and the principal judicial business then might become that of testing, not cases by the standard of the law, but the standard itself by the infinitely various and uncertain judicial notions of

morality."  Any number of similar quotations may be made from other state courts.

*Id.* at 181 (quoting *Sunbury & E.R. Co. v. Cooper*, 33 Pa. 278, 283 (1859) (citation omitted in original)).  The Court knew constitutional course correction was not the purview of the judiciary, but also knew whose purview it is—the People.

> However far the legislature may depart from the right line of constitutional morality, we have no authority to supervise and correct their act on the mere ground of fraudulent or dishonest motives. . . .  The remedy for such an evil is in the hands of the people alone, to be worked out by an increased care to elect representatives that are honest and capable.

*Id.*  The Court affirmed the circuit court's judgment that Beckham was entitled to the office of governor.  *Id.* at 184.

When it rendered *Taylor 1*, the Court's political makeup was still 4-3 in favor of Democrats.  The only difference is that Judge Lewis, who retired at the end of his term in 1898, was succeeded by another Democrat, Judge Hobson,[105] who authored the majority opinion in *Taylor 1*.

But *Taylor 1* was not decided along party lines.  Six judges concurred—the four Democrats plus Republicans Judge Burnam and Judge Guffy.

---

[105] John Peyton Hobson (1850-1934) was elected to the Court of Appeals in 1898 and served on the Court from 1899 to 1915.  He twice served as Chief Justice (1905-1907, 1911-1915).  In 1924, he took a position as a Commissioner of the Court of Appeals where he served until his death in 1934.  KENTUCKY POST (Covington, Ky.), June 4, 1934, at 2.

Only Judge DuRelle dissented.  Judge Burnam concurred and wrote a separate opinion which Judge Guffy joined.

Burnam was "firmly convinced . . . that the general assembly, in the heat of anger, engendered by the intense partisan excitement . . . , have done two faithful, conscientious, and able public servants an irreparable injury in depriving them of the offices to which they were elected by the people of this commonwealth; and a still greater wrong" to the voters.  *Id.* at 185 (Burnam, J., concurring).  But there was much more at stake in this case than the others.

Specifically citing § 27 and § 28 of the Constitution, Judge Burnam acknowledged both the General Assembly's plenary power granted by § 90 and the constitutionality of the Goebel Election Law, regardless of its advocate's motives.  *Id.*  More importantly, he acknowledged the Court could not divine authority from § 27 and § 28 to interfere in the General Assembly's exercise of express powers; that would take an express constitutional grant.  "[N]o appeal or power to review their finding is given to the courts by the constitution, which is the basis of all power both in the legislature and in the courts . . . ."  *Id.*  "I have been led with some reluctance to the conclusion," he said, "and not without some misgivings as to its correctness, that there is no power in the courts of the state to review the finding of the general assembly in a contested election for the offices of governor and lieutenant governor as shown by its duly–authenticated records."  *Id.*  This

necessarily included the implied authority in §§ 27 and 28 that DuRelle had urged over the past several years as a source of judicial power—and would urge again one day. But on this day, Judge Burnam's judicial integrity and independence was on praiseworthy display.[106]

When Judge Burnam died in 1919, "[b]eautiful and impressive services were held . . . in open Court" in his honor and memory. DAILY REGISTER (Richmond, Ky.), Sept. 27, 1919, at 2. After the reading of the Court's Resolution heralding his achievements, Judge Hobson paid a special tribute.

Hobson was no longer on the Court but chaired the Court of Appeals' Resolution Committee. He said:

> [T]he highest tribute that could be paid to Judge Burnam as a man, a lawyer and an impartial judge was his attitude and conduct as Judge of Kentucky's highest court during the contested election between [Beckham] and W. B. Taylor. . . . [W]hile Judge Burnam was an intense Republican and from his standpoint condemned the legislature in its action in that celebrated case, he was first a lawyer and a judge and had regard for the constitution as the fundamental law of the state, and as an impartial Judge joined with the court [majority] . . . . [C]onsidering the then inflamed condition of the public mind and the extreme partisan feeling raging at the time, Judge Burnam's conduct was not only a monument to his character and intellectual integrity, but that it reflected great honor upon the highest judicial tribunal of the state in those troublous times . . . . In other words . . . it elevated the court to a plane high above the partisan feelings of the times.

---

[106] And Guffy's, too, I suppose, by association.

*Id.* But Judge DuRelle could never bring himself to do the same.

### 28.  **Taylor 2—*SCOTUS weighs in on our form of republican government***

The Court of Appeals rendered *Taylor 1* on April 6, 1900, and Taylor's attorneys immediately prepared a petition for a writ of error to the Supreme Court of the United States.  On April 15, Taylor checked into the Raleigh Hotel in Washington, D.C. and "was busy preparing for the hearing of his case" even as news from Kentucky certainly distracted him.[107]  EVENING TIMES (Washington, D.C.), Apr. 20, 1900, at 2.  Taylor's attorneys, Helm Bruce who had appeared before the nation's high court fifteen times before[108] and former

---

[107] Less than a week after Taylor arrived in Washington, the whole country was abuzz with news that the grand jury in Frankfort indicted Taylor "as an accessory to the murder of Governor Goebel."  EVENING TIMES (Washington, D.C.), Apr. 20, 1900, at 2.  The report may have been premature but the number of newspapers reporting the story are too many to list.  A sampling from around the country includes these:  RIVERSIDE DAILY PRESS (Riverside, Cal.), Apr. 20, 1900, at 1; MORNING GAZETTE-NEWS (Kalamazoo, Mi.), Apr. 20, 1900, at 5; MORNING TRIBUNE (Lewiston, Idaho), Apr. 20, 1900, at 4; PORTLAND DAILY PRESS (Portland, Maine), Apr. 20, 1900, at 3; OREGONIAN (Portland, Or.), Apr. 20, 1900, at 3; BOSTON HERALD (Boston, Mass.), Apr. 21, 1900, at 2; BALTIMORE SUN (Baltimore, Md.), Apr. 20, 1900, at 1; PLAIN DEALER (Cleveland, Ohio), Apr. 20, 1900, at 1; OCALA EVENING STAR (Ocala, Fla.), Apr. 21, 1900, at 2; TIMES (Richmond, Va.), Apr. 21, 1900, at 2; DAILY EXPRESS (San Antonio, Tex.), Apr. 22, 1900, at 4; LEXINGTON DISPATCH (Lexington, S.C.). Apr. 25, 1900, at 2.

[108] Helm Bruce (1860-1927) attended Washington & Lee College and the Law School at the University of Louisville before beginning practice with his father in 1882.  He styled himself "an independent Democrat." He was active Louisville society generally, but especially in the Presbyterian Church, advocating for Prohibition and an end to pari-mutuel betting.  COURIER-JOURNAL (Louisville, Ky.), Aug. 11, 1927, at 1–2.  In 1892, he argued his first case before the Supreme Court of the United States, *Louisville Water Co. v. Clark*, 143 U.S. 1, 12 S. Ct. 346, 36 L. Ed. 55 (1892).  When he died, he was awaiting an opinion in his fiftieth case before the high court, *Atlantic Coast Line R. Co. v. Standard Oil Co. of Kentucky*, 275 U.S. 257, 48 S. Ct. 107, 72 L. Ed. 270 (1927).

Kentucky Governor William O. Bradley, were less distracted and no doubt ready for the case's eight hours of oral argument scheduled for April 30 and May 1. *Taylor v. Beckham*, 178 U.S. 548, 20 S. Ct. 890, 44 L. Ed. 1187 (1900) (hereinafter *Taylor 2*); EVENING BULLETIN (Maysville, Ky.), Apr. 17, 1900, at 2.

The Monday and Tuesday that straddled April and May were unseasonably warm; the temperature both days hovered around 80 degrees. EVENING TIMES (Washington, D.C.), May 1, 1900, at 9; May 2, 1900, at 6. It was likely no cooler in the Old Senate Chamber on the second floor of the Capitol when Chief Justice Fuller called the case as the Associate Justices took their seats. The Court's first order of business was to determine whether it could exercise original jurisdiction necessary to grant the writ. Taylor's claim that the Court of Appeals' decision denied him a property or other right protected by the 14th Amendment found no favor with the Court. *Id.* at 578, 20 S. Ct. at 901. So, Taylor urged another ground for jurisdiction, one more to the point of our case.

Taylor argued that if SCOTUS did not take jurisdiction, its inaction would abet a breach of the separation of the government's departments and Kentuckians "will be denied the benefit of a republican form of government, all of which is contrary to the provisions of the 4th section of the 4th article of the [Federal] Constitution . . . ." *Id.* at 557, 20 S. Ct. at 893. "[T]he general assembly deprived the people of Kentucky of the right to choose their own representatives,"

Helm Bruce said; that right, he argued, is "secured by the guarantee of the Federal Constitution of a republican form of government to every state, and [the Kentucky General Assembly] deprived them of their political liberty without due process of law." *Id.* at 573–74, 20 S. Ct. at 899. The remedy he claimed was the same as DuRelle wanted—judicial power to undo what the General Assembly had done by authority he imagined was in §§ 27 and 28.

Like DuRelle, Taylor believed the solution was the Court of Appeals' exercise of a power they saw as inherent but hiding for a hundred years in Kentucky's four constitutions' separation-of-powers provisions. Taylor wanted SCOTUS to agree with him and DuRelle. Given that Taylor's lawyers had four hours to argue, it would be beyond remarkable if they failed to make DuRelle's fallacious argument that the Thomas Jefferson-penned §§ 27 and 28 meant Kentucky's division of the departments surpassed that of all other republican forms of government. Such superiority in those separation-of-powers provisions, he argued, compelled not only the Supreme Court's jurisdiction, but its order that the Kentucky Court exercise that spectral power to redefine the boundaries where it believed they should go. Whether DuRelle's argument was made or not, the Supreme Court was not persuaded.

Chief Justice Fuller who penned the opinion, carefully and expressly entertained Taylor's argument. To explain why the Supreme Court was

unpersuaded, Fuller first commented on the Goebel Election Law itself. "The statute enacted for the purpose of carrying the provisions of the Constitution [§ 90] into effect has been in existence in substance since 1799 . . . [and m]any of the states have similar constitutional provisions and similar statutes." *Id.* at 574, 20 S. Ct. at 899–900 (citations omitted).

But Chief Justice Fuller astutely identified Taylor's real argument—not his objection to the law itself, but his disgust that the Kentucky Court of Appeals failed to act. "We do not understand this statute to be assailed as in any manner obnoxious to constitutional objection," said the Chief Justice, "but [Taylor's lawyers] complain of the action of the general assembly under the statute *and of the judgment of the state courts declining to disturb that action*." *Id.* at 574, 20 S. Ct. at 900 (emphasis added). That failure on the part of the Court of Appeals left Taylor nothing to argue but the guarantee of a republican form of government found in U.S. CONST. art. 4, § 4. So, he argued that "when the state of Kentucky entered the Union, the people[,]" received the federal government's "distinct pledge . . . of the guaranty of a republican form of government, and . . . that th[e] Supreme Court of the United States] has jurisdiction to enforce that guaranty . . . ." *Id.* at 578, 20 S. Ct. at 901.

Why did it seem to Taylor that Kentucky's highest court refused to guarantee a republican form of government? Like DuRelle, he was blinded by a

fundamental misunderstanding of "the distinguishing feature of that form of government . . . . the right of the people to choose their own officers for governmental administration . . . ." *Id.* at 578, 20 S. Ct. at 901. Chief Justice Fuller tried to explain.

The Supreme Court understood the reason "the judiciary of Kentucky was unable to do so"; *i.e.*, why it could not counteract the General Assembly's exercise of power under § 90 even if exercised to enact a dubious law. *Id.* It was "because of the division of the powers of government." *Id.* That is, the Supreme Court acknowledged that, rather than empowering the Court of Appeals, § 27 and § 28 restricted the judiciary from acting as a superlegislature.

So, if neither the Court of Appeals nor the Supreme Court could provide Kentucky with the republican form of government Taylor and DuRelle envisioned, who could? The Supreme Court had that answer, too. "It was long ago settled that the enforcement of this guaranty [of a republican government] belonged to the political department." *Id.* (citing *Luther v. Borden*, 48 U.S. 1, 12 L. Ed. 581 (1849)). It did not belong to the judiciary. Justice Fuller continued.

He and the Court found the words of an advocate in a prior opinion worthy of embracing and repeating:

> Mr. Webster's argument [in that prior case] . . . took a wider sweep, and contained a *masterly statement of the American system of government* as recognizing that the people are the source of all political power, but that, as the

-229-

exercise of governmental powers immediately by the people themselves is impracticable, they must be exercised by representatives of the people; that the basis of representation is suffrage; that the right of suffrage must be protected and its exercise prescribed by previous law, and the results ascertained by some certain rule; that through its regulated exercise each man's power tells in the Constitution of the government and in the enactment of laws; that the people limit themselves in regard to the qualifications of electors and the qualifications of the elected, and to certain forms for the conduct of elections; that our liberty is the liberty secured by the regular action of popular power, taking place and ascertained in accordance with legal and authentic modes; and that the Constitution and laws do not proceed on the ground of revolution or any right of revolution, but on the idea of results achieved by orderly action under the authority of existing governments, proceedings outside of which are not contemplated by our institutions.

*Id.* at 579, 20 S. Ct. at 901 (emphasis added) (quoting *Duncan v. McCall*, 139 U.S. 449, 461–62, 11 S. Ct. 573, 577, 35 L. Ed. 219 (1891) (citing 6 DANIEL WEBSTER, THE WORKS OF DANIEL WEBSTER 217 (17th ed. 1877) (paraphrasing language from 217–25))). "These observations are applicable here," said the Court. *Id.* at 580, 20 S. Ct. at 902. It was an ideal that should have rung a familiar bell.

The Supreme Court of the United States saw nothing improper or untoward going on in Kentucky, at least not in the structure of its organic and statutory laws. "The commonwealth of Kentucky is in full possession of its faculties as a member of the Union . . . ." *Id.* That was true even as measured against the expectations of the Federal Constitution.

In the eye of the Constitution, the legislative, executive, and judicial departments of the state are peacefully operating by the orderly and settled methods prescribed by its fundamental law, notwithstanding there may be difficulties and disturbances arising from the pendency and determination of these contests. This very case shows that this is so, for those who assert that they were aggrieved by the action of the general assembly properly accepted the only appropriate remedy which, under the law, was within the reach of the parties. That this proved ineffectual as to them, even though their grounds of complaint may have been in fact well founded, was the result of the Constitution and laws under which they lived and by which they were bound. *Any remedy beside that is to be found in the august tribunal of the people, which is continually sitting, and over whose judgments on the conduct of public functionaries the courts exercise no control.*

*Id.* (emphasis added). Once again, the cure for an objectionable law is political, to be administered by the People in reproaching or replacing their representatives.

Consider carefully the Supreme Court's last sentence speaking of the "august tribunal of the people" and especially the phrase—"over whose judgments on the conduct of public functionaries the courts exercise no control." *Id.* The courts are thus powerless to restructure the form of republican government the People created by the grant of legislative power in such provisions as § 90 and § 93. Pretending to find that power in the cytoplasm of §§ 27 and 28 makes us, the Judicial Department, the usurpers.

The Supreme Court dismissed the petition for a writ for lack of jurisdiction but not before leaving Kentucky jurists with these important lessons.

Taylor's and Marshall's pursuit of the two highest executive offices in Kentucky government had come to an end. But there was still much jurisprudence to come, and to discuss in this dissent, that bears on the instant appeal. Without discussion of those cases, *LRC v. Brown*, to the extent it follows *Pratt 1* and *Sibert*, cannot be appreciated for the failure of jurisprudence it is.

### 29. *(Almost) all Republicans ousted from lesser offices bring suit*

The General Assembly did not oust only Governor Taylor and Lieutenant Governor Marshall. It also ousted the Republicans who received certificates of election for the offices of Secretary of State (Caleb Powers), Auditor (J. S. Sweeney), Treasurer (H. R. Day), Attorney General (C. J. Pratt), Superintendent of Public Instruction (John Burke), and Commissioner of Agriculture (J. W. Throckmorton), all of whom had taken the oath of office in early January. On the day of Governor Goebel's funeral, February 8, 1900, attorneys representing those Republicans petitioned the United States District Court in Cincinnati for an injunction. CAMPAIGN 268, 277–78. After hearing arguments on February 12, the district judge dismissed the petition holding that, because no federal question was raised, their relief was in state court. *Id.* 280–82; *Taylor 2*, 178 U.S. at 577 n.4, 20 S. Ct. at 901 (The district court's decision cannot be found on Westlaw but the Supreme Court of the United States appears to have

expected it would be reported and cited the case as follows: "Sweeny v. Poyntz, Cir. Ct. U. S. Dist. Ky. not yet reported, Taft, J.").

But the Democrats already filed state actions in Franklin Circuit Court alleging the Republicans usurped their respective offices. By the time the circuit court ruled on April 17, 1900, the jurisprudence was well-settled by *George*, *Purnell*, and *Poyntz*. The judge followed those opinions and quickly "handed down a decision . . . sustaining the Democrats in every contention." HOPKINSVILLE KENTUCKIAN (Hopkinsville, Ky.), Apr. 20, 1900, at 2.

The window to appeal the circuit court judgment was two years. BULLITT'S CODE § 745, at 483 ("appeal shall not be granted except within two years next after the right to appeal first accrued"); *Schultz v. Schultz*, 332 S.W.2d 253, 254 (Ky. 1959) (First enacted in 1854, the same section provided a two-year appeals window at least until 1959.). None of the Republicans, save one, waited as long as a week to take their cases to the Court of Appeals. "[A]ppeal was prayed as to all cases except that of . . . [Attorney General Clifton J.] Pratt. Mr. Pratt . . . did not ask an appeal." EVENING STAR (Washington, D.C.), Apr. 24, 1900, at 3.

After some procedural bumps, *Sweeney v. Coulter*, 57 S.W. 254, 254 (Ky. 1900) (hereinafter *Sweeney 1*), the lead case contesting the office of State Auditor, came to the fore. Oral arguments were scheduled for October 6, 1900, but were soon canceled. *Sweeney v. Coulter*, 58 S.W. 784, 785 (1900), *overruled by*

*Pratt 1* (hereinafter *Sweeney 2*). No oral argument was necessary in a case hardly more difficult than what the circuit court addressed. The Court of Appeals had all the same jurisprudence the circuit court had—*George*, *Purnell*, and *Poyntz*—plus now it had the Supreme Court's decision in *Taylor v. Beckham* rendered May 21.

In deciding the cases contesting the lesser executive offices, the Court turned directly to the cases that should govern the instant appeal, *Purnell* and *Poyntz*. The Court said:

> It is urged that the election law enacted in 1898 is unconstitutional [as violating the separation of powers provisions, § 27 and § 28]. As this court recently passed upon that question in *Purnell v. Mann*, 48 S. W. 407, and gave its reasons for holding it constitutional, we will not again discuss it.
>
> It is also urged that the vacancies in the state board of election commissioners could only be filled by appointees of the governor. . . . The question was directly presented to this court in a suit between the appointees of the governor and those of Poyntz as to who had the authority to fill the vacancies, and this court, in *Poyntz v. Shackelford*, 54 S. W. 855, decided that Poyntz had the right under the law to appoint Fulton, and he and Fulton to appoint Yonts.

*Id.* at 786–87. The Republican judges dissented but, apparently deeming it futile to write separately, none of them did.

All the appeals addressing the remaining lesser offices were consolidated separately from *Sweeney 2* and, in deciding them, the Court of Appeals' simply followed suit:

Hill and Powers were opposing candidates for the office of secretary of state, Nall and Throckmorton for the office of commissioner of agriculture, Hager and Day for the office of treasurer, and McChesney and Burke for superintendent of public instruction. . . . The question was tried, and the state board of election commissioners adjudged that each [Democratic contestee] had been elected to the office claimed by him. Suits were instituted in the Franklin circuit court to obtain possession of the offices, books, etc., and to have a judgment rendered declaring each of the [Republican election certificate holders/office] usurpers, and the court below so adjudged. The same defense was made in each of the cases as was made in the case of *Sweeney v. Coulter*, in which the court this day delivered an opinion. By authority of the opinion in that case, the several judgments are affirmed.

*Powers v. Hill*, 58 S.W. 1132, 1132–33 (Ky. 1900) (hereinafter, *Powers 1*).

Again, Republican Judges Guffy, Burnam, and DuRelle dissented but did not write separately.  If they were disheartened, they would not remain so.  Judicial politics of 1900 would provide cause for Republican optimism.

### 30.  *The election of 1900—playing politics with the judiciary*

Unlike the other Republican politicians who prosecuted *Sweeney 1 & 2* and *Powers 1*, Clifton J. Pratt obeyed the Franklin Circuit Court's judgment and immediately turned over the Attorney General's office keys and papers to the candidate the court said obtained the most legal votes for that office, Robert Breckinridge.  DAILY PUBLIC LEDGER (Maysville, Ky.), Nov. 10, 1900, at 5.  Pratt returned to his home and law practice in Madisonville, gave the Memorial Day speech, participated in the local Republican Convention, and served as a delegate

to the state convention in Louisville. BEE (Earlington, Ky.), Mar. 15, 1900, at 6; DAILY PUBLIC LEDGER (Maysville, Ky.), May 10, 1900, at 3; July 19, 1900, at 2.

New Attorney General Breckinridge was immediately faced with the far thornier tasks of defending against the other Republican usurpers' appeals, and the even greater challenges of pursuing and trying the conspirators in William Goebel's assassination. The trials of Jim Howard and Caleb Powers for the murder would soon be scheduled and concluded before year's end.

On March 9, 1900, warrants were issued for the arrest of five men charged as accessories before the fact in the murder of Governor Goebel. HARTFORD HERALD (Hartford, Ky.), Mar. 11, 1900, at 3. The defendants included Caleb Powers who was, at that time, still Kentucky's Secretary of State. *Id.* Powers immediately left Frankfort in disguise, but he was soon arrested on the train in Lexington. EVENING BULLETIN (Maysville, Ky.), Mar. 12, 1900, at 3.

By mid-April, other indictments were handed down although withheld for a time. Rumors peppered newspapers around the country that Governor Taylor was among those indicted. *See* Section 28 and footnote 107, *supra.* "[H]e returned to Frankfort to face any indictment . . . but no paper was served on him"; even his written inquiries to the Commonwealth Attorney yielded no direct answer, and

whether Taylor was indicted "remained a profound mystery at the close of April."[109]  CAMPAIGN 320–21.

By the end of May, Taylor was in Indianapolis where he publicly stated he tried to determine "if there was an indictment against me, but they would not tell me."  He said Indiana was where he "will await developments."  THE ANACONDA STANDARD (Anaconda, Mont.), May 23, 1900, at 1.  That next development came in June when the Franklin County sheriff obtained a requisition from Kentucky Governor Beckham to Republican Indiana Governor James A. Mount to arrest and extradite ex-Governor Taylor.  DAILY CAMERA (Boulder, Colo.), June 02, 1900, at 2.  On June 13, 1900, Governor Mount refused to honor the requisition and gained national attention for giving asylum to his fellow Republican.  ADAIR COUNTY NEWS (Columbia, Ky.), Jan. 16, 1900, at 2; LINDA C. GUGIN & JAMES E. ST. CLAIR, EDS., THE GOVERNORS OF INDIANA 214–15 (2006).

Other events in the summer of 1900, would have more impact on Breckinridge personally and on Kentucky's constitutional jurisprudence, and not in a good way.  It was another election year.  The unexpired term of Governor Goebel was to be filled by a special election—a contest that pitted incumbent Beckham

---

[109] According to one newspaper that devoted a large portion of its January 16, 1901, issue to summarizing events of 1900, on April 17 the Franklin County Grand Jury returned indictments against ten men for complicity in the murder of William Goebel, including Governor Taylor. ADAIR COUNTY NEWS (Columbia, Ky.), Jan. 16, 1901, at 2.  Author and Franklin County Lawyer Lewis Franklin Johnson (1859-1931) gives the date of Taylor's indictment as May 5, 1900.  L.F. JOHNSON, FAMOUS KENTUCKY TRAGEDIES AND TRIALS 308 (1916) (hereinafter TRAGEDIES).

against Republican John W. Yerkes. G. GLENN CLIFT, GOVERNORS OF KENTUCKY, 1792-1942, at 110 (1942). But the election that mattered at least as much then, and matters more to our jurisprudence today, was the contest for Judge of the Court of Appeals for the Seventh Appellate District.

That district went heavily for Taylor in the 1899 election and Republicans saw a chance to flip the Court of Appeals. In February and March, three Republicans threw their hats in the ring for the Republican nomination to challenge Chief Justice Hazelrigg who was in his first term holding that district's seat. OWINGSVILLE OUTLOOK (Owingsville, Ky.), Feb. 22, 1900, at 5; EVENING BULLETIN (Maysville, Ky.), Mar. 3, 1900, at 3. The Republican Central Committee canvassed the district in May and scheduled a nominating convention just for that office. Before the end of May, as he approached the end of his only term on the Court, Democrat Chief Justice Hazelrigg read the tea leaves and chose not to seek re-election. BOURBON NEWS (Paris, Ky.), May 29, 1900, at 5.

On June 5, 1900, as scheduled, the district's Republican Party officials nominated 38-year-old Montgomery Circuit Judge Ed O'Rear as its candidate for the Seventh Appellate District of the Court of Appeals. ADAIR COUNTY NEWS (Columbia, Ky.), Jan. 16, 1900, at 2. Judge O'Rear, who had been campaigning for the nomination since February, put his campaign into a higher gear. The Democratic Party was not as quick to act.

Finally, on September 29, 1900, almost four months after the Republicans picked their candidate and seven months after O'Rear began campaigning, the Democratic Party convened delegates in Winchester from not quite all the counties of the Seventh Appellate District. Harlan Circuit Judge W. F. Hall did not solicit the nomination, but the party nominated him by acclamation anyway. HOPKINSVILLE KENTUCKIAN (Hopkinsville, Ky.), Oct. 2, 1900, at 2; COURIER-JOURNAL (Louisville, Ky.), Oct. 2, 1900, at 6; 4 KENTUCKY 363.

Although the governorship was again on the ballot, a federal official who campaigned for the Kentucky Republicans[110] said "[t]here was as much interest in that [judicial] race among Kentucky Republicans as there was over the governorship." INDIANAPOLIS JOURNAL (Indianapolis, Ind.), Nov. 11, 1900, at 2. O'Rear's election "means a great deal for that state[,]" he said, to have "a Republican majority of the court." *Id.*

No one was surprised when Governor Beckham defeated his Republican challenger, but perhaps the margin of victory did; Beckham won by

---

[110] That official was John W. Langley of Pikeville. In 1900, Langley was the appointment clerk at the Census Office in Washington. INDIANAPOLIS JOURNAL (Indianapolis, Ind.), Nov. 11, 1900, at 2. From 1907 to 1926, he served in Congress from Kentucky's the 10th Congressional District, earning the nickname "Pork Barrel John" before being convicted of violating Prohibition laws and resigning his seat. James C. Klotter, Kentucky: Portrait in Paradox, 1900-1950 283 (1996). His wife, Katherine Gudger Langley, was elected as his successor and served in the House of Representatives from 1927 to 1931. Biographical Directory of the U.S. Congress, Katherine Gudger Langley: https://bioguide.congress.gov/search/bio/L000073.

only 3,689 votes of 562,415 votes cast.  G. GLENN CLIFT, GOVERNORS OF KENTUCKY, 1792-1942, at 110 (1942); FRANKFORT ROUNDABOUT (Frankfort, Ky.), Dec. 8, 1900, at 4.  Notwithstanding the near equal division in the citizenry's political loyalties, a Beckham spokesman told the press, "The first official act of Governor-elect Beckham will be to demand of the Governor of Indiana that he surrender ex-Gov. W. S. Taylor and ex-Secretary of State [to Gov. Bradley, 1895–1899] Charles Finley, who are indicted as accessories in the murder of William Goebel."  EVENING POST (New York, N.Y.), Nov. 14, 1900, at 3.

But the election that impacts Kentucky jurisprudence to this day and therefore impacts the instant appeal was that of Republican Judge O'Rear.  His margin of victory over Hall—3,564—nearly matched that of Beckham over Yerkes.  EVENING BULLETIN (Maysville, Ky.), Dec. 08, 1900, at 3.

Soon after O'Rear's election, predictions were rampant.  "The Republicans now have a majority in the court of appeals . . . and they say they would be paying the Democrats back, in their own coin for contesting and taking the state offices last year."  AKRON DAILY DEMOCRAT (Akron, Ohio), Nov. 08, 1900, at 2; TO DAY (Detroit, Mich.), Nov. 08, 1900, at 5.  Governor Taylor, "the Kentucky fugitive[,]" was asked if O'Rear's election would have "any effect on the Goebel murder cases now pending," and he predicted "the present court" would expedite matters and "could easily dispose of the Howard and Powers appeals"

before their fates could be affected differently by Judge O'Rear's investiture in January 1901. DENVER POST (Denver, Colo.), Nov. 09, 1900, at 2.

Although the governor's race was close—a margin of just 1.5%—, the Republican Committee chose not to contest it, reasoning that "if a contest should be filed by the Republicans, the Democrats would retaliate by contesting the election of Judge O'Rear . . . and the Goebel State Court [Board of Electoral Commissioners] would count him out. *The election of O'Rear is regarded as of more importance than even the election of Yerkes as Governor*." EVENING POST (New York, N.Y.), Nov. 12, 1900, at 1 (emphasis added).

The most immediate impact of Judge O'Rear's election related to the appeals of Republicans convicted of murdering William Goebel.

### *31.  Appeals of the Goebel assassination conspirators*

There were at least nine trials of Goebel's accused assassins. L.F. JOHNSON, FAMOUS KENTUCKY TRAGEDIES AND TRIALS 308 (1916) (hereinafter TRAGEDIES). In August 1900, a Georgetown jury found Caleb Powers guilty of Goebel's murder and sentenced him to life in prison.[111] ADAIR COUNTY NEWS (Columbia, Ky.), Jan. 16, 1901, at 2. A month later, Eastern Kentuckian Jim

---

[111] Justice Cooper says, "Powers was brought to trial in March 1900." *Fletcher v. Graham*, 192 S.W.3d 350, 385 (Ky. 2006) (Cooper, J., dissenting). Too many sources, including several cited in this dissent, tell us Justice Cooper was mistaken. *See, e.g.*, Semi-weekly Interior Journal (Stanford, Ky.), July 10, 1900, at 3 ("Georgetown, July 9.—The case of Caleb Powers . . . was called today . . . .").

Howard faced a Franklin County jury that found him guilty of the same crime and sentenced him to death. THE BOURBON NEWS (Paris, Ky.), Sept. 28, 1900, at 3.

As it turns out, Governor Taylor's prediction was wrong. Both appeals were decided after O'Rear took the bench. Jim Howard's first conviction was so error-filled it was unanimously reversed, and a new trial ordered. *Howard v. Commonwealth*, 61 S.W. 756, 762 (Ky. 1901).[112]

But it is the appeal of Caleb Powers' first of four trials that is most relevant here. *Powers v. Commonwealth*, 61 S.W. 735, 736 (Ky. 1901) (hereinafter *Powers 2*). The opinion in *Powers 2* is entirely consistent with all the jurisprudence discussed in this dissent from *Taylor v. Commonwealth*, decided in 1830, through and including *George*, *Purnell*, *Poyntz*, *Sweeney 1*, *Sweeney 2*, and the state and the U.S. Supreme Court opinions, *Taylor 1* and *Taylor 2*, respectively.

What is surprising is that *Powers 2* was authored by Judge DuRelle, the judge who disagreed with *Taylor v. Commonwealth* and who dissented in each and every one of those other cases, beginning with *George*.

---

[112] His conviction at his second trial was also reversed, but this time along party lines, with Judges Paynter, White, and Hobson dissenting. *Howard v. Commonwealth*, 70 S.W. 1055, 1060 (Ky. 1902). On his third appeal, after the defeat of Judges DuRelle, White, and Guffy, the conviction stood. *Howard v. Commonwealth*, 80 S.W. 211, 216 (Ky. 1904), *aff'd sub nom. Howard v. Commonwealth of Kentucky*, 200 U.S. 164, 26 S. Ct. 189, 50 L. Ed. 421 (1906).

### 32. *DuRelle follows Kentucky jurisprudence—contradicting his past dissents*

At Caleb Powers' first trial, the circuit court rejected as invalid "a pardon . . . , purporting to have been issued by W. S. Taylor, as governor of Kentucky, dated March 10, 1900. . . . The simple production of a valid pardon of the offense whereof appellant was charged would put an end to the proceedings, and render void any proceeding thereafter taken in the trial." *Powers 2*, 61 S.W. at 737. Because it was a legal question to be decided on undisputed facts reviewed *de novo*, it was the Court of Appeals' task "to decide the validity of the paper produced as a pardon . . . ." *Id.* If, as DuRelle repeatedly said all along, the "inherently vicious" Goebel Election Law was unconstitutional, the pardon would be valid because Taylor would have been governor on March 10, 1900. Despite four Republicans on the Court, DuRelle appears not to have had the votes for declaring the law unconstitutional in *Powers 2*. Not even DuRelle urged such a ruling in *Powers 2*, even though he began his analysis as if he would.

"[W]e must consider the situation at the time it was issued[,]" DuRelle began. *Id.* It was, he said, "a period of political excitement and bitterness perhaps unexampled in the history of the commonwealth." *Id.* The race for governor was hotly contested and the actions of government and its leaders were chaotic. However, despite his previous dissents to the contrary, he said the General Assembly's actions were lawful:

The state board of election commissioners, elected [by the General Assembly] under the act of March 11, 1898 [the Goebel Election Law], examined and canvassed the returns of election, and issued a certificate of election to W. S. Taylor. This gave a prima facie title to the office to Taylor, who accordingly was duly inaugurated as governor, took the oath of office, and took possession of the state building, and the archives and records appertaining to the office. This did not give him an absolute, indefeasible title to the office of governor, but his title was subject to be defeated by the determination of a contest for the office. . . . Until the certificate was set aside in some *appropriate proceeding*, he was entitled to retain possession and perform the duties of the office without interference. . . . A contest was instituted by Goebel before the legislature, and was pending at the time of the murder, as were also contests before the state board of contest for the minor state offices, certificates of election to which had been issued to the candidates upon the same ticket with Taylor. After the shooting, the militia was called out by Taylor, and the legislature prevented from meeting in the state capitol, and at certain other places at which they attempted to hold meetings. The records of the legislature show, however, that a meeting was held, at which it was determined by the legislature that William Goebel, and not William S. Taylor, had been elected governor of Kentucky, and that J. C. W. Beckham, and not John Marshall, had been elected lieutenant governor. After Goebel's death, Taylor retained possession of the executive building, archives, and records, and continued to act as governor. Beckham opened an office in the Capital Hotel, a few blocks away from the capitol, which was called the "Governor's Office," and he also acted as governor. . . . So the question is narrowed to an inquiry as to who was de jure governor on March 10, 1900. The *legislative record shows* that *the general assembly determined the contest*. By the *Goebel election law* of March 11, 1898 (Ky. St. § 1596a, subsec. 11), *that decision was a judgment determining the title to the office. It was a self-executing judgment*: "When a

-244-

> new election is ordered or the incumbent adjudged not to be entitled, his powers shall immediately cease, and if the office is not adjudged to another it shall be deemed to be vacant." ***If this judgment of the legislature was valid and final, it settles the question***. In an opinion of ***this court***, . . . in the case of Taylor v. Beckham . . . , it was said that the judgment of the legislature was final and conclusive. ***That decision settled the question finally***, and the pardon must be adjudged invalid. The authorities upon this question are collated more fully in the opinion of Judge WHITE, who concurs upon this question.

*Id*. at 737–38 (emphasis added) (citations omitted). What DuRelle previously called unconstitutional, he now called an "appropriate proceeding," and he declared that "the general assembly determined the contest" pursuant to the "Goebel election law" which was ruled "valid and final . . . by this court," thereby "settl[ing] the question finally[.]" *Id.* at 738.

As DuRelle noted, Justice White, writing separately, explained that the Court of Appeals was now unanimous on the issue of the constitutionality of the Goebel Election Law. Seemingly satisfied that DuRelle had accepted the facts, judicially, Judge White only cited *Taylor 2*, and not the jurisprudence leading up to it and *Taylor 1*. But he held the Republican judges' feet to the fire, listing what the Court of Appeals "judicially knows" stating:

> The court judicially knows that on the 31st day of January, 1900, the general assembly, ***in pursuance to the power given it under our constitution***, decided the contest over the office of governor in favor of the contestant, William Goebel. The court knows judicially that on that day William Goebel was inaugurated as governor; that he

-245-

afterwards died, and J. C. W. Beckham became, by virtue of the law, he being lieutenant governor, the acting governor from the 3d day of February, 1900. The court further knows that it was decided by this court, and its decision was sustained by the supreme court of the United States, that **the courts had no jurisdiction** in the matter; that the **decision of the contest before the general assembly was final and conclusive**, from which there was no appeal.

*Powers 2*, 61 S.W. at 748 (White, J., concurring, in part, and dissenting, in part).

Where the Republicans and Democrats on the Court differed was in Caleb Powers' claims of judicial error in jury selection, the admissibility of prejudicial or incompetent evidence, and jury instructions. *Id.* at 738–47.

But where constitutional issues mattered, DuRelle honored the doctrine of *stare decisis* and said *Taylor 1* settled the question that, yes, the Goebel Election Law was constitutional—the General Assembly was not prohibited by § 28 or otherwise from appointing members of the election contest boards. In a matter of months, DuRelle would show he did not really mean it. For reasons outside the realm of credible judicature, DuRelle would dishonor that doctrine of *stare decisis*, and render a purely political decision that, 80 years later, became the foundation of *LRC v. Brown*.

### 33. *Political hope springs eternal in DuRelle's message for Pratt*

Just about a year before *Powers 2* was rendered, the Franklin Circuit Court held Clifton Pratt to be a usurper to the office of Attorney General, just like

all the other Republican politicians ousted from the executive branch offices.  But Pratt reacted differently than the rest.  By all accounts, he immediately moved on with his life and that drew praise from Democrats.  SEMI-WEEKLY INTERIOR JOURNAL (Stanford, Ky.), May 1, 1900, at 3 (calling Pratt "a good lawyer . . . sensible enough to get out").

Republicans were split.  Pratt's fellow Hopkins Countians expressed "just pride" in his "dignified, clean and high-toned professional conduct[.]"  BEE (Earlington, Ky.), Mar. 3, 1900, at 2.  Other Republicans thought "Mr. Pratt's course may be one of wisdom, but those who voted him Attorney General think differently. . . .  [H]e should have fought with the tenacity of his bold and fearless leader, Gov. Taylor.  [Instead,] Mr. Pratt has proven himself not equal to the demands of his times."  HARTFORD REPUBLICAN (Hartford, Ky.), May 4, 1900, at 3.  Despite such criticism, Pratt neither left the company of Republicans nor tempered his service to his party.

No doubt Pratt was aware of the political landscape in the summer of 1900 when ex-Governor Taylor was indicted for Goebel's murder.  By the end of the year, Attorney General Breckinridge and Governor Beckham turned Taylor's extradition into a crusade.  That and the hope that Republican judges soon would dominate the Court of Appeals may have renewed Pratt's interest in the office of

Attorney General.  And he had until April 16, 1902, to decide whether to appeal the judgment that removed him from office.  BULLITT'S CODE § 745, at 483.

One of Pratt's advisors "prior to the election [of 1900] . . . suggested to him, to which he fully agreed, to ask a reversal in his behalf" from the judgment ousting him as Attorney General.  BEE (Earlington, Ky.), Nov. 22, 1900, at 2.  And just three days after Judge O'Rear's election, it was "leaked out that Judge Pratt is going to take the proper legal steps to regain the Attorney Generalship.  From present indications his fight to that end will be successful . . . ."  DAILY PUBLIC LEDGER (Maysville, Ky.), Nov. 10, 1900, at 5.  Success would have to come at the expense of a large body of jurisprudence, and it did.

The following Monday, Pratt confirmed that "when O'Rear takes his seat on the court of appeals bench, the first of January, he will take an appeal from the judgment of the Franklin circuit court in the contest case for the attorney generalship. . . . [H]e thinks he will have an easier time than his brethren" who appealed before "Judge O'Rear's accession [gave] the Republicans a majority of that court."  HOPKINSVILLE KENTUCKIAN (Hopkinsville, Ky.), Nov. 13, 1900, at 6.

Some said, "Pratt has reason to hope that O'Rear will at the proper time vote with Burnam, Guffy and Durelle to restore to him his rightful office."  HARTFORD REPUBLICAN (Hartford, Ky.), Nov. 16, 1900, at 2.  But is it possible that jurists could be quite that overtly political?  Sadly, it seems to be the case with

DuRelle and with Ed O'Rear, too.  Biographer, historian, and contemporary of

O'Rear, E. Polk Johnson, wrote of him in 1910 while O'Rear was still serving on

the Court of Appeals.  Johnson said:

> In politics Judge O'Rear has ever been uncompromising
> in his allegiance to the principles and policies of the
> Republican party and he has been a most able exponent of
> its cause. . . . Judge O'Rear is recognized as one of the
> leaders of the Republican Party in his native state and at
> the time of this writing (in 1910) his name is being
> frequently mentioned in connection with the candidacy for
> the office of governor of the state for the election of 1911.

2 KENTUCKIANS 814.  He did run for Governor in 1911, while still on the bench,

but was defeated by the Democratic Party candidate, Governor James B.

McCreary.  HARTFORD HERALD (Hartford, Ky.), Nov. 29, 1911, at 2.  O'Rear's last

opinion, *Hall's Adm'x v. Hall's Adm'r*, was rendered December 8, 1911, a month

after he lost the election for Governor.  141 S.W. 70 (Ky. 1911).

But, back to the days immediately following O'Rear's 1900 election

to the Court.  Hadn't the jurisprudence become so settled that the hopes of a

political decision by the Court of Appeals reinstating Pratt as Attorney General

would be jurisprudentially impossible?  Or too obviously partisan?  After all, in

DuRelle's opinion in *Powers 2*, the Court clearly and unanimously agreed on the

General Assembly's constitutional power under § 93 to enact the Goebel Election

Law and to establish the process to lawfully determine who won the race for

governor.  That included the General Assembly's power to itself elect members of

boards and commissions.  Surely, then, the determination that Breckinridge won the election for Attorney General must follow.  But, never say never.

DuRelle, in the *Powers 2* opinion itself, sent a message giving Pratt and the Republican Party cause to think otherwise.  DuRelle pointed out that *Taylor 1* was a decision "from which the writer of this opinion dissented emphatically[.]"  *Powers 2*, 61 S.W. at 738.  Ignoring the fact that his dissent expressed views about the nature of republican government rejected by the Supreme Court of the United States in *Taylor 2*, something else DuRelle had to say was more important to Pratt.

DuRelle disclosed in *Powers 2* itself a private communication between him and Judge O'Rear about his emphatic dissent in *Taylor 1*.  DuRelle wrote in *Powers 2* that Judge O'Rear would have agreed with DuRelle's *Taylor 1* dissent and would have voted with him had he had been on the Court then instead of Judge Hazelrigg.  "[I]n the views of [DuRelle's *Taylor 1*] dissent Judge O'Rear concurs," he said.  *Id*.

That revelation is a little astonishing to me.  Is there any reason for telling the world how a new judge would have voted on the merits of an old case if it was not to telegraph how that judge would vote if a factually similar case again were to come before the Court?

Undaunted by the jurisprudence, and perhaps even encouraged, Pratt continued to press his appeal of the judgment ousting him from office. If he was looking for a partisan decision, he seems never to have been vocal about it.

In fact, Pratt was going "to ask reversal in his behalf on questions of law, about which the present court [before O'Rear's election] had expressed no opinion, growing out of the late election law." BEE (Earlington, Ky.), Nov. 22, 1900, at 2. His attorneys were expected to raise "questions of law such that a reversal, if had, might be concurred in by the whole court, without even seeming to conflict with what had been decided in other cases under that law." *Id.* And his attorneys did make such arguments. But that did not foreclose the possibility that DuRelle would reopen the wounds he felt when the reasonings of his dissents could not persuade the past Court. Now it was a new Court, a different Court, a Republican Court.

### 34. *Pratt's attorneys do not repeat arguments rejected in* **Purnell, Poyntz, et al**

The Clerk of Court called the case of *Pratt v. Breckinridge* for two days of oral argument beginning at 11:15 A.M. on Wednesday, September 24, 1901. BEE (Earlington, Ky.), Sept. 26, 1901, at 4. Pratt's attorneys must have presumed the futility of regurgitating the losing argument pressed in *Purnell* and the many cases that followed that only the executive can exercise the intrinsically executive power to appoint the election contest boards' members. *Pratt 1*, 65 S.W.

at 144 (Hobson, J., dissenting) ("[T]he power of appointment . . . does not in fact arise in this case, nor was it made, as we understood, in the argument.").

Rather, instead of arguing that the law encroached on the Executive Department's exclusive power of appointment, Pratt's counsel said the law encroached on the Judicial Department's exclusive power to adjudicate the law. The election contest boards exercised judicial power, they said, and "that by section 109 [of Kentucky's Constitution] the judicial power of the commonwealth is vested in the courts established by the constitution, and that by section 135 the legislature is forbidden to establish courts not provided for by the constitution." *Pratt 1*, 65 S.W. at 145. The issue was thus framed: "Was the grant by the statute to the board of election commissioners of power to try contested elections a violation of sections 109 and 135 of the constitution, as being the creation of a court other than those established by the constitution? This presents a new question, which could arise only under the new constitution." *Id*. at 141–42. Oral argument concluded on Thursday afternoon and the Court adjourned, apparently having heard no argument that the General Assembly lacked the power to make appointments.

### 35.  *Oral argument to rendition—much was riding on* **Pratt v. Breckinridge**

Less than a week passed after oral argument when the Frankfort Chief of Police accompanied two attorneys to Indianapolis to deliver to Indiana's new

governor, Winfield T. Durbin, a second set of requisition papers for the extradition of ex-Governor Taylor. EVANSVILLE JOURNAL (Evansville, Ind.), Sep. 28, 1901, at 3; THE COURIER-JOURNAL ALMANAC FOR 1902, at 33 (1902). The Chief of Police was "Arthur Goebel, brother of the late William Goebel[.]" *Id.*

As a courtesy, Governor Durbin spent two hours with the Kentucky representatives but sent them away without an answer. DAILY JEFFERSONIAN (Cambridge, Ohio), Oct. 23, 1901, at 1. On November 2, 1901, before the Court of Appeals rendered *Pratt 1*, Governor Durbin wrote a long letter to Governor Beckham. Letter from Winfield T. Durbin to J.C.W. Beckham (Nov. 2, 1901) *in* MESSAGES AND DOCUMENTS OF WINFIELD T. DURBIN, GOVERNOR OF INDIANA, 1900–1902, at 49–53 (1902). Like his predecessor in office, Governor Durbin also made national news by refusing to turn Taylor and Finley over to Kentucky authorities. *See, e.g.*, EVENING STAR (Washington, D.C.), Nov. 5, 1901, at 14.

Because Governor Durbin's refusal supported a facially plausible claim that Indiana's chief executive officer violated Article IV § 2, cl. 2 of the Federal Constitution, Governor Beckham spoke openly of bringing a federal lawsuit against the State of Indiana. DAILY PUBLIC LEDGER (Maysville, Ky.), Nov. 23, 1901, at 3. Of course, that might not happen if Pratt prevailed in his appeal.

An attorney "who represented Goebel, Beckham and the other Democratic officers," told reporters that if Clifton Pratt were Attorney General, he

could "'block any proceedings brought in the Federal Court to return Taylor and Finley to Kentucky. Representing the Commonwealth, he can go to the Federal Court and ask that the action be dismissed.'" *Id.* Helm Bruce, who represented Taylor before the Supreme Court of the United States, added that "[i]f the cases of Caleb Powers and Jim Howard are again carried to the Court of Appeals, Mr. Pratt as the Attorney General will have the complete conduct of those cases for the state in the higher Court." *Id.* A lot was riding on the opinion in *Pratt v. Breckinridge*.

### 36. *From the ashes of DuRelle's dissents*—**Pratt v. Breckinridge**

The appeal Pratt brought, as in at least six appeals before it, "called in question the validity of the election law of 1898[.]" *Pratt 1*, 65 S.W. at 136. Yes, Pratt challenged the same Goebel Election Law held constitutional again and again in *Purnell*, *Poyntz*, *Sweeney 2*, and *Taylor 1* and *Taylor 2*, and even in the opinion DuRelle himself authored just eight months earlier, *Powers 2*. But the argument Pratt's lawyers made—the law violated §§ 109 and 135—was new. It challenged the law on the ground that the election contest boards were courts exercising judicial functions strictly reserved to the Judicial Department. Pratt's argument thus left "only the question of the authority of the legislature to confer upon the board the power to hear the contest, and on this question the counsel for appellant . . . mainly rested their case." *Pratt 1*, 65 S.W. at 144 (Hobson, J., dissenting).

The majority opinion would eventually get around to ruling favorably on Pratt's argument, and that is how the journalists reported the decision. *See, e.g.*, HARTFORD HERALD (Hartford, Ky.), Nov. 27, 1901, at 2 ("Court of Appeals holds that the statute giving the commission power to try contested elections is a violation of Section 109 and 135[.]"). But whether the goal was simply putting a Republican in the Attorney General's office or advancing DuRelle's § 28-based, judicial empowerment agenda, the opinion's initial focus is not at all the argument Pratt's attorneys advanced. More than Pratt's argument motivated the Court.

We must scrutinize *Pratt 1* with eyes wide open, not squinting as the *LRC v. Brown* Court viewed it.[113] Relatively contemporary scholarship saw *Pratt 1* for what it is. It was cited, for example, in a 1931 Yale Law Journal article as proof that sometimes a judge "cannot separate his judicial capacity from himself and his normal mental processes; his view as to what ought to be is inseparable from his determination of what is to be." Dodd, *Extra-Constitutional*, *supra*, 1211. Professor Dodd then pointed directly to *Pratt 1*'s political motives, saying, "[O]ne would expect judges as well as others in the community, to be influenced by their

---

[113] The Court in *LRC v. Brown* at least acknowledged the "volatile atmosphere in the Commonwealth tha[t] had existed in *Pratt*" and urged "those who desire to learn more of the political atmosphere" to read James Klotter's DECADES. *LRC v. Brown*, 664 S.W.2d at 922, 922 n.20. My acceptance of that invitation led to this dissent.

political opinions. That this is occasionally the case may appear from *Pratt v. Breckinridge . . . ."* *Id.* at 1218 n.106.

Unquestionably, those who decided *Pratt 1* were affected by partisan politics, but that merely describes the Court's motivation and does not justify rejecting the case out-of-hand. Such obvious political motives compel special scrutiny because even an opinion driven by partisanship may still be consistent with our jurisprudence. *Pratt 1* is not such a decision.

### 37. *Pretense to authorship; pretense to honoring existing jurisprudence*

Judge Guffy took credit for authoring *Pratt 1*, although contemporary reports expressed "doubt about authorship" of the opinion. COURIER-JOURNAL (Louisville, Ky.), Nov. 21, 1901, at 1. I am beyond doubting that Judge DuRelle was the intellectual force behind the opinion. *Pratt 1* parrots the exact language DuRelle used in his *Purnell* dissent to describe the Goebel Election Law—that the law was "inherently vicious, as an invasion by the legislature of the powers of the executive." *Compare Pratt 1*, 65 S.W. at 137 *with Purnell*, 50 S.W. at 264 (DuRelle, J., dissenting). After that, *Pratt 1* foists upon bench and bar, once again, DuRelle's Thomas Jefferson myth:

> The provisions embodied in sections 27 and 28 of the constitution, and which, in substantially the same words, have been embraced in every constitution of the state, were *drawn by Mr. Jefferson* as an improvement upon the provision of the federal constitution, designed by him to insure a more perfect separation of the powers of the three

great departments of government than was secured by that instrument, and *their adoption by the convention was accomplished by the power of his name* . . . .

*Pratt 1*, 65 S.W. at 137 (emphasis added). Ignore the irony that, to secure judicial power lying dormant for a century in the unchanging language now found in § 28, the Republican judges invoked the gravitas of the founder of the Democratic-Republican Party, forerunner of the modern Democratic Party. That irony aside, DuRelle and his ghost writer Judge Guffy repeatedly invoked the judicial power they believe implicitly resides in § 28.

For example, there is this misleading representation: "The congress of the United States, deriving its authority from a constitution which does not contain the inhibition of section 28 of the Kentucky constitution, has never passed an act which created an office, and at the same time filled it." *Pratt 1*, 65 S.W. at 137. This is misleading because, as discussed in Section 7, *supra*, the Federal Constitution's Appointing Power Clause specifically limits the entities in which Congress may vest appointment power, and the list does not include Congress itself. U.S. CONST. art. II, § 2, cl. 2. But neither § 93 nor its 1850 antecedent (CONST. OF KY. of 1850, art. III, § 25) ever limited the Kentucky General Assembly as to which entity it may vest appointment power. To the contrary, our constitutional jurisprudence has forever abided by the rule that "it was not necessary that the Legislature . . . be expressly authorized by the Constitution to

enact such a law [any law, in fact, including one that both creates a board and elects its members,] but that it was a sufficient delegation of such power to it that the Constitution does not prohibit it[.]" *DuBois Adm'r v. Shannon*, 122 S.W.2d 103, 106 (Ky. 1936). Following that principle and applying § 93's antecedent (CONST. OF KY. of 1850, art. III, § 25), and undoubtedly mindful of the existence of the antecedents of §§ 27 and 28 (CONST. OF KY. of 1850, art. I, §§ 1, 2), Kentucky long ago expressly said the General Assembly itself possesses the power to elect inferior officers. *Speed v. Crawford*, 60 Ky. 207, 211 (1860).

When *Pratt 1* is examined closely, it reveals itself as a masterpiece of chicanery. In addition to the Jefferson myth and the sleight-of-hand comparison with the Federal Constitution that diverts our attention from the Appointing Power Clause, there are false presumptions we today accept as truth.

The opinion says, since the day of Kentucky's statehood, "the spirit of each successive change in the organic law of the commonwealth [has] been in the direction of more strictly limiting the legislative power." *Pratt 1*, 65 S.W. at 139. But the 1849 Constitutional Convention unquestionably proves that statement false. In Section 4, *supra*, I touch upon my conviction that the 1890 Constitutional Convention was not *inordinately* focused on cabining in the General Assembly's

power, and the proof of that is in the pudding.  The Goebel Election Law is but one example.[114]  One can disagree, of course.

But whether we accept James Proctor Knott's informed explanation that the 1890 convention was called to assure *all of government* is restrained,[115] two facts remain beyond dispute:  (1) this newest version of our organic law did not alter the language of the separation-of-powers provisions or the century of jurisprudence interpreting them; and (2) not one thing occurred since 1792 or at the 1890 convention itself suggesting § 28 had been secreting away, for more than a century, a judicial power just waiting for Judge DuRelle to discover.

DuRelle's "discovery" is the focus of the first three-fourths of the majority opinion in *Pratt 1*, notwithstanding it appears not to have been argued by Pratt's attorneys.  Despite being deemed "finally settled" by DuRelle himself in *Powers 2*, the issue whether the Constitution authorized the General Assembly to appoint election board members was revisited, ignoring that these members were

---

[114] As discussed in Section 4, *infra*, Governor Willson's 1910 State of the Commonwealth Address demonstrates his personal belief there was no change in the General Assembly's strength since the shift in appointment power from the Executive to the Legislative Departments in the 1850 Constitution.  If reining in the General Assembly was a goal of the 1890 Convention, it failed dramatically.

[115] *See* Section 4, *supra*, discussing *Fiscal Court of Jefferson County v. City of Louisville*, 559 S.W.2d 478 (Ky. 1977), and its misquoting of James Proctor Knott from the 1890 Constitutional Convention.  *See also* I DEBATES (1890) (Remarks of Mr. Hendrick) ("We are limiting the powers of all Departments . . . ."); II DEBATES (1890) 1684 (Remarks of Mr. Hopkins) ("Judicial reform was one of the main questions that was contemplated in the calling of this Convention.").

previously and "regularly adjudged by this court to be entitled to the office." *Pratt 1*, 65 S.W. at 144 (Hobson, J., dissenting) (citing *Poyntz v. Shackelford*, 54 S. W. 855). Before even getting to Pratt's "election-contest-board-is-an-unconstitutional-court" argument, the DuRelle/Guffy majority opinion said the law violated § 28. This might all be deemed *dicta* running contrary to established jurisprudence because the substance of the holding is, as the newspapers reported it, that the law violates §§ 109 and 135. But the Court went out of its way to expressly reverse *George*, *Purnell*, *Poyntz*, and *Sweeney 2*. The analysis to justify doing so is underhanded and not worthy of respect. It begins right after the retelling of the Jefferson hoax.

From the start, the majority knew it had to slay a giant of Kentucky jurisprudence—*Taylor v. Commonwealth*, 3 J.J. Marsh 401, 26 Ky. 401 (1830), There is no need to repeat what was thoroughly discussed about *Taylor*'s national significance in Section 12, *supra*, but only to summarize its two important doctrines: (1) while appointment power is intrinsically executive in nature, (2) appointment power, like the power to elect representatives, resides first with the People who may delegate it constitutionally to any department of government, expressly to the Executive or Judicial Departments, but otherwise inherently to the Legislative Department as among its plenary powers unless withheld by express

prohibition. This was Kentucky's undoubted jurisprudence from 1830 until *Pratt 1* pretended it wasn't. *See* Section 12, *supra*.

So, how did DuRelle/Guffy get around *Taylor v. Commonwealth*? By simply ignoring the second doctrine. It had to be ignored because it directly contradicted DuRelle's ideal of a "perfect separation of the powers of the three great departments of government[.]" *Pratt 1*, 65 S.W. at 137. Ignoring the second doctrine was also necessary to the telling of another DuRelle falsehood about the Kentucky framers' intentions—"The framers of the constitution . . . deemed it necessary to *expressly* permit the legislature to exercise the executive power of appointment . . . [and] forbid[ding] the legislature to exercise such power in any other case." *Pratt 1*, 65 S.W. 137 (emphasis added). Express permission is not necessary for legislative action as has been said often enough to eliminate the need for more citation here.

By discussing *Taylor v. Commonwealth*'s first doctrine alone, the majority could say, with some legitimacy as far as it went, that "[t]his doctrine has been quoted and followed by many courts of last resort. Until the legislation of 1898 was under consideration, it seems never to have been disapproved in this state[.]" *Id*. The majority continues its deception with cites to *Harcourt* and *Gorham* and *Applegate*, all of which follow both of *Taylor v. Commonwealth*'s doctrines. *See* Section 12, *supra*. But *Pratt 1* ignores that inconvenient part of

those opinions, too, maintaining focus only on the first doctrine—that appointment power is intrinsically executive. *Pratt 1* wraps up discussion of these Kentucky cases with a conclusory syllogistic juxtaposition—"The legislature has no more power to elect or appoint such officers than it has to enact a law providing the judgment to be entered in a pending litigation." *Id.* at 138. We need not be fooled.

Tellingly, the *Pratt 1* majority avoided citing *Speed v. Crawford*, 3 Met. 207, 60 Ky. 207 (1860). *Speed* reviewed a circuit court judgment that a law vesting a judicial officer with power to appoint members of a police board was unconstitutional on three grounds. *Id.* at 209. The Court of Appeals agreed with one of the three grounds but reversed the judgment to the extent it held the General Assembly lacked the constitutional authority to grant that appointment power (a § 93 argument) and to the extent it held the law violated the separation-of-powers provisions (a § 28 argument).[116]

The Court said the antecedent of § 93 (CONST. OF KY. of 1850, art. III, § 25) empowered the General Assembly to determine appointment power; the positions on the police board "may be appointed by the governor, or by any judicial officer to whom the legislature might see fit to delegate the power of

___

[116] The Court of Appeals "concur[red] with the circuit judge" only to the extent "that the act fails to comply with the requirements of the constitution, in providing for a tenure of office, unknown to that instrument . . ." (a § 51 argument). *Speed*, 60 Ky. at 213 (citing CONST. OF KY. of 1850, art. 6, § 6).

appointment." *Speed*, 60 Ky. at 213 (emphasis omitted). The parties and this Court reviewing the instant appeal have conflated the idea of appointments and elections, to no real harm or confusion, but *Speed* made the distinction. In doing so, the Court expressly identified the power of the General Assembly to select all inferior officers (by election) other than those expressly identified in the Constitution. "Wherever the selection of an officer is referred to the governor or other functionary it is called an *appointment,* and wherever such selection is referred to the people, or to an organized body (*as the legislature, for instance*), it is called an *election.*" *Id.* at 211 (emphasis original; double emphasis added).

In *Speed*, the circuit judge made the mistake of seeing the separation-of-powers argument as DuRelle did, and the Court of Appeals reversed him for it. That circuit court judgment said empowering a judicial officer with appointment power was "in conflict with the constitution . . . [i]n conferring upon [a judicial officer] powers which are essentially executive . . . ." *Id*. at 209. Rather than lay out a full analysis itself, the Court of Appeals gave the circuit judge and the parties' lawyers a reading assignment. Alluding to the antecedent of § 28 (CONST. OF KY. of 1850, art. I, § 2), the Court said: "For a satisfactory exposition of the clause of the constitution on which this objection is founded, we refer to the commentaries on the constitution of the United States by Judge Story, and especially to the chapter on the 'distribution of powers.' (Sec. 517, etc.)." *Speed*,

-263-

60 Ky. at 214 (referencing 1 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION

OF THE UNITED STATES § 518[117] *et seq*., at 363 (2d ed. 1851) (hereinafter STORY

(1851)).  That chapter includes the following enlightening passages, all of which

are entirely consistent with *Taylor v. Commonwealth* and *George* and its progeny,

and contrary to DuRelle's view:

> [W]hen we speak of a separation of the three great departments of government, and maintain, that that separation is indispensable to public liberty, we are to understand this maxim in a limited sense. . . . The true meaning is, that the whole power of one of these departments should not be exercised by the same hands, which possess the whole power of either of the other departments; and that such exercise of the whole would subvert the principles of a free constitution.  This has been shown with great clearness and accuracy by the authors of the Federalist. [citing by footnote FEDERALIST NO. 42 (James Madison)] . . . . [Both] Montesquieu and Blackstone . . . embraced this division of powers in a general view; but which, at the same time, established an occasional mixture of each of the others . . . .
>
> . . . .
>
> Notwithstanding the memorable terms, in which this maxim of a division of powers is incorporated into the bill of rights of many of our state constitutions the same mixture will be found provided for, and indeed required . . . . Thus, the governor of Massachusetts exercises a part of the legislative power, possessing a qualified negative upon all laws. . . .  In New Jersey, the governor is appointed by the legislature . . . .  In Virginia the great mass of the appointing power is vested in the legislature.

---

[117] The Court appears to have miscited the beginning of the chapter entitled "Distribution of Powers" (Chapter VII) as § 517 instead of § 518.

> Indeed there is not a single constitution of any state in the union, which does not practically embrace some acknowledgment of the maxim, and at the same time some admixture of powers constituting an exception to it. [citing by footnote FEDERALIST Nos. 47, 48 (James Madison)].

1 STORY (1851) §§ 525–27, at 368–70.

"The authors of the Federalist thought this subject a matter of vast importance," said Judge Story, "and accordingly bestowed upon it a most elaborate commentary." *Id.* at § 529, at 371. He said the reason for devoting such time and effort to the concept was that the Anti-federalists made this "a special objection to the constitution of the United States, that though it professed to be founded upon a division of the legislative, executive, and judicial departments, yet it was really chargeable with a departure from the doctrine . . . ." *Id.* § 528, at 370.

Lawyers and jurists of Judge Story's day were steeped in THE FEDERALIST and that likely led him to believe, "[a]t the present time, the objection may not be felt as possessing much practical force, since experience has demonstrated the fallacy of the suggestions on which it is founded." *Id.* (corrected for punctuation). But what about a future day? What would change if THE FEDERALIST became merely optional reading for law students?

What about those advocates in Judge Story's future who, from want of knowledge or desire for power or some other failing, saw benefit in reviving the Anti-federalist argument? Judge Story, no doubt, had in mind such lawyers as

DuRelle when he acknowledged that "the objection may be revived . . . by the opinions of ingenious minds, dazzled by theory, and extravagantly attached to the notion of simplicity in government[,]" or Judge Thomas who analogized our government as a simple three-legged stool. *Id.* § 529, at 371. Story suggested the cure for that ill was "to recur to some of the reasoning by which those illustrious statesmen who formed the constitution, while they admitted the general truth of the maxim endeavored to prove, that a rigid adherence to it in all cases would be subversive of the efficiency of the government, and result in the destruction of the public liberties." *Id.* That is to say, the cure was, and still is, to again become steeped in THE FEDERALIST.

With some degree of faith that the circuit judge and the lawyers would swallow the medicine Judge Story prescribed to read the Framers' masterworks, *Speed* wrapped up this part of its decision by saying how ludicrous the argument was for this strict construction of the separation-of-powers provision: "A construction which would deny to the legislature the right" to grant power to make appointments to a non-executive functionary simply because appointments "are in their nature strictly executive, would greatly embarrass, if it did not defeat, to some extent, the practical workings of our system." *Speed*, 60 Ky. at 214. In a practical sense, to give credence to *Pratt 1* as sound jurisprudence is to deny it to *Speed*. *Speed*, then, must also be considered reversed by *Pratt 1*, like so many other cases

forming the foundation of Kentucky constitutional jurisprudence in the 19th century.

Another Kentucky opinion, not cited in *Pratt 1* but implicitly and necessarily reversed by it, is *Pennington v. Woolfolk*, 79 Ky. 13 (1880).  It is an early case in which an attorney not steeped in THE FEDERALIST but who, with an "ingenious mind[], dazzled by theory, and extravagantly attached to the notion of simplicity in government," argued for the strict and perfect separation of powers DuRelle found quietly lingering in § 28.

The appellant, Pennington, challenged a law granting the county court power to summon before it any property owner to determine whether he failed to list his property to be taxed and "to assess and fix the value of the same for the years such property was not assessed, and the same shall be certified by the said court to the proper officers for the collection thereof."  *Id.* at 14–15 (emphasis omitted).  "The objection taken to the act in this case is, that by it the Legislature has attempted to confer on a judicial tribunal a power not judicial in its nature [the legislative power to impose taxes], in violation of article one of the Constitution," after which the Court quotes in their entirety the antecedents of §§ 27 and 28, CONST. OF KY. of 1850, art. I, §§ 1, 2.  *Id.* at 15–16.

Sadly, but perhaps predictably with the passage of time, the *Pennington* Court does not cite *Speed* (from 2 decades before), or Judge Story's

Commentaries (from 3 decades before), or THE FEDERALIST (from 9 decades

before). What carried the day for the law's constitutionality was that by 1880 these

principles, so clearly articulated in those authorities, were baked into our

constitutional jurisprudence.

The Court chose "to look to the practical construction uniformly given

to [the separation-of-powers provisions] since the formation of the government."

*Id.* at 16. After examining that history, the Court said:

> Whatever doubt we might otherwise have of the power of
> the legislature to confer upon the county court powers
> which are not judicial, must yield to the authority of the
> long continued practical construction to be found in the
> statute to which we have referred, and which have been
> acquiesced in by the bar and all departments of
> government for more than three quarters of a century.
>
> Since some of these statutes were enacted, the constitution
> has been twice amended and re-adopted. *The conventions
> must be presumed to have been well acquainted with the
> fact that these non-judicial powers had been conferred by
> various acts, and were being exercised by the county
> courts, and the re-adoption of the first article* [what later
> becomes §§ 27 and 28] *in the very words of the former
> constitutions was a virtual recognition of the validity of
> the statutes by which these powers had been, from time to
> time, conferred.*

*Id.* at 19 (emphasis added).[118]  It will be recalled from Section 4, *supra*, that the

1890 convention delegates shared such a common understanding of what the

---

[118] The law was found unconstitutional for an entirely different reason. In a case previous to *Pennington*, "it was contended that the statute is unconstitutional, because the title does not

separation of powers provision meant that they simply reiterated in § 27 and § 28 the unchanging language of their antecedents without debate.

Again, however, DuRelle/Guffy did not dare cite *Speed* or *Pennington*, so let us return to the authorities *Pratt 1* did cite.

*Pratt 1*'s deception continues with citations from our sister states, starting with *State ex rel. Attorney General v. Kennon*, 7 Ohio St. 546 (1857), in which the Ohio court said the legislature could create a board—an exercise of legislative power—, but could not exercise an executive power to appoint its members. *Id.* at 562–63. Again, *Pratt 1* failed to tell the whole story that, unlike Kentucky's Constitution, Ohio's Constitution *expressly* prohibited its legislature from making appointments. *Id.* at 556 ("*but no appointing power shall be exercised by the general assembly*, except as prescribed in this constitution" (emphasis in original) (quoting CONST. OF OHIO of 1851, art. 2, § 27)). Plenary power enjoyed by all legislatures in a tripartite republican system can only be stifled in two ways: (1) by express prohibition to its exercise as in Ohio; or (2) by implied prohibition by the constitution's vesting of the power in a different department. Otherwise, that plenary power remains, uninhibited, to be exercised

---

indicate the subject of the act . . . . In this case the point there made is not relied upon. If, however, *we find the act constitutional in other respects*, it will become necessary to decide whether the title is insufficient, because if, for that reason, the act is void, the county court had no jurisdiction, even to entertain the proceeding." *Pennington*, 79 Ky. at 15. After finding the law constitutional in other respects, the Court said, "the act must be held unconstitutional because its subject is not expressed in the title." *Id.* at 20.

by the Legislative Department.  Neither express nor implied restriction to the power of appointment of members of such boards as the Fair Board can be found in Kentucky's Constitution.

Another part of *Kennon* the majority opinion in *Pratt 1* omits is the passage that reveals that these Ohio jurists, unlike DuRelle and Guffy, understood what Judge Story explained.  The Ohio jurists laid out the fallacy of DuRelle's "perfect-separation-of-powers" idea right there in *Kennon*:

> under a constitution in which the philosophical theory of a division of the powers of government into legislative, executive, and judicial, should be exactly carried out in detail, the power of prescribing the *manner* of making appointments to office would fall naturally and properly to the legislative department; while the power to make the appointments themselves would fall as naturally and properly to the executive department. ***This exact adherence to theory, however, is seldom if ever found in any frame of government*** . . . .

*Id*. at 560–61 (second emphasis added).  It was not "exact adherence" to the separation of powers that yielded *Kennon*'s result as DuRelle might have us believe; it was the Ohio Constitution's express prohibition that did.

Similarly, citing *Langenberg v. Decker*, 31 N.E. 190 (Ind. 1892) for an interpretation of a strict separation of powers, *Pratt 1* again failed to paint a complete picture.  The issue in *Langenberg* was whether an executive branch agency, the state board of tax commissioners, could exercise power that is intrinsically judicial in nature.  *Id.* at 193.  *Pratt 1* withheld from its discussion of

-270-

*Langenberg* that the Indiana court also said just because the board "is a body belonging to the executive or administrative department of the government it by no means follows that it may not perform functions which are, in their nature, judicial."[119]  *Id.* at 193–94.  This is entirely consistent with both doctrines established in *Taylor v. Commonwealth*.

The majority opinion had a predictable answer to the cases rendered "in other states in which a different view is taken of this question" and followed all of *Taylor v. Commonwealth*.  *Pratt 1*, 65 S.W. at 138.  That answer?  Those cases "arose under a constitutional provision which provided merely that 'the legislative and executive and judicial powers of government ought to be forever separate and distinct from each other,'—a provision containing no express inhibition, but merely a declaration as to what was proper."  *Id.* at 139.  The explanation that those states were not blessed with DuRelle's imagined perfect separation-of-powers provisions cunningly posits elements of red herrings and straw men.

Such selective citation to foreign cases was intended to give the impression that *Pratt 1* is squarely in the mainstream.  But that too is false.

---

[119] What the legislature could not do in Indiana was confer contempt powers on the executive branch agency.  "[T]he power to punish for contempt belongs exclusively to the courts, except in cases where the constitution of a state expressly confers such power upon some other body or tribunal.  Our state constitution confers such power upon the general assembly, but upon no other body.  The doctrine that such power rests with the courts alone is based upon the fact that a party cannot be deprived of his liberty without a trial."  *Langenberg*, 31 N.E. at 194 (Ind. 1892).

-271-

Not long after the Court of Appeals rendered *Pratt 1*, the Arizona Supreme Court entertained the argument DuRelle had been urging, "that an appointment to office is an executive function, and therefore properly belongs to the executive department." *Dunbar v. Cronin*, 164 P. 447, 449 (Ariz. 1917). The Arizona court surveyed opinions in all state courts and determined there were two views—(1) appointment power is an intrinsically executive power and can only be exercised by the executive; and (2) unless retained by the People from whom it originates, and unless expressly delegated in the constitution to the executive or judicial branch, it is a power left to the legislature. *Id.* at 449–50 ("Where the people have not provided [in the Constitution] for the manner of filling offices newly created, or vacancies in office, they have left to the Legislature, as their representatives, such duties."). The results were quite lopsided.

"The view that appointment to office is purely and [sic] executive function to be exercised only by the executive department of government is taken by only two states," and cited *Pratt 1* as one of them. *Id.* at 451 (citing *Pratt 1* and *State ex inf. Hadley v. Washburn*, 67 S.W. 593 (Mo. 1902)). The Tennessee Supreme Court previously made the same observation as the Arizona court, saying, "[S]o far as our investigations have extended, the courts of Missouri and Kentucky stand alone in adhering strictly to the doctrine of the exclusive right of the executive to exercise the appointing power, in the absence of constitutional

-272-

provisions vesting it otherwise." *Richardson v. Young*, 125 S.W. 664, 671 (Tenn. 1910). Recognizing them to be so much in the minority, the Tennessee court "d[id] not think it is necessary . . . to review these cases." *Id.*

According to the Arizona Court, thirteen states ascribed to the second view. Interestingly, one of the Kentucky opinions *Pratt 1* expressly reverses, *George*, is listed among the thirteen. *Dunbar*, 164 P. at 450 (citing *George* and opinions from Alabama, California, Georgia, Indiana, Idaho, Michigan, Nevada, New York, North Carolina, New Jersey, Oregon, and Rhode Island).

A similar survey in 2005 again surveyed these competing views and reached a similarly lopsided conclusion.

> [I]n the great majority of our sister states in which the question has been presented, the courts have held that under their respective state constitutions the power to appoint executive officers is not an exclusively executive function that may be exercised only by the Governor or another executive official, but rather is a power that may be exercised—either in general or in appropriate circumstances—by the Legislature.

*Marine Forests Soc'y v. Cal. Coastal Commonwealth*, 113 P.3d 1062, 1085 (Cal. 2005) (listing 24 states[120] following the view stated above). "Of the minority of state cases that reach a contrary conclusion, some (albeit not all) are based upon

---

[120] Those twenty-four states are Alabama, Arizona, Arkansas, Connecticut, Delaware, Georgia, Idaho, Illinois, Kansas, Louisiana, Maryland, Michigan, Minnesota, New York, Nevada, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, and Wisconsin.

language in a particular state constitution that explicitly grants the Governor a broad right to appoint executive officers or that explicitly prohibits the Legislature from making such appointments." *Id.* at 1086 (identifying *LRC v. Brown* as among that "albeit not all" category).

Unquestionably, neither *Pratt 1* nor *LRC v. Brown* represents the mainstream of American jurisprudence nor, for that matter, the mainstream of Kentucky jurisprudence if closely examined. The *Pratt 1* dissenters did their best to point that out.

### 38. *The* **Pratt 1** *dissents*

There were two dissents in *Pratt 1*. The first, by Judge Hobson, began by accurately noting the bipartisan decision in *George* already determined "under our constitution the legislature [itself] may be empowered by law to elect subordinate officers for the state government not named in the constitution." *Pratt 1*, 65 S.W. at 143 (Hobson, J., dissenting) (citing *George*). Consistent with the jurisprudence discussed in this dissent, Hobson correctly said the holding in *George* "is in accord with the great weight of authority, and the settled practice in the state, long recognized by this court." *Id.* (citing *Taylor v. Commonwealth*, 26 Ky. 401 (1830)). In a refreshingly honest assessment why this divergence of the majority opinion was happening, Judge Hobson said it was simply "a change in the constitution of the court" that turned the jurisprudence on its head. *Id.* at 149.

Hobson gave examples of "[t]he legislature . . . elect[ing] not only the librarian, but the warden of the penitentiary[.]" *Id.*  He wondered, rhetorically, whether *Pratt 1* meant those elections would be unconstitutional, too.  Of course, they must be.  Or so the press believed.  As one Kentucky editor said:

> The decision reverses interpretations given statutes for the last half century.  The effect of it is beyond estimation.  Under it, it is doubtful whether the General Assembly has the power to, at its coming session, elect two members of the State Prison Commission to succeed the two retiring officials.

MOUNT VERNON SIGNAL (Mount Vernon, Ky.), Nov. 22, 1901, at 3; EVENING BULLETIN (Maysville, Ky.), Nov. 25, 1901, at 3 ("Many of the candidates for Prison Commissioner and State Librarian are wondering . . . if the opinion . . . means that the Legislature has no power to elect any of these officers.").  It was not doubtful at all, as it turns out.

The General Assembly took no heed whatsoever of *Pratt 1*.  On Saturday, March 1, 1902, the Speaker of the House of Representatives made an announcement and call of a joint session of the General Assembly, scheduled for Monday, March 3, 1902, for "the election of two State Prison Commissioners to succeed the incumbents . . . ."  JOURNAL OF THE REGULAR SESSION OF THE HOUSE OF REPRESENTATIVES OF THE COMMONWEALTH OF KENTUCKY [COMMENCING JANUARY 7, 1902] 632–33 (1902) (hereinafter HOUSE JOURNAL (1902)).  No member of the Executive Department pursued a writ of prohibition based on *Pratt*

*1* to stop the Legislative Department's exercise of power to fill those offices. As scheduled, on March 3, 1902, the General Assembly elected James Richardson and Edwin Finnell to succeed the two retiring commissioners. *Id.* at 647–50.

The Executive Department officers, obviously including the Governor, never tried to stop the elections by the General Assembly of these commissioners or of the State Librarian. When the General Assembly met for the first time "in the beautiful new State House" in 1910, it conducted business as usual and elected the librarian and the commissioners. JOURNAL OF THE REGULAR SESSION OF THE SENATE OF THE COMMONWEALTH OF KENTUCKY [COMMENCING JANUARY 4, 1910] 3, 459, 1509 (1910) (hereinafter SENATE JOURNAL (1910)). The General Assembly ignored *Pratt 1* and kept right on following *George*, electing Penitentiary Board commissioners and State Librarians session after session. It seems the Legislative Department considered the Judicial Department opinion that appointments were reserved to the Executive Department just so much nonsense.

Hobson's dissent then turned to a more elaborate explanation than *Pennington v. Woolfolk* gave us of the maxim of *contemporanea exposition* (contemporaneous construction by the departments of government). *Id.* at 144–49. It was obvious to Hobson that Pratt's attorneys were aware of the maxim and its harmony with such recent opinions as *Poyntz v. Shackelford*, and all of this "[wa]s, in effect, conceded by the majority opinion[.]" *Id.* at 144. Because Pratt's

attorneys never raised the losing argument that only the chief executive possessed appointment power, Hobson found it "difficult to perceive why the court discussed at such length, or undertook to determine, a question not before it." *Id.* Judge White and the Chief Justice, Judge Paynter, concurred.

Judge Hobson's dissent was strong, but it was Chief Justice Paynter's dissent that drew most of the press. *See, e.g.*, EVENING BULLETIN (Maysville, Ky.), Nov. 23, 1901, at 3 (calling Paynter's dissent "salty" and printing it in toto); CRITTENDEN PRESS (Marion, Ky.), Dec. 05, 1901, at 2 ("a scorching separate dissenting opinion . . . [of] Judge Paynter"). Writing a day after the majority opinion was rendered, Paynter called that opinion "an unfortunate one, and far–reaching in its consequences and effect." *Pratt 1*, 65 S.W. at 151 (Paynter, C.J., dissenting). In summary, he said:

> It unsettles the law which had been settled in the state by numerous decisions, ranging over a period of 50 years, and it is in disregard of the interpretation which every branch of the government has given the constitution for that period. It is revolutionary in character. It is such opinions as this that bring reproach upon courts.

*Id.* Paynter supported that summary by citing dozens of opinions, in addition to those expressly reversed, that the majority simply ignored. *Id.* at 150. He further supported it by calling out each of the four judges of the majority, revealing their hypocrisy by identifying opinions they authored or in which they concurred that expressed diametrically opposite views just a few years earlier.

-277-

Paynter saw that the *Pratt 1* majority opinion was about to paint the Court into a corner. There were other cases on the docket that would have to fit this freakish new jurisprudential paradigm. It would not be easy to thread the needle of ruling on the many cases in the court's pipeline that would raise the issue again in the context of the local election contests. Perhaps the majority had not thought that far ahead. But Chief Justice Paynter had. He said:

> It was conceded by counsel for appellant on the argument, and was not denied on consideration of the case, nor is it in the opinion delivered, that if the general assembly has not the constitutional authority to create a contest board composed of state officers, or a state board of election commissioners, to try a contest as to state offices and other contests, it has not the constitutional authority to create a contest board composed of county officers or of county election commissioners to try a contest over county offices, as it would be, according to the reasoning of the court, conferring judicial powers in each case on tribunals other than the courts of the state.

*Id.* And, at the time, there were 119 such local election contest boards adjudicating an indeterminate number of contests.

The first of those local election contest appeals was just weeks away.

### 39. *Court of Appeals "tied itself into a knot"*—Tousey v. Stites

Just as Chief Justice Paynter predicted, a local election contest came before the Court of Appeals soon after it rendered *Pratt 1*. The appeal challenged the results of an April 1900 election on the local option question whether to allow the sale of spiritous liquors in a part of, coincidentally, Breckinridge County.

-278-

*Tousey v. Stites*, 66 S.W. 277, 277 (Ky. 1902) (rendered Jan. 15, 1902).  The case's

history starts with an earlier election contest from the prior winter.

In December 1899, a Breckinridge County magisterial district

comprised of four precincts voted in the majority to disallow the sale of spiritous

liquors.  *Tousey v. De Huy*, 62 S.W. 1118, 1118 (Ky. 1901).  "Appellants contested

the election before the county election board, who decided against them.  They

appealed from the decision of the board to the circuit court, which also held the

election valid, and from this judgment they have appealed to this court."  *Id.*  In

May 1901, before *Pratt 1* was rendered, the Court affirmed the county election

contest board's certification of the election.  *Id.* at 1119.

In the meantime, in April 1900, one of the four precincts involved in

*Du Huy* held its own local option election on the same issue.  When the same

election certification process was followed and the vote approving the sale of

spirits was contested, the same county election contest board made a legal

determination that the local option statute prohibited another election by the same

voters within three years of the previous vote.[121]  *Stites*, 66 S.W. at 277

(referencing KS 2554 (1899)).  Robert Breckinridge's attorneys, waiting to be

heard on their petition to rehear *Pratt 1*, took notice of *Tousey v. Stites*.

---

[121] *Tousey v. Stites* cleverly avoids mentioning the county election board's participation.  But *Pratt 1* was then far from being rendered.  The very process followed just months before in *Tousey v. Du Huy* was certainly followed here.  The Goebel Election Law was the only process that existed.

They believed the Court "tied itself in a knot as it were on the Pratt-Breckinridge Attorney-General opinion" when it rendered *Tousey v. Stites* because the Court treated the local contest board just like a court and affirmed its legal ruling.  EVENING BULLETIN (Maysville, Ky.), Jan. 21, 1902, at 3.  That was certainly inconsistent with *Pratt 1*.  Breckinridge's attorneys "filed a supplemental petition for rehearing . . . in which they ask[ed] the court . . . 'Can judicial power be assumed in county contest boards and not in State contest boards?'"  *Id.*

The Court of Appeals was not amused by the argument.  "[I]t is suggested that this court," said Judge Guffy, just two weeks ago "on the 15th January, 1902, in *Tousey v. Stites* (Ky.) 66 S.W. 277, upheld the legality of the board in regard to a local option election."  *Pratt v. Breckinridge*, 66 S.W. 405, 409 (1902) (hereinafter *Pratt 2*) (denying petition for rehearing of *Pratt 1*).  Judge Guffy, who penned both *Pratt 1* and *Pratt 2*, being pressed on the issue, admitted that "[t]he writer of this opinion, Judge O'Rear, and Judge DuRelle were, it is true, present" when *Tousey v. Stites* was argued and decided.  *Id.* at 409.  Breckinridge's lawyers thus confirmed the judges most adamantly insisting the state election contest board was unconstitutional less than two months earlier now hypocritically recognized the local election contest board's constitutionally in *Tousey v. Stites*.  In general, Judge Guffy told Breckinridge to move on with his argument; there was nothing to see here.  His specific response was, in fact, petty and vapid.

Before giving an answer to Breckinridge's argument, Judge Guffy played a trifling "gotcha" card. Breckinridge's counsel misidentified the author of *Tousey v. Stites* as the Chief Justice. As if to lead with his most sustainable point, Judge Guffy said, "The writer of the petition has fallen into an error of fact as well as an error of law. The Chief Justice did not deliver the opinion, but the opinion referred to was delivered by Judge White." *Pratt 2*, 66 S.W. at 409. Aha!

As for Breckinridge's error of law, Judge Guffy said no one in *Tousey v. Stites* brought up *Pratt 1* or the unconstitutional Goebel Election Law or the illegal contest boards. Out of sight, out of mind, and out of the *Tousey v. Stites* opinion. Judge Guffy said,

> There was no reference made to the constitutionality of the election law in question, nor to the legality of the board to try such contested election, either before the board of contest or the circuit court. No such question was considered by the court, nor is it referred to in the opinion delivered by Judge White.

*Pratt 2*, 66 S.W. at 409. Guffy offered no more explanation for the hypocrisy.

### 40. *Court of Appeals tries to ignore* **Pratt 1** *after it serves its purpose*

For an opinion that so changed the direction of Kentucky constitutional jurisprudence, *Pratt 1* was rarely cited. In context, that is no surprise. It had served its political purpose and that was no secret, at least not at the time. *See, e.g.*, ERIE TIMES (Erie, Pa.), Feb. 11, 1902, at 4 ("The Pratt case is the most unique turn in politics in the history of Kentucky.").

The Republican judges made fellow Republican Clifton J. Pratt the Attorney General, though his failures in that role had more impact than his successes. His record defending the Commonwealth on appeal of the convictions of Goebel assassination conspirators Caleb Powers, Jim Howard, and the rest, went more and more underwater as conviction after conviction was reversed. That may have been his desired result. Pratt never retrieved ex-Governor Taylor from Indiana or brought him to trial, and he never sued Indiana on behalf of the Commonwealth for violating the Federal Constitution's Article IV § 2, cl. 2. Almost certainly, that was the intended result. Eventually, all those indicted for Goebel's murder were pardoned,[122] and ex-Governor Taylor spent the rest of his

---

[122] James Klotter in WILLIAM GOEBEL: THE POLITICS OF WRATH, *supra*, says:

> Both Howard and Powers petitioned the Republican governor for a pardon. On 13 June 1908, "Gus" Willson stated his belief that both men were innocent, and that [Henry] Youtsey [of the auditor's office], now a thoroughly discredited Republican, had killed Goebel. No conspiracy existed, said the governor. Less than a year later, Willson issued pardons to six other men, including former Governor Taylor. "The American Dreyfus," as Powers was being called, had, like Howard, been imprisoned for over eight years when freed. Democrats regained the governorship in 1911, and five years later Youtsey was paroled. Democratic Governor James D. Black—from Powers's Knox County—granted the last of the three convicted men a full pardon in 1919.

WRATH 137. *See* footnote 112, *supra*, and accompanying text for citation to Jim Howard's appeals. Caleb Powers' saga is cited in *University Medical Center, Inc. v. Beglin*, as follows:

> After Goebel's death, the republican Secretary of State, Caleb Powers was tried four times for his part in the murder. The first three times, he was sentenced to be "hanged," but his conviction was reversed *each time* by the Kentucky Court of Appeals—then the state's highest court. The fourth time, he was given a life sentence, but was then pardoned by Governor Augustus E. Wilson. *See Powers v. Commonwealth,* 110 Ky. 386, 61 S.W. 735 (1901); *Powers v. Commonwealth,* 114

life in Indiana where he is buried.  Whether it was worth it is for anyone to guess.

But *Pratt 1*, no doubt, did damage, and that became evident very quickly.

Guffy may have realized, too, what Paynter suggested—*Pratt 1* so

disrupted jurisprudence, it invited mischief.  His opinion reveals a sense of it.

His wording of the actual holding in *Pratt 2* might be a tell that my

suspicion is correct:  "I think the petition for rehearing should be overruled."  *Pratt 2*, 66 S.W. at 410.  The wording of that ruling shows little confidence.

The opinion's opening sentence does not signal confidence either.  It

dodges the argument urged by Appellants in the instant appeal—that the General

Assembly has the power to elect or appoint members of boards.  "The reasons and

authorities[,]" said Judge Guffy, "are so conclusive of the question that I shall not

make any response to the petition[.]"  *Id.* at 405.  But *Pratt 1*'s scathing dissents

prove Guffy wrong—the authorities are by no means conclusive on any of its

holdings except to contradict them.  The majority just refused to rehear that issue.

However, intentionally or not, *Pratt 2* helps light the opinion's

pathway to obscurity.  It identifies three separate powers at the heart of *Pratt 1*'s

constitutional challenges of the contest boards' authority.  The first power is "the

---

Ky. 237, 70 S.W. 1050 (1902); *Powers v. Commonwealth,* 114 Ky. 237, 71 S.W. 494 (1903); *Powers v. Commonwealth,* 139 Ky. 815, 83 S.W. 146 (1904).

375 S.W.3d 783, 802 n.30 (Ky. 2011), *as modified on den. of reh'g* (Mar. 22, 2012) (Scott, J., concurring, in part, and dissenting, in part).

power of the legislature *to appoint*"; the second power is that of "*creating* the election board"; and the third power is "the *power to try* contested elections[.]" *Pratt 2*, 66 S.W. at 405 (emphasis added). In the two decades that followed, when the Court chose not to ignore the opinion, *Pratt 1* was never applied to hold unconstitutional the General Assembly's exercise of the first power, the power of appointment.

### 41. *Court of Appeals cannot hide from* **Pratt 1** *forever*

*Pratt 1* clearly created problems for the Court. For two decades, all branches of Kentucky government ignored *Pratt 1* where it could as in *Tousey v. Stites* and as in the General Assembly's continued election of the Penitentiary Board commissioners and the State Librarians, without any objection from the Governor's office. But when advocates appearing before the Court of Appeals waved the opinion under its judges' noses, *Pratt 1* was hard to ignore. The Court would ignore it just one more time before it faced its own music.

Less than two months after rendering *Tousey v. Stites*, the Court demonstrated its lack of confidence in *Pratt 1* a second time in *Smith v. Coulter*, 67 S.W. 1 (Ky. 1902). Sam Smith wanted to be paid for his work as "a clerk and member of the clerical force of . . . [the] auditor of public accounts of Kentucky[.]" *Id.* at 1. John Sweeney had hired Smith before Gus Coulter ousted and replaced him as auditor effective February 26, 1900. But Smith continued to perform work

in the auditor's office until June 13, 1900, and claimed he was due salary of a bit

more than $429.  *Id.*

But here it was, the middle of March 1902, and the Court said just

four months earlier, in *Pratt 1*, that everything the state election contest board did

violated the constitution, and that would include removing Sweeney and putting

Coulter in office.  Sweeney, in theory at least, should still be in office.[123]  But you

would never know the state election contest board was ever illegal by reading

*Smith v. Coulter* which, indicating quite the opposite, says:

> [U]nder the law the term of office of said J. S. Sweeney and all of his appointees expired when he (Coulter) qualified as required by law, to wit, on the — day of February, 1900, after having been *legally adjudged by the election contest board* the rightful auditor of the commonwealth of Kentucky . . . by law the term of office as auditor of said Sweeney expired the 26th day of February, 1900 . . . .  it was finally decided that appellee, Coulter, was the legal auditor . . . .

*Id.* at 2 (emphasis added).  Given *Pratt 1*, how did the election contest board

legally adjudge anything?  It took some legal gymnastics irrelevant here, but the

Court figured out a way to get Sam Smith his salary.  *Id.* at 2–3.

---

[123] After *Pratt 1*, many could not understand why all the Republicans who had been removed from office by the state election contest board were not also reinstated.  DAILY PUBLIC LEDGER (Maysville, Ky.), Nov. 22, 1901, at 3 ("If Judge Pratt was elected Attorney General, the other Republican candidates who were on the ticket with him were elected also.").  In fact, right after Judge O'Rear's election, counsel for those other defeated office seekers petitioned for a rehearing. HOPKINSVILLE KENTUCKIAN (Hopkinsville, Ky.), Dec. 04, 1900, at 5.  By late January, the decision was made that "[t]here will be no reopening of the contests over the [other] Kentucky minor state offices . . . ."  DAILY PUBLIC LEDGER. (Maysville, Ky.), Jan. 30, 1901, at 3.

Ignoring *Pratt 1* might have worked as a short-term strategy. It was not a viable long-term solution.

## 42. *Court of Appeals faces the music, with its fingers in its ears*

The first of the few cases in which the Court acknowledges *Pratt 1* is *Davidson v. Johnson*, 67 S.W. 996 (Ky. 1902), rendered a month after *Smith v. Coulter*. W. A. Johnson won the race for mayor of Covington and his opponent, George Davidson, contested the election. *Id.* at 997. Defending his victory, Johnson cited *Pratt 1* and claimed the local election contest board had no jurisdiction as a court to hear Davidson's challenge and, therefore, the circuit court had no appellate jurisdiction to hear it either; Johnson asked the Court of Appeals to dismiss Davidson's appeal because the Court of Appeals thus also lacked appellate jurisdiction. *Id.*

Judge Guffy, who also authored *Davidson*, could no longer ignore *Pratt 1*, certainly not if he wanted to get to the merits of the case, and he apparently did.[124] Both *Tousey v. Stites* and *Smith v. Coulter*, contrary to *Pratt 1*, presumed the legality of the local contest board's actions. In *Davidson*, Guffy did an about face and outright declared "the circuit court . . . could not acquire [appellate] jurisdiction to hear and determine the contest upon a record made out and

---

[124] Guffy might have simply dismissed the appeal for lack of jurisdiction, Davidson's contest would have been a nullity, and Johnson would be mayor. But Guffy did not do that. Why, is anyone's guess.

transmitted by *the commissioners, who had no power to try a contested election*, as was expressly decided in *Pratt v. Breckinridge*." *Id.* at 998 (emphasis added).

Given *Pratt 1*, Johnson's irrefutable lack-of-jurisdiction argument forced Guffy to find a way to get around the Court of Appeals' own lack of appellate jurisdiction to reach the merits. Perhaps that "ingenious mind, dazzled by theory" served him again because he chose to imagine a legal fiction. He said, "If it be conceded (*we do not decide whether it is so or not*) that the circuit court would have had jurisdiction of the contest if proceedings had been originally instituted therein," then the Court of Appeals could address the merits. *Id.* (emphasis added). But why include this parenthetical? There is one explanation.

Guffy must have realized the predicament the *Pratt 1* dissents foreshadowed—the majority went against the grain of too much Kentucky jurisprudence. Not only did it misinterpret the nationally prominent opinion in *Taylor v. Commonwealth*, 26 Ky. 401 (1830), it also implicitly reversed another Kentucky opinion of national prominence, *Batman v. Megowan*, 58 Ky. 533 (1859).[125]

---

[125] The following opinions cite *Batman* for its main point of law about to be discussed: *Parks v. State*, 13 So. 756, 761 (Ala. 1893); *Baxter v. Brooks*, 29 Ark. 173, 186–87 (1874); *O'Dowd v. Superior Court of California in and for City and Cnty. of San Francisco*, 111 P. 751, 753 (Cal. 1910); *Woodard v. State*, 30 S.E. 522, 523 (Ga. 1898); *The King v. Buffum*, 3 Haw. 462, 464 (1871); *In re Gunn*, 32 P. 948, 961 (Kan. 1893); *Robertson v. State ex rel. Smith*, 10 N.E. 582, 607 (Ind. 1887); *Bradburn v. Wasco Cnty.*, 106 P. 1018, 1019 (Or. 1910); *State v. De Gress*, 53 Tex. 387, 393 (1880); *Goff v. Wilson*, 9 S.E. 26, 31 (W. Va. 1889).

*Batman* held that the Legislative Department alone had the constitutional authority to decide election contests; "the power of the general assembly to determine the result [of an election] is exclusive, and that its decision is not open to judicial review." *Taylor 2*, 178 U.S. at 574, 20 S. Ct. at 899 (citing *Batman*). *Pratt 1* took the diametrically opposite position, but mentioning *Batman* or worse, expressly reversing it, clearly would have gone too far. Now, in *Davidson*, the errant reasoning of *Pratt 1* returned to haunt the Court. *Pratt 1* had been too clever by half.

Guffy knew the Court could not "decide" the circuit court had original jurisdiction to hear an election contest. Without a statute, *Batman* prohibited such a ruling. And no such statute then existed. Because *Pratt 1* had not expressly reversed *Batman*, Guffy either would have to reverse it here or solve the dilemma *Pratt 1* created in a different way. So, Guffy cleverly "conceded" the circuit court's original jurisdiction while declining to "decide" whether such jurisdiction existed. We know he knew it did not exist; otherwise, his fiction would not have been so obviously tortured.

As the dissenters pointed out in *Pratt 1*, its majority opinion (if we accord it legitimacy) effectively reversed far more jurisprudence than it expressly identified. We, the sitting appellate court of first resort today, do not have to

choose whether to follow *Pratt 1* or *Batman*. Our jurisprudence is proof the Supreme Court's predecessor already made that choice—not to follow *Pratt 1*.

Proof came quickly that *Batman* was not reversed and that the Court ignored *Pratt 1* as much as it could even on its real holding, "simply that the state board of contest, composed of three commissioners, was a legislative court, within the meaning of this section of the Constitution." *Albin Co. v. City of Louisville*, 79 S.W. 274, 274 (Ky. 1904).

Consider the case of *Pflanz v. Foster*, 159 S.W. 641 (Ky. 1913). The case expressly reaffirmed *Batman*, holding, "There is no inherent power in the courts to pass upon the validity of elections or to try contested election cases; their authority is wholly statutory, and must be either given expressly or by necessary implication." *Id.* (citing *Batman*). That line of cases spanning *Pratt 1* from *Batman* to *Pflanz* and beyond was not impacted in even the slightest way by *Pratt 1*. *Pratt 1* was then, and should now be, simply ignored.

### 43. *Court of Appeals continued to sideline* Pratt 1

The need to deal with the problems *Pratt 1* caused continued. By the end of 1902, Judge DuRelle was writing one of his last opinions as a judge, having lost his re-election campaign, along with Judge Guffy, in November that year. HOPKINSVILLE KENTUCKIAN (Hopkinsville, Ky.), Nov. 28, 1902, at 6. The case was *Herndon v. Farmer*, 70 S.W. 632 (Ky. 1902).

Judge DuRelle's opinion in *Herndon* is another election contest appeal, but it was not brought under the Goebel Election Law. The new bipartisan election law now governed. *Id.* at 634 (citing "the act of October 16, 1900, 'to further regulate elections,' and the act of October 24, 1900 'to amend an act entitled, "An act to further regulate elections"'").

Herndon's appeal had nothing to do with the General Assembly's power of appointment. He argued the new law violated § 51 of the Kentucky Constitution and *Pratt 1* would not help him there.[126]

According to Judge DuRelle, "it may be said that the case of *Purnell v. Mann*, 48 S.W. 407, in which the election law of 1898 was held not objectionable by reason of this constitutional provision, was not overruled in *Pratt v. Breckinridge*, 65 S.W. 136, in so far as the former case passed upon this question." *Id.* *Pratt 1*, again, is inapposite.

After DuRelle and Guffy were gone, the new Court continued to neutralize *Pratt 1*. The new Court of Appeals, seated January 1, 1903, was made up of five Democrats and two Republicans.[127] In *Albin Company v. City of*

---

[126] "[S]ection 51 . . . provid[es] that 'no law enacted by the general assembly shall relate to more than one subject, and that shall be expressed in the title, and no law shall be revised, amended, or the provisions thereof extended or conferred by reference to its title only, but so much thereof as is revised, amended, extended or conferred, shall be re-enacted and published at length.'" *Herndon*, 70 S.W. at 634.

[127] "Personnel of the Court of Appeals after January 1 [were] Curtis F. Burnam, Republican, Chief Justice, Edward C. O'Rear, Republican, J.P. Hobson, Democrat, Thos. J. Nunn, Democrat, Warren

*Louisville*, a corporate taxpayer did not like his assessment and, citing *Pratt 1*, argued Louisville's board of equalization that determined his tax liability was an unconstitutional court.  79 S.W. 274, 274 (Ky. 1904).  Rejecting that argument, the Court began talking about the narrow nature of the holding in *Pratt 1*, saying, "The direct *point decided in this case was simply* that the state board of contest, composed of three commissioners, was a legislative court, within the meaning of this section of the Constitution."  *Id.* (emphasis added).

It seems the creation of an election contest board was very different from the creation of an agency to carry out a legislatively determined public policy initiative.  "If the Legislature is powerless under the present Constitution to provide for such a tribunal as a board of equalization, then the whole revenue system of the state, counties, and municipalities must give way . . . ."  *Id.* at 275.  Of course, the Court indicated, the General Assembly can populate a mere board with inferior officers by exercising its power granted by § 93.  *Id.*

Just a few years later, in *Board of Trustees of Firemen's Pension Fund v. McCrory*, the Widow McCrory wanted her late husband's pension, but the governing board denied her claim.  116 S.W. 326, 327 (Ky. 1909).  Mrs. McCrory argued the pension fund board was a court of the type prohibited by *Pratt 1*, and

---

E. Settle, Democrat, Henry S. Barker, Democrat, Thos. H. Paynter, Democrat.  All subordinate officers of the court, now Republicans, will be replaced by Democrats."  HOPKINSVILLE KENTUCKIAN (Hopkinsville, Ky.), Nov. 11, 1902, at 9.

that the law unconstitutionally prohibited her from seeking judicial relief. No, said the Court, this is different than *Pratt 1*. The General Assembly certainly had the power to create the whole administrative structure just as it did.

More importantly to the instant appeal, the General Assembly appointed the pension board's five members. 1902 Ky. Acts 3, ch. 2, § 16. And no one claimed it couldn't. The General Assembly created the board and elected its members, that board acted on her application, its decision was reviewed by the Executive Department personnel the General Assembly assigned to do so, and the law constitutionally left the judiciary out of the process. "We have no appellate power over the commissioner, and no right to review his decision." *McCrory*, 116 S.W. at 328. "The case of *Pratt v. Breckinridge*, 112 Ky. 1, 65 S. W. 136, 66 S. W. 405, cited by appellee, is not apposite to the question in hand." *Id.*

Soon after, the Court was given the opportunity to apply *Pratt 1* to hold the creation of a Board of Control of Charitable Institutions unconstitutional. *Willis v. Scott*, 142 S.W. 1012 (Ky. 1912). Willis was superintendent of the Eastern Kentucky Asylum until the board which had appointed him, removed him from office. Citing *Pratt 1*, he argued the board "had no power under the law to try him, and . . . giving it such power and the right to remove him was unconstitutional and void, as it constituted a court . . . and the Legislature had no power to create such a court, or any other court than that established by the

Constitution of the state." *Id.* at 1012. That argument seemed to compare nicely with the unconstitutional board of election contests in *Pratt 1* which the *Willis* court acknowledged "had no such power; that it exercised judicial functions in that matter, or attempted to exercise such functions, which was an express violation of the Constitution." *Id.* at 1013. But the Court saw no similarity.

Not only did the Court distinguish *Pratt 1*, it acknowledged the Legislature's power to create the board and to establish the process of selecting and removing superintendents, and to exclude judicial review. *Id.*

More importantly, *Willis* recognized the General Assembly's "right to . . . authorize[] their removal" from the superintendent position, or as we would now say, the General Assembly had the right to delegate the intrinsically executive power of removal to a board of the General Assembly's creation. *Id.* That acknowledgment runs contrary to the interpretation in *Pratt 1* that such powers as appointment and removal are exclusively reserved to the Governor and cannot be exercised by the legislature.

However, as the *Pratt 1* dissenters said, it is entirely consistent with Kentucky's great body of jurisprudence. *Gorham*, 45 Ky. at 159 (citing *Taylor v. Commonwealth*, 26 Ky. 401 (1830)) (power of appointment is intrinsically executive unless vested elsewhere). As said in *Page v. Hardin*, "whatever might be the inference as to the power of removal, if it were left to inference, (as to which

we need not inquire,) that power which we may presume would have been expressly granted to the executive [*i.e.*, the Governor]," is no longer an executive power when it "has been expressly confided to other hands."  47 Ky. 648, 675 (1848); *see Lowe v. Commonwealth*, 60 Ky. 237, 238–39 (1860) ("*Gorham v. Luckett* . . . decided that the power of removal . . . when conferred upon a court, was a judicial and not an executive power").

Just as revealing in the analysis is another principle of jurisprudence ignored in *Pratt 1* but cited in *George* and *Purnell* and by the *Pratt 1* dissenters and addressed in the dissent you are reading—that is, no power can be delegated that is not first possessed and exercisable by the entity delegating it.  *Slack v. Maysville & L.R. Co.*, 52 Ky. 1, 137 (1852) ("he can not exercise a power derived from his principal which, at the time it is attempted, the principal does not himself possess") (quoted at length in Section 9, *supra*).  The Constitution authorized the General Assembly to vest in another entity, *i.e.*, to delegate to another entity, the power of appointment to and removal from an inferior office.  It must have been possessed of the power of appointment itself in order to lawfully delegate that power, and any power, not legislative in its nature.  "'The rule precluding the delegation of power by the legislature does not embrace every power the legislature may properly exercise.  Any power not legislative in character which

the legislature may exercise it may delegate.'" *Commonwealth v. Assoc. Indus. of Ky.*, 370 S.W.2d 584, 588 (Ky. 1963) (quoting 1 AM. JUR. 2D 898).

Thus, the Court effectively returned to the holding in *George* that the General Assembly was empowered by § 93 to appoint inferior officers and was not explicitly or implicitly prohibited by any other constitutional provision from exercising that power.

### 44.  **Pratt 1** *did not affect how the General Assembly appointed inferior officers*

The truth is, *Pratt 1* really changed nothing.  When Governor Willson gave his State of the Commonwealth Address in 1910, he repeated the perennial lament of Kentucky governors that he did not have enough appointment power. He did not expressly blame the People of Kentucky who voted to adopt the 1850 Constitution and its antecedent to § 93, but he might as well have.  Before both chambers of the General Assembly, he expressed frustration:

> [S]ession after session, the Legislative Branch has made laws taking away from the Executive Department appointments and powers always in every State and always before in this State [under the first and second constitutions], vested in the Chief Executive. . . .  [T]he result is that the Legislative Department has not only chosen its own organization and attendants as expressly authorized by the Constitution, but it has taken from the Governor nearly all of the Executive powers and duties of appointment, control, supervision and removal of officers and employes . . . .  [T]his has been done . . . partly by creating offices for executive business to be filled by men elected by the Legislative branch, as notably in the case of the Prison Commissioners.

> In short, it has come to pass that the Governor . . . has practically almost no part in the appointments . . . . In Kentucky, the only appointments left to the present Governor, or any successor, of any party, are, speaking from memory, but substantially correct, a Private Secretary, a Stenographer, a Messenger and Capitol Watchman, a State Inspector and Examiner, Adjutant-General, Assistant Adjutant-General, four members of the Board of Control [of Charitable Institutions], seven members of the Board of Equalization and a few other appointments . . . .

SENATE JOURNAL (1910) 20–21. The song seems always to be the same, even if the singer gives it his own rendition. But this speech certainly supports two contentions of this dissent: (1) except in the area of local and special laws the 1890 Constitutional Convention did not clip the General Assembly's wings; and (2) Pratt was not considered authoritative by its contemporaries. However, the General Assembly was listening to Governor Willson.

By an act of June 12, 1912, the General Assembly, "removed from office the persons then holding the places of prison commissioners [whom the General Assembly had elected] and put the appointment of their successors in the hands of the Governor." *Stone v. Board of Prison Comm'rs*, 176 S.W. 39, 39 (Ky. 1915). The Governor's appointment, however, remained subject to Senate confirmation (which, in the perfect separation-of-powers view DuRelle embraced would itself be an infringement on the intrinsically executive power of appointment). 1912 Ky. Acts 201, ch. 50, § 1.

This act amended KS 3795 by which the General Assembly exercised the power it retained of electing inferior officers that was expressly delegated to it by the People in § 93 and, to whatever degree not expressly granted, in its plenary power. For that plenary power to have been tempered in any way required an express prohibition or a prohibition implied from a grant of such power to the Governor in the first place. Neither has existed since 1850.

It is inescapable that the very vesting of this appointment power in the Governor—a delegation of its own power to elect commissioners—was an exercise of the very power of § 93 Appellees claim is lacking somehow today. *Id.*, §§ 1, 2. But what motivated the General Assembly to relinquish the power?

The statute was not amended because the Court of Appeals in *Pratt 1* said the General Assembly lacked the power of appointment. The change came "in obedience to the Democratic [Party] platform . . . ." JOURNAL OF THE REGULAR SESSION OF THE SENATE OF THE COMMONWEALTH OF KENTUCKY [COMMENCING JANUARY 6, 1914] 59 (1914) (hereinafter SENATE JOURNAL (1914)) (State of the Commonwealth Address of Governor James McCreary, Jan. 6, 1914). It was a pledge of politicians desiring to become or remain legislators that they would exercise the power of § 93 to change the "manner as may be prescribed by law" in appointing or electing these specific inferior officers. All this activity surrounding the appointment power after 1901 is acknowledgment by all three branches that the

power of appointing or electing inferior officers was a power the General Assembly itself could exercise, or could delegate to any person or entity, consistently with the constitutional jurisprudence and in repudiation of *Pratt 1*. *See, e.g.*, *Commissioners of Sinking Fund v. George*, 104 Ky. 260, 47 S.W. 779, 782 (1898)*, overruled by Pratt v. Breckinridge*, 112 Ky. 1, 65 S.W. 136 (1901) ("election of the commissioners was not essentially an executive function, and that the legislature had the right to elect them"); *Speed v. Crawford*, 60 Ky. 207, 211 (1860) (a law in which an officer's "selection is referred to the people, or to an organized body (as the legislature, for instance) . . . .").

That could not have been made more clear than in *Sewell v. Bennett*, in which the Court of Appeals confirmed, well after *Pratt 1*, that § 93 gave complete control to the General Assembly of appointment/election power, including "the undoubted power to make these appointments itself . . . ." 220 S.W. 517, 519 (Ky. 1920).

## 45. *Court of Appeals confirms General Assembly's complete control of appointments in 1920*

In *Sewell v. Bennett*, the Court of Appeals thoroughly discussed the General Assembly's complete authority over appointments to and/or elections of inferior officers. The contest was between two competing claimants to public

-298-

office as members of the Workmen's Compensation Board.[128]  *Id.* at 518.  Sewell

was a vacation appointment by Governor Stanley while the Senate was not in

session.  *Id.*  After Edwin Morrow succeeded Governor Stanley, "Governor

Morrow advised the Senate that he had, subject to its consent and approval,

appointed . . . Bennett . . . ."  *Id.*

When the Senate convened, it passed a "resolution rejecting the

appointments . . . by Gov. A. O. Stanley, during Senate vacation, and consenting to

and confirming the appointment of . . . Bennett . . . ."  *Id.*  Sewell, claiming his

own entitlement, sought an injunction in Franklin Circuit Court restraining Bennett

from taking office.  The circuit court denied the injunction.

Under the procedural rules at that time, Sewell filed a motion with the

Court of Appeals for the same injunction to be entered by the Chief Justice.  Chief

Justice John Carroll, apparently recognizing the significance of the legal issues

raised, had the entire Court hear the case.  *Id.* at 518, 523.

Sewell argued that the "Workmen's Compensation Act . . . enacted by

the Legislature in 1916" provided that the Board "shall consist of three members

appointed by the Governor" and did not require Senate confirmation.  *Id.* at 518.

The Court acknowledged "no provision was made requiring the Governor to

---

[128] Actually it was two sets of claimants:  "N. B. Sewell and H. J. Allington, on the one side, and A. S. Bennett and Clyde R. Levi, on the other[.]"  *Sewell*, 220 S.W. at 518.  For ease of reading, I will refer only to the lead movant and lead respondent, Sewell and Bennett, respectively.

submit to the Senate for its rejection or confirmation the names of the persons

appointed by him . . . ." *Id.* at 519; 1916 Ky. Acts 375–76, ch. 33, § 39.  It noted

that "if this act was the only applicable law on the subject of these appointments,"

seeking confirmation would have been unwarranted and the Senate approval or

disapproval "would have no binding force on either the Governor or his

appointees." *Id.*

However, the Court said there was "another statute of general

application that must be considered" from the chapter of Kentucky Statutes entitled

"Offices and Officers," KS 3750 (1893).  That statute said:  "all persons appointed

to an office by the Governor . . . shall hold office, subject to the advice and consent

of the Senate . . . ." *Id.* at 519–23.

The Court spoke of these statutes as introduction to its discussion of

the General Assembly's power of election/appointment.  The Court said the Board:

> is purely a legislative creation and in providing for the
> appointment of members of the board ***the Legislature had
> the undoubted power to make these appointments itself***
> or give them to the Governor, or indeed any other person
> or body that it might designate, and also the power to
> provide that the appointing authority should submit his or
> its appointments to any person or body the Legislature
> might designate for his or its approval or rejection.
>
> This power is conferred on the Legislature by section 93
> of the Constitution, providing in part that:
>
> "Inferior state officers, not specifically provided for in this
> Constitution, may be appointed or elected, in such a

manner as may be prescribed by law, for a term not exceeding four years, and until their successors are appointed or elected and qualified."

A full discussion of the power of the Legislature in this respect may be found in ***Sinking Fund Commissioners v. George***, 104 Ky. 260, 47 S. W. 779, 20 Ky. Law Rep. 938, 84 Am. St. Rep. 454; *State v. Boucher*, 3 N. D. 389, 56 N. W. 142, 21 L. R. A. 539; *Davis v. State*, 7 Md. 151, 61 Am. Dec. 331; *People v. Freeman*, 80 Cal. 233, 22 Pac. 173, 13 Am. St. Rep. 122.

*Id.* (double emphasis added). I especially note the emphasized language. The General Assembly itself had the "undoubted power" to make appointments to boards it created. Just as importantly, in discussing the General Assembly's appointment power, *Pratt 1* is ignored, and *George* is cited as the authoritative Kentucky jurisprudence despite being expressly overruled by *Pratt 1*.

The unanimous Court denied Sewell's motion after considering whether the doctrine of contemporaneous construction justified ignoring KS 3750 (1893). *Pratt 1* was truly in the ash heap of Kentucky jurisprudential history until the peculiar case of *Sibert v. Garrett*, 246 S.W. 455 (Ky. 1922).

### 46. *The "non-law" that* **Sibert v. Garrett** *adjudicated*

*Sibert v. Garrett* is peculiar for many reasons, beginning with what it adjudicated. At first blush, it reads as though it determined the constitutionality of a statute. It did not. Closer reading shows the Court never tested a law's constitutionality. The opinion states at the very beginning, what the Court

-301-

reviewed was "an act *attempted to be passed* at the 1922 session of the General Assembly of Kentucky, commonly known as the 'Simmons Road Bill[.]'" *Sibert*, 246 S.W. at 455 (emphasis added).  Here is the backstory of that non-law.

One need not be a historian to appreciate that in the 1920s, especially with the burgeoning of motorized transportation, Kentucky and all of America had a roads problem.  *See Mason v. Barnett*, No. 2016-CA-000778-MR, 2018 WL 5726387 (Ky. App. Nov. 2, 2018) (Section III,1(d)(1), entitled, "The roads problem").  Among other efforts, the Kentucky General Assembly sought to address this challenge by enacting the "Moss Good Roads Bill" in 1920, a law intended to improve 3,500 miles of Kentucky roads.  1920 Ky. Acts 76, ch. 17; ADAIR COUNTY NEWS (Columbia, Ky.), April 07, 1920, at 2, 8.

The Moss Good Roads Bill reorganized the Department of Public Roads, renaming it the Department of State Roads and Highways, supervised by a State Road Commission of four members, two from each of the major parties, who would hire a State Highway Engineer.  1920 Ky. Acts 76, ch. 17, § 1.  Pursuant to the authority of § 93, the General Assembly vested the power of appointing the members of the commission in the Governor.  *Id.*

In November of the following year, as part of a Federal-State partnership, Congress passed Senate Bill 1072 to improve the nation's highways, making available significant federal funding on a state matching basis.  Federal

Highway Act of 1921, Pub. L. No. 67–87, 42 Stat. 212 (1921).  This led the

Kentucky legislature to seek a means to produce such funds as could fulfill that

matching criterion.  A $50,000,000 bond issue was proposed.  Except for its size, it

was like other bond issues.  This large sum would be managed by the four-

member, bipartisan board of the Department of State Roads and Highways.  On its

face, this was hardly objectionable, but one of the board's two Republican

members happened to also be the Republican Party treasurer, H. Green Garrett.

COURIER-JOURNAL (Louisville, Ky.), Jan. 1, 1923, at 4.  The Senate Democrats'

response was to propose the Simmons Road Bill, named after its sponsor, Senator

Robert C. Simmons.

The initial draft of the Simmons Road Bill proposed a referendum

vote of the People in November 1922 on the "$50,000,000 bond issue to be used

on the highways of the state[.]"  ADVOCATE (Mt. Sterling, Ky.), Feb. 14, 1922, at

2.  It also called for a bipartisan board of twelve volunteers appointed by the

Governor.  KENTUCKY POST (Covington, Ky.), March 2, 1922, at 1.

For various reasons, the bill was reported unfavorably out of the

House committee but, following a demonstration by 200 members of the Kentucky

Good Roads Association, it passed in the House handily on a bipartisan basis, 63–

34 (32 Democrats and 31 Republicans for; 33 Democrats and 1 Republican

against). COURIER-JOURNAL (Louisville, Ky.), Jan. 1, 1923, at 4; DAILY REGISTER (Richmond, Ky.), Feb. 16, 1922, at 2. The real fight was in the Senate.

"Changes made in the $50,000,000 bond issue bill in the Senate . . . endangered [its] passage . . . ." KENTUCKY POST (Covington, Ky.), March 2, 1922, at 1. To assure potential control of this money was wrested from the Republican Party treasurer, Democrat senators proposed a Senate substitute. Like the original draft, it would abolish the existing bipartisan board but, instead of the twelve-member, Governor-appointed, bipartisan board proposed in the original draft, the substitute bill named in the bill itself four Democrats who would have more control and would be salaried. 1922 Ky. Acts 460, 462–63, app. By this substitute, "[t]he Democrats succeeded in placing the Republicans in the position of favoring the $50,000,000 road bond issue only if administered by a State Highway Commission of Governor Morrow's appointment." BIG SANDY NEWS (Louisa, Ky.), March 24, 1922, at 6.[129] DAILY REGISTER. (Richmond, Ky.), Feb. 08, 1921, at 5. The overtly

---

[129] My research discovered no better or more thorough discussion of the political, social, legislative, and judicial events leading to the Court of Appeals' decision in *Sibert v. Garrett* than that appearing in the January 1, 1923, edition of the Courier-Journal. Vance Armentrout, *Story of Simmons Road Law Reveals Fight Over Expenditure of Millions*, COURIER-JOURNAL (Louisville, Ky.), Jan. 1, 1923, at 1, 4, 8. An excellent account covering events till the end of the legislative session is *The New Highway Body and the Bond Issue*, BIG SANDY NEWS (Louisa, Ky.), March 24, 1922, at 6.

partisan election of initial members offended even the Democrat who introduced the original bill in the House. *Id.*[130]

Senate Republicans did all they could to stop the Senate substitute. "[I]n the closing days of the Legislature . . . an effort [was] made by Republicans to delay matters so no veto of the governor could be overruled during the last 10 days of the Legislature." *Id.*, February 16, 1922, at 1. Their filibuster lasted till 4:30 AM on March 1, 1922, when a "derangement of the lighting system" resulted in a motion to adjourn until daylight; "The vote was put and carried in the dark." DAILY REGISTER (Richmond, Ky.), March 1, 1922, at 2. Additionally, more than thirty motions to amend the bill and 37 roll calls did not prevent its eventual passage along party lines, 19 Democrats for the bill to 17 Republicans against it. DAILY REGISTER (Richmond, Ky.), March 1, 1922, at 2.

On the Attorney General's advice that the bill was unconstitutional, the Lieutenant Governor did not sign it. COURIER-JOURNAL (Louisville, Ky.), Aug. 28, 1922, at 1. He took the position that the bill was "for the appropriation of money or the creation of debt" and did not "receive the votes of a majority of all the members elected to each House" as required by the Constitution. CONST. OF

---

[130] "Representative Harry J. Meyers, Covington, who introduced the original bill as passed in the House is fighting the Senate substitute. . . . Meyers says: 'They can read me out of the Democratic party on this bill. I'm not going to vote for putting the roads into the hands of a partizan [sic] commission.' . . . Many favor a smaller advisory committee, but want it bipartizan [sic]. The bill comes [back to] the House Friday, and a storm is brewing." KENTUCKY POST (Covington, Ky.), March 2, 1922, at 1.

KY. of 1891, § 46; *Sibert*, 246 S.W. 456.  In the Senate, 20 votes were needed, and the bill received only 19.  Therefore, he would not sign it.

The last legislative day ended at noon on Saturday, March 4, 1922.  KENTUCKY POST (Covington, Ky.), March 4, 1922, at 1.  "That ended the legislative episode.  The bill lay in the Executive office as 'an unauthorized legislative document.'  The acts were compiled that spring by the Attorney General and the law was consigned in the volume as an 'appendix,' unchaptered at the end of the acts and resolutions."  COURIER-JOURNAL (Louisville, Ky.), Jan. 1, 1923, at 4; 1922 Ky. Acts 459, app.  The Simmons Road Bill was not a law.

The overwhelming response to this political battle over the universally popular issue of road improvement was negative.  The partisan nature of the substitute bill turned enthusiastic advocates into begrudging opponents, nearly overnight.  "[T]he placing of almost all power within one political party is not approved by any very large number of the Democratic party and disapproval by the Independents and Republicans is absolutely as near unanimous as possible . . . ."  Editorial, HARTFORD REPUBLICAN (Hartford, Ky.), March 10, 1922, at 5.  Another editor said, "The honest Democrats of Kentucky will never stand for the building up of such a gigantic political machine as was contemplated in the passage of this bill . . . ."  Editorial, MT. STERLING ADVOCATE (Mt. Sterling, Ky.), March 21, 1922, at 6.  The editor of the COURIER-JOURNAL was in outright despair.

> The Courier-Journals' championship of a bond issue for immediate construction of needed highways, provided the issue be duly safeguarded, is well-known. It was one of the first advocates of the principle. But the final worth of the principle rests upon the practical details of its application.
>
> . . . .
>
> The [Democrat majority in the] Senate . . . cast its vote for an absolutely partisan board . . . . If the majority of the Senate can bring itself to believe that a bond issue under such a condition can sweep the State [in a referendum,] it is permitting a partisan interest to becloud a public vision.
>
> The voters of Kentucky will not and should not turn [over] $50,000,000 to either Republican or Democratic partisans with any power residing in them to use it as a means for building up, through patronage, a vast and invincible political machine.

Editorial, COURIER-JOURNAL (Louisville, Ky.), March 2, 1922, at 6; Letter to the Editor,[131] COURIER-JOURNAL (Louisville, Ky.), March 6, 1922, at 4 ("your editorial . . . should be a guidepost for the Legislature . . . .").

To save the bill, Governor Morrow proposed a compromise of: (1) a bipartisan commission of six members; (2) gubernatorial appointment with Senate confirmation; (3) his agreement to name three Democrats selected by a caucus of Senate Democrats; and (4) immediate submission of names for confirmation.

---

[131] The author of this letter to the editor was Eugene Stuart (1885-1960), secretary-manager of the Louisville Automobile Club (1914-1959). JOHN E. KLEBER, ED., THE PUBLIC PAPERS OF GOVERNOR LAWRENCE W. WETHERBY, 1950-1955, at 116 n.5 (1983).

KENTUCKY POST (Covington, Ky.), March 6, 1922, at 1. Democrats urged their party's Senators to accept Governor Morrow's bipartisan compromise if only to deprive the Republicans of the talking point of partisanship in the November elections. Editorial, LICKING VALLEY COURIER (West Liberty, Ky.), March 9, 1922, at 3. But the Democrats refused. DAILY REGISTER (Richmond, Ky.), March 9, 1922, at 2. "Partisan feeling had been inflamed during the filibuster as the impedimenta of parliamentary practice were discarded by both sides and the spirit of battle took possession of them[,]" wrote the COURIER-JOURNAL's State Capitol Correspondent.[132] COURIER-JOURNAL (Louisville, Ky.), Sept. 24, 1922, at 1. "[N]either the Governor nor the Senate leaders, as far as could be ascertained, made a step toward a conference. Each side was suspicious of the other[.]" *Id.* The parties, and the bill, were at a standstill as the session came to a complete end.

Republicans suspected "an effort to legalize the bill thru a court action" and they "were prepared to fight[.]" KENTUCKY POST (Covington, Ky.), March 4, 1922, at 1. Their concern was justified as a caucus of Democrat senators set about "obtaining opinions from former members of the Court of Appeals . . . on

---

[132] Lyman Vance Armentrout (1878-1970) joined the Courier-Journal in 1905. He made headlines in 1934 when serving as associate editor. An anonymous Kentucky legislator had written a critical parody of then-Governor Ruby Laffoon. Armentrout refused to tell a Kentucky House committee the author's name. He was cited for contempt, briefly imprisoned, and fined. This led to legislation protecting the right of a newspaper reporter to refuse to disclose sources. COURIER-JOURNAL (Louisville, Ky.), Aug. 29, 1970, at 3; *The Press: Who Believes in Honest Government?* TIME, March 26, 1934, https://content.time.com/time/subscriber/article/0,33009,747248,00.html.

the constitutionality of the Simmons[ Road] bill . . . ."  DAILY REGISTER

(Richmond, Ky.), March 9, 1922, at 2.

In the end, the Attorney General never listed the Simmons Road Bill

among the numbered acts—it was never a law.  Therefore, the law it proposed to

amend, 1920 Ky. Acts 76, ch. 17, was still in force.  That law required Governor

Morrow, in the summer of 1922, to again appoint members of the State Road

Commission and he did so, again naming two Republicans and two Democrats.

MT. STERLING ADVOCATE (Mt. Sterling, Ky.), Sep. 07, 1922, at 5.

No, the Simmons Road Bill never became a law—but, in *Sibert v.*

*Garrett*, the Court of Appeals gave the Senate and the Governor its advisory

opinion that the bill would have been unconstitutional if it had been enacted.

## 47.  *Procedural peculiarities in the circuit court*

In the same session that the Simmons Road Bill failed to become law,

another bill succeeded, enacted as the Declaration of Rights Act.  1922 Ky. Acts

235, ch. 83 (approved March 23, 1922).  Fortuity then was all that allowed the

Democrats even to make "an effort to legalize the bill thru a court action[.]"

Declaration of rights was "a new step in procedural law."  Thomas R.

Gordon, *Declaratory Judgments*, 10 KY. L.J. 1, 1 (1921).[133]  That step may not

---

[133] Thomas R. Gordon (1853-1929) was a judge of the Jefferson Circuit Court from 1902 to 1927. This article is a reprint of his address before the Kentucky State Bar Association on July 7, 1921. On that same date, the Bar Association unanimously endorsed declaratory judgment actions and

have been fully understood by these parties, their lawyers, or the judges. As Judge

Gordon explained in his article, declaration of rights actions "enable persons who

have an actual controversy *as to their rights* in certain circumstances to have an

authoritative and binding *declaration of their rights* by the court before there is an

actual breach by one and an actual loss by another . . . ." *Id.* (emphasis added).

But if the Court in *Sibert* reviewed a declaratory judgment, we must be able to

identify whose rights were allegedly imperiled, who allegedly imperiled them, and

what was the source of those rights when suit was filed in Franklin Circuit Court?

We know who the plaintiffs were—Sibert, *et al.* To get a hearing

before the circuit court, the theory of the case had to be that the rights of the four

men named in the Simmons Road Bill to serve as members of the State Road

Commission[134] were deprived of their offices by the members of Governor

Morrow's bipartisan board who had served since their original appointment in

1920 and re-appointment in 1922, and who refused to vacate office.[135] *See* 1920

Ky. Acts 76, ch. 17.

---

authorized a committee to seek passage of such a law at the next session of the legislature. The Louisville Bar Association did the same. Gordon, *Declaratory Judgments*, at 1.

[134] They were Democrats General William L. Sibert, Benjamin Weille, Mart L. Conley, and Leslie Samuels. BIG SANDY NEWS (Louisa, Ky.), March 24, 1922, at 6.

[135] Those members were Republicans H. Green Garrett and Hugh H. Asher, and Democrats Benjamin Weille and Ed F. Monohan. PUBLIC LEDGER (Maysville, Ky.), June 5, 1920, at 2.

The peculiar thing about this theory is, as the Court of Appeals acknowledged, Sibert's and his colleagues' claims of right were not based on a statute; the Simmons Road Bill was only "an act *attempted* to be passed . . . ." *Sibert*, 246 S.W. at 455 (emphasis added). That was not enough under the new Declaration of Rights law. The law was designed to protect "[a]ny person . . . whose rights are affected by statute . . . or who is concerned with any title to . . . office . . . provided always that an actual controversy exists with respect thereto . . . ." 1922 Ky. Acts 235, ch. 83, § 2. Because the Simmons Road Bill was never signed by the presiding officer, the Lieutenant Governor, and was never enrolled, it was never given a chapter number in the 1922 Kentucky Acts; it was merely included there as an appendix. *Sibert*, 246 S.W. at 455. Therefore, the bill was not entitled even to a presumption it was a valid statute. *See D & W Auto Supply v. Dep't of Revenue*, 602 S.W.2d 420, 425 (Ky. 1980) ("there is a prima facie presumption that an enrolled bill is valid"). The plaintiffs in *Sibert v. Garrett* were not claiming rights under a statute; they were claiming rights under nothing more than "an act attempted to be passed."

The truth is the Senate wanted the judiciary's advice whether the Simmons Road Bill would be constitutional if it had become law. "'All parties concerned,' Mr. Simmons said in explanation, 'have consented to file a friendly suit . . . ." BIG SANDY NEWS (Louisa, Ky.), Sep. 8, 1922, at 5. "[B]eing a friendly

suit, the Court might be of the opinion that a real controversy does not exist between the parties and that both sides might desire [the same outcome.]" *Selle v. City of Henderson*, 218 S.W.2d 645, 650 (Ky. 1949). Perhaps they did.

As noted, public interest in seeing the Simmons Road Bill become law dissipated with the bill's provision for a partisan board. But interest seems to have waned with the plaintiffs/appellants, too. The real party interested in the constitutionality of the bill was the Senate Democratic caucus. The names on the petition were just straw men.

## 48. *Interest wanes in the Simmons Road Bill*

By the time suit was filed, many citizens agreed that "[c]ounties which are receiving help from the present commission are satisfied with things as they are." KENTUCKY POST (Covington, Ky.), Sept. 15, 1922, at 4. And opposition was still strongly against a law that, if passed, would empower four members of the same party to control $50,000,000. COURIER-JOURNAL (Louisville, Ky.), Jan. 1, 1923, at 4.

Furthermore, there is good cause to believe the four plaintiffs had lost their enthusiasm for the suit—or never had any.

The Democrats named General William L. Sibert (1860-1935) chairman of the commission "without his knowledge." COURIER-JOURNAL (Louisville, Ky.), Jan. 1, 1923, at 1. He "was added to the commission at a time

-312-

when votes were needed for the measure, and it's not to be denied that his reputation brought strength to and aided in the passage of the bill thru the Legislature . . . ." KENTUCKY POST (Covington, Ky.), Aug. 31, 1922, at 4. The COURIER-JOURNAL wondered whether "there is any hesitancy" and urged him to accept the post. COURIER-JOURNAL (Louisville, Ky.), March 31, 1922, at 6. Sibert was a natural choice, having assisted in constructing the Panama Canal and other Army engineering projects before retiring in 1919 to "rest at his farm near Bowling Green[.]" *Id.*, April 5, 1920, at 3. But General Sibert had some distractions.

In 1921, oil was discovered on his farm; before summer's end, he had twenty wells producing crude. KENTUCKY POST (Covington, Ky.), July 22, 1921, at 6. Perhaps more distracting, on June 8, 1922, several weeks after being unceremoniously named in the Simmons Road Bill, he married his third wife, Miss Evelyn Cline Bairnsfeather (1881-1958), twenty years his junior, and planned to "sail in the Fall for Edinburgh to visit the bride's mother . . . ." COURIER-JOURNAL (Louisville, Ky.), June 9, 1922, at 1. That made his departure for Europe sometime shortly after his lawsuit was filed on September 1, 1922, in the Franklin Circuit Court. HERALD (Lexington, Ky.), Sept. 5, 1922, at 5. But on Thursday, September 7, 1922, less than a week after suit was filed, General Sibert was among the six thousand people at the Warren County Fair, where his foal won third place "[i]n

the special class of the best foals sired by the government stallion, Sand Bed"; the prize was $5. PARK CITY DAILY NEWS (Bowling Green, Ky.), Sept. 8, 1922.

Leslie Samuels, the second Democrat named in the Simmons Road Bill, was never in favor of it. Samuels, "at no time had authorized the use of his name in the suit" and asked the lawyers "to strike his name from the petition as one of the plaintiffs." KENTUCKY POST (Covington, Ky.), Sep. 15, 1922, at 4.

Mart L. Conley was the third Democrat named in the Simmons Road Bill. His interest in the lawsuit came to a sad end a little over a week after the circuit court ruled. On September 24, 1922, after more than three years of battling kidney disease, including surgery by Dr. Mayo himself in Minneapolis, Conley died at the age of 51. BIG SANDY NEWS (Louisa, Ky.), Sep. 29, 1922, at 2.

One might think the fourth Democrat named in the bill, Benjamin Weille, would not care one way or the other. He was named to the original board by Governor Morrow and named again in the Simmons Bill. No matter how the courts ruled, he would be a member of the commission. BRECKENRIDGE NEWS (Hardinsburg, Ky.), June 09, 1920, at 4. If anything, he might have favored the Simmons Bill because he would have been paid for doing the same work. But he, too, stated he opposed the Simmons Road Bill and expressly asked "to be named as a defendant with the other members of the present commission . . . ." BIG SANDY NEWS (Louisa, Ky.), Sept. 8, 1922, at 5.

Of these potential straw men plaintiffs, only two were named in the petition—General Sibert and Mart Conley. Then Conley died. And then there was one—General Sibert. The "*et al.*" that appears in the caption in our law books represents no one at all.

## 49. **Sibert v. Garrett** *is nothing more than an improper advisory opinion*

As discussed, Sibert and the others had no basis, statutory or otherwise, for claiming a judicial declaration of their rights. Two of them, Samuels and Weille, expressly declined to make such a claim. And even though *Sibert v. Garrett* is understood and cited as deciding the constitutionality of a statute, it did not review a statute, but merely "an act attempted to be passed." "There was no constitutional challenge to enacted legislation." *Bevin v. Commonwealth ex rel. Beshear*, 563 S.W.3d 74, 85 (Ky. 2018) (citing *Philpot v. Haviland*, 880 S.W.2d 550, 553 (Ky. 1994)); *cf. Utz v. City of Newport*, 252 S.W.2d 434, 436–37 (Ky. 1952) (no exception for "proposed ordinance" or "a proposed amendment to the Constitution" or "a call for a constitutional convention").

The 1922 session of the General Assembly ended without the Simmons Road Bill becoming law. However, failed bills often return in subsequent sessions. The view from 1922 was that this bill might make a return in 1924, or it might not. But it would certainly have been helpful for legislators to

know ahead of time whether the bill could withstand constitutional muster. That is why *Sibert v. Garrett* was initiated, and that makes *Sibert v. Garrett* nothing but an advisory opinion.

"'The Court will not render advisory opinions or consider matters which may or may not occur in the future.'" *Nordike v. Nordike*, 231 S.W.3d 733, 739 (Ky. 2007) (quoting *Pursley v. Pursley,* 144 S.W.3d 820, 827 n.27 (Ky. 2004) (quoting *Richardson v. Richardson,* 598 S.W.2d 791, 795 (Tenn. App. 1980))). "Our courts do not function to give advisory opinions, even on important public issues, unless there is an actual case in controversy." *Philpot v. Patton*, 837 S.W.2d 491, 493 (Ky. 1992). In 1922, the Court of Appeals broke these rules.

Even when constitutionally or statutorily authorized, "[a]dvisory opinions have no precedential value . . . and thus reliance on a court's advisory opinion is erroneous." 20 Am. Jur. 2d *Courts* § 34 (2024); Gordon, *Declaratory Judgments*, 10 KY. L.J. at 13 ("it is very properly said . . . 'an advisory opinion . . . can have no binding effect'" (citation omitted)).

I am convinced that *Sibert v. Garrett*, at best, is an advisory opinion that has no precedential value. But there is so much more wrong with the opinion to bolster my argument that *Sibert v. Garrett* should be purged from our jurisprudence along with *Pratt 1* and *2*.

**50.** **Sibert v. Garrett** *ignored decisive facts before revisiting* **Pratt 1**

Judge Gus Thomas who authored *Sibert v. Garrett* said there were "a number of urged grounds" to hold the Simmons Road Bill unconstitutional. *Sibert*, 246 S.W. at 456. He thought only three of them deserved the Court's attention. But two of those arguments received hardly any attention at all. *Id.* The opinion devotes a single paragraph each to two grounds argued on appeal—grounds based on indisputable facts—that should have determined the case's outcome.

One argument, dispatched on more than questionable reasoning, was that the Simmons Bill failed to comply with § 46 of Kentucky's Constitution. Bills that appropriate money or create a debt require 20 of 38 votes in the Senate and this bill received only 19 votes. *Id.*; CONST. OF KY. of 1891, § 46. But Judge Thomas said § 46 was not applicable to the facts.

The § 46 argument "would be well taken[,]" said Thomas, "if there was no prior appropriation of funds for the payment of salaries and expenses of the state road department[.]" *Sibert*, 246 S.W. at 461. "[T]he 1920 act appropriated $250,000 for the payment of salaries and expenses of the state road department"; therefore, "the 1922 act . . . was not an original appropriation of money, but only the distribution, in the manner indicated, of an appropriation already made . . . ." *Id.* There is a problem with Judge Thomas's facts. They are not true.

The 1920 act did not appropriate $250,000. That figure appears nowhere in the act. 1920 Ky. Acts 76–101, ch. 17, §§ 1–12. The law merely capped expenses, saying, "Total expenses of the Department shall not exceed in the aggregate, in any one year, ten per centum of the total road fund for said year." *Id.* at 81, ch. 17, § 2. The 1922 Simmons Road Bill would have limited expenses to that "ten per centum" amount but also added monies "received by the road fund on account of registration fees for motor vehicles, gasoline tax, and the annual ad valorem tax in Kentucky, but exclusive of any money received from the proceeds of any bonds issued by the Commonwealth for road purposes." 1922 Ky. Acts 465, app. The State Road Commission budget was not $250,000 as Judge Thomas said, but the cap on expenditures certainly did change.

Furthermore, although capped, expenditures did increase. The 1922 act did not allow the Commission itself to employ staff, but the Simmons Road Bill would have. *Compare* 1920 Ky. Acts 77–81, ch. 17, §§ 1, 2 *with* 1922 Ky. Acts 464 app. Also, appropriation for salaries was authorized in the 1922 act only for the State Highway Engineer "and such assistants and employees" as he hired. 1922 Ky. Acts 80–81, § 2. The Simmons Road Bill included the same salary for the State Highway Engineer and "such assistants and employees" as the Commission itself hired. But it also authorized an additional $15,800 for the salaries of the four commissioners that was not appropriated in the 1920 act.

*Compare* 1920 Ky. Acts 80–81, ch. 17, § 2 *with* 1922 Ky. Acts 463–64 app. The Court's ruling on this point depended upon a made-up appropriation in the prior law of $250,000.

A second argument relied on the irrefutable fact that the Lieutenant Governor, the presiding officer of the Senate, did not sign the bill before the General Assembly adjourned sine die. Although signing the bill was a ministerial duty, *Kavanaugh v. Chandler* makes it very clear that once the legislature adjourns, the Lieutenant Governor's signature cannot "breathe the breath of life into the bills and transform them into living laws, either at his pleasure or under orders of the court." 72 S.W.2d 1003, 1006 (Ky. 1934). For that reason alone, although there are others, the Simmons Road Bill was not a statute any court could measure for its constitutionality.

How did Judge Thomas handle that obvious argument? He simply said he doubted whether the signature could be withheld. *Sibert*, 246 S.W. at 461. Of course, he was correct, but he failed to think one iota further or he would have realized that, after adjournment, the duty to sign is irrelevant, and its absence from the bill is fatal to its becoming a law. Judge Thomas made a conscious decision not to think harder on this case. "Be this, however, as it may," he said, "we have concluded also not to elaborate the point . . . ." *Sibert*, 246 S.W. at 461. Looking more closely might have yielded a better, non-advisory opinion.

These arguments were pushed aside for easier fare but should have been grounds for remanding to the circuit court with instructions to dismiss the action brought under the Declaration of Rights Act as not within the scope of that law, and because deciding the constitutionality of a bill not yet a law such as the Simmons Road Bill amounts to an advisory opinion.

As discussed, *infra*, Judge Thomas did elaborate on the remaining argument, the argument "[t]hat the Legislature possessed no constitutional right to name in the bill the first members of the commission, or to elect their successors thereafter[.]" *Id.* at 456. He relied, of course, on *Pratt 1*. But turning to that old and ignored opinion was not original with Judge Thomas. He got the idea from Judge Sam Hurst who rendered the circuit court judgment.

### 51. The Sibert v. Garrett *circuit judge—Sam Hurst*

Not only was the Declaration of Rights Act a new law when Sibert sued Garrett, but the circuit judge was also quite new himself. He came to the bench, generally, and to this case, specifically, amidst some real controversy.

In the summer of 1920, Sam Hurst was a first-time candidate in a three-way race for "the republican nomination for Circuit Judge in the Lee-Estill-Breathitt district"; one of the other candidates he defeated was his cousin, W. Y. Kash. DAILY REGISTER (Richmond, Ky.), Aug. 10, 1920, at 2. It was a nasty

campaign and newspapers across the state covered the post-election contest Kash waged. *See, e.g.*, COURIER-JOURNAL (Louisville, Ky.), Aug. 11, 1920, at 9.

Kash brought lawsuits in Breathitt County and Franklin County charging Hurst and his campaign with vote buying,[136] fraud, taking money from corporations, padding the votes, and stuffing ballot boxes. BIG SANDY NEWS (Louisa, Ky.), Aug. 20, 1920, at 2. The contest eventually made its way to the Court of Appeals before Sam Hurst was named the victor in the primary election by a single vote. *Kash v. Hurst*, 224 S.W. 757, 762 (Ky. 1920) (Because Sam Hurst "received a plurality of 1 vote, the lower court properly declared him the Republican nominee for the office aforesaid.").

On November 2, 1920, Hurst faced off in the General Election against Judge J. K. Roberts who was the incumbent, having been appointed to fill the vacancy. COURIER-JOURNAL (Louisville, Ky.), Oct. 26, 1920, at 4. That election was also close. Hurst won "on the face of the returns by 205 votes" and Judge Roberts' attorney lodged a protest with the State Board of Elections. COURIER-JOURNAL (Louisville, Ky.), Nov. 11, 1920, at 3. His protest appears to have had something to do with the "[s]earch . . . for a ballot box said to have been thrown

---

[136] Incredibly, Kash claimed "$20,000 [(more than $300,000 in today's currency)] was used in bribing voters and corrupting election officers . . . [and] fully 500 votes were influenced in favor of Mr. Hurst . . . . In his response, Mr. Hurst . . . alleg[ed] that Mr. Kash used $25,000 in the campaign, of which $10,000 was contributed by corporations. He charges that more than 750 votes were corrupted in favor of Mr. Kash[.]" DAILY REGISTER (Richmond, Ky.), Sep. 8, 1920, at 2.

into the Kentucky River in a Breathitt County precinct. Breathitt is a Democratic county." *Id.*; BRECKINRIDGE NEWS (Hardinsburg, Ky.), Nov. 17, 1920, at 2.

It may be only coincidence that the lawyer who defended Sam Hurst against Judge Roberts' protest was formerly a Court of Appeals Judge. Hurst's lawyer was Ed O'Rear, the fourth Republican judge to vote with the majority in *Pratt 1*. *Id.*

Controversy found Judge Hurst again when Governor Morrow appointed him to fill in for Franklin Circuit Judge R. L. Stout who was recuperating in California from surgery. COURIER-JOURNAL (Louisville, Ky.), Aug. 28, 1922, at 12. It would be Sam Hurst who presided over the Franklin Circuit Court's docket for September 1922, beginning with *Sibert v. Garrett*. *Id.* Later, politics was suspected in Governor Morrow's appointment of Hurst to sit in Franklin County in similar cases which the Governor "hastened to deny . . . ." COURIER-JOURNAL (Louisville, Ky.), Dec. 31, 1922, at 1; *Id.*, Jan. 1, 1923, at 1 (with the headline "Politics Denied in Naming Hurst").

I doubt Judge Hurst's appointment was anything other than a coincidence, no matter how fortuitous it may have been for Governor Morrow to appoint a judge to hear *Sibert v. Garrett* who had been counseled by Judge O'Rear.

## *52.* **Sibert v. Garrett** *in the circuit court*

We learn nothing of what occurred in the circuit court by reading the Court of Appeals opinion in *Sibert v. Garrett* except that the Simmons Road Bill was found unconstitutional. We know the petition had to claim the bill was a law or it could not go forward. We know from the press that Garrett, being represented by the Attorney General, argued it was not a law because it failed to pass with the sufficient vote tally required by § 46, but Judge Hurst said it was not an appropriation. WEEKLY MESSENGER (Mayfield, Ky.), Sep. 22,1922, at 3. We know Garrett's second argument was that it was not signed by the presiding officer, but Judge Hurst said lack of the presiding officer's signature "did not invalidate it." *Id.* So, we know Judge Hurst treated the bill as an enacted law.

As a third argument, Garrett said "the action of the general assembly in appointing members of the commission was an invasion of the prerogatives of the executive department." *Id.* It is no surprise that argument came last. As judges would soon thereafter point out, such reasoning had been rejected and the only Kentucky opinion that ever expressed it, *Pratt 1*, was ignored for years. But, as is sometimes the case, a lawyer can be surprised which of his sails catches the wind. He never knows what argument will stir the judge's attention.

Had Judge Hurst heard of that theory before? Had he and his lawyer, Judge Ed O'Rear, ever discussed *Pratt 1*? No matter. The third argument

persuaded him. "The decision of Judge Hurst was based on an opinion of the court of appeals in the case of Pratt against Breckinridge . . . ." PUBLIC LEDGER (Maysville, Ky.), Sep. 16, 1922, at 2. Relying on *Pratt 1*, Judge Hurst declared the Simmons Road Bill a law, but unconstitutional because the General Assembly could not elect the State Road Commission's members. The case was expedited to the fall term of the Court of Appeals.

## 53. *The oral argument in* **Sibert v. Garrett**

"There was an unusual number of visitors in attendance" at 10:20 AM, on October 27, 1922, when the Clerk called the case of *Sibert v. Garrett*. STATE JOURNAL (Frankfort, Ky.), Oct. 26, 1922, at 1. Lawyers for each side were given an hour and a quarter to make their arguments. *Id.* Oddly, the Attorney General, representing Garrett, the appellee, went first. *Id.*

Understandably, the Attorney General did not lead with the argument that won in the circuit court. *Id.* There was a wealth of jurisprudence against it. He first argued on the basis of § 46, then on the ground that the Lieutenant Governor never signed the bill. *Id.* Only then did he argue *Pratt 1*. *Id.*

General Sibert's counsel, Alexander Humphrey (1848-1928), countered with the arguments one would expect in supporting the constitutionality of the bill. His defense of the General Assembly's authority under the Constitution to itself elect members of boards and commissions was consistent with what I have

-324-

explained in excruciating detail in this dissent. COURIER-JOURNAL (Louisville, Ky.), Oct. 28, 1922, at 2. I believe he was right, but when the Court rendered the opinion, only Judge William R. Clay (1864-1938) agreed with Humphrey and me.

## 54. *The absurdity of the* **Sibert v. Garrett** *majority opinion*

With the confidence of a Harvard professor, Judge Gus Thomas repeated all the pablum of *Pratt 1*—starting with full quotes of §§ 27 and 28 of the Constitution; he could not resist rediscovering that hidden judicial power first found by Judge DuRelle after a century of its hiding in those provisions. Yes, somehow, Judge Thomas found in those words a rule (and a back-up rule, to boot) that "the Legislature is forbidden to exercise [the appointment power], but, if not strictly so, that the officer *should be* appointed by that department with which his duties are allied and closely connected . . . ." *Sibert*, 246 S.W. at 456 (emphasis added). An amorphous standard to say the least. This clearly never was Kentucky's jurisprudence.

Then, of course, Judge Thomas repeats DuRelle's myth that "history tells us [§ 28] came from the pen of the great declaimer of American independence, Thomas Jefferson," and even embellishes the story saying "delegates from Kentucky, . . . waited upon him, and he penned for them the substance of what is now section 28[.]" *Id.* at 457. This is simply not true. *See*, Section 16, *supra*. From this, Judge Thomas's ingenious mind, dazzled by theory,

and extravagantly attached to the notion of simplicity in government was inspired to his metaphoric expression of "the American tripod form of government" which I previously described as naïve and deceptive. *Id*.; *see*, Section 17, *supra*.

Judge Thomas then cites what appears to be every authority cited by both parties before the Court, nearly four dozen, before saying, "to discuss the grounds upon which the court in each of them rested its opinion, and to point out the distinguishing features between many of them, would expand this opinion to the dimensions of an ordinary size law book[.]" *Sibert*, 246 S.W. at 457. Don't I know it. But I am suspicious that he not only refrained from discussing the cases cited, he may also have skipped reading them and examining the law closely enough to discover *Pratt 1* is just such the aberration that it is.

Judge Thomas' opinion said that since at least 1906, "the doctrine of the *Pratt–Breckinridge* Case has been scrupulously followed by the Legislature in not assuming to elect officers, except those whose duties pertain to its own sessions, and, except that of librarian, the grounds for which are fully set out in the *Pratt–Breckinridge* opinion, as well as many of the foreign cases supra, notably the late Arizona case of *Dunbar v. Cronin*." *Sibert*, 246 S.W. at 459. But, as Judge Clay's dissent authoritatively points out, that was not so.

I urge the reading of Judge Clay's dissent. It is as authoritative an account of the actual state of the law on the General Assembly's power to elect

members to boards and commissions available in one place. Specifically on the influence of *Pratt 1* from its rendering to the rendering of *Sibert*, Judge Clay is dead on. "It is said in the majority opinion that *Pratt v. Breckinridge* has been acquiesced in for a long time, and that the question should be finally settled. As a matter of fact, however, *Pratt v. Breckinridge* has never been acquiesced in, but has been entirely ignored." *Sibert*, 246 S.W. a 466 (Clay, J., dissenting).

Judge Thomas's citation to *Dunbar v. Cronin* in his quote above is perplexing. Perhaps it is proof Thomas did not read it. As discussed in Section 37, *supra*, *Dunbar* rejected the reasoning of *Pratt 1* in favor of "the great body of American law on that subject . . . ." *Dunbar*, 164 P. 447, 451–52. As for the fact of Judge Thomas's assertion *Pratt 1* was scrupulously followed, it is refuted by Governor Willson's State of the Commonwealth Address; he, for one, would not agree with Judge Thomas's facts.

The absurdity of *Sibert* shows in what Judge Thomas obviously forgot—that a mere two years earlier, he was part of a unanimous court that held "the Legislature had the undoubted power to make these appointments itself . . . ." *Sewell*, 220 S.W. at 519. Judge Clay's dissent obviously did not sway him then. But that does not mean Judge Thomas was not eventually made to see the light.

## 55. *Judge Thomas changes his mind on* **Pratt 1**

The relationship between Judge Thomas and Judge Clay is revealed in apparently well-known anecdotes, repeated in the press upon Judge Thomas's passing. For example, "[t]he court was in consultation one day when Thomas expounded his views on a case with unusual zeal." COURIER-JOURNAL (Louisville, KY.), June 4, 1951, at 1. Judge Clay interrupted him, saying "'Judge, that's nothing but pure dictum.' 'By God, we'll make it sticktum,' Thomas replied." *Id.*

But another anecdote may have involved the very legal question Thomas flip-flopped on—*Pratt 1*. The Kentucky Post reported it this way:

> [Judge Thomas's] flair for argument was great. Once Judge William Rogers Clay stated a case, then cited what he considered the applicable law. Judge Thomas arose to dispute Clay's conclusions and challenged:
>
> "Judge Clay, if you'll show me airy bit of law to support your position, I'll eat it . . . book, cover and all."
>
> Hastily, Judge Clay accepted the challenge. He went to an adjoining bookcase, produced authorities that justified his position and then retorted:
>
> "Now, eat it."
>
> Judge Thomas, chagrined, merely retorted with an expletive.

KENTUCKY POST (Covington, Ky.), June 7, 1951, at 1.

We will never know what legal point was being argued. But we do know this. Judge Thomas completely reversed his view of *Pratt 1*. When he

-328-

authored *Lyttle v. Wilson* in 1934, he addressed the appellee's reliance on *Pratt 1* and cases subsequently rendered, probably just as Judge Clay would have in 1922. 67 S.W.2d 498 (Ky. 1934). Judge Clay and the rest of the Court concurred.

*Pratt 1* was decided by "a bare majority of the court[,]" said Judge Thomas before elaborating, as follows:

> The dissenting opinion in that case by three members of the court very much weakens the reasoning of the majority opinion. In addition thereto, the cases supra, and others referred to therein [coming after *Pratt 1*], utterly ignored the doctrine of the majority opinion in the *Pratt* Case, and approved the position taken by the minority members in the dissenting opinion. But in none of them was the *Pratt* majority opinion expressly overruled, and we will not do so in this case, since the conclusion we have reached renders it unnecessary . . . .

*Id.* at 501–02. It is now well past time to overrule *Pratt 1* and the opinions misguided by following it, starting with *Sibert v. Garrett*.

My take on *Sibert* is that everyone wanted the Simmons Road Bill to go away. An inexperienced circuit judge whose ethics were questioned presumed it was a law and saw *Pratt 1* as a way to get shed of it. Judge Thomas, with just one disinterested claimant left, saw the same easy path before him and took it.

Unfortunately, *Sibert* gave us a "qualification" to the General Assembly's authority under § 93 that has lingered: "the Legislature is given full power to determine by whom the appointment of all inferior officers and agents may be made (section 93, Constitution), *subject to the qualification*, laid down in

-329-

the *Sibert* Case, that it may not itself make appointments to office." *Craig v. O'Rear*, 251 S.W. 828, 831 (Ky. 1923) (emphasis added). But the jurists of our courts must open their eyes. We cannot use the mysticism and myth of our separation-of-powers provisions to make up language to append to the express words of the Constitution. That is what *Sibert* did. That is what *Pratt 1* did. And building on the repugnance of these opinions, that is what *LRC v. Brown* did.

## 56. **LRC v. Brown** *is a compromised opinion*

Although deemed a seminal opinion, *LRC v. Brown* is mortally tainted by its reliance on the dreadfully faulty opinions of *Pratt 1* and *Sibert*. *LRC v. Brown* also needlessly demeans an opinion I consider nearly unassailable in its constitutional jurisprudence—*Brown v. Barkley*, 628 S.W.2d 616 (Ky. 1982). Why, is the question. Two participants in *LRC v. Brown* give us a likely answer.

Snyder & Ireland tell us there was a "dramatic change in composition of the Supreme Court between *Brown v. Barkley* and *L.R.C. v. Brown*." Snyder & Ireland, *Analysis*, at 197. It may not have been as dramatic a change as in 1900 when the Court switched political party dominance, but "four of the seven seats on the Supreme Court changed hands, with three of them being won by Judges of the Court of Appeals." *Id.* at 197–98. The law journal article continues:

> These changes in the Court's composition were significant in many respects. Chief Justice Palmore and Justice

Lukowsky[137] had intellectually dominated the Palmore Court, with dissenting opinions being a rare occurrence. [Palmore did not stand for re-election and Lukowsky died even before *Barkley* was rendered]. Also, when the intermediate Kentucky Court of Appeals was created in 1975, the friction between it and the Palmore Court was instantaneous. The Kentucky Supreme Court promulgated rules that denigrated the Court of Appeals, such as . . . preventing the Court [of Appeals] from deciding for itself which of its opinions to publish . . . . The Kentucky Supreme Court also published opinions expressing criticism of Court of Appeals' opinions in uncharacteristically blunt language. Many Court watchers therefore predicted that, having chafed under the Palmore regime, the three justices arriving from the Court of Appeals would be reluctant to follow the former Chief Justice's excessive rhetoric in *Brown v. Barkley*.

*Id.* at 1298. It should go without saying, I do not agree that *Barkley*'s rhetoric is excessive; certainly not as it relates to the issues discussed in this dissent.

---

[137] I have considered Justice Lukowsky's career and included this footnote in an opinion:

Justice Robert Lukowsky [(1927-1981)], who died too soon at age 54, should best be remembered for his constitutional acumen, notable in cases such as *Stone v. Graham*, 599 S.W.2d 157, 159 (Ky. 1980) (Lukowsky, J., dissenting), *rev'd,* 449 U.S. 39, 101 S. Ct. 192, 66 L. Ed. 2d 199 (1980) (Ten Commandments case) and *Kentucky State Bd. for Elem. and Secondary Ed. v. Rudasill*, 589 S.W.2d 877 (Ky. 1979) (limiting state regulation of private and parochial schools). Unfortunately, his most frequently quoted bit of jurisprudence is this well-worn phrase: "The appellants will not be permitted to feed one can of worms to the trial judge and another to the appellate court." *Kennedy v. Commonwealth*, 544 S.W.2d 219, 222 (Ky. 1976), *overruled by Wilburn v. Commonwealth*, 312 S.W.3d 321 (Ky. 2010).

*Owens v. Commonwealth*, 512 S.W.3d 1, 15 n.14 (Ky. App. 2017).

-331-

It should also go without saying that such extra-judicial motivations as *Snyder* & *Ireland* describe may be different in degree from those affecting the decision-making in *Pratt 1* and *Sibert*, but they are no different in their nature.

## 57. *Conclusion*

*LRC v. Brown* needs no further discussion in this dissent. Its flaws could have been avoided if it simply had ruled as it promised it would, treating the case as a delegation-of-powers case. But it is never too late to correct the flow of our case law, no matter how long aberrant opinions have lingered in the backwaters of our jurisprudence. *See Calloway Cnty. Sheriff's Department v. Woodall*, 607 S.W.3d 557 (Ky. 2020).

In *Pratt 1* and *2*, a partisan and politically driven Court of Appeals twisted the language and meaning of §§ 27 and 28 to grasp unwarranted judicial power. The Court wielded that power to relocate the bounds of the departments of government to implement the agenda of installing as Attorney General a politician with an affinity for party goals. The passage of time, a forgetfulness of these historical events, and extra-judicial influences of their own, led subsequent courts to see *Pratt 1* and *2* as something they are not—sound jurisprudence.

For these reasons, I cannot agree with the majority Opinion. For these reasons, I sincerely hope the Supreme Court will consider clarifying the "veering" of our constitutional jurisprudence to which *LRC v. Brown* alludes.

BRIEFS FOR COMMONWEALTH, *EX REL.* ATTORNEY GENERAL RUSSELL COLEMAN:

Matthew F. Kuhn
Brett R. Nolan
Heather L. Becker
Michael R. Wajda
Frankfort, Kentucky

BRIEFS FOR JONATHAN SHELL, COMMISSIONER OF THE DEPARTMENT OF AGRICULTURE AND MARK LYNN, CHAIRMAN OF THE STATE FAIR BOARD:

Joseph A. Bilby
Frankfort, Kentucky

Ellen Benzing
Louisville, Kentucky

ORAL ARGUMENT FOR COMMONWEALTH OF KENTUCKY, *EX REL.* ATTORNEY GENERAL:

Matthew F. Kuhn
Frankfort, Kentucky

BRIEFS FOR GOVERNOR ANDY BESHEAR AND SECRETARY LINDY CASEBIER:

S. Travis Mayo
Frankfort, Kentucky

Sarah Grider Cronan
Frankfort, Kentucky

Mitchel T. Denham
Erin M. Shaughnessy
Louisville, Kentucky

ORAL ARGUMENT FOR GOVERNOR ANDY BESHEAR AND SECRETARY LINDY CASEBIER:

S. Travis Mayo
Frankfort, Kentucky